UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 11 CIV. 1874

UNITED STATES OF AMERICA
Plaintiff,

-v.-

DANIEL B. KARRON
Defendant.

> Memorandum of Facts and
> Law to accompany 28 USC
> §2255 Motion to Vacate
> Criminal Verdict 07 CR 541

## 1. Introduction

The Defendant, D. B. Karron, responding *pro se* at this time, respectfully submits the following Memorandum of Fact and Law in support of her 28 USC §2255 motion. The Defendant contended there are genuine material issues of fact and law, not previously heard in any court or part of any argument before the court on this conviction. These facts were not brought to evidence in the original trial, but should have been.

Had these facts been considered by a reasonable factfinder, due consideration would result in an innocent verdict.

## 2. Table of Contents

## Table of Contents

1. Introduction ................................................................................................... 1
2. Table of Contents ........................................................................................... 2
3. Background ..................................................................................................... 7
   A.  The Grant ................................................................................................. 7
   B.  The Defendant .......................................................................................... 7
   C.  The Winning Proposal .............................................................................. 8
   D.  The Meddling Accountant Hayes wears too many hats ............................ 8
      i.    Hayes lied to Karron ........................................................................... 9
      ii.   Hayes lied in her audit of CASI .......................................................... 9
      iii.  Hayes lied to the ATP, OIG ................................................................ 9
      iv.   Hayes lied IRS Special Agents investigating ATP payroll taxes.. *Ibid. Dunlevy Decl.* 10
      v.    Why did Hayes and Spring have so much trouble with CASI? ........... 10
      vi.   Why did Hayes Lie? ............................................................................ 11
      vii.  Hayes continued to meddle after the government funding was suspended and running on CASI funds ............................................................... 11
   E.  Overview of Evidentiary Tsunami ......................................................... 11
      viii. Documents already published on PACER in Defending Collateral Civil Attack. ..... 12
      ix.   Overview of Novel Defense Evidence .............................................. 15
4. Reasons for failure to bring pivotal exculpatory evidence to Initial Trial ............ 16
   F.  Increased protection to prevent miscarriages of justice in criminal procedure ................ 18
   G.  Defendant's Transsexuality caused Unconstitutional Discriminatory Prosecution ....... 18
   H.  Inculpatory evidence seems to be created to order ....................................... 19
      x.    Duplicate unsigned  and signed timesheets, .................................... 19
      xi.   CASI Business Process Manuals through the years ......................... 19
      xii.  Karron signed in Pink ink. ................................................................ 20
      xiii. Who is a mess, CASI Accounting or the Governments Accounting ? ...... 20
      xiv.  Suppressed evidence of explicit, written permission ....................... 21
      xv.   Witnesses coerced to commit perjury ............................................... 23
      xvi.  Key documents, memos and evidence withheld or destroyed ............ 25
      xvii. Violation of Defendant's Privacy ..................................................... 25
      xviii. Continuing Punishment because of Conviction ............................... 25

5.  Undisputed Facts..................................................................................................... 25

   A.  STATUTE OF CONVICTION 18 U.S.C. § 666: Theft or Bribery Concerning Programs Receiving Federal Funds............................................................................................. 25

   B.  Post-Verdict Motions ............................................................................................ 26

      xix.  The Findings of the District Court...................................................................... 26

      xx.  The Mandate of the Circuit Court....................................................................... 27

6.  Questions of Law ...................................................................................................... 28

   A.  Forensic Reconstruction........................................................................................ 29

   B.  Conviction for misappropriation is spending funds without authority ........................ 30

      xxi.  even if beneficial  to the grant ............................................................................ 30

   C.  What is authorized spending in light of 18 USC §666?.............................................. 30

7.  Overview of the Four Grounds for 2255 motion. ...................................................... 30

   A.  Funds considered misappropriated were in fact property of Karron and did not belong to the government......................................................................................................... 30

   B.  The grant funds were not spent beyond the statutory flexibility limits.......................... 30

   C.  Conviction foundation laid on erroneous, misleading, and false data causing plain error. 31

   D.  Ineffective Assistance of Counsel .......................................................................... 31

8.  GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A ........................... 31

9.  Grounds One: Funds considered misappropriated were in fact property of Karron and did not belong to the government. ...................................................................................... 32

   A.  Karron's Salary .................................................................................................... 33

   B.  Karron's contribution ........................................................................................... 33

   C.  CASI tax returns substantiate Karron's Salary ........................................................ 34

   D.  What did Karron do with this earned money ?........................................................... 34

   E.  Project Overfunding ............................................................................................. 34

   F.  EVIDENCE OF OTHER ATP ALLOWANCES ......................................................... 39

   G.  Allowance for Power by NIST................................................................................ 39

      xxii.  ATP Auditor Riley Allowance of CASI Power Costs ............................................ 40

   H.  Reclassification of Rent as Salary .......................................................................... 42

   I.  Even without Rent reclassified, the project is still overfunded. .................................. 42

   J.  Allowance of Telephone, Cable, Internet, and other overhead costs................................. 42

   K.  IMPLICATIONS OF KARRON FUNDING and COST ALLOWANCES ................. 42

      xxiii.  Defendant's Privacy...................................................................................... 43

      xxiv.  Excess Prosecutor Zeal because of Defendant's Transsexualty ............................ 43

xxv.    The Dog Day Afternoon Scenario as motivation for Defendants Theft ................. 44

L.    GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A .................... 44

M.    TITLE TO EQUIPMENT ........................................................................... 45

N.    KARRON OUT OF POCKET DURING AND AFTER GRANT IGNORED ............. 46

10.    Grounds Two: The grant funds were not spent beyond the statutory flexibility limits ..... 48

xxvi.    Rule of Lenity ............................................................................... 49

A.    THE NIST ATP BUDGET REVISION PROCESS ........................................ 50

B.    TACIT v EXPLICIT PERMISSION STANDARDS AT ATP ............................... 55

11.    Grounds Three:  Conviction foundation laid on erroneous, misleading, and false data. ... 56

A.    Plain Errors in Facts at Trial ................................................................ 57

i.    Government Foundation Accounting Plain Errors ....................................... 57

ii.    Riley copied from Hayes ................................................................... 58

iii.    Grant recipients were to be treated on a case by case basis ....................... 60

iv.    Karron negotiations successful and suppressed ........................................ 60

v.    Hayes Hostile Audit motivations ......................................................... 61

vi.    THE COURT'S FAILURE TO CHARGE A TRACING REQUIREMENT and acknowledge Karron's cofounding ......................................................... 65

vii.    A. Legal Standard for vacating judgment .............................................. 66

viii.    The Government must Trace Misapplied Funds To the ATP Grant Funds ............... 67

ix.    The 18 U.S.C. §666 Bribery Cases Are Factually Distinguishable from the § 666 Theft Cases and Should Not Have Been Relied Upon By The Court .................... 71

B.    Foundation of Conviction .................................................................... 74

x.    Jury Charge ................................................................................... 75

xi.    Jury Callback during Deliberations ...................................................... 75

xii.    GX114 and Readback of Benedict Testimony ......................................... 75

xiii.    Sentencing ................................................................................... 75

xiv.    Identification ................................................................................. 75

C.    Confusion and Obsfucation of Defendant's bona fide Salary ......................... 75

D.    Detailed Analysis OF GX114 Errors ...................................................... 76

xv.    SPECIFIC PROBLEMS WITH GX114 ..................................................... 81

xvi.    The RENT paid to KARRON was reclassified as SALARY. ........................... 83

xvii.    The Two Author Hypothesis ............................................................. 88

xviii.    IS GX114 EVIDENCE OF A PRIOR NEGOTIAQTED ALLOWANCE OR RECLASS? ..................................................................................... 90

xix.    The OIG Did NOT do an audit. ......................................................... 90

xx.   Conclusion: Gx114 is hard evidence of a prior reclassification of rent paid by program to Karron as bona fide Salary. .................................................................... 91

