Brought forward here are renewed forensic analysis and re-analysis of the criminal

evidence submitted, new evidence submitted herein by affidavit (Benedict & Hayes, 2003),

extraordinary statements made by the government witnesses under cross examination[36], and

additional evidence from pre-trial discovery not brought into evidence, additional spending

---

[32] THE COURT: She[DoC OIG Auditor Riley] has got a salary category. She shows it. Go on a couple of pages. Payroll, next page, $35,293.58. MR. EVERDELL: **If he is allowed a payroll, a salary of $175,000, it doesn't necessarily matter how the defendant himself characterizes those payments to himself.** Whether he calls them payroll checks or whether he calls them loans, it's still a payment to him personally from CASI funds.

[33] The reference is to the Blender Seizure Story, Below

[34] The Story of the Shoe Rack, GX 120, Seizure Inventory Page 2, Line Item 75, see Trial Transcript Page 557, Line 21 *et seq.*, Trial Transcript Page 1156 Lines 5 *et seq.*

MR. RUBINSTEIN: Q. All right. Did your[sic] have occasion to give Dr. Karron any any items that you owned?
MS. FARNSWORTH: A. Well, I give things to people, I'm quite generous. And I do recall one of the things that I gave Dr. Karron was a shoe rack.
Q. Let me show you what's in evidence as a government1 exhibit -- I show you what's in evidence as Government's Exhibit 125.
A. Uh-huh.
Q. Do you recognize this item?
A. Yes, I do.
Q. And how do you recognize this item?
A. It was the rack that I gave D. B. Karron when I purchased one that sat on the floor instead of one that hung on the door.
Trial Transcript Page 1184 Line 20 *et seq.*
For the purported grant invoice for the Shoe Rack in question see GX 119(??) SEIZURE WARRANT PURSUANT TO 18 U. S. C. § 981 07 07 (FILED UNDER SEAL) (MAG 970) Signed June 19, 2007 on Affidavit of RACHEL ONDRIK page 129, Homefront Hardware Statement 2003-10-11 invoice INV2002221301 Line Item 5 Whi-1651Navy Nylon 10/PKT HNG. Shoe Org, for $15.99.

[35] Defense attorney MR. RUBINSTEIN: "He goes and takes a loan on the apartment, on a line of credit, **and he puts $60,000 into CASI to pay bills …$60,000 of his own money that he borrowed from himself.** And it's **not the only time he borrowed money from himself to put in the CASI during this grant period.** And of course the grant people say you weren't supposed to do that, you were supposed to give us the 60,000, so we are still keeping you suspended even though you are spending this 60,000 on grant-related items, even though you are paying back bills that you incurred before the grant was suspended. He keeps going with the project because he believes … I'm working hard and I'm doing everything right here, and I have all the records, and let the accountants decide what is right or wrong and tell me."
Trial Transcript Page 49 *ff*, Line 16 *et seq.*

[36] CROSS of SNOWDEN BY MR. RUBINSTEIN:
Q. Well, **Dr. Karron submitted a budget where he was to receive $175,000 in salary, correct?**
**A. Yes.**
**Q. And that was approved.**
**A. Yes."**
Trial Transcript Page 350 line 1 *et seq.*

accounts (credit card, cash, in-kind) ignored during trial, patterns of small and large errors that

have propagated from Hayes Audit through the Government audit (See Dunlevy Declaration),

published salient federal rules (OMB Circular A133, 2007), ATP special rules (15CFR295 2003,

2003) public statements made by program personnel (Stanley M. G., 2007), and other factual or

historical sources (Belinda Riley, 2008) (Joan Hayes, 2008) (US Dept of Commerce,

2005)**EVIDENCE OF OTHER ATP ALLOWANCES**

Karron kept grinding away for budget changes and for reimbursement for nominally not

allowed costs.  The government argues it demonstrated Karron's intent to misappropriate funds

the Defendant knew were not allowed to be used for those purposes.  However, as we show here,

the government had in fact, allowed these expenses and then obscured or tried to hide this

information from the Defense.  The analysis here shows that the Defendant's efforts were

succeeding.

```
MR. RUBINSTEIN: Q.. Would you please read that second paragraph,
thedefendant's response?
MR. SPRING: A. Right. This is from the defendant. You and she need to
keep grinding away on disallowed items. Power, Jill Feldman, Solomon
and Bernstein, Peter Berger, et cetera, et cetera, et cetera, are all
actually and partly allowable. Rent, some cable, some telephone are not
yet allowed. I may get an allowance on rental of the living room to the
project, as it is clearly completely taken over by the project.
Q. Say again what's the date of that e-mail was?
A. November 30th, 2002.
```

## G. Allowance for Power by NIST

Riley's audit workpapers, show a special page for analysis of CASI Power, allowing of

the power costs from Con Edison and ConEdison Solutions.  And yet, with a portion of the

utilities clearly written up as 'allowed', we see the very same person, OIG Auditor Riley

subsequently disallowing[37] power in testimony at trial:

```
MR.RUBINSTEIN: Q. You disallowed utilities, did you not?
MS. RILEY: A. Disallowed utilities?
Q. Yes.
A. Yes.
Q. Are you aware that there were discussions between Dr. Karron and
NIST as to whether to allow a portion of the utilities?
A. Yes.
THE COURT: When? All right.
Q. And is it fair to say that you determined that a portion of the
utilities should be allowable?
```

[Discussion by Prosecution about topic of answer: Audit or Analysis obstructed direct answer by witness.
Mr. Rubinstein changed topic without a direct answer by witness on this point.]

Trial Transcript Page 780 Line 12-22

There is other evidence of other cost allowances in the audit work papers of Hayes and

Riley; in fact they seem to have copied each other's schedules.


The key point is that Utilities, normally not eligible for federal reimbursement, are  being

paid out of Karron's pocket.  See analysis by Dunlevy. See below.



### xxii.    ATP Auditor Riley Allowance of CASI Power Costs


**See Audit Workpaper - Expense Detail**
CASI
Detail of Expense Account Balances
For the Year Ended 9/30/02
Electric Differential - Con Edison Bills
Base Year
Before Project Project Year One
. Amount Date Amount Differential

---

[37] Into which schedule Riley made this disallowance is made is not specified.

