The two offenses are quite distinct, and they merit different

treatment with respect to a tracing requirement. Dr. Karron was

charged with violating the theft provision of § 666, the jury

should have been instructed on a tracing requirement, and the

Court's failure to do so criminalized non-criminal conduct by

conflating CASI funds with ATP funds. The interests of justice

requires that this Court vacated the defendant's conviction and

order a new trial.

## B. Foundation of Conviction

Misapplication of funds have been affirmed without tracing ownership or source of funds

Prosecution withheld obscured and misrepresented evidence.

Prosecution Opening Statement

> THE COURT: " All right. We will now begin with the government's opening statement. Mr. Everdell.MR.
>
> EVERDELL: Thank you, your Honor. Ladies and gentlemen, the defendant, Dr. D.B. Karron cheated the government out of hundreds of thousands of dollars. **In 2001 the defendant got what many scientists can only hope to get.** He was given a $2 million grant from the federal government to conduct his scientific research, $2 million of taxpayer money, and the only thing that the government required in return for this money was that the defendant spend it on one thing and one thing only: **His research,** nothing else.[!?!?!]
>
> But the evidence will show that instead of putting that money towards his research, the defendant chose to spend much of that money on himself. For over a year and a half the defendant used the grant money as his own personal piggy bank to pay for personal expenses like **meals at restaurants, electronic gadgets like a GPS tracking device and a digital camera, even a blender[see blender end note] and shoe rack[see shoe rack end note] for his apartment,** and he bought all these things even though **he was already paying himself $175,000 in salary out of the grant funds.**
> Trial Transcript Page 33 *ff* Line 22 *et seq*.[Emphasis added]

Later, in sentencing, after the jury returned a guilty verdict:

MR. EVERDELL: `your Honor, because almost every single expenditure has some benefit to the research …" "… then there would be no loss at all,…"`
Sentencing Transcript Page 22 Line 22. And Page 23, 10-22  [Emphasis added]

The Prosecution laid a foundation for Karron's conviction based on two Exhibits, GX114, which was based on GX110 and GX111.  GX114 purports to analyze grant spending for the first year of the grant, for Fiscal Year 2001-2001 (October 1, 2001 through Sept 30, 2002). There was no discussion of the Second, short year grant spending.

x.     **Jury Charge**
xi.    **Jury Callback during Deliberations**
xii.   **GX114 and Readback of Benedict Testimony**
xiii.  **Sentencing**
xiv.   **Identification**

## C. Confusion and Obsfucation of Defendant's bona fide Salary

THE COURT: `You see what he did was -- I think it is borne out by the defendant's papers to some degree -- is he took a very low salary to pay back the loans. Is that a fair statement?`

MR. EVERDELL: `Your Honor, that fact that you just said, the fact that he didn't take his full salary, is taken into account`

THE COURT: `I didn't say that. I want to know whether you're disputing what I just said.`

MR. EVERDELL: `That I agree with is that, yes, `**`the defendant did not take his full salary in the sense that when you look at salary in checks, they are less than the $175,000 of quote unquote salary.`**

Sentencing Transcript Page 9 *ff*, Lines 21 *et seq.* [While this is not correct, the judge comes closer to the truth]

MR. EVERDELL: `This is a defendant, who under the grant in year one alone, `**`is given an annual salary of $175,000, $175,000 in taxpayer's money.`**` That's a lot of money for a lot of people, but not for this defendant because he kept misspending...`

`Sentencing Transcript Page 75 Line 20 `*`et seq.`*

## D. Detailed Analysis OF GX114 Errors [52]

That GX114 is in error is self evident, and has been referenced as "A Mess" by the Court.

Understanding the nature of each of the multiple errors is instructive and revealing. Are these

errors harmless[53], and without deeper meaning ? Or are these significant, plain errors[54], that bely

deeper truths?  What do the patterns of errors reveal about the NIST ATP project?  The natures

---

[52] Close Enough for Government Work? (Cotton, 2000)

[53] A harmless error is a ruling by a trial judge that, although clearly mistaken, does not meet the burden for a losing party to reverse the original decision of the trier of fact on appeal, or to warrant a new trial.  Harmless error is easiest to understand in an evidentiary context. Evidentiary errors are subject to harmless error analysis, under Federal Rule of Evidence 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.")[1]. The general burden when arguing that evidence was improperly excluded or included is to show that the proper ruling by the trial judge may have, on the balance of probabilities, resulted in the opposite determination of fact.

In the case of Earll v. State of Wyoming 2001 WY 66 29 P.3d 787, the Wyoming Supreme Court distinguished between reversible error (which requires a conviction be overturned) and harmless error (which does not), as follows:

"… Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. Jones v. State, 735 P.2d 699, 703 (Wyo. 1987).            "

In the evidentiary context, a harmless error is usually one where the evidence had no relevance to the issues to be decided by the trier of fact, evidence admitted actually helped the party seeking the reversal, or the remaining evidence was overwhelmingly against the party seeking reversal.

[54] "plain error". "Clearly Erroneous" Standard

Under the "clearly erroneous" standard, where a lower court makes a finding of fact, it will be reviewed for "plain error".  It will not be reversed unless the lower court has made a decision that has its basis in a plainly erroneous understanding of the facts. For example, if a court finds that the defendant was standing 30 feet from the curb, the appeals courts will not reverse this finding unless it is obviously in contradiction to the clear and undisputed facts.

In U.S. federal court, if a party commits forfeiture of error, e.g. by failing to raise a timely objection, then on appeal, the burden of proof is on that party to show that plain error occurred. If the party did raise a timely objection that was overruled, then on appeal, the burden of proof is on the other party to show that the error was harmless error. This approach is dictated by Federal Rule of Criminal Procedure 52, which holds, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded...Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." It should be noted that the appellate court has discretion as to whether or not to correct plain error. Usually the court will not correct it unless it led to a brazen miscarriage of justice.

of the errors in GX114 are clumsy and innumerate[55], not an error an accountant such as OIG

Auditor Riley would make.  However, Riley is repeatedly held forth as the author of this exhibit.

From analysis of Riley's work papers, and her experience as a punctilious award winning

auditor[56], and her honesty in admitting the [57] omission of reconciliation of her audit under oath[58i],

the Defense posits here that one person could NOT be simultaneously honest, numerate, a CPA,

and innumerate, and as clumsy with numbers as the execution of GX114 belies.

---

[55] Innumerate:  A term meant to convey a person's inability to make sense of the numbers that run their lives. Innumeracy was coined by cognitive scientist Douglas R Hofstadter in one of his Metamagical Thema columns for Scientific American in the early nineteen eighties. Later that decade mathematician John Allen Paulos published the book Innumeracy. (Paulos, 2001)

[56] Riley Expert Witness Resume, Page 5, AWARDS (Number 4 of 4 total)
2005 DOC Silver Medal Award for Meritorious Federal Service "For conducting a complex and unique **joint** audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT.[sic]"[emphasis added]:Further, the deference to credit for this project to a 'joint' collaborator begs the question if this was the CASI Accountant and Auditor Hayes being referenced as the joint author of her OIG audit for which she won commendation for.

[57] Issuing an audit report, without reconciling all accounts is a breach of AICPA professional ethics American Institute of Certified Public Accountants, AICPA Professional Standards As of June 1, 2008 Code of Professional Conduct and Bylaws.
http://www.aicpa.org/Research/Standards/CodeofConduct/DownloadableDocuments/2008Codeo fProfessionalConduct.pdf See also Ethics and the Auditing Culture: Rethinking the Foundation of Accounting and Auditing by David Satava1 , Cam Caldwell2 and Linda Richard, Journal of Business Ethics, Volume 64, Number 3 / March, 2006 Pages 271-284. " Recent high profile events indicate that the accountants and auditors involved have followed rule-based ethical perspectives and have failed to protect investors and stakeholders – resulting in a wave of scandals and charges of unethical conduct. In this paper we describe how the rule-based traditions of auditing became a convenient vehicle that perpetuated the unethical conduct of firms such as Enron and Arthur Andersen.... [We make] suggestions that the accounting and auditing profession should consider to restore public trust and to improve the ethical conduct of accountants and auditors.

[58] MR. RUBINSTEIN: Q. Did you do a bank reconciliation of the various bank accounts of CASI?
MS. RILEY: A. For this, for this audit?
Q. Right.3
A. No
Trial Transcript Page 473*ff* Line 24 *et seq*.  For the full context of this witness admission and the resulting defense objection and  sidebar discussion, see the below.