E.   WILLFULL IGNORANCE BY PROSECUTION ........................................................ 91

F.   KARRON ACUSED OF KNOWINGLY NOT OBEYING SPENDING 'RULES' ........ 92

i.   Accused of misappropriating government funds to rent ................................................. 92

ii.   Accused of misappropriating government funds to pay for utilities. ......................... 92

G.   The OIG did NOT do an audit ...................................................................... 92

iii.   Testimony regarding source of Audit by OIG Auditor ............................................. 92

H.   OIG seizes Blender, Shoe Rack Seizure, and All Computers and evidence, leaves coffee machine. ........................................................................................................ 98

iv.   The Shoe Rack Story ................................................................................... 98

v.   OIGBlender Seizure ........................................................................................ 99

I.   The OIG Gets the total Grant Disbursed Amount in Error ............................................. 100

J.   The Grant is never terminated and the funds sat unused for years following suspension. 100

K.   Karron's piggy bank is her personal piggy bank and other comments. ......................... 100

L.   OIG Auditor False Sworn Affidavits, secret joint award ........................................... 100

12.   Grounds Four: Ineffective Assistance of Counsel ........................................................ 100

13.   Conclusion ............................................................................................... 101

14.   Appendix................................................................................................. 101

A.   28 USC § 2255.  Federal custody; remedies on motion attacking sentence.................................................................................................... 101

B.   FRCP Rule 33. New Trial ................................................................................. 102

C.   FRCP RULE 33Notes ....................................................................................... 103

D.   18 USC § 666. Theft or bribery concerning programs receiving Federal funds .......... 104

E.   Elements of Offenses - 18 U.S.C. § 666A ............................................................... 105

F.   15 CFR Subtitle B, Ch. II (1–1–02 Edition) PART 295—ADVANCED TECHNOLOGY PROGRAM................................................................................................... 105

G.   15 USCODE §278n Advanced Technology Program........................................................ 106

H.   SDNY Local Rules......................................................................................... 106

Local Civil Rule 72.1. Powers of Magistrate Judges........................................................ 106

vi.   Rule 11. Amendments of Pro Se Petitions for Collateral Relief from Convictions . 107

I.   USDoC, OMO DAO 213-5 AUDIT RESOLUTION AND FOLLOW-UP .................... 107

J.   USA v KARRON Full Trial and Sentencing Transcript ................................................. 109

K.   Government Exhibits from USA v KARRON......................................................... 109

i.   GX110 ........................................................................................................ 109

ii.   GX111 ........................................................................................................ 109

iii.   GX114 ........................................................................................................ 109

## 3. Background

### A. The Grant

On May 5, 2001, while the Defendant was adjunct faculty at City College of the City of New York (CCNY)[1], he attended a NIST ATP solicitation talk by Marc Stanley at the Graduate School[2] Stanley suggested that the Defendant attend the NIST ATP National Meeting in Baltimore, on June 3-5[3]. He (then) actively participated in the June 3rd convention and he had extensive discussion with various ATP personnel about how to win and manage an ATP grant for CASI. *Karron Decl. Ex. 114*. At the meeting, the Defendant announced her intention to submit a proposal and solicited business and management support from other attendees. There he met Robert Benedict, who would later become a consultant and

### B. The Defendant

The Defendant holds a Ph.D. in Applied Science from New York University.  The Defendant is a scientist; a professional versed in matters of evidence in the courts of natural law, experienced in objective, quantitative, and rational analysis of numbers as images.  One of the problems in making decisions based on digital imaging is that of illusions[4] ,  in imagery, statistical perception, and human judgment[5].

---

[1] DBK CCNY CUNY ID 0B5tahXvgtqadNzJjNzNlYTAtNjhmNi00OWExLWIyNDUtZTUwYjJlZGQ3ZGI3

[2] Marc Stanley NIST ATP Presentation at CUNY Grad Center May 5, 2001 48675517/Marc-Stanley-NIST-ATP-Presentation-at-CUNY-Grad-Center-May-5-2001

[3] NIST ATP National Meeting in Baltimore https://docs.google.com/viewer?a=v&pid=explorer&chrome=true&srcid=0B5tahXvgtqadYjRiOWIwZWMtYjJmYS00N2Y5LWIzNDAtOWJmNzhjNTQzMzkw&hl=en

[4] Typically referred to as 'optical' illusions, but the illusion is not in the physical optics, but in the psychophysical processes in the mind of the observer. http://www.123opticalillusions.com/ http://www.cooloptical illusions.com/, http://en.wikipedia.org/wiki/Optical_illusion

[5] Psychological research on cognitive biases are deviations from a mathematical basis for judgment  such as http://en.wikipedia.org/wiki/List_of_cognitive_biases

## C. The Winning Proposal

Karron wrote and submitted a winning four "Gate" proposal to ATP that resulted in the October 1 2001 award of a cooperative agreement for 2 million dollars direct funding for Karron's DMT image analysis algorithm. *Karron Decl. Ex. 136.* The novel concept was to do a definitive "map", much like the Human Genome Project "map", of the Visible Human Project Data, and to develop the idea of 'computer anatomy and surgery' a goal to which Karron is committed to even to this day. *Karron Decl. Exhibit Group 21.*

## D. The Meddling Accountant Hayes wears too many hats

The 9/11/2001 attacks here in NYC caused many people to rethink their lives.  Longtime Karron / CASI accountant Jill Feldman C.P.A. decided to retire from accountancy and sold her practice to Joan Hayes C.P.A in the winter of 2001.  Hayes thought she had much experience with audit, corporate accountancy, and the federal cost principles. *Karron Decl. Ex. 41, 52, 61, 62, 111,112,113.*  As it turned out, Hayes was perhaps the worst accountant ever to meddle in a business and government project. *Karron Decl. Ex. 40 ,54, 56, 121, 127, 128.* She wore too many hats; she lacked even a pretense of auditor independence, in fact she was secretly hostile to her client. *Karron Decl. Ex. 61,62, 505. Government Exhibit GX 3503A-M.* She gained the confidence of Karron **and** the Department of Commerce and then proceeded to make a train wreck of an otherwise promising research project and career[6].  One can only assume she is profiting from this case as a whistleblower.  or has some bias against Dr. Karron because of her religious beliefs.

---

[6] Cooper, Neal A.  (1995-1996) Third Party Liability or the False Claims Act: It Is Time for Consultants to Pay the Price for Their Bad Advice 29 J. Marshall L. Rev. 923

### i.   Hayes lied to Karron

Hayes lied in her Audit Report, specifically in her reporting of the "Rent Checks" as being discovered her examination of canceled checks Karron gave to her, when she had already filed Karron's personal taxes and had reported the allocation of the apartment for tax purposes to business and the income from the rental to CASI [7].

### ii.   Hayes lied in her audit of CASI

The implication of her audit 'finding' was that Karron was withholding vital information from her, and that she was uncovering fraud when non existed.

### iii.   Hayes lied to the ATP, OIG

Hayes was exceptionally friendly with the ATP Program Manager and OIG Special Agents. The government 3500 e-mail reveals Hayes and government officials were on a first name basis, while she was continuing to work for CASI and Karron. She was 'Wistleblowing' on Karron with stories from her audit report.

During the trial they all ate lunch at the same table.

At the trial, the prosecution decided not to put her on as a witness despite qualifying her as an expert witness.