| Con Edison Solution Bills | | | | | | |
|---|---|---|---|---|---|---|
| Oct | not provided | n/a | 10/25/2001 | $261.57 | - | |
| Nov | 11/21/2000 | $222.16 | 11/27/2001 | $314.51 | $ 92.35 | |
| Dec | 12/28/2000 | $190.89 | 12/21/2001 | $352.92 | $ 162.03 | |
| Jan | 1/28/2001 | $215.67 | 1/28/2002 | $511.83 | $ 296.16 | |
| Feb | 2/23/2001 | $186.17 | 2/27/2002 | $536.58 | $ 350.41 | |
| Mar | 3/28/2001 | $187.82 | 3/28/2002 | $494.00 | $ 306.18 | |
| Apr | 4/26/2001 | $165.91 | 4/29/2002 | $479.14 | $ 313.23 | |
| May | 5/23/2001 | $166.51 | 5/28/2002 | $470.38 | $ 303.87 | |
| Jun | 6/26/2001 | $228.04 | 6/26/2002 | $527.53 | $ 299.49 | |
| Jul | 7/24/2001 | $148.79 | 8/4/2002 | $669.88 | $ 521.09 | |
| Aug | 8/22/2001 | $418.83 | 8/26/2002 | $670.95 | $ 252.12 | |
| Sep | 9/21/2001 | $254.77 | 9/25/2002 | $649.00 | $ 394.23 | |
| | | | | | $3,291.16 | $3,291.16 |
| Con Edison Electric Bills | | | | | | |
| Oct | 10/24/2000 | $182.72 | 10/24/2001 | $137.18 | $ (45.54) | |
| Nov | 11/22/2000 | $199.67 | 11/26/2001 | $172.13 | $ (27.54) | |
| Dec | 12/26/2000 | $166.44 | 12/26/2001 | $190.42 | $ 23.98 | |
| Jan | 1/25/2001 | $156.52 | 1/25/2002 | $264.32 | $ 107.80 | |
| Feb | 2/26/2001 | $166.95 | 2126/2002 | $286.05 | $ 119.10 | |
| Mar | 3/27/2001 | $184.51 | 3/27/2002 | $299.77 | $ 115.26 | |
| Apr | 4/25/2001 | $113.16 | 4/25/2002 | $246.05 | $ 132.89 | |
| May | 5/24/2001 | $ 88.49 | 5/24/2002 | $191.22 | $ 102.73 | |
| Jun | 6/25/2001 | $137.34 | 6/25/2002 | $304.52 | $ 167.18 | |
| Jul | 7/25/2001 | $ 80.34 | 8/1/2002 | $374.19 | $ 293.85 | |
| Aug | 8/23/2001 | $238.26 | 8/23/2002 | $361.76 | $ 123.50 | |
| Sep | 9/24/2001 | $170.83 | 9/24/2002 | $362.05 | $ 191.22 | |
| | | | | | $1,304.43 | $1,304.43 |
| | | | | | | $4,595.59 |

Total Can Edison Solution Bills 3,291.16
Total Can Edison Electric Bills 1,304.43
Total Allowed power bills - Year One 4,595.59
**Note**
Base year was the year immediately before program year-one during which time there was no activity at CAS!.
The differential is, consequently, deemed to be the program usage during program year-one.

## H. Reclassification of Rent as Salary

As the section below on Gx114 errors reveals, rent was counted twice in two different classifications: once as Salary and again, a second time as a stand alone category of 'Rent'. While rent is an overhead category, and not a stand alone category it appears by comparing GX114 against GX 3502-J that this was a well thought out considered analysis by two different people, and that at some point the rent must have been previously classified as salary.

Had it been an error, then the rent would have to have been removed as salary and entered as Rent. This would have caused a problem of insufficient salary line item relative to Karron's tax returns, the approved budget.

Therefore it is reasonable to conclude that the rent was reclassified as Salary, as was negotiated by Karron, despite all of the testimony to the contrary <<CItATION>>

## I. Even without Rent reclassified, the project is still overfunded.

In Dunlevy's analysis, she holds the rent as a 'Stand Alone Item'

## J. Allowance of Telephone, Cable, Internet, and other overhead costs.

Analysis of OIG Auditor workpapers show allowances for these items.

## K. IMPLICATIONS OF KARRON FUNDING and COST ALLOWANCES

All of this begs the question:

Q: Why was this evidence not brought forward in the criminal trial ?

A: Some was, albeit ineffectively.

A: Because all of the defendants records were seized by the government in 2007 (OIG, 2007).

The defendant had to sell his only remaining property, his apartment on East 33rd Street, already devalued from running the NIST ATP project inside of it, to pay $30,000 for an OIG sanctioned computer forensics company to recover Karron's own data from Karron's own computers. Further, Karron had to borrow funds and buy and build new host computers large enough to hold the seized computer disk image data, and then painstaking reconstruct the file system. This did not leave enough time for analysis and understanding on the part of the Defense Counsel, Mr. Rubinstein.

### xxiii.    Defendant's Privacy

Nothing of **anyone else's business** was secret or withheld from ATP or the CASI Accountant Auditor.  **Except that Dr. Karron was transgendered and seeking surgical relief of a long term and pressing medical issue**.  Dr Karron had Oral surgery for a festering tooth. Gurfein mistakenly testified that this was cosmetic facial surgery

### xxiv.    Excess Prosecutor Zeal because of Defendant's Transsexualty

This seems to have caused untoward auditor or investigator excitement[38],. Sex change surgery to alleviate a subtle gender issue[39] seems to have been an early motivation for this attack, before such surgery became commonplace amongst employers (HRC Human Rights Campaign, 2010)in recent years, culminating with the very controversial appointment of a transsexual in the Department of Commerce (Eye on America Roadshow, 2010).

---

[38] Dr. Karron had oral surgery during the course of the project in 2002 to remove and implant an artificial tooth. Trial Transcript Page 995 Line 24.  This was misinterpreted by Gurfein in his testimony
[39] Trial Transcript Page 782 Line 13: Auditor Riley admits knowledge of Karron's 'Surgery'.

xxv.   **The Dog Day Afternoon Scenario as motivation for Defendants Theft**

Early allegations, since dropped[40], were that the Defendant 'stole' money from her grant to pay for her sex change surgery.  As time went by and Dr. Karron was demonized, ATP and the government decided to forget their prior <u>understandings and allowances.</u>.

This scenario was dubbed the 'Dog Day Afternoon Scenario of theft', after the 1975"Dog Day Afternoon" movie .  The title refers to the "dog days of summer". The film was inspired by P.F. Kluge's article "The Boys in the Bank", which tells a similar story of the robbery of a Brooklyn bank by John Wojtowicz and Salvatore "Sonny" Naturile on August 22, 1972. This article was published in Life Magazine in 1972. When Sonny's wife, Leon Schermer (a transsexual) arrives, he reveals to the crowd and officials one of Sonny's reasons for robbing the bank is to pay for Leon's sex reassignment surgery

## L.  GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A

Table 2 Ground Truth Grant Spending for First Year by Quarter cast in SF269A

| SF269A Review | | | | | | |
|---|---|---|---|---|---|---|
| Corrected Figures | | Q1 | Q2 | Q3 | Q4 | x sum |
| a | Total Outlays | $258,320.00 | $190,036.00 | $214,071.00 | $223,545.00 | $885,972.00 |
| b | Recipient Share of Outlays | $ 41,682.00 | $ 1,365.00 | $ 17,053.00 | $ 18,104.00 | $ 78,204.00 |
| c | Federal Share of Outlays | $210,000.00 | $240,000.00 | $140,000.00 | $210,000.00 | $800,000.00 |
| d | Total Unliquidated Obligations | $ 6,638.00 | $ (51,329.00) | $ 57,018.00 | $ (4,559.00) | $ 7,768.00 |
| | b+c+d | $258,320.00 | $190,036.00 | $214,071.00 | $223,545.00 | $885,972.00 |
| | Zero Check(b+c+d-a) | $ - | $ - | $ - | $ - | $ - |
| | Original Date Signed | 1/31/2002 | 4/21/2002 | 7/12/2002 | 10/28/2002 | $149,660.00 |
| a | Total Outlays | $219,573.00 | $188,203.00 | $208,727.00 | $212,977.00 | $829,480.00 |
| b | Recipient Share of Outlays | $ 9,573.00 | $ 8,214.00 | $ 8,727.00 | $ 2,979.00 | $ 29,493.00 |
| c | Federal Share of Outlays | $210,000.00 | $180,000.00 | $200,000.00 | $210,000.00 | $800,000.00 |
| | Over Cofunding | $ 48,320.00 | $ (49,964.00) | $ 74,071.00 | $ 13,545.00 | $ 85,972.00 |

---

[40] As related by prior counsel in the 5 years the Defendant was a target of OIG investigation.

This chart is the culmination of extensive forensic analysis of CASI-ATP spending by quarter for the first year. Appended in the Declaration of Karron Exhibit DBK 902 are these figures in restated SF269A Short Forms. The main observation to be made here is that in almost every quarter, the co-funding exceeded the spending except for Q2. The overall co-funding exceeded the ATP funding by the end of Year 1 by 85,972, well in excess of the required year 1 co funding requirement called out in the budget of %4.57, or $30,500. The original SF269A were not accurate, but the error was not to the harm of ATP, but understated CASI cofounding by $48,711.00.