The Defense proposes that two people had their hands on GX114 without knowledge of what the previous person had deigned to denominate as Karron's Salary.  Before we delve into the *prima facie* issues with GX114, let us hear the District Court make the observations we will refine in proving our **"Two Authors in Isolation"** hypothesis.  Below we observe the District Court Judge Patterson as he tries to determine Karron's salary and issues of loss from GX114, *viz*:

```
THE COURT: You're willing to proceed on that basis?
MR. KWOK: The government is ready to proceed.
THE COURT: Then I guess the best way -- I don't know how
the parties think the best way to proceed, but it would
appear to me that the best way to proceed is by considering
Mr. Rubinstein's letter of October 17, which disputes the
computation of loss contained in the presentence report and
in the government's letter. I might say that I've had some
concerns about the loss computation. It's not clear to me
that a failure to get approval of expenditures from the
grant officer amounts to the same as an intentional
misapplication of funds. And to the extent that we have
here in this case, as I understand it, the final budget as
approved in December 2001, and subsequent to the
applications to amend the budget were not approved. So the
requisite documents that the Court has to examine of the
budget contained in -- is it Exhibit 12?
MR. KWOK: Your Honor, I think the last approved budget is
the budget attached to Government Exhibit 22. It's the
third page --
THE COURT: It's Exhibit 12.  Just a second.  Exhibit 12 is
the original budget that Dr. Karron signed. Then there is
Exhibit 20.  21 was just an administrative contact change.
Exhibit 22 contains the final budget approved -- amended
budget approved by the agency. So I have difficulties. For
instance, looking at Exhibit 20 and 22 and the fringe
benefits being allowed at 34 percent of salary, as I see it
in the documents.  I have difficulty also with the
tabulation contained in Government Exhibit 114 and 115
because they are just rough calculations, as I see it. I
don't know who compiled them, but I gather it was Ms.
Riley, but we never went into the detail about, for
instance, the statement in the tabulation that Dr. Karron's
salary budgeted.at 175, various cash. He spent 200,486,
```

**according to that tabulation.**  Those amounts, as I saw
them, err were salary.  They involved loans made which
someone, I don't know whom, I presume Ms. Riley, determined
the equivalent of salary.  As I alluded to earlier, the
fringe benefits figure in this tabulation -- **I'm looking at
114 says that Dr. Karron didn't spend $40,337 in fringe
benefits, and yet in the same tabulation it says that the
fringe benefits were not allowed and spent $4,081.**  That
whole scenario .of fringe benefits is somewhat illusive to
me.  The testimony, as I recollect it, was CASI, the
corporation, did not have a formal benefit plan and they
were endeavoring to compile one during the time of the
grant.  And instead what Dr. Karron did was to pay benefits
just as he was accustomed to paying them, for whatever
medical expenses the various employees had for their wives.
I have some difficulty in, finding that there was criminal
intent with respect to these expenditures, which are all on
Government 114, and with the manner in which those over
expenditures were computed.  It seems to me this is just a
rough calculation and not something that a Court could rely
on in a criminal case.  I'll hear from you.  **That's my
assessment of that proof.** [Emphasis Added]
Sentencing Transcript Page 3-5 *ff* Line 1 *et seq.*

The following section is the prosecution digging deeper and deeper into a mess much

worse than they realize.  No one at that time realizes the full and real meaning in the figures. The

Prosecution is being evasive on the backup for GX114 for the spreadsheets GX110 as discussed

below. The two prosecutors Kwok and Everdell attempt to argue and insist, with no factual

rational, that GX114 has any basis in reality or GX110, yet even the judge realizes he can NOT

make some combination of the numbers from GX110 come out on GX114.  Something is wrong.

MR. EVERDELL: Your Honor, I think; in fact, I know 114 and
115 are based on Ms. Riley's underlying analysis [GX110
??].
THE COURT: The spreadsheets.
MR. EVERDELL: Yes, the spreadsheets.
THE COURT: But it doesn't meet it because in her
spreadsheet she doesn't have any payment like $248,000
worth of salary in year one.
MR. KWOK: Your Honor, she does. [really ?]  That number is
the net transfers.

THE COURT: I've looked at salary, I think.

MR. KWOK: Including the tax withholding, I believe is the testimony that she testified to. When you take into account all the money that Dr. Karron took out from CASI, minus the amount that he paid back --

THE COURT: That isn't salary. We are talking about salary. I don't see salary. There is nothing like salary in those documents that equals 248 -- $200,488.

MR. KWOK: Salary is just a heading. What she meant by this is money that defendant took, pure money, not in terms of expenditure; cash that he took from CASI, whether in the form of quote unquote loan or whether in terms --

THE COURT: Show me. She has no tabulation putting [GX]114 into context with her [GX]110, Exhibit [GX]110.

MR. KWOK: If your Honor could look at Government Exhibit 110. it here.

THE COURT: I did look at Exhibit 110.

MR. KWOK: Page 38.

THE COURT: I have it here. I don't know that I have

MR. KWOK: Page 38 of 44.

THE COURT: I guess we will have to get 110, because I don't think I have it here, but I'm fully familiar with it. I think it's in Mr. Rubinstein's submission, as a matter of fact.

MR. KWOK: That page shows money going to the defendant and money coming from the defendant. So taking

THE COURT: What page are you referring to? Maybe it's in Mr. Rubinstein

MR. KWOK: 38 of 44.

THE COURT: He has · payroll. Looking at 13 of 44?

MR. KWOK: Page 38 of 44.

THE COURT: That's loan and loan repay. That's not salary.

MR. KWOK: If you look at the memo line, it is salary. Look at, for example, the third check, per check register, salary advance.

THE COURT: That one she treated as a loan.

MR. KWOK: These are expressed in a spreadsheet as loans, but they are all money going to the defendant.

THE COURT: I understand. It's just not salary.

MR. KWOK: You can give it whatever label you like, but the bottom line is, the defendant took from the company this much money which added to 188.

THE COURT: I don't doubt that's what your calculations are.

MR. KWOK: If I can just correct a misimpression, Government Exhibit 114 is not a rough calculation. It's not a guess. It's based entirely on Government Exhibit 110 which, In

turn, is based entirely on the bank records that she
reviewed.
THE COURT: They are certainly not in those records, a
showing of $200,488 in salary.
MR. KWOK: If I can explain how she got that number.
THE COURT: It's denominated salary. It's a table saying
salary. I don't care how she got the number.
Sentencing Transcript Page 5-7[Emphasis and Editorial Added]

### xv.    SPECIFIC PROBLEMS WITH GX114

    i.    The categories in GX114[59] appear *ad hoc* and do not correspond with the NIST 1262 official budget object class categories[60].

    ii.    There is no congruence between the two sets of categories with which to calculate percentage changes between.

    iii.    The % Column is incorrectly based. The base for percentage changes relative to budget is by statute to be 10 % of the federal **and** non-federal share.

---

[59] GX114 'Budget Categories': Subcontractor,
Dr. Karron Salary,
Other Employees' Salaries,
Equipment,
Dr. Karron Fringe Benefits ,
Other Employees' Fringe , Benefits, Travel ,
Materials / Supplies , Audits , Dr K Rent ,
Other- (Bookkeeping / Auto Exp / Bank
Processing Consultants / Lawyers / Dues
Subscriptions , Utilities , Dr. Karron Fringe
Benefits -Not Allowed ,
Other Employees' Fringe Benefits - Not allowed
Capital Improvement ,
Cleaning - D. Ferrand ,
Meals

[60] NIST 1262 Budget Form Categories    A. Personnel Salaries Wages,
    B. Personnel Fringe Benefits,
    C. Travel,
    D. Equipment,
    E. Materials/Supplies,
    F. Subcontracts,
    G. Other

iv.   The pie charts showing percent excess budget changes are therefore

misleading and incorrect.

| Amendment # 2 - 1/4/02 | | 10/1/2001 - | 10/10/2002 | | % |
| --- | --- | --- | --- | --- | --- |
| | **Budget** | **CASI Spent** | **Difference** | | **Difference** |
| Subcontractor | $250,000 | $75,962 | (174,038) | -69.62% | |
| Dr. Karron Salary | $175,000 | $200,488 | 25,488 | 14.56% | |
| Other Employees' Salaries | $150,000 | $141,922 | (8,078) | -5.39% | |
| Equipment | $110,000 | $189,819 | 79,819 | 72.56% | |
| Dr. Karron Fringe Benefits | $59,500 | $19,163 | (40,337) | -67.79% | |
| Other Employees' Fringe Benefits | $51,000 | $20,222 | (30,778) | -60.35% | |
| Travel | $20,000 | $10,914 | (9,086) | -45.43% | |
| Materials / Supplies | $11,000 | $26,364 | 15,364 | 139.68% | |
| Audits | $10,000 | $5,000 | (5,000) | -50.00% | |
| Dr K Rent | $0 | $60,000 | 60,000 | | |
| Other- (Bookkeeping / Auto Exp / Bank Processing Consultants / Lawyers / Dues Subscriptions | $0 | $43,592 | 43,592 | | - |
| Utilities | $0 | $16,341 | 16,341 | | |
| Dr. Karron Fringe Benefits -Not Allowed | $0 | $4,061 | 4,061 | | - |
| Other Employees' Fringe Benefits - Not allowed | $0 | $5,751 | 5,751 | | - |
| Capital Improvement | $0 | $11,248 | **11,248** | | - |
| Cleaning - D. Ferrand | $0 | $5,019 | 5,019 | | - |
| Meals | $0 | $1,936 | 1,936 | | - |
| Total Direct Costs | $836,500 | $837,822 | | | |

Figure 2 GX114 table only

The problem is that the **only** explanation that can account for the $200,488 salary figure

is to add in the **rent** and the **net loan** proceeds and apply 8.08% estimated tax loading on THE

RENT ONLY[61]. The very low net salary figure is also off because it ignores large journal entries

_____

[61]RILEY: A. By including the withholdings portion of the fringe benefits as part of the salary of what he received. It includes the salary, it includes the difference between the loans he received and the loans he paid, and it includes the fringe benefits. Trial Transcript Page 803 Line 22 *et seq.*

for salary advances taxes, made up by reclassifying early payroll loans as salary here as well[62].
That implies that the **rent** was reclassified to salary, at least at some time period in this saga.