---

[7] During our examination of cancelled checks, we noted that certain expenditures of the award recipient, which were not directly related to the ATP project, were paid with federal funds provided for the ATP project. These payments were made to the Principal Investigator for rental expense, at the monthly rate of $2,000, for the use of his apartment as office space for 11 months during the first project year and for 19 months prior to the start of the project
*GX 50 Page 11.*
See Also Karron Personal Tax Return 2001 1040 Signature Page and Schedule E

iv.   **Hayes lied IRS Special Agents investigating ATP payroll taxes..** *Ibid.*
      *Dunlevy Decl.*

Hayes continued to meddle with CASI well after the grant was suspended, and when IRS

Special agents were attempting to find the missing ATP Grant Withholding taxes.  Hayes

continued to harass the IRS agents, saying she had the records to solve the problem. Hayes

suggesting to Karron's successor Forensic Accountants Jerome Schwartz at Schwartz &

Salomon, P.C. *viz*:

```
Re: Our File No. 6614
Dear Dr. Karron:
I am recovering from a telephone conversation I had when Mrs. Hayes responded
to my letter. She says:
1. Why don't you[Karron] call her{Hayes} instead of hiring people like
me{Schwartz] to call her[Hayes]?
2. She straightened out all the payroll records through 2001-2002. She says
everything through these periods in regard to payroll tax requirements has been
attended to.
3. She knows nothing about complaints from any of the government agencies about
non-payment or non-filing while she was on her watch.
...
5. She admitted that she has copies of the payroll taxes but clearly refuses to
give them up.
6. In view of the fact that I was on the telephone with her for 35 minutes, I
don't think anything rational could be accomplished in dealing with her on a
voluntary basis.

Letter on web[8]
```

v.   **Why did Hayes and Spring have so much trouble with CASI?**

We believe that Hayes attempted to gain undue control over Karron and CASI, and was

misdirecting Spring in a Sisyphean task of re-creating CASI books at an inordinate expense.

During this period Hayes had asked, and Karron complied, with moving the bookkeeping off

site.  All of checks, books and records were moved to Springs employer, the Ken Jackson Group.

The Ken Jackson group gleefully billed hourly and overhead costs went out of control.  Further,

out of supervision, CASI checks and payroll started bouncing, something that had not happened

when Karron had control. *Dunlevy Declaration.*  Checks were bouncing, the bills from the

---

[8] See the Original Letter Here

Jackson Group were mounting, Mission Critical vendor invoices were not getting paid, and

checks were bouncing, and worst, the main task of creating a new set of books was never

completed[9].   A subsequent forensic accountant, Mel Spitz CPA handily recreated a set of books

in time for the OIG audit second visit[10]. Years later the IRS would come calling looking for

missing taxes from the second year; the period that Karron let the back office run amuck off site.

*See above.*

### vi.   Why did Hayes Lie?

We believe Hayes framed the defendant to cover her own theft or attempted theft, to gain

undue control over the Defendant, or to protect herself from Karron's OPD complaint and

resultant rick of professional censure.

### vii.   Hayes continued to meddle after the government funding was suspended and running on CASI funds.

After the grant was suspended, Karron continued the project with her own out of pocket

and borrowed funds.  Hayes continued to attempt to misappropriate the payroll.  Paychecks, from

her payroll company started arriving in Hayes LLC's name, belying Hayes behind the scenes

meddling.

## E. Overview of Evidentiary Tsunami

The Defendant, using simple arithmetic, and simple statistical reasoning, shows below

that the foundation of the Defendant's conviction was innumerate, but *prima facie* materially

wrong (See below).  This can be done without reference to any additional evidence, but

---

[9] 3 When I arrived, the new books weren't completed yet,
4 so they were going to be completed the next day so I waited
5 till the next day.
Trial Testimony Page 473 Lines 3-5
[10] Spitz'es report can be found Here

additional new evidence bolsters the veracity of this finding.  The volume of evidence can be daunting.  Evidence consists of documents from these sources:

1) **USA v Karron (07-CR 541) criminal trial,**
2) **USA v Karron (08-CV-10223) Collateral Civil attack,**
3) **CASI server computer seized by the government**

The CASI server RAID disks were imaged by DoC approved computer forensics firm, Digital First Discovery, LLC, make image copies of each disk.  Under the court's order, an exact copy of the disk image data is being held at the Department of Commerce (DOC) Office of Inspector General (OIG)[11].  Karron was able to reassemble the RAID images into the NTFS file system[12].  Original, contemporaneous source documents, recorded in the usual course of routine business by CASI Employees and Karron, are presented here as verifiable[13] new evidence.

### viii.  Documents already published on PACER in Defending Collateral Civil Attack.

In an attempt at documentary transparency, the Defendant seeks to publish this case. New web based publishing tools such as Scribd, Google Docs, and RECAP enable free publication of raw material on the web for all to review.  Documents already published for the legal community for a fee with PACER can be republished with RECAP for free.  Scribd offers extensive conversion facilities from PDF to text, and immediate extensive natural language indexing on Google, Bing and other specialized search engines.  This Memorandum of Fact and Law document seeks to synthesize a compelling and straightforward narrative of the facts in this

---

[11] A copy of that order is here.
[12] However, the file system reconstruction was too late to be of material assistance to defendant counsel, who was unable to deal with the volume of exculpatory material on the courts short timeframe. See Grounds Four, below..
[13] It is further ordered that the defendant, by and through his attorney, has consented to provide the Government with exact electronic copies of all documents and files that are retrieved or duplicated. Page 3 of above order.

convoluted matter.  The volume of documentation is large, but manageable as each document can be reduced to a hyperlink.

In order to reduce the volume of this submission, references to the Affidavits of Dunlevy and Karron, which are quite large, can be made on PACER at within the Court Systems, and externally for free on RECAP[14]

A FULL GUIDE TO ALL DOCUMENTS IN THIS CASE IS ONLINE AT

https://docs.google.com/document/d/1J1y27EuiICw9rdr8hg1q9HZ6Lv3XFN3hZV1k2v

mxXkk/edit?authkey=CLbD9h8&hl=en#


REFERENCES TO DUNLEVY DECLARATION can be found at these address on

RECAP, which refer to PACER DOCUMENTS

PACER  RECAP DOCKET

http://ia700408.us.archive.org/2/items/gov.uscourts.nysd.336104/gov.uscourts.nysd.3361

04.docket.html

DUNLEVY DECLARATION IS

Document Number 32 Attachments 0 through 18

http://ia700408.us.archive.org/2/items/gov.uscourts.nysd.336104/gov.uscourts.nysd.336104.32.0.

pdf

Document Number 32 Attachment 1

Document Number 32 Attachment 2

Document Number 32 Attachment 3

Document Number 32 Attachment 4

Document Number 32 Attachment 5

---

[14] The Criminal Docket on RECAP is here, the Civil Docket on RECAP is here.

Document Number 32 Attachment 6

Document Number 32 Attachment 7

Document Number 32 Attachment 8

Document Number 32 Attachment 9

Document Number 32 Attachment 10

Document Number 32 Attachment 11

Document Number 32 Attachment 12

Document Number 32 Attachment 13

Document Number 32 Attachment 14

Document Number 32 Attachment 15

Document Number 32 Attachment 16

Document Number 32 Attachment 17

Document Number 32 Attachment 18

An additional copy complete is available at scribd.com at

http://www.scribd.com/doc/37969910/Declaration-of-Dunlevy-as-Signed-1

Additional documents from the Collateral Civil Attack are available on PACER and on

Scribd and Google Docs.  Printed copies can be provided on request to the court.