## M. TITLE TO EQUIPMENT

Title to equipment purchased by the Defendant with NIST funds vests with CASI[41]. Title to equipment purchased with Karron's own funds vest with CASI. Because the grants manager did not specify any disposition action within 120 days of the grant termination, title irrevocable passed to CASI, if the grant was in deed terminated. There was never any evaluation of

---

[41] TITLE 15 - PART 14 –
UNIFORM ADMINISTRATIVE REQUIREMENTS FOR GRANTS AND AGREEMENTS WITH INSTITUTIONS OF HIGHER EDUCATION, HOSPITALS, OTHER NON - PROFIT, AND COMMERCIAL ORGANIZATIONS
subpart c - POST - AWARD REQUIREMENTS
14.34 - Equipment.
(a) Title to equipment acquired by a recipient with Federal funds shall vest in the recipient, subject to conditions of this section.
...
(c) The recipient shall use the equipment in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by Federal funds and shall not encumber the property without approval of the DoC.
(2) The Grants Officer shall issue disposition instructions within 120 calendar days after receipt of a final inventory. The final inventory shall list all equipment acquired with grant funds and federally-owned equipment. If the Grants Officer fails to issue written disposition instructions within the 120 calendar day period, the recipient shall apply the standards of this section, as appropriate.
(3) When the DoC exercises its right to take title, the equipment shall be subject to the provisions for federally-owned equipment.
(5) Adequate maintenance procedures shall be implemented to keep the equipment in good condition.

equipment value for compensation, if requested.  If the grant was suspended but not terminated, title vests with CASI.

Confiscation of CASI property without compensation and due process is illegal. The OIG press release[42] of CASI and ATP furnished evaluated the haul at some  400

Maintenance contracts on SGI equipment continued out of pocket post grant. Service contract on Scanner, shredder and other heavily used e3quipment continued until after seizure. Karron maintained PC's out of pocket al al cart, replacing parts, installing heavy cooling fans.

## N. KARRON OUT OF POCKET DURING AND AFTER GRANT IGNORED

The Defendant funded overhead items out of pocket, as was her right43 and did not keep it a secret44. The prosecution accused the Defendant of using the Grant as her piggybank, when

---

[42] Jail Time, Restitution Ordered for Former Research Scientist Convicted of Federal Grant Fraud
On October 21, 2008, a former research recipient convicted of intentionally misapplying federal grant funds was sentenced to a combined 15 months' in prison and home detention and ordered to pay $120,000 in restitution. Daniel B. Karron, president and chief technical officer of Computer-Aided Surgery, Inc., (CASI) had received a $2 million Advanced Technology Program (ATP) grant from the National Institute of Standards and Technology (NIST) in October 2001. The grant was payable over 3 years in increments of approximately $800,000 per year for specific use in designated research.
In 2003, NIST requested an audit by OIG because Karron had submitted several mismatching versions of his actual grant costs in required reports. The OIG Office of Audits examined Karron's use of the grant funds from 2001 to 2003, found he had not been spending the money properly, and NIST suspended the grant. OIG's Office of Investigations later determined that Karron, 52, had spent approximately $500,000 of the ATP grant funds to pay for numerous personal expenses, including rent, home renovations, cleaning services for his condominium, restaurant meals, and miscellaneous household items.
In delivering the sentence, U.S. District Judge Robert Patterson stated it is crucial that grant recipients face serious criminal consequences for committing fraud. This case was OIG's first conviction at trial for a fraud case involving research grants made by NIST's Advanced Technology Program. From the OIG Website at http://www.oig.doc.gov/oig/investigations/000584.html
[43] SNOWDEN in CROSS EXAMINATION BY MR.RUBINSTEIN: Q. And in your discussions with either Lee Gurfein or Dr. Karron about the deductibility of the rent did you suggest to either of them that they could increase Dr. Karron's salary and he could pay the rent out of an increase in salary?
A. No.
Q. I mean he could do anything he wants with his $175,000 that he gets paid in the initial year, correct?
A. If he gets a paycheck, just like me and you when we get our paycheck, you can do whatever you want with it once you're paid for services rendered.
Q. And in fact you approved the second year budget for CASI, did you not?
A. Yes, I think funds for year two was approved.
Trial Transcript Page 381 *ff* Lines 10 *et seq.*

she used her salary line to fund her personal her piggy bank, nothing more. The simplest trace of Karron's funds easily proves this[45]. Karron's conviction was for willful misappropriation: She was spending her own money on otherwise disallowed and unallowable items, or negotiations had already given her permission, or it was determined that no specific permission was needed to spend ATP funds on these items, albeit retroactively.

Finally, we will show hard forensic evidence that **all** of the above issues disappear into thin air, like a bad dream. It is a matter of math and logic. The evidence was there all along; it took a fresh look, outside the 'box'[46] and at the ground truth[47]

---

[44] MR. RUBINSTEIN: Q. Now, did there come a time that you learned that Dr. Karron had taken any loan from the funds, the ATP funds of $75,000?
A. I heard -- I wasn't -
THE COURT: No. Did you -
THE WITNESS: Did I ever hear that?
THE COURT: In your capacity.
THE WITNESS: I heard that.
Q. And did you have any conversations with Dr. Karron about that $75,000?
A. No.
THE COURT: When did you hear it?
THE WITNESS: From Joan Hayes.
THE COURT: What?
THE WITNESS: From Jones Hayes the auditor.
Trial Transcript Page 382 Line 10 *et seq.*

[45] "Tracing is thus neither a claim nor a remedy. It is merely a process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property."- (Foskett v. McKeown, 2000),the seminal British case in which a trustee used trust money together with some of his own money to purchase a life insurance policy. Then he committed suicide. The insurance company paid out to his family. There is controversy as to what the true basis is of this trust.

[46] Thinking outside the box (sometimes erroneously called "thinking out of the box" or "thinking outside the square") is to think differently, unconventionally or from a new perspective. This phrase often refers to novel, creative and smart thinking. This is sometimes called a process of lateral thought. The catchphrase, or cliché, has become widely used in business environments, especially by management consultants and executive coaches, and has spawned a number of advertising slogans. To think outside the box is to look further and try not to think of the obvious things, but try and think beyond that. (Wkipedia , 2010)

[47] Ground truth is a term used in the military, cartography, meteorology, or other situations where representations of the truth are gathered at a distance. Ground truth refers to information that is collected "on location.", in auditing it would be from raw source documents  The collection of ground-truth data enables calibration of remote-sensing data, and aids in the interpretation and analysis of what is being sensed.
More specifically, ground truth may refer to a process allows supervised classification to help determine the accuracy of the classification performed by the remote sensing therefore minimize errors in the classification such as errors of commission and errors of omission.

## 10.     Grounds Two: The grant funds were not spent beyond the statutory flexibility limits

The total spending was within the acceptable statutory and ATP variation limits of plus and minus 10% between any budget categories.

The main basis for Grounds two is that the base for the percentage variation must necessary and logically be fixed, and must be the entire grant budget, not solely the government's funded amount to date. It can not also be the first year budget including co-funding and all direct costs and indirect costs, but the entire budget, including proposer funded direct costs (Budget Line Item 1I) and proposed absorbed indirect costs (Budget Line Item 1J).