### xvi.   The RENT paid to KARRON was reclassified as SALARY.

Under the terms of the Cooperative Agreement, ATP was substantially involved in CASI

affairs, as opposed to this being a regular grant[63].. There were no 'secrets', there was no 'fraud',

perhaps **except for Karron's gender dysphoria**[64]. ATP and CASI were actively negotiating

various budget and allowance issues from the very start of the project. It now appears, that all of

these requests [power, internet, benefits] were effectively granted, as revealed here and in the

original Riley audit work papers. Further, as we will show further on, the aggregate budget

changes did not rise to meet the plus or minus 10 percent budget permission threshold if the

appropriate base is used<<REFERENCE TO SECTION>>. We see this in many pieces of

evidence discussed previously, including the Orthwein Kickoff Meeting agenda memo

(Orthwein, 2001), Snowden Trial Testimony[65] and in Progress Reports 1 through 6 (CASI,

---

[62] MR. RUBINSTEIN: Q. Do you have any documentation to show $165,000? [in additional salary]. RILEY: A. This chart was prepared from the check register. The 200,000 comes from the loan -- the difference between the loan, the loan pay back and the amount of salaries that he received, plus the withholdings from applicable payroll, withholdings, … Trial Transcript Page 806 *ff* Line 21 *et seq*. However, this testimony is still misleading and incorrect, because net loan proceeds by her register GX110 shows $(92,850.00) in net loan proceeds. $(60,000) is needed to bring the total unloaded salary to $(152,850.00). Loading that with fringes of $(12,345.01) brings the salary to the stated $(200,488.59). The actual gross salary is higher still if we remove the taxes on the net salary to make it gross. Dunlevy gives her analysis in her affidavit attached. Riley must have known knew about the rent and her answers were evasive.

[63] Trial Transcript Page 120 *ff* Line 19 *et seq*.,quoted previously.

[64] Gender Dysphoria: Gender identity disorder (GID) is the formal diagnosis used by psychologists and physicians to describe persons who experience significant gender dysphoria (discontent with the biological sex they were born with). It is a psychiatric classification and describes the attributes related to transsexuality, transgender identity, and transvestism. (Wikipedia, 2010)

[65] MS. SNOWDEN Q. Now, you told us that you had these discussions with Gurfein about the rent, correct? A. Yes.
MR RUBINSTEIN: Q. And that was early on in the grant?
A. The discussion was before the kick-off presentation and after the kick-off presentation, so in October and in November.
Q. 2001.
A. 2001.

2002), (CASI, 2002) (CASI, 2002) (CASIq, 2002) (CASI, 2002) (CASI, 2003) (CASI, 2003) as

well as various e-mail threads(see section "ATP Substantial Involvement"). Hayes, the ATP

'independent' auditor devised the ill-fated scheme to solve all of Karron's initial 'draws' by

reclassifying them as salary and calculated the payroll taxes on these re-classes[66]. She also

discussed this with Snowden, of ATP of this early on[67], as discussed in Snowden's testimony

about initial advances made to Karron[68]. Then at some point in early 2003 Hayes decided to

---

Q. And then --
THE COURT: You had those with Gurfein.
THE WITNESS: With both Gurfein and Dr. Karron.
Trial Transcript Page 379 *ff* Line 25 *et seq.*
[66]MR. SPRING: … I was aware once I sat down with Dr. Karron that there
were corrections that needed to be made for the books in preparation
for the audit by the ATP-appointed person Joan Hayes.
MR. RUBINSTEIN: Q. It was your understanding that Joan Hayes was
appointed by ATP?
Trial Transcript Page 871 Line 1 *et seq.*
[67]MR. RUBINSTEIN: Q:. And is it fair to say that Hayes called between
September 30, 2002 and the end of that year 2002 and asked you about
the deductibility of the rent, correct?
MS. SNOWDEN:  A. It's fair to say that within that time period I was
called by Joan Hayes and she did ask about the rent.
 Q. And in your discussions with either Lee Gurfein or Dr. Karron
about the deductibility of the rent did you suggest to either of them
that they could increase Dr. Karron's salary and he could pay the rent
out of an increase in salary?
A. No.
 Q. I mean he could do anything he wants with his $175,000 that he
gets paid in the initial year, correct?
A. If he gets a paycheck, just like me and you when we get our
paycheck, you can do whatever you want with it.
Trial Transcript Page 381 Line 5 *et seq.*
[68] MR. RUBINSTEIN: Q. Now, did there come a time that you learned
that Dr. Karron had taken any loan from the funds, the ATP funds
of $75,000?
MS. SNOWDEN: A. I heard -- I wasn't --
THE COURT: No. Did you --
THE WITNESS: Did I ever hear that?
THE COURT: In your capacity.
THE WITNESS: I heard that.
Q. And did you have any conversations with Dr. Karron about that
$75,000?
A. No.

forget her journal entries in her Audit and disavowed all of the re-classes and even attempted to disavow her knowledge of the rent in her audit report language[69] despite her having prepared Karron's personal taxes and the CASI 1099 forms reflecting the payment rental income from CASI[70] to Karron.



Figure 3 GX114 Karron Salary Component Breakdown

---

THE COURT: When did you hear it?
THE WITNESS: From Joan Hayes.
THE COURT: What?
THE WITNESS: From Jones Hayes the auditor.
Trial Transcript Page 382 Line 10 *et seq.*
[69] During our[Hayes] examination of cancelled checks, we noted that certain expenditures of the award recipient, which were not directly related to the ATP project, were paid with federal funds provided for the ATP project.  These payments were made to the Principal Investigator for rental expense, at the monthly rate of $2,000, for the use of his apartment as office space. GX 050 Page 11, First 'Item'.
[70] See Karron Affidavit AC <<DBK PERSONAL TAXES PREPARED BY HAYES>>



**Figure 4 Karron GX114 Salary components**

It now appears that this reclassification plan was approved, but no formal written budget change was required as no budget changes reached the minimum plus minus 10 percent threshold magnitude. Approval was not required or this but this discussion was suppressed or just not considered important. However, this attempt to highlight this rent and fringe by a second person on GX114 was innumerate in character and done by someone who did not prepare accounting data for this exhibit; They would have known what was already in the Karron salary mix. Because of this clumsy addition to GX114 without the concomitant subtracting the rent and fringes from the other items, we can now reveal this fossilized evidence of this initial reclassification.

Using only GX110 numbers[71], and Riley's attempted rationalization of fringe benefit rate[72], it is an inescapable conclusion that the "denominated" salary figure of Two Hundred Thousand, Four Hundred and Eighty Eight dollars ($200,488) must necessary include the Sixty

---

[71] GX110 showing only relevant section of spreadsheet data detailing checks from and to Karron for year 1 alluded to in GX114 testimony.