The Opposing Memorandum of Law

http://www.scribd.com/doc/38426150/Opposing-Memorandum-of-Law-FINAL-Signed

The Opposing 56.1 Statement of Material Facts

http://www.scribd.com/doc/37674983/Opposting-56-1-Statement-of-Material-Facts-13-2

The Declaration of Eric A Eisen on Video Excerpts Transcription

https://docs.google.com/viewer?a=v&pid=explorer&chrome=true&srcid=0B5tahXvgtqad

MzM5YWNhMTEtODI5YS00MTc3LTlhNTktNjA0YjRhYWUzZDM0&hl=en

This is only the front door of this mystery.  10 years ago I did not understand what the accountant Hayes was doing to me, and as we have come to understand, other clients and accountants.  These are serious wrongdoings by the Accountant Hayes, ensnaring the government accountant and launching a firestorm on the Defendant.  These errors are not due to arithmetic imprecision, round off error, or harmlessly incorrect.  These errors are at best negligent, innumerate, to massive, systematic, hostile, and quite possibly fraudulent.  The lack of regard for the sanctity of the truth on the part of the government is beyond shameful.  The errors are numbers made up by adding large numbers twice where convenient, and ignoring whole classes of accounts.  The breadth and scope of bad accounting, possibly fraudulent auditing, is revealed by three years of attempting to reconstruct the numbers that put Dr. Karron in prison and destroyed her career in military and civilian research.   The collateral damage is the loss of the original research programming on the seized computers, the CASI Intellectual Property on those computers, all of the defendants personal property and earning power, and cast a shadow on the their inventions and theories.

### ix.   Overview of Novel Defense Evidence

These new facts are analogous to DNA exculpatory evidence that was there all the time, but only the analysis of the facts provides the exoneration, not the mere facts themselves.  Some of these new facts were there in all the time, lying dormant in the corpus of trial discovery and in the prosecution's numbers.

## 4. Reasons for failure to bring pivotal exculpatory evidence to Initial Trial

These new facts were not brought to trial for these main reasons.

- All of the Defendants exculpatory evidence, all of which was on the Defendant's computers, all of which were seized prior to trial, rendering the Defendant without any records at all. *Government Exhibit 120* All daily logs, tax records, accounting records, research data, all of the research software the government had paid to produce, and personal e-mail of the Defendant was seized[15]

- . The capricious nature of what was taken is discussed further on. All sorts of the Defendant's 'stuff' was taken regardless of the title (see below, title of equipment purchased with these funds vested with the recipient), if it was paid with grant funds, prior property of the defendant, or purchased subsequent to the grant suspension with

---

[15] 18 He had four different color checks for each different
19 company that he had that was related to this. He then scanned
20 every single document, every single document he ever came in
21 touch with. He didn't hide anything.
Trial Transcript Page 48 Lines 18-21
21 MR. RUBINSTEIN: You know what, Judge, they seized
22 everything the man had, all his computers as you well know from
23 your trial. Everything was scanned in, they have a disk that
24 they paid $30,000 for. They have all the records, period. And
25 I think this is outrageous okay.
Trial Transcript Page 927 Lines 21 et seq
16 MR. RUBINSTEIN: I understand that Dr. Karron gave
17 everything to Joan Hayes and Joan Hayes has cooperated with the
18 government throughout, and they have all of his documents. If
19 they can point to a document that they are missing, we will
20 attempt to find, find it in our system, and maybe duplicate it,
21 but they have everything, they seized everything. What they
22 didn't seize, Hayes gave them.
Trial Transcript Page 926 Lines 16 et seq
3 "1. The document marked for identification as
4 Government Exhibit 120 is an inventory of items seized on or
5 about June 26, 2007 from 300 East 33rd Street, Apartment 4N,
6 New York, New York, pursuant to a seizure warrant issued by the
7 Honorable Douglas F. Eaton, United States magistrate judge of
8 the Southern District of New York.

personal funds of the defendant. Backup tape archive libraries were taken containing hundreds of tapes, backup hard disks and backup computers were taken. Only fragmentary backup tapes remained, without any computers on which to unload them.

- o Recovery of the Defendants business logs and data from RAID Disk images was not completed in time for Defense Counsel to comprehend, much less, analyze the data.
- o Exculpatory data was obscured from the Defense in the morass of 10,000 pages of numerical Discovery data, and only recently brought to light in intensive forensic accounting analysis.

- Defense Counsel was unable to provide effective assistance because of
  - inadequate funding, The Defendants attorney could not be paid the amount he requested, and at the time requested,
  - insufficient time to prepare for trial, and
- The Defense Attorney requested to be relieved of the case. This request was denied. The attorney was not motivated to provide best professional effort and committed professional malfeasance.
- Defense counsel failure to pay for testimony of two forensic accounting resources available at the time.
- Failure to mount an adequate forensic accounting fact based defense
  - o Failure to realize that criminal intent was not required to win a criminal conviction, and pursued an intent based defense instead of a fact based defense.
- judge was rushing the proceedings, and the data recovery effort was lagging behind 'schedule'.

- o It was not until June 2008, just prior to the trial in June 2008 that some of the data was recovered, and there was insufficient time to analyze the terabytes of data prior to trial. It was considered, at the time, too expensive to recover all of the data on the Defendant owned equipment. Only the main server main data RAID was recovered.

As a result, a miscarriage of justice has occurred despites the courts interest in finality and equitable conservation of scarce judicial resources, and in the interests of justice this must be corrected.

## F. Increased protection to prevent miscarriages of justice in criminal procedure

Specific failures of increased protections in Karron trial

Conservation of Judicial Resources

Issues in Judicial Finality

Continuing Punishment

Interests of Justice

## G. Defendant's Transsexuality caused Unconstitutional Discriminatory Prosecution

The Defendant believes the ferocity of the OiG persecution of this case is because the Discrimination against the Defendant. The defendant is a post-operative transsexual. This information was not known to the government at the time of award. This information was leaked to the ATP Management and the OIG.

## H. Inculpatory evidence seems to be created to order

A second set of payroll records were found in the Governments Bates Stamped Discovery material. These are different from the contemporaneous, red pen signed copies that were used as the basis to generate paychecks in the original QuickBooks. Copies of the original source documents from the CASI computers and from the Government Discovery can be published on the web for comparison. Many pay dates have contemporaneous support document and additional Discovery Documentation that we maintain was fraudulently created to support the government's case. None of this was brought up at the Trial.

### x.    Duplicate unsigned and signed timesheets,

Hayes, in her Audit report found at *Government Discovery Bates Stamped Page 154*, cites that "

> We also noted that timesheets did not indicate the performance of services for non-project activities.

at *Government Discovery Bates Stamped Page 154*

There are multiple sets of signed and unsigned timesheets in the Discovery material at Bates Stamp a-5665 through a5827, and occasionally contain signatures and countersignatures, and the CASI PAID stamp. A second batch of Bates Stamped timesheets, at a-6079 through a-6285 is present. This batch is mostly unsigned, and contains apparently analysis of the unsigned timesheets.