Both Prosecution and Defense did not how the ATP grant works, as distinguished from other grants and funding vehicles. Grant rules and special ATP statute allows plus or minus ten percent variation without the need for prior approval. Approval was being negotiated to preserve change budget margins. However, the budget negotiations cut off abruptly without any apparent reason. We surmise that the real reason was the revelation by the accountant that the PI was a transsexual about to have her surgery. The budget worksheet details the requested changes, none of which was out of the ordinary. It was not until the trial that it discovered that accountant poisoned the negotiations and the Special Agents were brought on the scene. The grant statute and rules do not spell out or specify the budget base amount on which spending can vary in relation to. Total spending is not just the amount the government put in, but the total amount Karron/ CASI were budgeted to put in plus the amount the government sponsor puts in. The

---

An example of an error of commission is when a pixel reports the presence of a feature (such as trees) that, in reality, is absent (no trees are actually present).
An example of an error of omission is when pixels of a certain thing, for example maple trees, are not classified as maple trees. The process of ground truthing helps to ensure that the pixel is classified correctly.
In US military slang, "ground truth" is used to describe the reality of a tactical situation as opposed to what intelligence reports and mission plans assert the reality to be.
"Ground truth" may be used in the scientific vernacular to refer to the presumed objective reality of a statement or situation, in contrast with some predicted or computed expectation of reality. "Is (x) ground truth?" is a way of asking "Is x really what is going on, objectively, versus some evidential claims we are making?"

issue of the correct change base to use was never brought up at trisl.  On a $2,100,000 projected budget such as here the allowed budget variation is $210,000 that may be moved from one category to another without a budget amendment.  This means that the total variation is $420,000 across all categories, with 210,000 may be moved from subcontractors to equipment WITHOUT PRIOR APPROVAL, for a gross change of $420,000.  Effectively, if the project were re-started now, it would be possible to complete the program without any budget changes, but the change margins would be very narrow.  Unexpected variations in spending could exceed the margin of unapproved changes.  The prudent action to take if the project were restarted would be to renegotiate a new budget prior to starting to maintain safe margins.

### xxvi.    Rule of Lenity

In the criminal context of the civil grant rules, the ambiguity of the change base must be interpreted for criminal purposes with the statutory interpretation demanded by the rule of Lenity.

The judiciary interprets how legislation should apply in a particular case as no legislation unambiguously and specifically addresses all matters. Legislation may contain uncertainties for a variety of reasons:

- Words are imperfect symbols to communicate intent. They are ambiguous and change in meaning over time.
- Unforeseen situations are inevitable, and new technologies and cultures make application of existing laws difficult.
- Uncertainties may be added to the statute in the course of enactment, such as the need for compromise or catering to special interest groups.

Therefore, the court must try to determine how a statute should be enforced. This requires statutory construction. It is a tenet of statutory construction that the legislature is supreme (assuming constitutionality) when creating law and that the court is merely an interpreter of the law. In practice, by performing the construction the court can make sweeping changes in the operation of the law.

In construing an ambiguous statute, the court should resolve the ambiguity in favor of the defendant. See McNally v. United States, 483 U.S. 350 (1987); See, e.g., Muscarello v. U.S., 524

U.S. 125 (1998) (declining to apply the rule of lenity); Evans v. U.S., 504 U.S. 255 (1992) (Thomas, J., dissenting); Scarborough v. U.S., 431 U.S. 563 (1977) (Stewart, J., dissenting); See United States v. Santos (2008).

## A. THE NIST ATP BUDGET REVISION PROCESS

As we see from the 15 CFR § 14.25 budget revisions were not prohibited as long as the purpose was consistent with the original appropriation. Never was there any question that Karron's conduct was inconsistent with the original appropriation. The only allegations were 'pot shots' at specific cost items, without identifying the source of the funds for these items. Further not all spending or spending that would produce an effective budget change requires a formal budget revision, or even ATP acknowledgement; only notification was requested.

While the Defendant can show positive notification and involvement of ATP management, as part of the 'Substantial Involvement' of ATP, ATP was not required to answer or generate a budget revision for each notification. Frequently the answer was that no budget revision was required to make the change. These were frequently just phone calls or comments in other conversations. At one point, Lide or Orthwein asked that Karron not natter them with proposed changes… it would be too much work to do it piecemeal, and batch it up for an end of year revision. Unfortunately, documentation about this communication did not survive to now except as line items phone call charges..

Finally, approval for overhead charges was never required, as it was not funded with government funds. Yet the prosecution seems to feel that 'Substantial Involvement' gave them the authority to retroactively second guess costs not paid with government funds (Shoe Racks, Coffee Makers, Blender, Repairs Construction, Cleaning Services, came up in the trial)

Further, many non-budget changes were never specifically acknowledged; some were (Amendment #1) the only evidence of budget change was the issuance of a budget revision, but

such revision never contained specific recitations or acknowledgement of the permission for the detailed changes requested as part of the budget change[48]. This information was in the budget worksheet, which was submitted with a budget revision, but was not a part of the approved budget amendment. This means that permission for specific subcontractors, employees was NEVER made part of the formal approved budget. While ATP wanted notification, they were not required to provide an acknowledgement or blessing for many of the items the Government is alleging were not allowed. The Plaintiff's allegation of willful disobedience does not hold up in the light of the evidence of Karron's continuous e-mail stream, technical quarterly reportage, and regular budget revision submissions.

---

[48] A cursory review of amendments 1 through 6 substantiates the uneven nature of formal amendments: it was uncertain, especially if it came to money changes, exactly what was being authorized. See Amendment change review and Analysis section<<DON'T forget to do this>>.

In October 2002, ATP Orthwein and Lide conducted a second site visit after the first year

to confirm that CASI was indeed working toward its original program goals. The progress

metrics are impossible to fake. The CASI record of publication and promulgation was in

accordance with the requirements of the ATP Statute[49]. The publication generated from this

project have been regularly cited by future publications, as shown in the citation analysis in the

Declaration of Karron. The result of the site visit was that ATP was satisfied that the project was

technically stable, if not unstable in its business management. The two ATP trip report was never

brought into evidence[50]. Cleary Karron was focused on the technical side of the shop and Hayes

---

[49]§ 295.8  Intellectual property rights; publication of research results. ( c) Publication of research
results: The decision on whether or not to publish research results will be made by the funding
recipient(s). Unpublished intellectual property owned and developed by any business or joint
research and development venture receiving funding or by any member of such a joint venture
may not be disclosed by any officer or employee of the Federal Government except in
accordance with a written agreement between the owner or developer and the Program. The
licenses granted to the Government under §295.8(b) shall not be considered a waiver of this
requirement.

[55 FR 30145, July 24, 1990. Redesignated and amended at 59 FR 667, 669, Jan. 6, 1994; 63 FR
64414, Nov. 20, 1998]
[50]MR. RUBINSTEIN: Q. What, if anything, about the budget did you
discuss during this visits?
A. We discussed proposed changes in equipment categories. Also,
since there were new people there, we asked for justification of
what those people were doing, whether they were on ATP funds or
not. Because, as we said, for them to be working on our project,
they need prior approval. So we explained the need for a revised
budget request and documentation to substantiate it.
Q. Did you have this conversation with Dr. Karron as well?
A. Yes.
Q. Now, Ms. Lide, was this the only site visits you made to
CASI?
6 A. No. That was in May of 2002, and the budget issues
continued over the summer, and so the project management team
felt it imperative to have a voice-to-voice conversation again
with Dr. Karron, and we paid another site visit in October of
2002. …
Q. What did you hope to accomplish going back the second time?

was gleefully meddling with the bookkeeping with Spring. This is indicated because Hayes was

attempting to get Spring to use quad entry "fund accounting"[51] to re-create CASI's quick books