| Dr. Karron | | | | Sum | $ (188,143.58) |
|---|---|---|---|---|---|
| **Loan** | | (60 detail records) (15 detail records) | | Sum | $ (129,850.00) |
| 1058 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/17/2001 | 2953 | Per Check Register -Capital Loan | $ (300.00) | |
| 1083 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/23/2001 | 2961 | Emergency Loan | $ (300.00) | |
| 1059 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2962 | Per Check Register - Salary Advance | $ (75,000.00) | |
| 1061 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/21/2001 | 3103 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (500.00) | |
| 1072 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3144 | Per Check Register - DBK (Vendor) Capital Loan NIST (per GL Loan Repay-CASI ACCT) | $ (1,000.00) | |
| 1073 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3145 | Per Check Register - DBK (Vendor) Capital Loan NIST(per GL Loan Repay-CASI ACCT) | $ (5,000.00) | |
| 1074 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/7/2002 | 3151 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (5,000.00) | |
| 1075 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/12/2002 | 3153 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (4,000.00) | |
| 1098 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/25/2002 | 3155 | (Karron Draw)(per GL DBK Loan) | $ (2,000.00) | |
| 1076 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 4/1/2002 | 3160 | Per Check Register - DBK (Vendor) A/P (per GL Karron Draw - DBK Loan) | $ (13,000.00) | |
| 1079 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/24/2002 | 3184 | Per Check Register - DBK (Vendor) A/P (per GL - DBK Loan) | $ (2,000.00) | |
| 1080 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/25/2002 | 3193 | Per Check Register - DBK (Vendor) A/P (per GL Karron Draw - DBK Loan) | $ (1,000.00) | |
| 1106 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 8/19/2002 | 10407 | (Per GL - DBK Loan) | $ (750.00) | |
| 1107 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 9/13/2002 | 10451 | (Per GL Karron Draw - DBK Loan) | $ (15,000.00) | |
| 1108 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/4/2002 | 10473 | (Per GL Karron Draw - DBK Loan) | $ (6,000.00) | |
| **Loan Repay** | | (7 detail records) | | Sum | $ 37,000.00 |
| 1047 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 10/11/2001 | | Emergency Loan - Ck # 1006 (prior to NIST First Deposit 10/26/2001) | $ 2,000.00 | |
| 1051 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 12/4/2001 | | Loan to Corp - chk # 5189 | $ 5,000.00 | |
| 1050 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 2/25/2002 | | Emergency Loan to Corporation - Chk # 1052 | $ 1,000.00 | |
| 1042 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 8/13/2002 | | loan to company - chk # 1121 | $ 20,000.00 | |
| 1043 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 8/16/2002 | | loan to company - chk # 1122 | $ 1,000.00 | |
| 1054 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 9/4/2002 | | (Check # 5301) (Per GL - DBK Loan repay NIST) | $ 3,000.00 | |
| 1045 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 10/4/2002 | | chk # 1129 (Per GL - DBK Loan repay CASI) | $ 5,000.00 | |
| **Payroll** | | (8 detail records) | | Sum | $ (35,293.58) |
| 1057 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/13/2002 | 10192 | ( 7/7/2002 - ?/7/2002 Pay Period) | $ (5,019.84) | |
| 1115 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/3/2002 | 10212 | 5/1/2002 - 5/31/2002 pay period | $ (5,002.25) | |
| 1127 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/2/2002 | 10280 | (6/1/2002 - 6/30/2002 pay period) | $ (25,023.17) | |
| 1130 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/2/2002 | | Check Reversal # 10280 (6/1/2002 - 6/30/2002 pay period) | $ 25,023.17 | |
| 1117 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/5/2002 | 10290 | (10/1/2001 - 10/31/2001 Pay Period) | $ (5,552.01) | |
| 1120 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/5/2002 | 10291 | (11/1/2001 - 11/30/2001 Pay Period) | $ (4,756.38) | |
| 1121 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/5/2002 | 10292 | (12/1/2001 - 12/31/2001 Pay Period) | $ (9,288.07) | |
| 1055 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 8/13/2002 | 10401 | (7/1/2002 - 7/31/2002 Payperiod) | $ (5,675.03) | |
| **Rent on Office** | | (30 detail records) | | Sum | $ (60,000.00) |
| 1087 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2977 | Rent on Office - (per GL Oct 00 Rent) | $ (2,000.00) | |
| 1088 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2978 | Rent on Office - (per GL-Feb 00 Rent) | $ (2,000.00) | |
| 1089 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2979 | Rent on Office - (per GL-March 00 Rent) | $ (2,000.00) | |
| 1090 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2980 | Rent on Office - (per GL , -April 00 Rent) | $ (2,000.00) | |
| 1091 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2981 | Rent on Office - (per GL-May 00 Rent) | $ (2,000.00) | |
| 1092 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2982 | Rent on Office - (per GL -June 00 Rent) | $ (2,000.00) | |
| 1093 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2983 | Rent on Office - (per GL-July 00 Rent) | $ (2,000.00) | |
| 1094 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2984 | Rent on Office - (per GL -Aug 00 Rent) | $ (2,000.00) | |
| 1095 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2985 | Rent on Office - (per GL -Sept 00 Rent) | $ (2,000.00) | |
| 1084 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 11/9/2001 | 3040 | Rent on Office - (per GL -Jan 01 Rent) | $ (2,000.00) | |
| 1096 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 11/23/2001 | 3064 | Rent on Office - (per GL -Feb 01 Rent) | $ (2,000.00) | |
| 1085 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/11/2001 | 3093 | Rent on Office - (per GL -Mar 01 Rent) | $ (2,000.00) | |
| 1086 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/11/2001 | 3094 | Rent on Office - (per GL -Apr 01 Rent) | $ (2,000.00) | |
| 1060 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/14/2001 | 3100 | Per Check Register - DBK Rent - (per GL-Dec 01 Rent) | $ (2,000.00) | |
| 1062 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/28/2001 | 3107 | - (per GL - June 01 Rent) | $ (2,000.00) | |
| 1063 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/28/2001 | 3108 | - (per GL - May 01 Rent) | $ (2,000.00) | |
| 1064 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3115 | Per Check Register - DBK Rent (Per GL July 01 Rent) | $ (2,000.00) | |
| 1065 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3116 | Per Check Register - DBK Rent (Per GL Aug 01 Rent) | $ (2,000.00) | |
| 1066 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3117 | (Per GL Sept 01 Rent) | $ (2,000.00) | |
| 1067 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/11/2002 | 3122 | Per Check Register - DBK Rent (Per GL Jan 02 Rent) | $ (2,000.00) | |
| 1068 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3129 | Per Check Register - DBK Rent (Per GL Oct 01 Rent) | $ (2,000.00) | |
| 1069 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3131 | Per Check Register - DBK Rent (Per GL Nov 01 Rent) | $ (2,000.00) | |
| 1070 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3132 | Per Check Register - DBK Rent (Per GL Feb 02 Rent) | $ (2,000.00) | |
| 1071 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3143 | Per Check Register - DBK Rent (Per GL March 02 Rent) | $ (2,000.00) | |
| 1097 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3142 | (December 00 Rent) | $ (2,000.00) | |
| 1077 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 4/1/2002 | 3164 | Per Check Register - DBK Rent (per GL April 02 Rent) t | $ (2,000.00) | |
| 1078 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/2/2002 | 3175 | Per Check Register - DBK Rent (Per GL May 02 Rent | $ (2,000.00) | |
| 1099 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/4/2002 | 3185 | (Rent) | $ (2,000.00) | |
| 1105 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/15/2002 | 10323 | (per GL July 02 Rent | $ (2,000.00) | |
| 1081 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/7/2002 | 3200 | Per Check Register - DBK Rent (per GL Aug 02 Rent) | $ (2,000.00) | |

[72] MR. RUBINSTEIN: Q. CASI spent $200,488 on his salary. How did you get that number?
MS. RILEY: A. By including the withholdings portion of the fringe benefits as part of the salary of what he received. It includes the salary, it includes the difference between the loans he received and the loans he paid, and it includes the fringe benefits.
Trial Transcript Page 803 Line 19.

Thousand dollars ($60,000) initially classified by Karron as rent on the paper trail (invoices and checks). Is there any other explanation? Does this implicit reclassification represent yet another ATP harmless error of arithmetic or evidence of good faith negotiations to help Karron quashed by the Hayes and the DoC OIG. Did key witnesses lie or mislead the court by their answers that contradict the hard number evidence in the source documents?

### xvii.   The Two Author Hypothesis

Extensive attempts to reconstruct how these figures were arrived at lead one to the hypothesis that GX114 was constructed by two different people working successively, in isolation. The first person, probably Riley, attempted to capture all of the grant spending and could not make it add up to the disbursed amount. This is because they were ordered or refused to consider any other spending accounts (Credit Cards, PayPal Debit Cards, Cash, Gas Travel, Car Rental card amongst others). Another person subsequently took this list and just added in items willy nilly, without regard to backup documentation and without the realization that some items were already in the partial first total, to bring the total to the ATP grant disbursed amount. The Defendant saw this behavior in OIG negotiations and that innumerate lack of regard for algebra and arithmetic lead the Defendant to consider that behavior pattern in the formulation of GX114. If this is indeed the case, this second person did not realize, or perhaps care, that the rent, already reclassified into salary, as negotiated a long time ago, was re-entered a second time as rent without being subtracted from Salary. We are left with a forensic mathematical problem: how can such a theory be proven beyond any reasonable doubt?

IS THERE ANY OTHER POSSIBLE HYPOTHESIS?

Let us look at the possibility that the rent is not included in the elements summed to arrive at the putative total salary of $200,488. The only other free value, not previously pinned

down to a specific value is the fringes. We cannot reasonable assume a fringe value approaching 100,000 dollars, almost half of the total value. Such a large fringe value is unreasonable and not justified by the available pool of fringe like cost elements. We also note that fringes were separately listed and 'not allowed', which brings up another contradiction of simultaneous inclusion and exclusion of same element transactions. Therefor it is unreasonable to hypothesize that fringes can expand to fill up the gap left if we do not include $60,000 worth of rent reclassified as salary.

Let us now look at the next possibility. Is this is an innocent Harmless error? One would hope that the 15 months of incarceration suffered by the Defendant were not as a result of careless arithmetic or spreadsheet error. One can only hope that the Plaintiff fact checked and reviewed carefully exhibits used in the criminal trial. However, we are finding a large number of careful and careless math errors in so many exhibits that one cannot exclude that careless error may play a role in GX114. However, considering the expectation of higher standards of care and safeguards in criminal trials relative to civil trials, that if this "careless hypothesis", one must then considers negligence beyond harmless error because of the dire consequences of this error for the Defendant. This is a job for a fact finding jury.

Finally, we must also consider the possibility that the Karron salary number, and possibly that some or all of the numbers in GX110, are completely made up and has no basis in any numbers in GX110. Given the inability to find any combination of GX110 Karron transactions that sums exactly to this value of $200,244, and that we are forced to apply a portion of unspecified fringes, we must also consider the possibility that the number(s) is(are) maliciously whole cloth, made up and without any basis in GX110. If so we clearly have grounds for its disqualification as an element of fact in this case, a job for a jury of fact finders at trial.

xviii.   IS GX114 EVIDENCE OF A PRIOR NEGOTIAQTED ALLOWANCE OR RECLASS?

During negotiations to arrive at a new budget, the CASI accountant worked closely with Snowden and a reclassifications and fixes were reached, but for some reason never made it to a new budget being negotiated by Peter Ross, the grant manager at the time. Hayes was feeding Ross audit numbers, who was submitting them as budget actuals to Karron for submission to Snowden. Hayes would leave the audit 'actual' figures on the shelf in CASI and advise Ross to use them for preparing new budgets based on audited actuals. Unknown to Karron or Ross, Hayes was changing the audit figures week to week, and Karron or Ross did not noticed the instability in Hayes figures. This instability in budget numbers was what ostensibly triggered an audit.  We now know that Hayes was a terrible accountant, and her audit figures were not only unstable, but patently wrong is almost every way the forensic bookkeeper DUNLEVY tested them. Worse, these errors propagated into the Riley OIG analysis, leaving us with a second forensic accounting question:

### xix.   The OIG Did NOT do an audit.

Did Riley, as the OIG designated field auditor actually do an audit of CASI?