### xi.    CASI Business Process Manuals through the years

CASI had a published, through rudimentary business process manual, dating back to 1996, with revisions through March 3, 2003. Copies can be made available on the web or as an auxiliary evidence appendix.

xii.    **Karron signed in Pink ink.**

Dr. Karron signed all documents with a vivid pink pen, and all original documentation was scanned in color. Original, contemporaneous timesheets were countersigned by Dr. Karron in pink, and stamped Paid. When Scanned, they were stamped Scanned with the date and the person doing the scanning. Each days batch of scanning was kept in a directory by the person who did the scanning, and then file out of the scanning directory, so that errors in filing could be fixed later on and documents not lost into the nest of file directories. CASI had an business process. The allegations that Karron's bookkeeping was a mess may have been to cover fraudulent accounting by the accountant.

xiii.    **Who is a mess, CASI Accounting or the Governments Accounting ?**

The bookkeeper, Frank Spring, gives faint praise in his testimony:

```
10 Q. And is it fair to say that the Quick Books at CASI were a
11 mess?
12 MR. EVERDELL: Objection.
13 THE COURT: Overruled. I will get his judgment.
14 A. Yes. I mean that's kind of relative, but they could have
15 been in better shape.
16 Q. And the books, it was your opinion that the books were not
17 in good condition, right?
18 A. Yes.

Trial Transcript Page 872 Line 10-18
```

The criminal trial judge further observes the innumerate nature of the schedules presented at trial:

```
1  So I have difficulties. For instance, looking at
2  Exhibit 20 and 22 and the fringe benefits being allowed at 34
3  percent of salary, as I see it in the documents. I have
4  difficulty also with the tabulation contained in Government
5  Exhibit 114 and 115 because they are just rough calculations,
6  as I see it. I don't know who compiled them, but I gather it
7  was Ms. Riley, but we never went into the detail about, for
8  instance, the statement in the tabulation that Dr. Karron's
9  salary budgeted.at 175, various cash. He spent 200,486,
10 according to that tabulation. Those amounts, as I saw them,
```

```
11 err were salary. They involved loans made which someone, I
12 don't know whom, I presume Ms. Riley, determined the equivalent
13 of salary.
14 As I alluded to earlier, the fringe benefits figure in
15 this tabulation -- I'm looking at 114 says that Dr. Karron
16 didn't spend $40,337 in fringe benefits, and yet in the same
17 tabulation it says that the fringe benefits were not allowed
18 and spent $4,081. That whole scenario .of fringe benefits is
19 somewhat illusive to me.
20 The testimony, as I recollect it, was CASI, the
21 corporation, did not have a formal benefit plan and they were
22 endeavoring to compile one during the time of the grant. And
23 instead what Dr. Karron did was to pay benefits just as he was
24 accustomed to paying them, for whatever medical expenses the
25 various employees had for their wives. I have some difficulty
Page 5
1 in, 1, finding that there was criminal intent with respect to
2 these expenditures, which are all on Government 114, and with
3 the manner in which those overexpenditures were computed. It
4 seems to me this is just a rough calculation and not something
5 that a Court could rely on in a criminal case. I'll hear from
6 you. That's my assessment of that proof.
```

Sentencing Transcript at 4ff

Amazingly, these figures and the governments inconsistent and deeply flawed accounting above were the basis for the criminal case and the foundation of the conviction. The Criminal Trial Judge is referring to the Government Exhibit 114 'Audit' / Accounting Schedule says the governments exhibit as "**it s mess**":

```
13 THE COURT: He underspent budget through those fringe
14 benefits by $4,000 it says right above it. Look at that. This
15 is a mess.
```

Sentencing Transcript Page 16

xiv.   **Suppressed evidence of explicit, written permission**

The evidence of explicit allowance was there, but the court could not put their finger on it, and the prosecution hid their knowledge that the evidence was in fact in the Discovery, and alluded to by the government auditor in her testimony<<CITATION>>. However, buried in the

government's own audit workpapers permission for allocation of power costs as explicitly allowed.

The judge surmised it was orally allowed. The Defense counsel was no help, not knowing exactly what was in the evidentiary tsunami that poured in just prior to trial:

```
Page 18
19 THE COURT: Sounds like approval, but not written
20 approval.
21 MR. EVERDELL: He is talking to Bob Benedict. Bob
22 Benedict, I think, is a witness here who is the finance
23 manager. We are not talking to the people at NIST, who
24 actually made the approval, such as Hope Snowden. If I recall
25 correctly, Hope Snowden's testimony about utilities was simply
Page 19
1 that there were lots of conversations that she had with the
2 defendant himself and with others about whether or not grant
3 funds could be used for utilities, and she said no.
4 THE COURT: Where is this?
5 MR. EVERDELL: The cites to the record?
6 THE COURT: Yes.
7 MR. EVERDELL: Your Honor, I'm afraid I don't have
8 them --
9 THE COURT: This does say the witness summarizes his
10 testimony at the end of the page. The incremental amount of
11 additional expense caused by the grant could be classified as
12 direct expense and not indirect expense. Direct expenses are
13 allowed, regardless of what they are. Indirect expenses are
14 not allowed.
15 MR. EVERDELL: I think that that quote just says right
16 there that they are talking about a possibility, but a
17 possibility that was never actually approved. And a
18 possibility 'that was never actually budgeted. So--
19 THE COURT: It suggests not approved in writing. I
20 have seen that. I agree wi.th that. But it sounds as if it was
21 approved orally.
```

Sentencing Transcript at 18ff

The detailed audit workpapers allowance page is given here as an enlargement of the specific note: it could not be any clearer. It says Allowed Power bills – Year One

**Summary**

| | | |
|---|---|---|
| Total | Con Edison Solution Bills | 3,291.16 |
| Total | Con Edison Electric Bills | 1,304.43 |
| Total | Allowed power bills - Year One | 4,595.59 |

**Note**

Base year was the year immediately before program year-one during which time there was no activity at CASI. The differential is, consequently, deemed to be the program useage during program year-one.

Figure 1 OIG Auditor Riley Audit Workpapers Page 26

It appears that the Government tried to call the Defendant's records a mess when in fact, the accountant was manufacturing false records and creating a false schedules and evidence which did not reconcile back to the bank records. This caused the governments records, and not the defendants records to be in Judge Patterson's own words 'a Mess'.

### xv. Witnesses coerced to commit perjury.

A continuing Prosecution theme, which was bought by the Defense, and not rebutted, was that the Defendant's records were "a mess". They were a mess because they were seized by the government and the Defendant could not restore them in time for Counsel, who was not motivated to understand them.

Everyone knows Dr. Karron is a spaced out scientist; it seems reasonable that this strange half man-woman would keep messy records. Her hair is a mess. Her clothes are a mess. Why not her records ? Clearly anyone who changes sex is unreliable, dishonest, and most likely stole money from the government. Apparently the witnesses felt that a transsexual is not someone who should be entrusted with sound stewardship of federal funds.

It must have been easy for the Special Agents to coerce Karron's business staff to lie. None of the Professional Staff would take the stand against Dr. Karron. Because they would

have had to lie, and scientists have a high standard of truth, higher than the courts. Only the Business staff and ATP staff could be coerced into telling a story about the strange Dr. .Karron.

It is the Government's numbers that are a mess, not the Defendants evidence. They are a mess because they relied on a hostile accountant, who kept the bookkeepers from completing their task of rebooking the project data, and who framed the Defendant for infractions the government turned into crimes. This hostile account and auditor was yet able to issue an audit report not based on any completed books. In addition, this very same hostile accountant, who clearly took responsibility for payroll taxes , having done the CASI payroll in part of the the first year, and part of the second year, and continued to meddle with her payroll service. The net result of her work is the grant payroll taxes are missing.

A repeating theme is one of permission. A litany of witnesses was a continuing reframe of "now allowed". But then we show that there is a margin of allowances, and that the ATP auditors and staff themselves were making specific, written allowances.

At best the number of witnesses citing knowledge of permissions they had no personal knowledge of is refuted by rock solid numerical and explicit written evidence shows they were coached to lie or to make assumptions that they knew they did not know.