A. What we hoped to accomplish was to have a discussion to try to iron out the budget differences, because that had become a major issue in this grant, was to get a budget that the awardee could live with, and yet met the government rules and regulations.  By this time, if you remember the dates correctly, the first year of the grants was over.  So what we hoped to explain to the recipient was by then it should not be an estimated budget any more; he should be able to produce actual costs for year one.
Q. Did you discuss this with Dr. Karron?
A. Yes.  At that point we started requesting the actual figures for the year one, what had actually been spent.
Q. And what, if anything else, did you discuss with the defendant about the budget during this second site visit?
A. Typical issues were equipment and justification of who was working on the project, personnel who was working as an employee versus subcontract. We had trouble getting our hands on that.
Q. And what did you tell Dr. Karron that he had to do?
A. Submit a revised budget with justification for the changes in equipment and who was working on the project under ATP money and in which category, subcontractors or employees.
Q. Now, aside from these two site visits, did you have other in person meetings with the defendant?
A. Yes. There was one, possibly two times that the defendant came to NIST and we had discussions with him there.
Q. What did the defendant say about the purpose of the meeting?
...
A. Once again, the budget was the big deal, to iron out the budget was the main issue.
Q. And what did you discuss when you met?...
A. The changes that were proposed and the need to document them justify them and get written approval before the project could go forth with the new budget.
Q. And what, if anything, did you discuss relating to the technical aspect of your project?
A. We also tried to look ahead, because the project would need some technical input and changes in year three because it was going to use some human and animal subjects.
Trial Transcript Pages 126 *ff* Line 18 *et seq.*

[51] Fund accounting is an accounting system emphasizing accountability rather than profitability, used by non-profit organizations and governments. In this system, a fund is a self-balancing set of accounts, segregated for specific purposes in accordance with laws and regulations or special

using two copies of "Quicks Books" to track funds.  As Dunlevy, the forensic bookkeeper found

when she attempted to reconstruct CASI's books "There were dozens of half done sets of CASI

QuickBooks none of which were usable or remotely correct. What in the world was Spring doing

for all the hours he billed CASI?  What kind of supervision was Hayes providing ?"  Karron gave

Hayes free reign and no supervision with the accounting, and Hayes and Spring managed to trash

it in time for the OIG Audit.  Spring and Hayes never were able to provide a set of books, but

Hayes was able to provide the OIG an audit behind the scenes in June to Riley..  But Riley

testified that "the books were never ready"(see footnote).  Yet Hayes was able to give Riley an

Audit Report, without a set of books.  This only leads to the conclusion from the numbers flying

around in this case that the numbers are made up.  Because of this mayhem in the CASI back

office accounting, Karron and Ross never had access to sound accounting and project actual

figures. In fact, it was Hayes and .Spring's unstable actual numbers to Ross that allegedly

triggered the audit, according to Snowden.

    When Riley came out to audit CASI, Frank Spring was still not finished with this

"Sisyphean task".

> RILEY: Frank Spring, I guess Frank Spring was creating a new
> general ledger or a new ledger system or journal entry
> system for CASI at the time I was there.  When I called to
> schedule the initial appointment, CASI couldn't meet with
> me because they were in the process of redoing their books
> and records, and so it delayed my visit for a couple of
> weeks to give them time.  When I arrived, the new books
> weren't completed yet, so they were going to be completed
> the next day so I waited till the next day.

---

restrictions and limitations. http://en.wikipedia.org/wiki/Fund_accounting . This is a very labor
intensive way to keep books, and inappropriate for a small startup business with only one grant,
yet the Ken Jackson Group and Frank Spring were running up costs unnecessarily and not able to
keep any kind of book for CASI with Hayes meddling.

Trial Transcript, Page 472  Line 33 *et seq.*

The Defendant, as PI accepts responsibility for the people who worked under her, but finds the very same employees shielding their incompetence by turning on CASI and Karron.

## B. TACIT v EXPLICIT PERMISSION STANDARDS AT ATP

The ATP cooperative agreement is not a contract for how to conduct a project. It is an enabling mechanism to achieve project goals to the benefit of both the nation and the company. It sets only the broadest parameters for how the federal component of a project is to be spent. It does not specify how the non-federal component of the funding is to be spent. It does not dictate how to accomplish this, when or what it will cost. While CASI did attempt to segregate funds, with two checking accounts with two different color checks (Green checks for general CASI spending, and Burgundy Checks for NIST ATP Program spending) apparently the audit was completely account and color blind. Even so, ATP seemed to want to have control over non-atp employees and their activity<<CITATION TO TRANSCRIPT>>, a clear overreach of federal control. It does not specify employees, thought direct employees and contractors are vetted and approved by ATP management. The government has not provided any evidence of specific contactor or employee approval contained in the estimated 3 year budget form. A budget can not be arbitrarily limited if the intent of the program is preserved. The sole expression of program intent is not contained in the budget. There was no particular wisdom in the unrevised CASI budget. Without the amendments pending it was possibly unlivable. More funding was required for overhead, and this was accomplished by funding from Karron's salary line. The budget is not a device to put companies out of business by forcing them to go bankrupt with unlivable budgets. As Lide said during testimony

> "What we hoped to accomplish was to have a discussion
> to try to iron out the budget differences, because that had
> become a major issue in this grant, was to get a budget
> that the awardee could live with, and yet met the
> government rules and regulations.
> Trial Transcript Page 1228 Line 2-5

As we will show, the accommodations toward a "budget that the awardee could live with" were made and then disavowed. Something happened, unexpected. Lide's contention that there were long standing concerns were not borne out by the e-mail trail<<CITATION HERE>> showing the shutdown request was completely unexpected and a shock to all concerned. ATP did not want this project shut down, someone else did. ATP does not have any valid reasons not to amend the budget as CASI tried to amend it. Aside from concerns about CASI back office management, why could CASI and ATP not come to terms? It was something else, someone else that wedged the budget re-negotiation process. Not just incompetent accountant and bookkeeper trying to force the PI to cede budget control. To this day ATP has not terminated the project, it is still in suspense. *See Browning Closeout Letter and Response.*

## 11.    Grounds Three: Conviction foundation laid on erroneous, misleading, and false data.

The trial evidence and testimony is festooned with falsehoods, misrepresentations and lies. We will consider each in turn from the record with a correction.

The judge could not have said it better when he finally had to look at the numbers for sentencing:

> THE COURT: "Look at that ...[GX 114]. This is a mess".
> Sentencing Transcript Page 16 Line 14-l

Prosecutorial zeal to convict.

Innumerate Math Errors

Errors of fact and Material Errors

## A. **Plain Errors in Facts at Trial**

Evidence at trial showed that the Defendant expected an audit resolution. What was not brought at trial is that the expectation for negotiation was based on Karron's certain knowing that she was spending his own funds. For this reason she was convicted.

(1) That Dr. Karron had a reasonable expectation that she was entitled under the CFR to challenge the Hayes and OIG Audits through the statutorily mandated appellate process;

(2) That Karron was denied the right to such an appeal;

(3) That the Hayes audit was unverified;

(4) That, in fact, that audit was incorrect; and

(5) That the defendant fully complied with the administrative regulations embodied in 15 CFR part 14.

### i.   **Government Foundation Accounting Plain Errors**

Specifically, the government presented the testimony of Belinda Riley, an assistant regional inspector general for audits at the Department of Commerce, Office of the Inspector General. Trial Transcript Page 462. Ms. Riley performed an audit of CASI in the spring of 2003 and over defense objection she was qualified as an expert. Trial Transcript Page. 466, 475. During the course of her testimony, it became clear that the witness had relied heavily upon the first year audit report by Joan Hayes (hereinafter "the Hayes audit"). Trial Transcript Page. 469. Hayes, who was not called by the government as a witness, had served as Dr. Karron's personal

accountant, accountant for CASI, and as an "independent" auditor for NIST compliance purposes. Trial Transcript Page. 783.