Did Hayes do an audit of CASI ?

Did Riley copy Hayes Audit ?

Because this response is already too long, this question is considered in the Defendants Memorandum of Law

xx.    **Conclusion: Gx114 is hard evidence of a prior reclassification of rent paid by program to Karron as bona fide Salary.**

## E. WILLFULL IGNORANCE BY PROSECUTION

The overall story told by the factual evidence trail tells a tail of **a government willful ignorance of the Defendants after tax contribution to the project.** The proof of funding is presented in the Affidavit of Dunlevy, Where she reviews the various Karron tax returns and CASI payroll tax returns. And these were prepared by Hayes, the CASI auditor, and copied by Riley, the ATP auditor. As time went by, reclassifications and allowances negotiated by the Defendant were forgotten, and the made-up audit results and misunderstandings got worse and worse. Horribly more, much worse than anyone could ever imagine. What started out as negotiated allowances for Internet, telephone, co-funding in kind, salary allowances in lieu of rent, in-kind and cash co-funding became willful disobedience and criminal allocations, fraudulent allowances and demands for treble refunds and multiplicative punitive penalties. What evidence remains of these negotiated agreements? The evidence survives in plain sight, like fossils in exposed shale, in the corpus of trial records and corroborated by the recovered digital heritage of the defendant, specifically e-mail, faxes, memorandum circulated internally and phone traffic. Most tellingly, the government auditors work papers reveal that the ATP had, in fact, allowed many costs explicitly, but did not give credit for these costs in the 'published' versions of the audits.

## F.  KARRON ACUSED OF KNOWINGLY NOT OBEYING SPENDING 'RULES'

### i.   Accused of misappropriating government funds to rent

#### 4) Exoneration

### ii.   Accused of misappropriating government funds to pay for utilities.

#### 5) Exoneration

## G.  The OIG did NOT do an audit

### iii.   Testimony regarding source of Audit by OIG Auditor

Below is an annotated transcript of Riley's testimony, with Defendant observations and comments enclosed in square brackets [].

```
THE WITNESS: My name is Hazel Riley, H-A-Z-E-L R-I-L-E-Y, but I go by
Belinda.
DIRECT EXAMINATION BY MR. KWOK:
Q. Good afternoon, Ms. Riley.
A. Good afternoon.
Q. Where do you work?
A. Department of Commerce, Office of Inspector General, the Atlanta region.
Q. What's your job title?
A. Assistant regional inspector general for audits, Atlanta region.
Q. Is that a supervisory position?
A. Yes, it is.
Q. How long have you been a supervisor?
A. For about two years.
Q. What do you do in your current job?
A. I supervise several employees, and I plan audits and other duties
assigned.
Q. What did you do before you became a supervisor?
A. I was an auditor reviewing government grants or government programs.
Q. You were an auditor with which department?
A. The Department of Commerce, Office of Inspector General, since June of
'97.
Q. What were your duties and responsibilities when you were an auditor with
the Department of Commerce?
A. To audit commerce programs, work up commerce grants, under the various
agencies.
Q. What did you do before then, before you joined the commerce department?
A. I was a revenue agent with IRS for about 11 years.
Q. Can you give us a time frame if you remember?
A. I started in September of '86 and left in June of '97.
Q. And what did you do as an agent with the IRS?
A. For the first -- I audited individual tax returns, corporate tax returns,
excise tax returns.
Q. Ms. Riley, what's your educational background?
A. I have a bachelors of -- I have a B.A. in accounting, a B.A. in accounting
information systems, a Bachelor of Science in Computer Science Programming
Option, and I am a certified CPA.
```

Q. How did you become a certified CPA, what --
A. Certified Public Accountant.
Q. What does CPA stand for?
A. Certified Public Accountant.
Q. How did you become certified?
A. I took a CPA exam at the time, I think it was a two-and-a-half day test that's like 19 hours, and you also had to have five years for government to become a CPA in accounting.
Q. Miss Riley, what, if any, professional recognition have you received for your accounting and auditing work?
A. I have two bronze medals and a silver medal awarded from  the Department of Commerce.
**[The Silver Medal appears to be awarded for this very audit, as a 'joint' audit effort, according to Riley's Expert Witness Resume]**
MR. KWOK: Your Honor, government offers Belinda Riley as an expert in accounting and auditing procedures.
MR. RUBINSTEIN: No objection, your Honor.
THE COURT: All right. Ms. Riley is accepted as an expert in accounting auditing procedures -- accounting and auditing procedures.
BY MR. KWOK:
Q. Ms. Riley, what kinds of grants does your office audit?
A. We audit NIST ATP grants, which is National Institute of Standards and Technology Advanced Technology Program, audits for research. We audit NTIA grants in telecommunications. We audit EDA grants, which is Economic Development Administration, whatever -- we can audit any grant that one of our commerce agencies give.
Q. Do all grants awarded by the Commerce Department get audited by the Office of the Inspector General?
A. No.
Q. How does your office become involved?
A. Our office becomes involved by request from NIST or it could be from the hot line call that says that they suspect an organization is using fraudulent, doing fraudulent activity. Or we have a -- we review all of the NIST ATP research grant awards submitted by the CPA firms, and so if during one of our reviews someone sees suspicious, we may audit that award. Q. How many audits have you handled since you joined the department?
A. Probably about 10 or 15.
Q. How many times have you testified in a criminal trial before in connection with your auditing work?
A. None.
Q. Ms. Riley, did there come a time when you became involved  in auditing an Advanced Technology Program grant or ATP grant awarded to a company known as CASI?
A. Yes.
Q. Who was the principal investigator of that grant?
A. Dan Karron.
Q. Do you see Dan Karron in the courtroom here today?
A. Yes, he's over there.
 Q. Could you describe an article of clothing he's wearing?
A. He's got glasses -- he's got on glasses, a pony tail and is that a white and green tie?
MR. KWOK: Your Honor, may the record reflect that the witness has identified the defendant?
THE COURT: All right, the record will so reflect.
Q. Ms. Riley, how did you become involved in the CASI audit?
A. The NIST grants officers sent a letter to our -- the Office of Inspector General requesting an audit, and I was assigned the audit.

Q. What did they ask you to do?
A. To determine the financial status of the grant project.
Q. And when was this, approximately?
A. We received requests in May of 2003, approximately.
Q. What did you do upon receiving this request?
A. I called CASI to schedule an initial appointment for the audit.
Q. Where did you go to conduct this audit?
A. To the CASI office apartment.
Q. And where is that?
A. In Manhattan.
Q. You said apartment. How do you know it was an apartment?
A. Well, on some of the visits, Mr. Karron would be getting out of bed to answer the door because I would get there early in the morning, 10:00 o'clock, 9, 10:00 o'clock, and he was a late night person.
[In order to not disrupt the research going on at the CASI office, the actual audit was conducted across the street, at the Dalton Center of the Roman Catholic Church building. The nuns were gracious enough to let us use their meeting room pro bono, without charge and with no quid-pro quo. Mr. Benedict gave the Nuns a cash contribution out of his pocket that was never reimbursed by CASI. CASI provided a working luncheon catering for the CASI staff working there with Riley: See Todaros AMEX catering invoice. This went on for almost a full week. Riley also made a return re-audit that fall and worked at Spitz'es office for an additional week in December 2003 and gave a positive exit interview]
Q. And what was the objective of your visit?
A. To determine the financial status of the grant cost.
Q. How do you get up to speed on the company's financial situation?
A. Okay. Prior -- by reviewing the ledgers and invoices provided by CASI to me. Prior to going to the -- prior to coming to Manhattan, I interviewed the NIST grants office people and reviewed their grant files concerning CASI.
Q. As part of that preparation, did you talk to anyone at CASI?
A. Yes. At CASI I talked to Dan Karron, to Joan Hayes, the CPA that he provided to, Frank Spring, a book keeper, to Bob Benedict, the project manager.
[Benedict ultimately was never formally approved as Project Manager]
Q. And is that consistent with what you usually do?
A. Yes.
Q. Your usual practice?
A. Yes.
Q. You mentioned invoices. Can you tell us how those invoices related to what you do as an auditor?
A. Well, we trace -- we're provided journal entries or whatever, we're provided a list of expense, expenditures for award, we trace a sample of them, just the supporting voice or cancelled check.
Q. And were you able to find those invoices at CASI?
A. They provided some invoices.
[CASI provided each and every, in fact, ALL invoices and was unable not to provide any backup requested; CASI by Matt Rothman would pull and overnight mail DVD's of material to Riley, and retained copies of what was transmitted]
The invoices at CASI had been -- the original invoices had been scanned into the computer, and the original documents had been destroyed. And so for some of the invoices, there were multiple copies and some of them we had a hard time finding or didn't find.
Q. Did there come a time while you were conducting the audit that you spoke as to an individual by the name of Joan Hayes?
A. Yes.
 Q. And what is your understanding as to what Joan Hayes was doing at CASI?

A. She had done the first year audit, they're required to have an audit by ATP, and she was -- I guess she was there to help me with my audit or to provide information about the CASI books and records or for answering questions I might have concerning the books and records.

Q. And what did you do with the materials that Joan Hayes provided you?

A. I used, I used them as a source of my audit.

[as we show elsewhere, she also copied Hayes errors and did not do an independent audit, as alluded to by Defense counsel below]

Q. And how long were you at CASI for this audit?

A. I think I got there on Wednesday and I left Thursday or Friday of the next week.

Q. Did you prepare a report after the audit?

A. Yes. I prepared a memo report, a short report.

Q. If you could find what's been marked for identification as government exhibit 60 in that pile that is in front of you?