The facts of the matter do not support the conclusions of the witnesses. The governments case is circumstantial at best, with a foundation in false numbers. It took until Now to prove it.

xvi.   **Key documents, memos and evidence withheld or destroyed.**
xvii.  **Violation of Defendant's Privacy**

This information as to the Defendants transsexuality was disclosed to the government by the Defendant Accountant. The possibility of the political fallout from the possibility of the Defendant's having a sex change operation with federal funds was too much for the politically fragile ATP management. The while pre-trial allegations and the conviction straddled any personal privacy the Defendant had, and caused great harm to whatever remained of her Professional Reputation.

xviii.  **Continuing Punishment because of Conviction**

Prosecution destroyed career, rendering Defendant unemployable. Security Clearance Problems.

Disbarment from Federal Funding. Revelation of Transsexuality.

## 5. Undisputed Facts.

Statute

### A. STATUTE OF CONVICTION 18 U.S.C. § 666: Theft or Bribery Concerning Programs Receiving Federal Funds

(a) Whoever, if the circumstance described in subsection (b) of this section exists—
(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
(i) is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; [commits a crime]
(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of

Federal assistance.
(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or
expenses paid or reimbursed, in the usual course of business.


Bona Fides of spending

Salaries and Fringes



## B. Post-Verdict Motions

### xix.    The Findings of the District Court

```
 7 It's clear to me that there was an intentional
 8 misapplication of the rent money. The defendant was told time
 9 and time again not to use the rent funds for rent or for
10 utilities. That's what the record here substantiates.
```

Sentencing Transcript Page 91 Lines 7-10

The Post Trial Rule 33 Motion for a new trial was denied with this finding:

The defense contends that "misapplication of federal monies does not include any
requirement that a defendant act with *criminal* intent for the benefit of either himself or a
third party to defraud the government. Rather all that is necessary is that a defendant
intend to spend monies under their control in an unauthorized manner - even if for
legitimate purposes that benefit the grantee."


In its charge, the Court emphasized, "In this case, to intentionally misapply money means
to intentionally apply the grant money received by CASI in a manner which the
defendant knew was unauthorized under the terms and conditions of the grant.
Misapplication of money ... does not apply to bona fide salary, wages, fringe benefits, or
other compensation paid, or expenses paid or reimbursed, in the usual course of
business."  The Court then re-emphasized this instruction, "As I said, the government
must prove beyond a reasonable doubt that the defendant acted intentionally in
misapplying grant money. To find that the defendant acted intentionally you must be
satisfied beyond a reasonable doubt that the defendant acted deliberately and
purposefully, that is, the defendant's misapplication must have been the product of
defendant's conscious objective to spend the money for an unauthorized purpose, rather
than the product of a mistake or accident or some other innocent reason."

The Jury had ample grounds to find the defendant intentionally misapplied the grant
money because the evidence showed that, when the first payment of federal grant for
research was received by CASI from the Advanced Technology Program in October
2001, CASI had a negligible balance in its bank account, and Defendant drew nine
checks payable to herself for back rent on her apartment for months in the year 2000, a

year prior to the start of the grant. Defense counsel distinguishes 18 U.S.C. § 666 from 18 U.S.C. § 656, citing United States v. Castigila, 894 F.2d 533, 537-38 (2d Cir. 1990) ("an intent to injure, defraud or deceive the bank [is] the requisite mens rea under Section 656"), and United States v. Clark, 765 F.3d 297, 303 (2d Cir. 1985) ("to constitute 'misapplication' within the meaning of [§ 656], the bank officer's conduct must involve some risk of pecuniary loss to the bank"). Defense counsel states, "Therefore, in contrast to a conviction for misapplication under § 666, § 656 requires a defendant to act with the requisite intent to defraud." Letter dated 12/31/08 at 5. The Court's charge that "In this case to intentionally misapply money means to intentionally apply the grant money received by CASI in a manner which the defendant knew was unauthorized under the terms and conditions of the grant," clearly conveyed to the jury that the government's funds had to be expended intentionally by the Defendant for a purpose not permitted under the terms and conditions of the grant. Accordingly, based on the charge, the permitted under the terms and conditions of the grant. Accordingly, based on the charge, the jury had to find that Defendant acted with intent to, and did, defraud the government of its right to have its grant funds used for the research and development purposes for which they were intended, the equivalent of a violation of 18 U.S.C. § 656.

Accordingly, the Court finds that the argument raised in Defendant's letters do not raise a substantial question of law or fact likely to result in reversal, as required by 18 U.S.C. § 3143(b).

Letter dated 12/30/08 at 4;

see United States v. Urlacher, 979 F.2d 935 (2d Cir. 1992).

*ROBERT P. PATTERSON, JR., U.S.D.J., Opinion and Order, Jan 8, 2009*

## xx.   The Mandate of the Circuit Court

We review a claim of error in jury instructions *de novo, see, e.g., United States P. Quattrone,* 441 F.3d 153, 177 (2d Gr. 2006), but reversal is only appropriate when the charge, viewed as a whole, "either failed to inform the jury adequately of the law or misled the jury about the correct legal rule," *United States v. Fore!,* 435 F.3d 204, 209-10 (2d Cit. 2006). "To seew:e reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice." *United States v. Quinones,* 511 F.3d 289, 313 (2d Gr. 2007). Defendant argues that the District Court erred by failing to instruct the jury that it needed to find that defendant acted with the specific intent to defraud or injure the government Defendant further contends that the instructions given by the District Court prejudiced defendant because they precluded the argument that defendant's misapplication of funds was intended to benefit the grant-recipient organization, a legitimate purpose.

In *United States v. Urlacher,* we defined the tern "intentional misapplication" to include misuse of federal funds for "otherwise legitimate purposes." 979 F.2d 935, 938 (2d Cit. 1992). *Urla,Ws* holding has been followed uniformly by other courts that have considered the issue, including the First, Sixth, Seventh, and Tenth C?-cuits. *See, e.g., United States v. Cornier-Ortiz,* 361 F.3d 29, 37 (1st Cir. 2004); *United States v. Fra'lftr,* 53 F.3d 1105, 1110-11 (10th Cir. 1995). We are bound by *Urlather* to conclude that the jury instructions were not erroneous. Nor was defendant prejudiced by the Instructions because trial counsel was not precluded from presenting evidence or cross-examination showing that defendant did not intend

to defraud the government or undermine the grant program, or that defendant acted with the purpose of benefitting the grant recipient.

Defendant asserts the void-far-vagueness argument for the first time on appeal. The issue is therefore waived, and reviewed only for plain error. Fed. R. Crim. P. 51, 52. In order to show plain enor defendant must establish an error occurred that is "clear or obvious under current law" and that the error affected defendant's "substantial rights." *United State.f v.* GonzaJe~ 110 F.3d 936, 945-46 (2d Cit.1997). We find no error under the clear law set forth in *Urlacher*.

## 6. Questions of Law

Is the defendant entitled to spend budget authorized, advanced, after tax, bona fide salary on unallocable or disallowed costs on a grant project ?

Mathematical Defense.

Harmless Errors, Arithmetic

Plain Errors, Math

Accounting and Audit Errors

## A. Forensic Reconstruction

The main matter of material fact in this motion is the revelations of the "ground truth"[16] forensic reconstruction numbers. *Dunlevy Decl.* The purpose of this forensic reconstruction is to answer the most basic fiscal questions for this project.