### ii.    Riley copied from Hayes

Moreover, although it was clear that Ms. Riley relied upon the Hayes audit, she did not produce any of the documents or notes she used to create her audit. While Ms. Riley testified, on direct, about the disallowed expenses; during cross-examination it became clear that she could not defend her conclusions. For example, Riley claimed that Dr. Karron did not contribute to CASI and the NIST ATP Project despite being confronted with $36,000 worth of checks from the defendants personal bank account to CASI. Trial Transcript Page. 787-88, Exhibit FFF. Likewise, Ms. Riley was unaware of the defendant's monthly salary (See Above). She incorrectly attributed $129,850 as "loans" to the defendant. Trial Transcript Page. 796-97.

At trial, the Defendant counsel incorrectly conceded the original $75,000 salary advance as loan. Defense counsel contended said loan was repaid during the first year of the grant as part of Dr. Karron's tax paid salary. What was not made clear, but should have, was that the proceeds of this loan were used to fund program and non-program startup costs and old bills,

Ms. Riley's claim of an additional $54,850 in loans is totally unsupported by the evidence. We can only speculate, in the absence of evidence to the contrary, that Hayes incorrectly classified legitimate expenses as loans – and that recording was adopted by Riley. Defense Exhibit P-6, is an example salary check dated August 2, 2002. The gross amount of the check is $61,918.07 but the net amount is only $5,675.03. The adjustment between the gross and net amounts is an adjustment for the $75,000 salary advance.

We can only speculate, in the absence of evidence to the contrary, that Hayes incorrectly classified legitimate expenses as loans – and that recording was adopted by Riley without any critical analysis. *See* Govt Ex. 110, pp. 38-44.

Riley did not know what those items classified as loans were for, but just that they were recorded that way. *Id.* Clearly, she was relying upon documentation, most likely the Hayes audit, that the defendant was precluded from cross-examining her with because she did not have them with her.

Even more incredibly, Ms. Riley did not give Dr. Karron credit for uncollected salary, T. 802-08. Additionally, her method of concluding that Dr. Karron had received $200,488 in salary was equally misleading. She included the withholding portion of the fringe benefits as part of his salary, as well as the difference between loans she determined were received by the defendant as offset by the amount she determined was paid back on those loans. T. 803, 805-7. She did not, however, provide a basis for how she determined these figures. While obviously, the conversion of fringe benefits to salary would require payroll taxes, Ms. Riley's calculations represent an accounting entry and no actual money was expended. Moreover, fringe benefits were, under the budget, separately calculated. More importantly, the evidence adduced at trial showed that the ATP grant was governed by the administrative rules found in 15 CFR part 14. And included in that section, was a provision that allowed grant recipients to challenge an auditor's determination that certain expenditures be disallowed. T. 809.

### iii.    Grant recipients were to be treated on a case by case basis

Moreover, grant recipients were to be treated on a case-by-case basis. T. 746; 15 CFR

14.4. So although there is a post-audit appeals process, "an audit resolution", Dr. Karron was

denied the right to an audit resolution.2 T. 809, 810.

> 15 CFR 14.62(b) provides: "[i]n taking an enforcement action, the awarding
> agency shall provide the recipient an opportunity for hearing, appeal, or other
> administrative proceeding to which the recipient is entitled under any statute or regulation
> applicable to the action involved

Had the defendant been given the opportunity to challenge these hostile audit findings in

an audit resolution, Dr. Karron would have been entitled to substantiate what had already been

negotiated as allowable and use the already considerable overfunding to assume costs that were

not allowable. T. 810.  The main post conviction finding here is that Karron had already

overfunded the project and had funded disallowable costs with non government CASI funds, and

this information was not known to Defense Counsel, and suppressed by the Prosecution.

### iv.    Karron negotiations successful and suppressed

Dr. Karron had already successfully negotiated with NIST over the payment of utility

bills, which are usually disallowed as indirect costs. T. 780. She had every reason to believe that

she could successfully negotiate some of the disallowed expenses – or in the alternative negotiate

a settlement ot use the excess of private funds in play.

Moreover, since there was no appeal permitted, Riley's audit, and its many inherited and

inherent flaws, was never challenged, much less reviewed.  T. 810.  Likewise, it is fair to infer

that the Hayes audit was not reviewed either.

v.    **Hayes Hostile Audit motivations**

There is no evidence that Dr. Karron influenced Hayes' audit – as auditor, despite her relationship to CASI, she made overtly hostile determination how financial events and transactions were recorded in a never completed set of 'new books'. Without any set of books, she was still able to "audit" CASI. In effect, Dr. Karron is being held criminal liable for Hayes' condemnation by choice of classifications while he was denied the opportunity to challenge those determinations administratively. New Evidence now reveals that Hayes was lying, attempting a cover up, possibly attempting to gain control of CASI and cover a possible crime on her part by framing Karron for this one.

We submit, that the defendant's good faith belief that he would be provided the opportunity to defend CASI expenditures through administrative channels negates any finding that she intentionally violated 18 U.S.C. § 666(a)(1)(A). This conclusion is not altered by the government's argument that payment of the rent or the seventy-five thousand dollar salary advance is evidence of the defendant willfully and knowing misapplication of ATP grant money. The $75,000 was salary; and once Dr. Karron received his salary, the money could be spent in any way; including rent. While this may not be the most intelligent use of Karron's funds, it is not criminal. In other words, the rent paid was paid out of Dr. Karron's legitimately earned salary. As Dunlevy shows in her analysis, there is still sufficient funding to cover other overhead and disallowed costs, and make co-funding of direct costs. <<Dunlevy Declaration >>. Also, the kick-off meeting wherein the rules were explained to the defendant occurred after the $75,000 salary advance was taken by the defendant. T. 202. However, this salary advance is still not impermissible, nor does it require a budget amendment, or any permission whatsoever. In the same way that not drawing salary does not require permission to do so. The government's

application of rules to benefit itself and not apply budget guidelines when it does not benefit itself is disingenuous and unfair. Secondly, based upon Karron successful negotiations regarding the utilities,. Karron was optimistic that he would be able to negotiate rent as an "indirect cost": as an allowable expense. In the ultimate analysis, post conviction, it is clear that Karron's rent, while not allowed as a direct cost, was reclassified as Salary. This fact was buried in Government Exhibit 114.

At trial government relied heavily on the presumption that proof of Dr. Karron's intent to misapply the ATP funds was demonstrated by the defendant's apparent willful, knowing and contrived apparent failure to comply with the "spirit" of administrative rules embodied in 15 CFR 14. The government is clearly incorrect in retrospect. Karron was successful in renegotiating exceptions and allowances. By suppressing Karron's contribution, it created the illusion of knowing misapplication. The knowing was that Karron knew she was spending her own contribution on costs that were eventually admitted, then suppressed. The government attempted to cover-up its explicit granting of permission to Karron on two nominally disallowed indirect costs, Rent and Power.

In fact, the common theme throughout the regulations, is the acknowledgment that budgets are not fixed and can be subject to significant revisions without prior approval. First, according to 15 CFR 295.2(h), the definitions section, while defining indirect costs as

> "costs incurred for common or joint objectives that cannot be readily identified with activities carried out in support of a particular final objective,"

there is the clear provision that

"ATP shall determine the allowability of indirect costs in accordance with applicable Federal Cost principles."