A. Oh, okay. 60.

THE COURT: What period of time did you audit?

THE WITNESS: I audited the time 10/1 -- October, October 1st, 2001 through 6/30 -- 6/27, 2003.

Q. Do you have that document in front of you?

A. Yes.

Q. Government exhibit 60 marked for identification? Do you recognize that document?

A. Yes.

Q. Who prepared that document?

A. I did.

Q. And what is it?

A. It is our memo report that was prepared after the June 2003visits.

Q. Is that the visit you just referred to --

A. Yes.

Q. -- a moment ago?

A. Yes.

MR. KWOK: Your Honor, the government offers exhibit 60?

MR. RUBINSTEIN: I'd like a brief voir dire, your Honor.

THE COURT: Yes, you may.

VOIR DIRE:BY MR. RUBINSTEIN:

Q. Good afternoon, Ms. Riley.

A. Good afternoon.

Q. Now, you prepared this report from what documents?

A. This reports were prepared, my audit, as a result of the documents that Dr. Karron provided during that June visit.

Q. Dr. Karron or Ms. Hayes?

A. Dr. Karron, Joan Hayes, Bob Benedict, they were all there. Miss Hayes was supposed to be the representative leading me through the books and records, and she was representing Dr. Karron.

Q. Do you have copies of those documents?

A. The documents --

Q. That you used to --

A. Yes.

Q. -- create this report?

A. Yes.

Q. Where are they?

A. What -- my audit reports, my audit --

Q. Your what?

A. In my audit files. I think the document that my report, that the report was created from was provided. I mean, what -- my own -- I have my audit report that I used to prepare this.

Q. In other words, do you make a report or create some writings to show that you used to put into this report, Government's 60?
A. Yes.
MR. RUBINSTEIN: May I approach the government, your Honor.
THE COURT: Yes, you may.
(Pause)
Q. Is it correct, ma'am, that you used Joan Hayes' work papers to do your -- this report?
A. I used the work -- the general ledgers, the cash disbursement registers, the -- whatever information, the books that were prepared by -- some things that Joan Hayes provided. The books that were being re-prepared by Frank Spring. He also -- I also talked to him while I was there, to do -- to come up with the work papers from this report.
Q. Did you create any work papers, ma'am?
A. Yes, I did.
Q. Did you create a general ledger?
A. For this report?
Q. Yes.
A. No. I mean no.
Q. You used Joan Hayes' -- Isn't it a fact that Joan Hayes had no general ledger? There was no general ledger for CASI; is that a fact?
A. There were -- CASI used Quick Books, and so whatever the system of quick books there were -- there were -- there were things for Quick Books. Frank Spring, I guess Frank Spring was creating a new general ledger or a new ledger system or journal entry system for CASI at the time I was there. When I called to schedule the initial appointment, CASI couldn't meet with me because they were in the process of redoing their books and records, and so it delayed my visit for a couple of weeks to give them time. When I arrived, the new books weren't completed yet, so they were going to be completed the next day so I waited till the next day. The -- I used the records that they provided and,  including Joan Hayes, what Joan Hayes had provided to come up with the numbers for this. I did not take Joan Hayes' report and copy the numbers to come up with this.
[NB: This assertion by Riley is factually incorrect because Riley's audit report propagated Hayes payroll errors without notice or verification]
Q. In fact, you never -- do you have, either from your own work, from Frank Spring's -- he was a book keeper of some sort?
A. Yes.
Q. Or from Joan Hayes, a general ledger, ma'am?
A. I know I have some summaries provided different categories,
 and I think there are some ledgers there. I know I have to --
Q. Did you do --
A. Yes.
Q. -- a reconciliation? There were checking accounts, were there not?
A. Yes when I -- for the audit?
Q. Yes. There were checking accounts, CASI had a number of  checking accounts, did it not?
A. Yes.
Q. Did you do a bank reconciliation of the various bank accounts of CASI?
A. For this, for this audit?
Q. Right.
A. No.
MR. RUBINSTEIN: Your Honor, I object.
MR. KWOK: Sidebar, your Honor?
THE COURT: Yes.
(At the sidebar)
MR. KWOK: Grounds?

MR. RUBINSTEIN: The grounds -- these are some summary, some documents that she doesn't have, that she's unaware of, and she came up with these numbers from where we will never never know because we don't have original source documents to look at, judge.[we do have source documents] She clearly relied upon other people's work to determine the cost[and copied their errors, which proves the lack of validation or even auditing done by the government auditor]. It's hard to believe that someone could be an auditor and not reconcile bank accounts  that probably had less than 500 checks in total[The exact number is ], for the period that we're talking about.
12 MR. KWOK: Your Honor, we offer her as an expert witness under Federal Rules of Evidence 703. Underlying documents that an expert rely upon does not have to be admissible. That's what auditors do, they don't necessarily have the underlying documents. They go to sites to look at the company books. They don't necessarily take those documents back with them after they've completed an audit. I believe that's what happened in this case, that she wasn't -- went to CASI to look at the books. She tried to verify some of it to have some confidence about the accuracy of the numbers. She issued a report. It doesn't mean she took away those documents and attached them as some sort of attachment to her report. She went there, saw things, talked to people make some determinations and issue a report. The fact that she doesn't have the underlying documents should not be an issue, and she's an expert. Under Rule 703 the underlying documents --
THE COURT: I'm going to allow her to testify because a auditor does not have to take the records with them or copies of the records. They may have to take copies of portions that they rely on. But for illustration purposes, the auditor does not have to -- just has to use general accepted auditing methods to verify the books and accounts of the company.
MR. KWOK: I think that's exactly right.
THE COURT: It's the company, it's the company's account that the auditor is verifying.
MR. RUBINSTEIN: Here he didn't have accounts, Judge with all due respect, so that's why --
THE COURT: I don't know. I mean that's another  matter.
MR. KWOK: You can cross on it.
MR. RUBINSTEIN: I don't want --
THE COURT: They're supposed to have an accountant, sorry, as I understood it.[73]

There we have it: A non audit entered into testimony, subsequently proven by forensic analysis to be precisely what MR. RUBSTEIN alluded to: it was a rehash of Hayes hostile audit findings by Riley

---

[73] Trial Transcript Page 462-476 from Line 1 et seq.

## H. OIG seizes Blender, Shoe Rack Seizure, and All Computers and evidence, leaves coffee machine.

### In the prosecutions Opening Statement

THE COURT: " All right. We will now begin with the government's opening statement. Mr. Everdell.

MR. EVERDELL: Thank you, your Honor. Ladies and gentlemen, the defendant, Dr. D.B. Karron cheated the government out of hundreds of thousands of dollars. **In 2001 the defendant got what many scientists can only hope to get.** He was given a $2 million grant from the federal government to conduct his scientific research, $2 million of taxpayer money, and the only thing that the government required in return for this money was that the defendant spend it on one thing and one thing only: **His research,** nothing else.[!?!?!]
But the evidence will show that instead of putting that money towards his research, the defendant chose to spend much of that money on himself. For over a year and a half the defendant used the grant money as his own personal piggy bank to pay for personal expenses like **meals at restaurants, electronic gadgets like a GPS tracking device and a digital camera, even a blender[see blender end note] and shoe rack[see shoe rack end note] for his apartment,** and he bought all these things even though **he was already paying himself $175,000 in salary** out of the **grant funds.**

Trial Transcript Page 33 *ff* Line 22 *et seq.*[Emphasis added]


### iv.   The Shoe Rack Story

The Story of the Shoe Rack,

GX 120, Seizure Inventory Page 2, Line Item 75,
see
Trial Transcript Page 557, Line 21 *et seq.*,
Trial Transcript Page 1156 Lines 5 *et seq.*

MR. RUBINSTEIN: Q. All right. Did your[sic] have occasion to give Dr. Karron any any items that you owned?
MS. FARNSWORTH: A. Well, I give things to people, I'm quite generous. And I do recall one of the things that I gave Dr. Karron was a shoe rack.
Q. Let me show you what's in evidence as a government1 exhibit -- I show you what's in evidence as Government's  Exhibit 125.
A. Uh-huh.
Q. Do you recognize this item?
A. Yes, I do.
Q. And how do you recognize this item?

A. It was the rack that I gave D. B. Karron when I purchased one that
sat on the floor instead of one that hung on the door.

Trial Transcript Page 1184 Line 20 *et seq.*

For the purported grant invoice for the Shoe Rack in question see GX 120[74]

> SEIZURE WARRANT PURSUANT TO 18 U. S. C. § 981 07 07 (FILED UNDER
> SEAL) (MAG 970) Signed June 19, 2007 on Affidavit of RACHEL ONDRIK
>
> page 129, Homefront Hardware Statement 2003-10-11 invoice INV2002221301 Line
> Item 5 Whi-1651Navy Nylon 10/PKT HNG. Shoe Org, for $15.99.

### v.   OIGBlender Seizure

But the evidence will show that instead of putting that money towards
his research, the defendant chose to spend much of that money on
himself. For over a year and a half the defendant used the grant money
as his own personal piggy bank to pay for personal expenses like **meals
at restaurants, electronic gadgets like a GPS tracking device and a
digital camera, even a blender[see blender end note] and shoe rack[see
shoe rack end note] for his apartment,** and he bought all these things
even though **he was already paying himself $175,000 in salary out of the
grant funds.**

Trial Transcript Page 33 *ff* Line 22 *et seq.*[Emphasis added]

### 6)  Iconic Meaning of Blender in Movie "Enemy of the State"
See GX 120, Seizure Inventory Page 1 Line Item 37: Kitchen Classics Blender by Waring .