Questions such as

- ✓ How much were spent in total?. *Karron Decl. Exhibit Group 2, Ex 17-21.*

- ✓ Of that what was spent on direct project costs? *Karron Decl. Exhibit Group 2, Ex 17-21.*

- ✓ How much was spent on overhead? *Karron Decl. Exhibit Group 2, Ex 17-21.*

- ✓ How much did Karron earn? *Karron Decl. Ex Group 22 Ex 108 et seq,* Compare *Karron Decl. Ex 40, GX 50, Trial Transcript Page 803 Line 19, Ex 76.*

- ✓ How much did Karron co-fund? *Dunlevy Decl. Ex AA-001-A, BAC 301*

- ✓ What happened to the withholding taxes from the grant payroll? *Karron Decl. Exhibit Group 5, Ex55, 56, 50, 51, Ex 119,120,121,123,126.*

These questions were never unambiguously and authoritatively answered previously. Karron Decl. Ex 76, 77, 82 The criminal trial court had great difficulty even determining how much was lost, and even that is severely flawed17 *Sentencing Transcript Page 3 Line 9 et seq.* .

---

[16] Ground truth is a term used in cartography, the military, meteorology, and analysis of aerial photographs, satellite imagery, and a range of other remote sensing techniques in which data are gathered at a distance. Ground truth refers to information that is collected "on location". More specifically, ground truth may refer to a process in which a pixel on a satellite image is compared to what is there in reality in order to verify the contents of the pixel on the image. This imaging terminology is finding wider use in the military and even in accounting for data that is accepted as true and used to calibrate other, derived, inferred, or composite measures of reality.

These questions are material and important because it shows how the Defendant funded the non-federal portion of this project, and shows that federal funds were not used to pay for nominally disallowed, unallowable, or unallocable costs despite allegations by the Plaintiff of fraudulent funding of indirect and overhead costs. *Dunlevy Decl Ex AA-2*

## B. Conviction for misappropriation is spending funds without authority

xxi.   **even if beneficial to the grant**

if bona fide, in the normal course of business ?

## C. What is authorized spending in light of 18 USC §666?

A 'Brightline' standard rule for what is allowed and what is misappropriation.

## 7. Overview of the Four Grounds for 2255 motion.

### A. Funds considered misappropriated were in fact property of Karron and did not belong to the government

### B. The grant funds were not spent beyond the statutory flexibility limits

---

[17]THE COURT: It seems to me this [GX114] is just a rough calculation and not something that a Court could rely on in a criminal case. I'll hear from you. That's my assessment of that proof. *Sentencing Transcript Page 5 Lines 4-6.*

C. **Conviction foundation laid on erroneous, misleading, and false data causing plain error.**

D. **Ineffective Assistance of Counsel**

Failure of counsel to raise Tracing Issue against Courts Rejection of Tracing

Failure of counsel to use Two forensic accounting witnesses standing by for trial.

Failure of counsel to use any of the recovered exculpatory material at trial.

Other grounds to be described.,

8. **GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A**

**Table 1 Ground Truth Grant Spending for First Year by Quarter cast in SF269A terminology.**

| SF269A Review | | | | | |
|---|---|---|---|---|---|
| Corrected Figures | Q1 | Q2 | Q3 | Q4 | x sum |
| a  Total Outlays | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| b  Recipient Share of Outlays | $  41,682.00 | $   1,365.00 | $  17,053.00 | $  18,104.00 | $  78,204.00 |
| c  Federal Share of Outlays | $ 210,000.00 | $ 240,000.00 | $ 140,000.00 | $ 210,000.00 | $ 800,000.00 |
| d  Total Unliquidated Obligations | $   6,638.00 | $ (51,329.00) | $  57,018.00 | $  (4,559.00) | $   7,768.00 |
| b+c+d | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| Zero Check(b+c+d-a) | $          - | $          - | $          - | $          - | $          - |
| Original Date Signed | 1/31/2002 | 4/21/2002 | 7/12/2002 | 10/28/2002 | $ 149,660.00 |
| a  Total Outlays | $ 219,573.00 | $ 188,203.00 | $ 208,727.00 | $ 212,977.00 | $ 829,480.00 |
| b  Recipient Share of Outlays | $   9,573.00 | $   8,214.00 | $   8,727.00 | $   2,979.00 | $  29,493.00 |
| c  Federal Share of Outlays | $ 210,000.00 | $ 180,000.00 | $ 200,000.00 | $ 210,000.00 | $ 800,000.00 |
| Over Cofunding | $  48,320.00 | $ (49,964.00) | $  74,071.00 | $  13,545.00 | $  85,972.00 |

This chart is the culmination of extensive forensic analysis of CASI-ATP spending by quarter for the first year. *Karron Decl. Exhibit 17-21* contains these figures in restated SF269A Short Forms. The co-funding exceeded the spending except for Q2. The overall co-funding exceeded the ATP funding by the end of Year 1 by 85,972, well in excess of the required year 1 co funding requirement called out in the budget of %4.57, or $30,500. The original SF269A

were not accurate, but the error was not to the harm of ATP, but understated CASI cofounding

by $48,711.00.

## 9. Grounds One: Funds considered misappropriated were in fact property of Karron and did not belong to the government.

Funds from personal *bona fide*[18] earned salary, authorized in the grant budget, advanced

and tax paid, are personal property of Karron. These were the funds advanced to Karron.

Karron used them to fund personal costs. Karron also advanced a large portion of these tax paid

personal funds to CASI. CASI used these funds to pay project overhead costs. There are two

budget line items on the NIST 1262 form, line item 1J and 1K for these costs, Total Direct Costs

Shared by Proposer, and Total Indirect Costs Absorbed by Proposer. There is a line item for the

costs deemed misappropriated under 666.  The prosecution implication that all funds emanated

solely from the grant are just not true. and unimpeachable evidence of this will be presented

below. The mere existence of payments for nominally disallowed costs from general corporate

or personal funds does not constitute misappropriation, especially when payments were made

from personal or corporate checking and credit card accounts.

The government's chief case, and the foundation for the Defendant's conviction was that

the spending of government funds for indirect costs was knowing misapplication, even when

these funds benefited the government.

---

[18] See 18 USC 666( c ), *viz.*" **(c)** This section does not apply to *bona fide* salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

## A. Karron's Salary

The ATP project was co-funded and over funded by the Defendant. The total cost of the project is $1,524,264, of which the Federal Share is $1,345,500 and the CASI contribution was $178,764. *Dunlevy Decl., Karron Decl. Ex. 17.*

The Government cites salary figures ranging from a low of $ 35,293.58.[19][20], $175,000 (*Hayes audit*), $200,488(*OIG*), to $253,913 from the CASI Payroll Tax Returns prepared by Hayes.

Hayes prepared the Defendants Personal 2002 Tax return, but abruptly quit and it was completed by Solomon and Schwartz[21]  She did prepare the CASI Payroll Taxes and W2 that were included in that tax return<<CITATION>>

Finally, completed forensic analysis shows Karron's total Tax Paid salary for the entire project period of  $334,004.12 in the *Declaration of Dunlevy Ex. CAC 291*, mid page right.

## B. Karron's contribution

Karron has the right to fund her grant out of her tax paid salary. This is not 'double dipping'[22]. because it is *bona fide* after tax paid funds. *Dunlevy Decl.*

---

[19] THE COURT: She[RILEY] has got a salary category. She shows it. Go on a couple of pages. Payroll, next page, $35,293.58.
*Sentencing Transcript Page 9 Line 18-19.*
[20] MR. RUBINSTEIN: and you see his payroll checks which I put into evidence as P-1 through P-6, where his total amount for the year is about $35,000. Ask yourself, he gets $175,000, how does he only have $35,000?
*Trial Transcript Page 1293 Lines 20-24*
[21] Hayes completed Karron's 2002 tax return in July 2003, but refused to file it; she returned it to Karron but signed the extension request and completed the W2 forms before she "submitted" the ATP audit report in August 2003.
*Karron Declaration Exhibit 110.*

## C. CASI tax returns substantiate Karron's Salary

Description of the data in the Payroll Tax Returns and the Personal Tax Returns showing agreement of figures.