15 CFR 295.2(h).

Certainly, based upon Dr. Karron's own experience regarding payment of utilities, it is clear that the payment of indirect costs, *may* with approval, be reasonably allocated and paid for with grant monies.  Here, the only work being performed out of Apartment 4H, 300 East 33 Street was the ATP project, and was easily allocable. Likewise, and with the same spirit, it is acknowledged in 15 CFR 14.4, that "exceptions" would be addressed "on a case-by-case basis." 15 CFR 14.4.  As the facts now show, these exceptions were granted and then suppressed.

Therefore, Dr. Karron's the rent included within the scope of the grant was not evidence of wrongdoing but rather his attempt to comply with the regulations.  In the case the rent was reclassified as Salary, a reasonable compromise which Lide terms "both sides could live with".

Nonetheless during its case-in-chief, the government claimed that all alterations to the budget required prior approval under the CFR regulations. This is simply not true. 15 CFR 14.25 defines the times wherein a grant recipient was required to obtain prior approval and none of those situations were present in the instant case. For example, 15 CFR 14.25(c) lists the specific instances were a grant recipient was required to prior approval for program or budget related reasons. That regulation reads as follows:

(c) For non construction awards, recipients shall request **prior approvals** from the Grants Officers for one or more of the following program or budget related reasons. Approvals will be provided in writing by the Grants Officer.

(1) Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval).

(2) Change in a key person specified in the application or award document.

(3)The absence for more than three months, or a 25 percent reduction in time devoted to the project, by the approved project director or principal investigator.

(4) The need for additional Federal funding.

(5) The transfer of amounts budgeted for indirect costs to absorb increases in direct costs, or vice versa, **if approval is required by the DoC.**

(6) The inclusions, unless waived by the DoC, of cost that require prior approval in accordance with [ . . . ] 48 CFR part 31, "Contract Cost Principles and Procedures as applicable."

(7) The transfer of funds allotted for training allowances (direct payment to trainees) to other categories of expense.

(8) Unless described in the application and funded in the approved awards, the subaward, transfer or contracting out of any work under an award. This provision does not apply to the purchase of supplies, material, equipment or general support services.

15 CFR 14.25(c)[emphasis supplied]

The above-described circumstances are the only times when a recipient *must* seek prior approval prior to making a revision, according to the regulations.  For some of these provisions, including 15 CFR 14.25(c)(5), only require prior approval if required by the DoC. Dr. Karron was aware that the budget revisions CASI sought may not be approved, but accepted the risk that if not accepted, CASI would be financial responsible for restoring the original budget after appropriate budget negotiations.

It is clear that Dr. Karron believed, based upon representations made by NIST, that a budget could be revised after the fact, retrospectively. In fact, this was expected,. At the end of the budget year, a budget revision, giving actual spending figures, was used to make a new budget, retrospectively, with retroactive effect. Lide, during her testimony conceded that the information package give to CASI at the kick-off meeting on November 8, 2001, could be understood to all for the submission of a revised budget after all of the costs were reviewed at the close of a fiscal year. T. 193. That slide, indicated in part, that

> "review costs at the end of the year and submit a revised budget and a narrative if changes have occurred." *Id.*

The evidence adduced at trial demonstrated that Dr. Karron acted in good faith and in compliance with the applicable federal regulations; which alone negates any inferences that may support a finding that the defendant acted with the intent to misapply the ATP funds. Dr. Karron's conviction must be vacated based on the new evidence and analysis that shows government failure present sufficient evidence of the defendant's did in fact actually violated 18 U.S.C. § 666(a)(1)(A)

That Ms. Riley feigns ignorance of this accounting machinations now seems incredulous because these extra withholding and journal entries were calculated and executed by Hayes; the very same accountant who Riley relied upon for most of her figures. Therefore, it is clear that Hayes and Riley colluded to pollute the accounting, obscure Karron's salary, and contributions.

## vi.   THE COURT'S FAILURE TO CHARGE A TRACING REQUIREMENT and acknowledge Karron's cofounding

Ordinarily, the government is not required to prove "tracing" to sustain its burden in prosecuting an 18 U.S.C. § 666 case. However, in this case, the Court should have included a

tracing requirement in its charge to the jury due to the unique facts and circumstances of this case. Moreover and as a direct result, the Court's charge on the third and fifth elements of the theft count were inconsistent and operated to remove the requirement that the jury find that the defendant acted knowingly and intentionally with respect to grant funds derived from ATP as opposed to CASI funds.

Indeed, it is now clear that Karron was convicted of misappropriating her own funds to pay for the budget line item 'indirect costs'. Not only is it impossible to have a project without any indirect costs, but these are *bona fide* costs, paid in the normal course of business and exempt from the reach of 18 USC §666. Had Karron actually misappropriated funds on undocumented costs not to any benefit of the project, such as prostitutes and vacation travel, the taint of misappropriation would be clearly present.

### vii.    A. Legal Standard for vacating judgment

Explained by the Court of Appeals,

"the ultimate test" "whether letting a guilty verdict stand would be a manifest injustice."

*United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)[internal quotations marks omitted].

Here, it is submitted that the Court's erroneous reliance upon case-law interpreting the bribery portion of 18 U.S.C. § 666 in determining that the government was not required to prove tracing in a theft/misapplication prosecution establishes good cause to vacate Dr. Karron's conviction, especially now in light of the rent and salary new evidence..

As detailed below, the Court's instructions on 18 U.S.C. §666(a)(1)(A) undermined the requirement that the government prove beyond a reasonable doubt that the defendant acted

knowingly and intentionally with government funds as opposed to defendants funds. Allowing the defendant's conviction to stand without sufficient proof of the defendant's actual violation 18 U.S.C. § 666(a)(1)(A)by misapplying non government funds not subject to ATP grant rules would be manifestly unjust.

The standard of spending would be that as long as sufficient invoices for allowed or allocable costs can be presented as proof of spending of federal funds, the existence of non program costs does not imply misapplication of federal funds. The shoe rack, coffee maker, home construction were all funded out of Karron's pocket if all of the government funds were adequately spent on program costs. The goverments position that any non program spending or indirect spending is prima facae evidence of misappropriation can not hold if there is any non federal co-funding. Indirect costs and their absorption by the proposal are buit into the budget, at lines J and I.

### viii.   The Government must Trace Misapplied Funds To the ATP Grant Funds

In the case at bar, Dr. Karron was charged with theft under 18 U.S.C. § 666(a)(1)(A) and not with bribery under §666(a)(1)(B) or § 666(a)(2). The government based its argument on the premise that CASI was solely funded by the ATP grant and therefore any CASI monies spent in a manner inconsistent with the ATP grant budget classifications were, by definition, misapplied. However, the government's theory ignored contributions made by the defendant to CASI by means of foregoing the bulk of the $175,000 yearly salary allotted to him through the ATP grant.[3] Simply put, monies cofunded by Dr. Karron, were not necessarily subject to the restrictions of the Federal ATP grant funds. Yet the Court's instruction with respect to the Fifth Element of § 666, coupled with the government's erroneous theory of prosecution, served to conflate CASI funds with ATP funds.

Unfortunately, the Court's failure to require that the government prove that the misapplied funds were directly traceable to the ATP grant rendered the crime charged one of strict liability, to wit, that the spending of CASI monies in a manner inconsistent with the grant – regardless of the source of those monies – was a crime. Clearly Karron can not steal from herself. Specifically, with respect to the Third Element, the Court in part, instructed the jury that the government was required to prove that:

> "During that one-year period, the defendant without authority intentionally misapplied the grant money." J.C. at 18.

However, authority can be derived from the applicable line item for each and every item, even if it is an indirect cost, as it does have a line item and it can be absorbed by the proposer.