SEIZURE WARRANT PURSUANT TO 18 U. S. C. § 981 07 (FILED UNDER SEAL)( MAG 970)
Signed June 19, 2007 on Affidavit of RACHEL ONDRIK page 122
Invoice INV20020927301902 BLA-BL600 Spd ,420z Glas Blender $34.99.

This, harkens to the movie "Enemy Of The State", Will Smith played DEAN, man with a passion for blending.

> From the Screenplay
> "DEAN: They didn't take the jewelry. They took the computers. They took the big-screen TV, they took
> my blender.
> JERRY: The blender?
> DEAN: I love my blender.
> JERRY: They didn't take the silverware?
> DEAN: No, but they took my blender..
> …

---

[74]
https://docs.google.com/viewer?a=v&pid=explorer&chrome=true&srcid=0B5tahXvgtqadNTI2NmNjNWYtMWRjZ
S00NjRjLTlhN2YtNjVhZDViOTlmODgy&hl=en

MORELOS: I'm just trying to determine if Mr. Zavitz was involved in something more than a simple bus accident.
DEAN: Than why don't you talk to the bus driver?
MORELOS: Why so edgy, Mr. Dean?
DEAN: Somebody took my blender
(Drew's Script-O-Rama, 2010)

What makes this all the more creepy is that the Coffee Maker, purchased on the grant, for

significantly more money, which only used proprietary Coffee Company Coffee packets.

References to invoices and delivery from Coffee

### I. The OIG Gets the total Grant Disbursed Amount in Error

Amazingly the OIG audit documents have the total disbursement in error by $500.00 .

### J. The Grant is never terminated and the funds sat unused for years following suspension.

See the Closeout Letter and our response to it.

### K. Karron's piggy bank is her personal piggy bank and other comments.

Because it was personal funds, Karron's behavior was appropriate.

### L. OIG Auditor False Sworn Affidavits, secret joint award

Both Joan Hayes and Belinda "Hazel" Riley won a secret joint silver Department of

Commerce Medal award. This was not listed on the award publicity brochure, but listed on each

of the respective accountants resumes. Publicity photographs from the award banquet show what

appears to be both persons attending the Gala affair.

## 12.   Grounds Four: Ineffective Assistance of Counsel

Counsel failed to at key times of trial.

1) Failed to mount a forensic accounting based defense component and instead relied solely on "lack of intent to defraud".

2)       This did not overcome the 'knowing" standard common in recent criminal convictions.
3)  Failed to study details of case until eve of trial,
4)  Was unable to absorb large amount of defense data, 'winged it' on stand.
5)  Forced sale of apartment to raise funds for data recovery and fee.
6)  $ 100,000 Fee awarded by the court felt fee was insufficient to mount defense.
7)  Relied only on prosecution data, did not study defense data.
8)  Missed Accountant Auditor Exculpatory Prepared Tax Returns.
9)  Did not acknowledge Co-Funding, or Karron Salary.
10) Bored and confused Judge and Jury.
11) Key points were lost on Judge and Jury.
12) Did not push for Tracing of Funds requirement when objected to by judge.  Judge may have felt it was just a delaying tactic.
13) Did not push to Cross Examine Joan Hayes CPA when withdrawn as expert witness by Prosecution. Her confusing and contradictory evidence trail.
14) Key comments by Frank Spring were stricken from record and not pursued.
15) Did not pursue Government Auditor Riley on key points she admitted to.
16) Did not raise issue of contradictions in GX114.
17) Did not raise issue of missing year two withholding taxes when prosecution offered to not raise issues from Year 2; because that is when the accountant misapplied/stole the withholding taxes.

There are more issues with counsel and they will be presented in a future revision.


## 13.        Conclusion

Statutory standard for reversal, set aside, of verdict under 2255


## 14.        Appendix


## A.        28 USC § 2255.  Federal custody; remedies on motion attacking sentence[75]

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b) Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise

---

[75] http://www.law.cornell.edu/uscode/uscode28/usc_sec_28_00002255----000-.html Downloaded Saturday, February 12, 2011 at 13:15:50 Hours

open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

(c) A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

(d) An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

(e) An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

(g) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

(h) A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

# B. FRCP **Rule 33. New Trial**[76]

### (a) Defendant's Motion.

Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

### (b) Time to File.

---

[76] Federal Rules of Criminal Procedure (2010) (incorporating the amendment that took effect Dec. 1, 2010) http://www.law.cornell.edu/rules/frcrmp/Rule33.htm Downloaded Saturday, February 12, 2011 at 13:27:22 Hours

**(1) *Newly Discovered Evidence.***

Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

**(2) *Other Grounds.***

Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

> *(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; July 12, 2005, eff. Dec. 1, 2005.)*

## C. FRCP RULE 33Notes[77]

### NOTES OF ADVISORY COMMITTEE ON RULES - 1944

This rule enlarges the time limit for motions for new trial on the ground of newly discovered evidence, from 60 days to two years; and for motions for new trial on other grounds from three to five days.  Otherwise, it substantially continues existing practice. See Rule II of the Criminal Appeals Rules of 1933, 292 U.S. 661. Cf. Rule 59(a) of the Federal Rules of Civil Procedure (28 U.S.C., Appendix).

### NOTES OF ADVISORY COMMITTEE ON RULES - 2002 AMENDMENT

The language of Rule 33 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

### NOTES OF ADVISORY COMMITTEE ON RULES - 1987 AMENDMENT

The amendments are technical.  No substantive change is intended.

### NOTES OF ADVISORY COMMITTEE ON RULES - 1966 AMENDMENT

The amendments to the first two sentences make it clear that a judge has no power to order a new trial on his own motion, that he can act only in response to a motion timely made by a defendant. Problems of double jeopardy arise when the court acts on its own motion.  See United States v. Smith, 331 U.S. 469 (1947). These amendments do not, of course, change the power which the court has in certain circumstances, prior to verdict or finding of guilty, to declare a mistrial and order a new trial on its own motion. See e.g., Gori v. United States, 367 U.S. 364 (1961); Downum v. United States, 372 U.S. 734 (1963); United States v. Tateo, 377 U.S. 463 (1964). The amendment to the last sentence

---

[77] http://www.law.cornell.edu/rules/frcrmp/NRule33.htm  Downloaded Saturday, February 12, 2011 at 15:02:53 Hours

changes the time in which the motion may be made to 7 days.  See the Advisory Committee's Note to Rule 29.

## D. 18 USC § 666. Theft or bribery concerning programs receiving Federal funds[78]

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

   (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

      (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

         (i) is valued at $5,000 or more, and

         (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

      (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

   (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

   shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

(d) As used in this section—

   (1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

   (2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

   (3) the term "local" means of or pertaining to a political subdivision within a State;

---

[78] http://www.law.cornell.edu/uscode/uscode18/usc_sec_18_00000666----000-.html downloaded Saturday, February 12, 2011 at 13:46:20 Hours

**(4)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(5)** the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

## E.  Elements of Offenses - 18 U.S.C. § 666A[79]

6.18.666A1A Theft Concerning a Program Receiving Federal Funds (18 U.S.C. §666(a)(1)(A))

6.18.666A1A-1 Theft Concerning a Program Receiving Federal Funds - Agent of Organization or Government Defined

6.18.666A1A-2 Theft Concerning a Program Receiving Federal Funds - Received Federal Funds Defined

6.18.666A1A-3  Theft Concerning a Program Receiving Federal Funds - Stole, Embezzled, Converted, and Misapplied Defined

## F.  15 CFR Subtitle B, Ch. II (1–1–02 Edition) PART 295—ADVANCED TECHNOLOGY PROGRAM

<<VERSION ALERT: must be version a/o 10/1/2001>>

**TECHNOLOGY PROGRAM**
**Subpart A—General**
Sec.295.1 Purpose.
295.2 Definitions.
295.3 Eligibility of United States- and foreign- owned businesses.
295.4 The selection process.
295.5 Use of pre-proposals in the selection process.
295.6 Criteria for selection.
295.7 Notice of availability of funds.
295.8 Intellectual property rights; publication of research results.
295.9 Protection of confidential information.
295.10 Special reporting and auditing requirements.
295.11 Technical and educational services for ATP recipients.
**Subpart B—Assistance to United States Industry - Led Joint Research and Development Ventures**
295.20 Types of assistance available.
295.21 Qualifications of proposers.
295.22 Limitations on assistance.
295.23 Dissolution of joint research and development ventures.
295.24 Registration.
295.25 Special rule for the valuation of transfers between separately-owned joint venture members.
**Subpart C—Assistance to Single-Proposer U.S. Businesses**
295.30 Types of assistance available.
295.31 Qualification of proposers.
295.32 Limitations on assistance.
AUTHORITY: 15 U.S.C. 278n.
SOURCE: 55 FR 30145, July 24, 1990, unless otherwise noted.
**Subpart A—General**
**§ 295.1 Purpose.**
(a) The purpose of the Advanced Technology Program (ATP) is to assisted United States businesses to carry out research and development on high risk, high pay-off, emerging and enabling technologies. These technologies