## D. What did Karron do with this earned money ?

Most of this after tax money was used to pay for the initial bootstrap loans to launch the project.

## E. Project Overfunding

Because the project was overfunded, the government ATP sponsor was not harmed.  The funding reports () that contains harmless errors to NIST but could only "harm" Karron by understating Karron's contribution.  Clearly, if Karron had not contributed to the project, then the first dollar of indirect costs might be problematic.  *Dunlevy Decl. Ex. BAC-301* shows Karron made significant contributions, out of after tax salary.  By Karron's turning back so much after tax salary, there is no liability for NIST being harmed by understated total grant spending.  There is adequate 'slop' in the gears benefiting NIST, such that the errors in the 'false' statements do not materially harm the government sponsor in any way.   The issues raised are matters of fact and math, not law.  GX114 reclassified rent as Salary by ATP.

---

[22] *Trial Transcript Page 1066 Line 22 et seq.* Benedict Cross, See *Karron Declaration Exhibit 57.*

Evidence consists of (but not limited to) approved budgeted salary line, contemporaneous signed time sheets, signed paychecks, withholding shown on paychecks, withholding tax transmittal checks and forms (state and federal), quarterly withholding tax returns (State and Federal), and journal entries on CASI books and adjustments on withholding tax returns made in subsequent quarters.

The main issues of fact are simple and straight forward:

How much did ATP put in?

How much did CASI put in?

How much did Karron put in?

From where? From whom ? For what? How much was spent in total for all categories, for the ATP project, for CASI/Overhead and finally for Karron personally.  How much was spent properly? Improperly?  Personally?  What was wrong with that ?  Why ?  What specific transactions were made falsely or fraudulently? With who's funds ? How much was spent improperly? On un allowed categories ? Unallocable categories ? In disallowed categories ? With who's money? Who else had funds, credit and credits in this murky pot?  None of these questions were settled in the criminal trial.  They cannot be estopped here.  They may be asserted in testimony, but not accepted by any means by the judge, who called the accounting "A mess" [23]Sentencing Transcript Page 16 Line 15. These questions must be affirmatively answered as we move forward toward a trial and are not subject to issue preclusion : there is no way that any rational and astute reading the trial transcript and evidence could say that the forensic accounting, *per se*, at the criminal trial clarified or settled any issues.  As we show here, it

---

[23] THE COURT: "Look **at that** …[**GX 114**]. **This is a mess**". Sentencing Transcript Page 16 Line 14-1

reveals key facts in project period contemporaneous mental states that contradict direct witness retrospective testimony about what people were thinking.  There is no way from the criminal trial that we can accept GX110 or GX114 as establishing any facts that can be precluded here, any more than a lottery numbers ticket can preclude a phone number..

Therefore, amongst the issues to be decided are gathering **all** of the marbles, allocating which 'bin' to put these 'marbles' and see where we stand then. Either Karron will owe ATP or ATP will owe Karron. There is just no way reasonable trier of facts to determine this from the criminal trial.  The only schedule purporting to represent a schedule of spending is too flawed to even consider; as we clearly showed above in our response to Plaintiff Paragraph 30.  We present forensic analysis schedules showing Karron is overpaid and ATP 'owes' Karron reimbursement.

Damages and Penalties sought by the Plaintiff centrally depend on establishing a basis for costs, spent or misspent, funds applied or misapplied. Drawing a closed loop around an otherwise ill-defined target is the first step to make it clear and well defined.  In accountancy this is known as the "Principle of Completeness"[24]. The next step in our analysis is making determinations of Allocability by the Cost Principles and assorted applicable rules. (OMB Circular A133, 2007)

The criminal trial left a number of issues hanging, or clues to deeper structural problems unresolved.  Most compelling are the errors in plain sight, such as

GX114, Plain Error

---

[24] Completeness: An auditor makes an assertion about completeness when certifying an audit report.  Completeness deals with whether all transactions and accounts that should be in the financial statements are in fact included. For example, management asserts that all purchases of goods and services are included in the financial statements. Similarly, management asserts that notes payable in the balance sheet include all such obligations of the entity, that there are no other 'off book' transactions. Standards of practice dictate that if there is any doubt about an account, it should be included or excluded at the item by item level. (Dauber, Levine, Quesheri, & Siegel, 2009)

The government auditor Riley did not audit,[25]

The district court Judge's multiple salient exculpatory comments made during trial[2627],

Prosecution's amazing admissions at opening [28] sentencing [29] [30] [31] and observations [32] [33]

[34] made at trial and sentencing[35].

---

[25] Defense attorney MR. RUBINSTEIN: "Q. Did you do a bank reconciliation of the various bank accounts of CASI? [Department of Commerce Office of Inspector General Auditor Riley, C.P.A., Expert Witness in Cross Examination]A. **For this, for this audit? Q. Right. A. No.** MR. RUBINSTEIN: Your Honor, I object. …" Trial Transcript Page 473, Lines 24 *et seq.* [Emphasis added]

[26] THE COURT: "**Look at that …[GX 114]. This is a mess**". Sentencing Transcript Page 16 Line 14-1

[27] THE COURT: "**He [Karron] can get a salary of 175,000 is[sic] what it says in the budget, plus 34 percent for fringe benefits**". (Doing the arithmetic, this leads to a total gross salary of $234,500)Sentencing Transcript Page 8 Line 2-3

[28] THE COURT: " All right. We will now begin with the government's opening statement. Mr. Everdell.MR. EVERDELL: Thank you, your Honor. Ladies and gentlemen, the defendant, Dr. D.B. Karron cheated the government out of hundreds of thousands of dollars. **In 2001 the defendant got what many scientists can only hope to get.** He was given a $2 million grant from the federal government to conduct his scientific research, $2 million of taxpayer money, and the only thing that the government required in return for this money was that the defendant spend it on one thing and one thing only: **His research,** nothing else.[!?!?!]
But the evidence will show that instead of putting that money towards his research, the defendant chose to spend much of that money on himself. For over a year and a half the defendant used the grant money as his own personal piggy bank to pay for personal expenses like **meals at restaurants, electronic gadgets like a GPS tracking device and a digital camera, even a blender[see blender end note] and shoe rack[see shoe rack end note] for his apartment,** and he bought all these things even though **he was already paying himself $175,000 in salary out of the grant funds.** Trial Transcript Page 33 *ff* Line 22 *et seq.*[Emphasis added]

[29] Prosecutor MR. EVERDELL: **your Honor, because almost every single expenditure has some benefit to the research …" "… then there would be no loss at all,…"** Sentencing Transcript Page 22 Line 22. And Page 23, 10-22 [Emphasis added]

[30] THE COURT: You see what he did was -- I think it is borne out by the defendant's papers to some degree -- is he took a very low salary to pay back the loans. Is that a fair statement? MR. EVERDELL: Your Honor, that fact that you just said, the fact that he didn't take his full salary, is taken into account THE COURT: I didn't say that. I want to know whether you're disputing what I just said. MR. EVERDELL: That I agree with is that, yes, **the defendant did not take his full salary in the sense that when you look at salary in checks, they are less than the $175,000 of quote unquote salary.** Sentencing Transcript Page 9 *ff*, Lines 21 *et seq.* [While this is not correct, the judge comes closer to the truth]

[31] MR. EVERDELL: This is a defendant, who under the grant in year one alone, **is given an annual salary of $175,000, $175,000 in taxpayer's money.** That's a lot of money for a lot of people, but not for this defendant because he kept misspending...Sentencing Transcript Page 75 Line 20 *et seq.*