Under this standard it is clear that the government was required to prove that the intentionally misapplied funds were ATP grant monies, not merely CASI funds, in order to sustain its burden of proof. However, the Court's latter instruction regarding the Fifth Element of the crime destroyed that standard:

> The fifth and final element the government must prove beyond a reasonable doubt is that the value of the intentionally misapplied money was at least $5,000.

> The word "value" means face, par or market value, or cost price, either wholesale or retail, whichever is greater. "Market value" means the price a willing buyer would pay a willing seller at the time the property was intentionally misapplied.

> You may aggregate or add up the value of money intentionally misapplied from a series of acts by the defendant to meet this $5,000 requirement, so long as you find that each act of intentional misapplication was part of a single scheme by the defendant to misapply grant money under the care, custody, and control of CASI.

The government does not have to prove that the particular money misapplied by the defendant was the money received by CASI as a federal grant. In other words, it is not necessary for the government to show that the intentionally misapplied money was traceable to the actual federal grant received by the organization. Thus, if the government establishes that CASI received more than $10,000 in federal aid during a one-year period, and that, during that period, the defendant misapplied funds valued at more than $5,000 under the care, custody, and control of CASI, the government will have satisfied its burden with respect to this element. Money is fungible, and the government need not trace the $5,000 or more alleged to be intentionally misapplied back to the federal grant.

J.C. at 21-22.

As a result, the Court's charge regarding the Fifth Element instructed the jury that they need not find that the misapplied money is traceable back to the federal grant.

First, this instruction failed to recognize that some CASI monies, ie, money co-funded by Dr. Karron's unclaimed salary and loans to CASI, were not subject to the grant requirements.

Second, instructions regarding the Third and Fifth Elements of the crime presents conflicting standards:

(1) the misapplied monies must be grant funds, but

(2) the government need not prove that the misapplied monies were grant funds.

This was a critical issue as demonstrated by the government's opening and closing statements. At the beginning of trial, the Court deemed tracing the source of the funds to be a part of the government's burden of proof, stating:

"I think you do have to prove the trace – I don't think you have to trace the amount, but I think you have to show that the expenditure was made by using those funds."

T. at 10.

The government accepted that it would have to prove a connection between the ATP grant funds and the funds allegedly misapplied by CASI, wherein it argued in its opening that

"[y]ou will see how virtually 100 percent of CASI's income was from the grant funds and how those funds went to pay for all of the nonallowable expenses."

T. at 39.

The government intended to prove a traceable link between the federal funds from the ATP grant and the misapplied money; in other words, the government operated on the assumption that, at a minimum there needed to be a connection between the source of the funds and the grant.

It was clear, however, after argument and review of the Court's propose instructions, that the Court did not intend to require that the government prove a connection between the CASI funds and the those funds subject to the ATP grant rules. As a consequence the government's altered its theory of prosecution as demonstrated in its closing argument. In summation, the government argued that the sole issue here was

"what is in dispute in this trial? It all comes down to this: Whether the defendant intentionally misapplied $5,000 or more of funds under CASI's control to pay for unauthorized expenses."

T. at 1260-61.

The government dramatically alter their theory of prosecution as a result of the Court determination that no connection need be established between the CASI funds and the ATP grant.

### ix.    The 18 U.S.C. §666 Bribery Cases Are Factually Distinguishable from the § 666 Theft Cases and Should Not Have Been Relied Upon By The Court

The cases relied upon by the government in arguing it was not required to prove tracing do so from the bribery provision of 18 U.S.C. § 666. Those cases should not apply to a 18 U.S.C. § 666 theft prosecution. For example, in *United States v. Sabri*, the defendant was a real estate developer convicted of offering bribes to a city councilman in exchange for various regulatory approvals; 541 U.S. 600 (2004). The Supreme Court rejected Sabri's argument that the government had to prove a connection between the bribes and specific federal payments: "Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value." *Sabri*, 541 U.S. at 606. While this concept was adopted by the Court in its jury instructions, there is no recognition by the Court that the bribery aspect was central to the interpretation of § 666 in *Sabri*.

*United States v. Salinas* is another example of a § 666 bribery case in which the lack of a tracing requirement is largely attributable to the bribery element; 522 U.S. 52 (1997).

In that case, a sheriff and deputy sheriff accepted bribes from a federal prisoner in county jail in exchange for permitting "contact visits" (i.e. conjugal visits) to that prisoner. *Salinas*, 522 U.S. at 55. In rejecting the tracing requirement argument of the defendant, the Supreme Court carefully parsed the language of the statute:

> "The word 'any,' which prefaces the business or transaction clause, undercuts the attempt to impose this narrowing construction [i.e. the tracing requirement]."

> *Id.* at 57.

This language, analyzed so carefully by the Supreme Court, is found in § 666(a)(1)(B), the bribery provision, but *not* in § 666 (a)(1)(A), the theft provision.

There is a single Second Circuit case which takes the view that a tracing requirement may not be necessary with respect to the theft provision of § 666. In *United States v. Naiman*, the Court of Appeals determined that the government was not obligated to trace the misapplied funds to federal funding; 211 F.3d 40, 48 (2d. Cir. 2000). For a number of important reasons, however, *Naiman* is both distinguishable from and inapplicable to the instant matter.

First, *Naiman* concerned the activities of the director of a nonprofit community organization, whereas CASI is a for-profit organization controlled by the defendant. As discussed in the jury charge conference, a case involving a not for-profit organization should not apply to the circumstances surrounding a for-profit organization. T. at 1234.

Second, the court in *Naiman* found overwhelming evidence of the defendant's criminal intent without reference to tracing, stating: "[t]he evidence at trial amply showed that Naiman's conduct rose above a mere violation of accounting or banking rules and did not constitute innocent maladministration." *Naiman*, 211 F.3d at 48. This included the defendant's directing that fraudulent subcontractor checks be issued which were cashed as part of the theft scheme. *Id.* at 44. Here, the evidence showed a disagreement in how expenses should be characterized and Dr.Karron never sought to conceal any of those expenses. Thus, the situation in *Naiman* is markedly different from the instant matter, in which the evidence of criminal intent was much weaker and very much in dispute. It is submitted that the factual circumstances in *Naiman* are distinguishable from those of the instant case, and those distinctions render *Naiman* inapplicable here.

While tracing may not be required in bribery cases, a tracing requirement is appropriate for the theft element of 18 U.S.C. § 666. Bribery and theft are sufficiently distinct crimes that a tracing requirement may be applied to one and not the other with respect to § 666. A

straightforward comparison of the two crimes can be found in their definitions in Black's Law Dictionary. Bribery is defined as follows:

"The corrupt payment, receipt, or solicitation of a private favor for official action."

*Black's Law Dictionary* (8th ed. 2004).

*Sabri* represents a classic example of bribery: The defendant, a real estate developer, offered several bribes to a city council member in exchange for various regulatory approvals that allowed Sabri to skirt licensing and zoning laws. *Sabri*, 541 U.S. at 602-3. The defendant in *Sabri* intended to avoid following the letter of the law, and used his own personal funds to pay off public officials in under-the-table deals. This is a very different situation from the instant matter, in which Dr. Karron kept records of every transaction, both in his personal account and the CASI accounts, and in which said transactions were out in the open for all to see. In this 2255 action, we bring a new level of openness and analysis with the detailed analysis of Dunlevy and the revelation that the ATP program did make specific allowances in response to Dr.Karron's requests, and that these allowances were discovered in the prosecutions numbers, and that this evidence was ignored by both sides in the criminal trial.

In contrast to its definition of bribery, Black's defines

theft as follows: "The felonious taking and removing of another

23

person's personal property with the intent of depriving the true

owner of it." *Black's Law Dictionary* (8th ed. 2004). While this

does not accurately describe the conduct of the defendant, it

does provide a telling contrast to the definition of bribery.