---

[79] Elements of Offenses - 18 U.S.C. § 666A et seq
http://www.ca3.uscourts.gov/criminaljury/Chap%206%20666%20Aug%2008.pdf Downloaded Saturday, February 12, 2011 at 14:12:08 Hours

are:
(1) High risk, because the technical challenges make success uncertain;
(2) High pay-off, because when applied they offer significant benefits to the U.S. economy; and
(3) Emerging and enabling, because they offer wide breadth of potential application and form an important technical basis for future commercial applications.
(b) The rules in this part prescribe policies and procedures for the award of cooperative agreements under the Advanced Technology Program in

<<EXERPTED>>

## G.  15 USCODE §278n Advanced Technology Program

§ 278n. Advanced Technology Program
(a) Establishment; purpose; focus; guidance There is established in the Institute an Advanced Technology Program (hereafter in this chapter referred to as the ''Program'') for the purpose of assisting United States businesses in creating and applying the generic technology and research results necessary to—
(1) commercialize significant new scientific discoveries and technologies rapidly; and
(2) refine manufacturing technologies. The Secretary, acting through the Director, shall assure that the Program focuses on improving the competitive position of the United States and its businesses, gives preference to discoveries and to technologies that have great economic potential, and avoids providing undue advantage to specific companies. In operating the Program, the Secretary and Director shall, as appropriate, be guided by the findings and recommendations of the Biennial National Critical Technology Reports prepared pursuant to section 6683l of title 42.
(b) Authority of Secretary; research and development; contracts and cooperative agreements; Federal laboratories; other activities with joint ventures Under the Program established in subsection
(a) of this section, and consistent with the mission and policies of the Institute, the Secretary, acting through the Director, and subject to subsections
(c) and (d) of this section, may—
(1) aid industry-led United States joint research
and development ventures (hereafter in this section referred to as ''joint ventures'') (which may also include universities and independent research organizations), including those involving collaborative technology demonstration projects which develop and test prototype equipment and processes, through—
(A) provision of organizational and technical advice; and
(B) participation in such joint ventures by means of grants, cooperative agreements, or contracts, if the Secretary, acting through the Director, determines participation to be appropriate, which may include (i) partial start-up funding, (ii) provision of a minority share of the cost of such joint ventures for up to 5 years, and (iii) making available equipment, facilities, and personnel, provided that emphasis is placed on areas where the Institute has scientific or technological
expertise, on solving generic problems
<<EXERPT>>

## H.  SDNY Local Rules[80]

### Local Civil Rule 72.1. Powers of Magistrate Judges

Page - 48
In addition to other powers of magistrate judges:
(a) Full-time magistrate judges are hereby specially designated to exercise the jurisdiction set forth in 28 U.S.C. § 636 (c).
(b) Magistrate judges are authorized to entertain *ex parte* applications by appropriate representatives of the United States government for the issuance of administrative inspection orders or warrants.
(c) Magistrate judges may issue subpoenas, writs of *habeas corpus ad testificandum* or *ad prosequendum* or other orders necessary to obtain the presence of parties or witnesses or evidence needed for court proceedings, and may sign *in forma pauperis* orders.

---

[80] Local Rules of the United States District Courts for the Southern and Eastern Districts of New York Effective April 15, 1997 Includes Amendments through May 11, 2010

(d) Matters arising under 28 U.S.C. §§ 2254 and 2255 or challenging the conditions of the confinement of prisoners may be referred to a magistrate judge by the judge to whom the case has been assigned. A magistrate judge may perform any or all of the duties imposed upon a judge by the rules governing such proceedings in the United States district courts. In so doing, a magistrate judge may issue any preliminary orders and conduct any necessary evidentiary hearing or other appropriate proceeding and shall submit to a judge a report containing proposed findings of fact and recommendations for disposition of the matter by the judge. Any order disposing of the petition may only be made by a judge.

[Source: Former Local Magistrate Judge Rules 1, 4, 6, and 10]

### vi.    Rule 11. Amendments of Pro Se Petitions for Collateral Relief from Convictions

Page - 101 -
 (a) Federal Convictions.
When a pro se motion for collateral relief under 28 U.S.C. § 2255 is filed, the pro se clerk shall first ascertain whether the petition is in proper form and, if not, take appropriate steps to have it corrected. The petition shall be submitted for all further proceedings to the judge who accepted the plea or sentenced the defendant, whichever is applicable. The judge may either act on the application without responsive papers or advise the United States attorney of the date when answering or reply papers are due.

If the judge concerned is deceased; is a visiting judge who declines to entertain the application within a reasonable time because of illness, disqualification, disability or prolonged absence; or a senior judge who elects not to entertain the application, the application shall be assigned by lot.

### I.  USDoC, OMO DAO 213-5 AUDIT RESOLUTION AND FOLLOW-UP[81]

AUDIT RESOLUTION AND FOLLOW-UP
Number:  DAO 213-5
Effective Date:   1991-06-21

SECTION 1. PURPOSE.

.01 This Order prescribes the policies and procedures to be used in resolving and implementing audit recommendations contained in: management audit reports; audit reports of Department of Commerce (DOC) grants, cooperative agreements, loans and loan guarantees; and preaward and postaward audits of DOC contracts. This Order also specifies the roles of the organizational units, Audit Follow-up Official and the Inspector General with regard to audit resolution and follow-up, and prescribes policies and procedures for recording receivable resulting from audit resolutions.

---

[81] U. S. Department of Commerce Office of Management and Organization, Department Administrative Orders http://www.osec.doc.gov/omo/dmp/daos/dao213_5.html downloaded Saturday, February 12, 2011 at 13:52:31 Hours

.02 This revision implements the provisions of OMB Circular A-50, "Audit Follow-up"; incorporates appropriate provisions from the Memorandum of Agreement of September 26, 1988 between the Inspector General and the Assistant Secretary for Administration covering the handling of financial assistance audits resulting in a debt; incorporates audit definitions and semiannual reporting requirements of the Inspector General Act Amendments of 1988; changes the title of the Order; and generally updates the structure and language of the Order.

## SECTION 2. SCOPE.

.01 This Order applies to all DOC organizational units (see paragraph 4.17) involved in monitoring and resolving audit recommendations, establishing audit-related debts due the Government, and implementing agreed-upon audit recommendations as a result of final audit reports issued by or under the supervision of the Office of Inspector General (OIG). Audit reports circulated in draft for the purpose of obtaining comments are not subject to this Order. Preaward contract audit reports involving recommendations on estimates of future costs and postaward contract audit reports are subject to this Order only to the extent of monitoring Contracting Officer actions, since such reports generally are resolved by negotiation or a contracting officer's decision and as such are not subject to the six-month time frame set forth in this Order. This Order does not apply to audits conducted by the General Accounting Office but does encompass Single Audit Act reports.

.02 This Order is intended to aid the internal management of the Department, and is not intended to create any right or benefit enforceable at law by a party against the Department or its officers.

## SECTION 3. POLICY.

.01 Audit follow-up is an integral function of management and is a shared responsibility of DOC and OIG management. DOC and OIG officials shall act promptly to resolve audit findings and recommendations and to implement corrective actions. A unified DOC decision on resolution of audit recommendations shall be made within six months of the issuance of the audit report. Timely action to implement accepted audit recommendations by responsible management officials is an integral part of the DOC's audit system, and is the key to its effectiveness. Monitoring of the implementation actions on resolved audit recommendations ensures that final actions are actually taken.

.02 The heads of the organizational units to which audit findings and recommendations pertain have primary responsibility for prompt and proper audit resolution and implementation.

.03 If the OIG does not agree with the proposal of the responsible audit action official for handling a recommendation contained in a management or financial assistance award audit report, every attempt will be made by agency management officials and OIG officials to resolve the issues. If this fails, the issues will e referred to the Audit Resolution Council. If resolution is not reached through the Council, the issue will be elevated to the Deputy Secretary for decision.

.04 In the case of preaward and postaward contract audit reports, the contracting officer is responsible for giving full consideration to the audit advice and for documenting the disposition of audit recommendations. The contract follow-up system should be structured in consonance with the independent , financial advisory role of the contract auditor.

<<EXERPTED>>

Exhibit 11. The position papers should reference their most recent attempt at resolution, and should be submitted directly to the Deputy Secretary for a final management decision.

f. The use of a standard format for the position papers will facilitate the Deputy Secretary's review of and decision on the outstanding issues. Exhibit 11 provides a basic format. The actual position papers should not exceed three pages, and must be signed by the head of the organizational unit and the Inspector General, as appropriate.

g. The preceding time frames are designed to afford the Deputy Secretary a minimum of 10 calendar days to make a final management decision within the 180-day statutory reporting requirements. After the Deputy Secretary's final decision, the involved organizational unit shall implement the decision in the same manner provided by this Order as it would for any other resolved audit report.

## J.   USA v KARRON Full Trial and Sentencing Transcript[82]

PUT EXERPTS HERE

A FULL REFERENCE COPY IS AT

http://www.scribd.com/full/48707631?access_key=key-21iwom8pqypjo97yqq6c

## K.  Government Exhibits from USA v KARRON

i.   **GX110**
ii.  **GX111**
iii. **GX114**[83]



---

[82] http://www.scribd.com/full/48707631?access_key=key-21iwom8pqypjo97yqq6c Uploaded Saturday, February 12, 2011 at 15:29:24 Hours
[83]
https://docs.google.com/viewer?a=v&pid=explorer&chrome=true&srcid=0B5tahXvgtqadMmU4MDM3YWEtODU
xNy00YmU3LWIwMmEtNDM4NzJmZjIyNTQx&hl=en&authkey=CJX7v_IN