USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/17/12

PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL B. KARRON

     Petitioner,

-V.-

UNITED STATES OF AMERICA

     Respondent.

     File 11-civ-1874 (RPP)
     07-cr - 541 (RPP)

CORRECTED Sur-Reply
Memorandum of Fact and
Law in support of Petitioners'
28 U.S.C. §2255 Motion to
Vacate Criminal Verdict

## (1)    Introduction and Tables

     The Defendant, D. B. Karron, responding *pro se* at this time, respectfully submits this corrected reply[1] to the Governments' "MEMORANDUM OF LAW IN OPPOSITION"[2] Rule 5(3)[3] and in further support of the Petitioners' Resubmitted 28 U.S.C. §2255 motion to Vacate Criminal Verdict[4] successfully submitted under Rule 3.

---

[1] RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS, EFFECTIVE FEBRUARY 1, 1977, AS AMENDED TO FEBRUARY 1, 2010.. Downloaded Aug 1, 2011
[2] 11-civ-1874 Docket number 94 or here on 07/16/2011
[3] Rule 5 (e) Reply. The petitioner may submit a reply to the respondent's answer or other pleading within a time fixed by the Judge. *Ibid.*
[4] 11-civ-1874 Version of April 28, 2011, cited in first paragraph of the governments reply brief (*above*) but not apparently re-docketed and available on PACER and as such not on RECAP. A copy is on Google Docs.

## **(.1)**    **Contents**

(1)    Introduction and Tables ...................................................................................1-1

  (.1)    Contents.............................................................................................1-2

  (.2)    Tables of Authorities ........................................................................1-4

    (...1)    Cases ....................................................................................1-4

    (...2)    Statutes .................................................................................1-5

    (...3)    Other Authorities.................................................................1-5

    (...4)    Rules .....................................................................................1-9

    (...5)    Treatises ...............................................................................1-9

  (.3)    The Defendant respectfully petitions to move the court .............................1-10

  (.4)    Discussion of Rule 6 and 7 ..............................................................1-10

  (.5)    Specific Requests under Rule 6 and 7 ..............................................1-10

(2)    Introduction: What is new in this case and why is it worth revisiting? ............2-1

  (.1)    The rent was reclassified as salary, it was never allowed...........................2-2

  (.2)    Why Brady Material must exist .........................................................2-3

    (...1)    Snowden admitted destroying and withholding correspondence .........2-3

    (...2)    Power and Telephone were allocated and approved ...........................2-4

    (...3)    GX114 reallocation supporting documentation must exist ...................2-7

    (...4)    Snowden admitted destroying and withholding correspondence .........2-8

    (...5)    Riley must have created contemporaneous documents .........................2-9

    (...6)    Lee Goldberg Affidavit to OIG withheld in Ondrik Declaration .......2-10

    (...7)    Budget revision change base rule conflicted: 10% of what?................2-11

  (.3)    The Government's Case has feet of Clay...............................................2-13

    (...8)    Collapse of *mens rea* with government knowledge defense and program cooperation...............................................................................................2-14

    (...9)    GX114 was partially made up. .........................................................2-15

(3)    Rebuttal to Respondent Arguments ...............................................................3-15

  (.1)    [Respondent Argument I]. Ineffective Assistance of Counsel....................3-15

    (...1)    The VI[th] Amendment.............................................................3-15

    (...2)    Failure to Investigate and Prepare .................................................3-16

    (...3)    Failure to Suppress ......................................................................3-17

    (...4)    Failure to confront hostile auditor Hayes as witness...........................3-18

  (.2)    [Respondent Argument II] Brady Violations .......................................3-21

    (...5)    The "Procedural Default" Doctrine .................................................3-21

(...6)    The Petitioners Brady claims are not Procedurally Defaulted ............................ 3-22

(...7)    Direct Evidence of Brady Material ................................................................ 3-23

(...8)    Indirect Evidence of Brady Material ............................................................. 3-25

(.3)    [Respondent Argument III] Actual Innocence .......................................... 3-25

(...9)    Four Counter Arguments ................................................................................ 3-26

(...10)    Evidence is irrefutable ................................................................................. 3-27

(.4)    [Respondent Argument IV] Dismissal would be an abuse of judicial discretion and a hearing should be granted. ..................................................................................... 3-28

(...11)    Quality of the Evidence ................................................................................ 3-30

(...12)    Trial Judge *sua sponte* expressed critical doubts about GX114 .......................... 3-30

(4)    Signature ................................................................................................................. 4-31

(5)    Appendix ................................................................................................................. 5-1

(6)    AFFIRMATION OF SERVICE ............................................................................. 6-1

(7)    Exhibits ................................................................................................................... 7-3

(.1)    Guide to Exhibits ................................................................................................. 7-3

(.1)    EXHIBIT B BROWNING LETTER ..................................................................... 7-5

(.1)    EXHIBIT E EISEN DECLARATION .................................................................. 7-6

(.2)    EXHIBIT D DUNLEVY Lead Sheets ................................................................. 7-7

(.3)    EXHIBIT G GOLDBERG ..................................................................................... 7-8

(.4)    EXHIBIT O ORTHWEIN ..................................................................................... 7-9

## (.2)     Tables of Authorities

### (...1)     Cases

Bousley v. U.S., 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ...............................3-22
Bousley v. U.S., 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L.Ed.2d 828 (1998)..............3-21
Bracy v. Gramley, 520 U.S. 899, 908-09 (1997)..........................................................................3-28
Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963) ................................3-30
Brady v. Maryland, 373 U.S. 83, 87 (1963) ...................................................................................2-3
Brown v. Borg, 951 F.2d 1011 (9th Cir . 1991) ..........................................................................3-23
Burns v. Thiokol Chemical Corporation,483 F.2d 300 5th Cir. (1973) .....................................3-31
Campino v. United States, 968 F.2d 187, 190 (2d Cir.1992)......................................................3-21
Coleman v. Zant, 708 F.2d 541, 547 11th Cir. (1983)................................................................3-29
Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469
    (1993). at 595 .........................................................................................................................3-17
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ........................................2-1
Davis v. United States, 417 U.S. 333 (1974)................................................................................3-22
Davis v. Washington, 547 U.S. 813 (2006) ..................................................................................3-19
Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613 C.A.5 (Ga.), (1977) ..........................................3-31
Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 615-617 5th Cir., (1977)..................................3-30
East v. Scott, 55 F.3d 996 (C.A.5 (Tex.), 1995) ..........................................................................3-29
Giglio v. United  States, 405 U.S. 150 (1972)...............................................................................2-3
Government of the Virgin Islands v. Bradshaw, 726 F.2d 115, 117 (3d Cir.), cert. denied, 469
    U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984)....................................................................3-29
Government of the Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1980) .............................3-29
Harris v. Nelson, 394 U.S. 286, 300 (1969) ..............................................................................3-29
Hodges v. Epp (1995) ..................................................................................................................3-29
Holland v. Florida, No. 09-5327 (U.S. 6/14/2010), 130 S.Ct. 2549 (2010)...............................2-1
Kimmelman v. Morrison, 477 U.S. 365, 385–87, 106 S. Ct. 2574, 2588–90, 91 L. Ed. 2d 305,
    326–27 (1986)........................................................................................................................3-18
Kimmelman v. Morrison, 477 U.S. 365, 91 L.Ed.2d 305, 106 S.Ct. 2574 (1986) ...................3-16
Machibroda v. United States, 368 U.S. 487, 494-95 (1962)........................................................3-31
Marone v. United States, 10 F.3d 65, 67 (2d Cir.1993)..............................................................3-21
Massaro v. United States, 538 U.S. 500, 503-04, 123 S. Ct. 1690, 1693, 155 L.Ed.2d 714 (2003)
    ...........................................................................................................................................2-3, 3-22
McLanahan v. Universal Insurance Company, 26 U.S. 1 Pet. 170 170 (1828)...........................2-1
Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009) .........................................................3-19
Murray v. Carrier, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) .......3-22
Neitzke v. Williams, 490 U.S. 319, 109 S. Ct. 1827, 104 L.Ed.2d 338 (1989)........................3-20
Newfield v. U.S., 565 F.2d 203 C.A.2 (N.Y.), (1977)................................................................3-31
People v. Wallace 187 A.D.2d 998, 998–99, 591 N.Y.S.2d 129, 130 (4th Dept. 1992) ...........3-18
Strickland v. Washington, 466 U.S. 668, (1984).......................................................................3-17
Strickland v. Washington, 466 U.S. 688, 691, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984) ...........3-16
Summerlin v. Schriro, 427 F.3d 623 (9th Cir. 2005) ...................................................................3-17
Thompson v. Com., 177 S.W.3d 782 (KY, 2005) .......................................................................3-18
Townsend v. Sain, 372 U.S. 293, 322 (1963)..............................................................................3-29

U.S. ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999) ..........................3-26
U.S. ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971 (E.D. Wis., 1998),  aff'd 168 F.3d
    1013 (C.A.7 (Wis.), 1999)............................................................................3-26
U.S. ex rel. Ubl v. IIF Data Solutions, 2011 WL 1474783 (4th Cir. April 19, 2011) ...............3-2.3
United States v. Bokun, 73 F.3d 8, 12 2d Cir. (1995)..................................................3-16
United States v. Frady, 456 U.S 102 S. Ct. 1584, 1594, 71 L.Ed.2d 816 (1982) ....................3-22
United States v. Frady, 456 U.S. 102 S. Ct. (1982) ....................................................3-22
United States v. Frady, 456 U.S. 152, 165 (1982) .....................................................3-21
United States v. Frady, 456 U.S. 152, 168, 102 S. Ct. 1584, 1594, 71 L.Ed.2d 816 (1982) .....3-21
United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) .....................................3-17
United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999).......................................3-17
United States v.Costanzo, 625 F.2d 465, 468 3d Cir. (1980)..........................................3-28
Walker v. Johnson, 312 U.S. 275, 285 (1941)...........................................................3-28
Washington v. Alaimo 934 F. Supp. 1395 (S.D. Ga. 1996)...............................................3-29
Yick Man Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010) .......................................3-21

(...2)   **Statutes**

15 U.S.C. §278n .........................................................................................2-13
18 U.S.C. §3006A ..........................................................................................1-10
18 U.S.C. §3500...........................................................................................3-28
18 U.S.C. §666(a)(1)(A) ...........................................................................3-29, 3-30
18 U.S.C. §666(a)(1)(A)(i).................................................................................3-29
28 U.S.C. §1915...........................................................................................3-23
Sixth Amendment to the United States Constitution ...............................................3-18, 3-21

(...3)   **Other Authorities**

07-cr - 541 ......................................................................................1-10, 2-8
08-cv-10223 ...............................................................................1-10, 1-10
11-civ-1874 ............................................................................1-1, 1-10, 2-8
8-11-73479.................................................................................................1-12
ABA Standards for Criminal Justice: Providing Defense Services, 3d ed., © 1992 American Bar
    Association................................................................................................3-19
American Bar Association Model Rules of Professional Conduct ...........................................3-18
Arraignment Transcript at 19 Line 14 .....................................................................2-6
Arraignment Transcript at 20 Line 2 ......................................................................2-7
Bates Stamped Discovery at-5347ff.........................................................................2-6
Criminal Trial Discovery Bates Stamped Pg.  5274, 5348, 5347ff of 6,636 .............................2-10
Department of Commerce Department Administrative Order 213-5, AUDIT RESOLUTION
    AND FOLLOW-UP, Effective Date: 1991-06-21 ...........................................................1-11
DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS
    INTERIM MANUAL (02/2002) Chapter 19, at 9,(3).........................................................2-7
DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS
    INTERIM MANUAL (2002-02) (4) (A.)(b) .................................................................2-7

DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS
   INTERIM MANUAL (2002-02) (4)(F)(4) 4 ................................................................2-7
Department of Commerce Office of Acquisition Management DEPARTMENT OF
   COMMERCE..............................................................................................................1-11
Discovery Documents Bates stamped at 05274 and 05348 ...........................................2-6
Discovery Material Bates Stamped at 5274, 5348, 5347ff of 6636 ...............................2-5
DXXXX ..........................................................................................................................3-34
DXXXX-1 .......................................................................................................................3-34
DXZ.................................................................................................................................3-34
DXZZZ ...........................................................................................................................3-34
DXZZZ-1 ........................................................................................................................3-34
Exhibit D........................................................................................................................3-34
Exhibit E ................................................................................................................ 2-3, 2-7
Exhibit E at 8 ........................................................................................................ 2-1, 2-1
Exhibit G................................................................................................ 2-12, 3-19, 3-34
Gershman, Bennett L. (2007)CASE WESTERN RESERVE LAW REVIEW, Vol. 57:3, at 13- 47
   .........................................................................................................................................2-3
GOVERNMENT  AUDITING  STANDARDS Answers to Independence Standard Questions
   (July 2002) GAO Publication GAO-02-870G ..............................................................2-11
Government Auditing Standards July 2007 Revision GAO-07-731G "7.05 Audit risk............2-12
Government Auditing Standards July 2007 Revision GAO-07-731G 4.01" ............................2-10
Government Auditing Standards July 2007 Revision GAO-07-731G 4.19 ............................2-11
GX1 .........................................................................................................................2-6, 2-13
GX10 .....................................................................................................................2-15, 2-16
GX110 ............................................................................................... 3-23, 3-24, 3-31
GX110 at 21 of 37...........................................................................................................1-13
GX111 ...........................................................................................................................2-11
GX114 .............................................................. 2-17, 3-19, 3-23, 3-24, 3-31, 3-34, 3-35
GX12 ..............................................................................................................................2-14
GX2 ........................................................................................................................ 2-6, 2-14
GX23 ...............................................................................................................................2-14
GX3 ...................................................................................... 2-7, 2-14, 2-15, 3-30
GX3 at 2 .3(b) .................................................................................................................1-11
GX4 ...............................................................................................................................2-14
GX60 ..................................................................................................... 2-10, 3-21
GX61 ...................................................................................................2-10, 2-15, 3-21
GX62 ........................................................ 1-11, 1-12, 2-10, 2-11, 3-21
GX62 APPENDIX III ....................................................................................................2-16
GX80 ...............................................................................................................................3-34
GX81 ...............................................................................................................................1-13
Jury Charge Case 1:07-cr-00541-RPP Document 56-7 Filed 07/21/2008 at 7.........................2-17
Karron Brief at 105 ............................................................................... 2-3, 3-18
Karron Brief at 18 ..........................................................................................................2-8
Karron Brief at 26 ................................................................................. 3-29, 3-34
Karron Brief at 33 ................................................................................... 2-1, 2-2
Karron Brief at 65 .............................................................................................3-17, 3-23

Karron Brief at 68, Footnote 204 ..................................................................3-18
Karron Brief at 70 ........................................................................................3-29
Karron Brief at 84 ........................................................................................3-18
Karron Brief Exhibit 1 ..................................................................................3-29
Ondrik Decl. Paragraph 4 .............................................................................2-12
R. Br at 16 ....................................................................................................3-17
R. Br at 26 ....................................................................................................3-32
R. Br. at 10 ...................................................................................................2-17
R. Br. at 16 ...................................................................................................3-23
R. Br. at 1-9 ...................................................................................................2-1
R. Br. at 23 ...................................................................................................2-12
R. Br. at iv ...........................................................................................2-15, 2-16
R. Br. Exhibit 1 ............................................................................................2-12
Riley Expert Witness Resume, at 5 ...............................................................2-12
Rule 33 Opinion and Order at 11. Footnote ..................................................2-11
Sentencing 1 Transcript at 1-10 ...................................................................3-24
Sentencing 1 Transcript at 16 Line 14et seq .................................................3-35
Sentencing 1 Transcript at 16 Line 15 ............................................................2-2
Sentencing 1 Transcript at 17 Line 15 ................................................2-5, 2-10
Sentencing 1 Transcript at 18 Line 12 ...........................................................3-31
Sentencing 1 Transcript at 21 ........................................................................2-7
Sentencing 1 Transcript at 5 Line 1 ...............................................................2-2
Sentencing 1 Transcript at 5 Line 3 ..............................................................3-35
Sentencing 1 Transcript at 5 Line 4 ..............................................................2-11
Sentencing 1 Transcript at 56 Line 7 ..............................................................2-1
Sentencing 1 Transcript at 57f ......................................................................2-15
Sentencing 1 Transcript at 6 Line 3 ......................................................2-2, 3-31
Sentencing 1 Transcript at 7 ..........................................................................2-8
Sentencing 1 Transcript at 7 Line 17 ..............................................................2-8
Sentencing 1 Transcript at 77ff Line 24 ..........................................................2-2
Sentencing 1 Transcript at 79 Line 11 ....................................................2-2, 2-3
Sentencing 1 Transcript at 81 line 9 ...............................................................2-6
Sentencing 1 Transcript at 88 Line 14 ............................................................2-2
Trial Transcript at 1078 Line 17 ...................................................................2-10
Trial Transcript at 1168 Line 1: ....................................................................3-19
Trial Transcript at 1172 Line 19 ...................................................................3-19
Trial Transcript at 122f ...............................................................................2-15
Trial Transcript at 1262-65 ..........................................................................3-??
Trial Transcript at 1263, 1268, 1283, 1287 ..................................................1-13
Trial Transcript at 127 Line 25 ......................................................................2-3
Trial Transcript at 1270ff Line 24 .................................................................3-24
Trial Transcript at 128 Line XX ....................................................................3-29
Trial Transcript at 1312 Line 2 ......................................................................2-6
Trial Transcript at 1370 Line 24 ...................................................................3-20
Trial Transcript at 1371 .................................................................................3-35
Trial Transcript at 1377 Line 1 .....................................................................3-35

Trial Transcript at 1379 Line 24.................................................................2-11, 2-17
Trial Transcript at 191 Line 1.................................................................2-14
Trial Transcript at 23 Line 19.................................................................1-12
Trial Transcript at 256 Line 16.................................................................2-6
Trial Transcript at 298 Line 17.................................................................2-14
Trial Transcript at 309 Line 4 et. seq..................................................2-4, 2-10
Trial Transcript at 348 Line 16.................................................................3-30
Trial Transcript at 387 Line 1.................................................................3-29
Trial Transcript at 395 Line 22.................................................................2-8
Trial Transcript at 407 Line 15.................................................................3-30
Trial Transcript at 419 Line 13.................................................................2-9
Trial Transcript at 419 Line 20.................................................................3-27
Trial Transcript at 420 Line 19..................................................2-4, 2-9
Trial Transcript at 420 Line 20..................................................2-1, 3-34
Trial Transcript at 423 Line 5.................................................................2-9
Trial Transcript at 423 Line 6.................................................................2-1
Trial Transcript at 424 Line 1..................................................2-4, 2-9
Trial Transcript at 424 Line 12.................................................................2-9
Trial Transcript at 424 Line 3..................................................2-4, 2-9
Trial Transcript at 424 Line 4..................................................2-4, 2-9
Trial Transcript at 424 Line 5.................................................................3-34
Trial Transcript at 446 Line 17.................................................................3-30
Trial Transcript at 454 Line 1.................................................................2-4
Trial Transcript at 454 Line XX.................................................................2-10
Trial Transcript at 455 Line 18.................................................................3-31
Trial Transcript at 456 Line 14.................................................................2-14
Trial Transcript at 456 Line XX.................................................................2-13
Trial Transcript at 473 Line 24.................................................................1-11
Trial Transcript at 473 Line XX.................................................................2-11, 3-20
Trial Transcript at 475 Line 12.................................................................2-2
Trial Transcript at 496 Line 16..................................................2-4, 2-10
Trial Transcript at 5 Line 4.................................................................3-35
Trial Transcript at 550 Line 25.................................................................3-19
Trial Transcript at 60 Line 10.................................................................2-14
Trial Transcript at 61 Line 1.................................................................2-13
Trial Transcript at 762 Line 17.................................................................3-20
Trial Transcript at 764 Line 22.................................................................3-20
Trial Transcript at 788-809.................................................................3-23
Trial Transcript at 803 Line 19.................................................................2-8
Trial Transcript at 810 Line 16.................................................................3-27
Trial Transcript at 811 Line 25.................................................................3-23
Trial Transcript at 811 Line 3.................................................................3-27
Trial Transcript at 842 Line 6.................................................................2-8
Trial Transcript at 850 Line 11.................................................................2-6
Trial Transcript at 850 Line 9.................................................................3-27
Trial Transcript at 851 Line 1.................................................................2-6

Trial Transcript at 86 Line 10..............................................................................2-15
Trial Transcript at 87 Line 1................................................................................2-14
Trial Transcript at 928 Line 22........................................................................... 2-1
Trial Transcript at XX Line 10.............................................................................3-27
Trial Transcript at XXX Line 94..........................................................................2-14
U.S. Commodity Futures Trading Commission (CFTC) Press Release: PR6114-11 September
    22, 2011 ........................................................................................................2-2

## (...4)   Rules

15 C.F.R. (1–1–01 Edition) §14.25 ......................................................................2-13
15 C.F.R. (1–1–01 Edition) §14.25 (d)................................................................2-15
15 C.F.R. (1–1–01 Edition) §14.25 (f) .................................................................2-15
15 C.F.R. (1–1–01 Edition) §24.30 Changes.  (a) ..............................................2-13
15 C.F.R. (1–1–01 Edition) §24.30 Changes.  (c) Budget changes—(1) (ii ............2-15
15 C.F.R. §295 .................................................................................... 1-12, 2-13
15 C.F.R. §295.2(l) .............................................................................................1-11
15 C.F.R. §295.32 ..............................................................................................1-11
15 C.F.R. §295.8 (2) ..........................................................................................1-13
15 C.F.R. §A (1–1–01 Edition) §24.12 ...............................................................3-31
F.R.E. 702 ......................................................................................................... 2-2
F.R.E. 703 ......................................................................................................... 2-2
Rule 6. Discovery: 1 (a) .....................................................................................3-35
Rule 7....................................................................................................................1-10
Rule 8..................................................................................................................1-10

## (...5)   Treatises

Cohen, J and Walsman, D. D. (2009)The 'Brady Dump': Problems With 'Open File' Discovery.
    New York Law Journal, Volume 242—No. 4, September 4, 2009.......................2-3
D. Satava , C. Caldwell  and L. Richard(2006): Ethics and the Auditing Culture: Rethinking the
    Foundation of Accounting and Auditing Journal of Business Ethics, Volume 64, Number 3 /
    March, 2006 At 271-284 ...............................................................................2-12
DAVIDSON, M. J. (2009) THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL
    FALSE CLAIMS ACT45 Idaho L. Rev. 41 2008-2009 ......................................3-27
EPSTEIN, R. A. (2011) Government by Waiver. National Affairs Issue #7, Spring 2011 .........2-5
Findley, Keith A., Learning from Our Mistakes: A Criminal Justice Commission to Study
    Wrongful Convictions (February, 09 2009). California Western Law Review, Vol. 38, No. 2,
    2002. Available at SSRN: http://ssrn.com/abstract=1340086................................2-1
Government Auditing Standards July 2007 Revision GAO-07-731G AICPA GAGAS ...........3-22
Mosteller, Robert P., Failures of the American Adversarial System to Protect the Innocent and
    Conceptual Advantages in the Inquisitorial Design for Investigative Fairness (December 14,
    2009). North Carolina Journal of International Law & Commercial Regulation, Vol. 36, No. 2,
    2011; UNC Legal Studies Research Paper No. 1523431. Available at SSRN:
    http://ssrn.com/abstract=1523431 ...................................................................3-17

### (.3)      The Defendant respectfully petitions to move the court

The Defendant respectfully moves the Court under FRCP Rule 6[5] to

i.      Conduct discovery (FRCP Chapter V *et seq*)[6] and

ii.     Appoint counsel to assist in the

1. Preparation of document production requests

2. Prepare interrogatories

3. Prepare requests for admissions

4. Prepare depositions of witnesses.

5. Organize the new findings for the court.

iii.    Prepare for a §2255 hearing(s)[7]

### (.4)      Discussion of Rule 6 and 7

Under Rule 7[8], the trial record can be expanded with new evidence not previously admitted.

### (.5)      Specific Requests under Rule 6 and 7

Specifically, the Petitioner requests expansion of the record to include[9] the following

1. The forensic reconstruction of Dunlevy[10], particularly the twelve summary pages or "lead sheets"[11].  This gives the total cost of the project as $1,524,264[12],

---

[5] Rule 6.  Discovery  (a) Leave of Court Required.  "A Judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery. If necessary for effective discovery, the Judge must appoint an attorney for a petitioner who qualifies to have counsel appointed under 18 U.S.C. §3006A".  *ibid.*

[6] Rule 6, *ibid.*

[7] Rule 8. Evidentiary Hearing. (a) Determining Whether to Hold a Hearing.  "If the petition is not dismissed, the Judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  *ibid.*

[8] Rule 7. Expanding the Record (a)
In General.  If the petition is not dismissed, the Judge may direct the parties to expand the record by submitting additional materials relating to the petition. *ibid.*

[9] But not limited to

[10] Exhibit D or Docket1:08-cv-10223 docket item 32attachment 0 At 16 ff  available from PACER  or RECAP (free)

[11] Exhibit D.  Dunlevys' exhibit for this motion was apparently not docketed under these docket number 11-civ-1874 or 07-cr - 541.  It was also used as an exhibit in the governments collateral civil attack docket 1:08-cv-10223 docket item 32 (2010-08-23).  As DECLARATION of Deborah A. Dunlevy in Opposition re: ...  (Additional

of which the Federal Share is $1,345,500[13] and the CASI co-funding
contribution was $178,764.[14]

2. The forensic Analysis of Melvin Spitz, CPA, created for the Department of
Commerce Audit Resolution administrative process[15], which was mandated in
Department of Commerce Department Administrative Order DAO 213-5 [16][17] but
blocked by the OIG Special Agents[18] escalation of this matter into a criminal
investigation and prosecution.

---

attachment(s) added on 9/29/2010: as attachments 1 through 18, available on PACER or RECAP (free). See
additional motion to correct record (Docket item 38 and the Judges orders in this regard at item 44
[12] Dunlevy Exhibit at AAC109 Line 18(Lead Sheet 9), BAC-227, BAC-310, BAC-375, BAC-535, CAC-180, CAC-
202, CAC-211
[13] GX62 at i (Exhibit at 10) Report ATL-16095-4-0002 August 2004. Even on the NIST final audit report, the total
government disbursement is cited incorrectly as $800,000 Year One and $545,000 for Year Two, which is short
$500, for an incorrect total of $1,345,000. The Browning Letter, Exhibit B, gives the total amount disbursed as
$1,345,500, and offers to disburse the remaining balance of $54 500. Dunlevy concurs at Lead Sheet at $54,500.
BAC-160, BAC-227, BAC-305, BAC-309, BAC-375, BAC-493, BAC-509, BAC-535, CAC-201, CAC-211, .
Spitz in GX62 Report ATL-16095-4-0002 August 2004 Audit Report Rebuttal and Appendix III at 14 of 38.
[14] Dunlevy Exhibit Lead Sheet at AA-001-C, Dunlevys' Contribution figure includes Cash and Non Cash
Contributions, such as statutory  in-kind [15 C.F.R. §295.32] ((d) The total value of any in-kind contributions used
to satisfy a cost sharing requirement may not exceed 30 percent of the non-federal share of the total project costs."]
[15 C.F.R. §295.2(l) "Sources of revenue to satisfy the required cost share include cash and in-kind contributions."),
See also GX3 at 2 .3(b) ("Exceptions to this requirement may be granted by the Grants Officer based on sufficient
documentation demonstrating previously determined plans for or later commitment of cash or inkind contributions.
However, the Recipient must meet its cost share commitment over the life of the award.") contributions, Account
Payables ( and paid later)Spitz in the Appendix of GX62 gives a different, lower figure for the CASI cash only
contribution out of Karrons' payroll at 79,474.18. This is still different from the Government's contention of zero
CASI contribution at GX62 Report ATL 16095-4-0002 at 6. at trial it was revealed that the audit was never
reconciled back to bank and credit card statements[Trial Transcript at 473 Line 24 Q. Did you do a bank
reconciliation of the various bank accounts of CASI? A "For this audit ?" Q: Right A: No]
[15] A copy of the Spitz report is included inGX62, the OIG Final Audit Report No. ATL-16095-4-0002 APPENDIX
III at 14 of 38 (Exhibit at 47 starting from first at cover letter) but never acknowledged at trial, only after trial in
Letter to Chambers from Rubinstein October 2,2008 following Rule 33 and 39 Oral Arguments).
[16] Department of Commerce Department Administrative Order 213-5, AUDIT RESOLUTION AND FOLLOW-UP,
Effective Date: 1991-06-21 Downloaded Sept 11, 2011 and gives exhaustive administrative civil remedies to resolve
audit disputes and appeals to audit disputes.
[17] Department of Commerce Office of Acquisition Management DEPARTMENT OF COMMERCE
GRANTS AND COOPERATIVE AGREEMENTS, Version of 02 / 2002 downloaded on Sept 11, 2011 from ([N.B.
Then current, now] "Obsolete INTERIM MANUAL", ) D. Audit Resolution. 1. In accordance with Department of
Commerce Office of [Acquisition Management DEPARTMENT OF COMMERCE] DAO 213-5, Department and
operating unit personnel shall act promptly to resolve both the financial and nonfinancial issues raised in an audit
report. Comments, arguments, and evidence (if any) submitted by the auditee and the operating unit shall be
considered in resolving these issues. A DOC decision on the resolution of audit findings and recommendations will
be made within 180 days of the issuance of an OIG audit report or OIG transmittal letter including findings and
questioned costs reported by an independent accountant in accordance with the procedures and within the specified
timeframes identified in DAO 213-5.   4. All disputes arising from audit resolution shall be decided in accordance
with the appeal procedures and specified time frames outlined in DAO 213-5, and DOC's "Policies and Procedures
for Resolution of Audit-Related Debts," as published in the Federal Register on January 27, 1989 (54 FR 4063).
[18] Trial Transcript at 23 Line 19. RUBINSTEIN: [...] This is an e-mail from Rachel Garrison [OIG Special Agent]
... cc'd to a number of people,... and it says, "Additionally, please do not proceed with audit resolution for CASI.
It's extremely important that a bill not be generated for the funds that CASI misappropriated from the award."

      3. The bankruptcy forensic accounting being sought by the newly appointed Trustee of the US Bankruptcy Court Neil H Ackerman, Esq[19,] who is engaging an forensic accountant to review Karron creditor claims including the IRS claims of missing payroll taxes and civil fines[20].

iv.    Conduct Discovery and Requests for admissions[21] as to

1.    Total[22] project costs[23] and total project spending[24],

2.    Karrons' salary, source[25] and how it was spent,

3.    Karron and CASI project payroll taxes paid and lost by CASI accountant and auditor Hayes[26],

4.    CASI NIST ATP cash co-funding, and in-kind contribution[27].

5.    Other program direct spending, such as ATP Payroll Fringes, Personal Master Card, Visa, American Express, PayPal and Accounts Payable, Personal Credit Card, Travel.

6.    CASI non program costs[28]

---

[19] Eastern District of New York, Central Islip, Bankruptcy Court, Case Daniel B Karron  Docket #8-11-73479 Docket Entry 33 "Order Granting Application to Employ Ackerman Spence, PLLC as Attorney for the Trustee." (Related Doc # 32 application for Employment ) Signed on 8/22/2011.

[20] Eastern District of New York, Central Islip, Bankruptcy Court, Case Daniel B Karron  Docket #8-11-73479 Bankruptcy Claims #5(5-1 ) filed by Internal Revenue Service, total amount claimed: $130,382.58 on 08/25/2011

[21] FRCP Rule 36 **request for admissions** or a **request to admit** are a set of statements sent from one litigant to an adversary, for the purpose of having the adversary admit or deny the statements or allegations therein

[22] ESTIMATED MULTI-YEAR BUDGET· SINGLE COMPANY OBJECT CLASS CATEGORY K and H

[23] Costs are out of pocket and invoiced costs in accrual basis.

[24] Spending is the payment of invoiced costs, prepaid costs not invoiced made by check, credit card, cash, transfer, etc.

[25] Where it came from.

[26] IRS Special Agent Debra Lynch been investigating this as one of a succession of IRS agents who have worked on this case (c.f. Dunlevy Declaration).  Lynch has filed federal tax liens against CASI and Karron and is involved in the Karron bankruptcy (*above*).

[27] Co-Funding schedule was in negotiation with Snowden(see argument below) Spitz credited only cash. Dunlevy credited cash and in-kind, accounts payable and corporate and personal credit card accounts on an accrual basis. (15 C.F.R. §295)  (see GX62 APENDIX III) (Contribution: Trial Transcript at 210 Line 1, at 239ff Line 3,  at 270f Line 18, at 414 Line 25ff, at 343 Line 2, In-kind at 1061ff Line8, at 1073ff Line 11)  Payments has been variously identified as "loan repayments", "loss offset" or ignored.  Obscuring co-funding are the early 150,000 initial advance, which included a  75,000 payroll 'bootstrap payroll advance loan'.  The purpose of this loan was to co-fund the project and payoff Karron debts.  The court focused on repayment, but not the proceeds of the payment, and ultimately accepted the loans as repaid

[28] Non Program Non Overhead costs. Unfunded patent mandate(15 C.F.R. §295.8 (2) Patent procedures)( GAO Testimony "FEDERAL MANDATES", or things you never expected you would have to pay for yourself on your grant because the government has an interest in your intellectual property") (GX81 and GX110 at 21 of 37, GREEN CASI checks to Patent Lawyers (Levison, Lerner, Berger & Langsam and Pennie & Edmonds).  Non Program travel for DARPA in Arlington Cited in Trial Transcript at 1263, 1268, 1283, 1287, as misappropriation along with Program Travel to NIST at Gaithersburg.

v.   Conduct Discovery for undisclosed exculpatory material evidence evidencing the granting wavers for CASI use of ATP funds

Conduct Depositions of key material witnesses, specifically Belinda Riley, Joan M. Hayes, Hope Snowden, B J Lide, Jayne Orthwein, Marilyn Goldstein, Marc Stanley, Frank Spring, Deborah Dunlevy, Melvin Spitz, and other as the Court deems warranted.

## (2)   Introduction: What is new in this case and why is it worth revisiting?

The main "new" evidence in this case[29] is arithmetic/math [30] [31]. This case is analogous to DNA exonerations[32], where instead of new biochemical technique, "e-discovery" techniques are used in "extreme diligence"[33] to build hard, direct, irrefutable forensic evidence[34] in contradiction to the almost overwhelming trial chorus of circumstantial inculpation[35]. The government's case is based in "Junk Auditing" [36] [37] [38] [39] supporting circumstantial evidence from unqualified eyewitnesses later impeached[40] in trial and/or by contradiction here.

---

[29] Credit is due to extreme diligence on Dunlevy, Spitz and others' part. One of the people who triggered this line of research was a comment by the Trial Judge Patterson himself at sentencing. Sentencing 1 Transcript at 56 Line 7 COURT: "This doesn't show that the amounts taken for rent were part of the salary computation." In this 2255 motion we show it was. Here we show it was. Karron Brief at 33. "10. The Explanation for the Karron Salary Line is to include Rent Checks"

[30] Perhaps in retrospect it is simple arithmetic and logic, and as such irrefutable in nature.

[31] Like a scientific discovery, invention, innovation or advance, it is not obvious until revealed, discussed and comprehended; then it appears simple and straightforward.

[32] Findley, Keith A., Learning from Our Mistakes: A Criminal Justice Commission to Study Wrongful Convictions (February, 09 2009). California Western Law Review, Vol. 38, No. 2, 2002. Available at SSRN: http://ssrn.com/abstract=1340086 <<PITHY QUOTE>>

[33] See a long and hoary line case law articulating this concept starting with McLanahan v. Universal Insurance Company, 26 U.S. 1 Pet. 170 170 (1828) "whether the rule as to diligence, may not, in certain cases, be somewhat more strict, so as to require, what in Andrew vs. Marine Insurance Company is called "extreme diligence;" or what in Watson vs. Delafield is left open for discussion, as extreme diligence; ... We think, however, that the principle of the rule requires only due and reasonable diligence,'(archaic citations omitted); Holland v. Florida, No. 09-5327 (U.S. 6/14/2010), 130 S.Ct. 2549 (2010) Due diligence does not require "the maximum feasible diligence" but it does require reasonable diligence in the circumstances

[34] Trial Transcript at 928 Line 22:[KWOK] And subsequent to that, we agreed to let defendant copy all the data on those computers. And so it is in their possession now, which they can review. [...] because we can't simply review 60 percent of the total holdings of the Library of Congress without knowing where the stuff is.

[35] R. Br. at 1-9, in summary, consisted of 1)testimony from ATP officials Lide and Snowden about ATP rules and practices to Karron. 2) Further testimony from CASI management vehemently admonished Karron to stop violating these laws because of criminal consequences. In essence (from the R. Br.), A) Lide laid down the law and B) Snowden says no to all requests. However, this does not stand up to closer examination. Snowden was calling CASI "quite a few" (Trial Transcript at 423 Line 6) and would "discard the old form"(Trial Transcript at 420 Line 20) documents. Snowdens' trial testimony is misleading, it being one side of a vigorous two-way debate in which permissions were granted as a new budget was being negotiated. Snowden granted oral and written waivers picked up in audit that were later suppressed by the OIG and disavowed by government staff. This is discussed in Exhibit E at 8 NIST ATP hated to say "no" and worked hard to find ways to say "yes" in support of their grantees. Missing is specific documentation to support specific denials in response to specific requests not granted. Exhibit E also at 6, lower "something that the technical and business project managers can evaluate and decide 'yes' or 'no'- they may decide they want additional peer review" Exhibit E at 8, ("We try not to be too bureaucratic.")

[36] "Junk Accounting" is analogous to "Junk Science", and should be excluded from courtroom forensics. See generally Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and prodigious progeny, F.R.E. 702,Trial Transcript at 475 Line 12: "KWOK Your Honor, we offer her as an expert witness under Federal Rules of Evidence 703[F.R.E. 703]. Underlying documents that an expert rely upon does not have to be admissible. That's what auditors do", Sentencing 1 Transcript at 5 Line 1: ("It seems to me this is just a rough calculation and **not**

### (.1)   The rent was reclassified as salary, it was never allowed.

The Rent was not allowed.[41]  It was never allowed.[42]  The rent was **reclassified** into salary[43].  Negotiations were underway from the first days of the first year between CASI, Orthwein[44] and Snowden[45].  The Petitioners perseveration in paying rent[46], was interpreted as evidence of criminal recalcitrance.  Because the Prosecutions' own schedule GX114 includes rent checks (buried) in the salary line, then the Petitioners negotiation to include the rent in some fashion was successful.  The ATP program had indeed accommodated[47] Karron.[48]

---

something that a Court could rely on in a criminal case.  [...]  That's my assessment of that proof.")  Sentencing 1 Transcript at 6 Line 3: ("COURT: "Show me. She has no tabulation putting 4 [GX] 114 into context with her [...] Exhibit [GX]110.")

[37] Because of Karron's lack of experience in grant accounting (Sentencing 1 Transcript at 88 Line 14, Sentencing 1 Transcript at 77ff Line 24, Sentencing 1 Transcript at 79 Line 11), spending was spread over a number of accounts (see Exhibit D, Dunlevy (lead sheets).  Frank Spring billed back corporate and personal charges on Karron's personal accounts back to CASI and NIST.  Because co-funding and co-mingled personal and overhead spending, accountants who have reviewed Karrons account also termed it as the Trial Court did: "a mess"(Sentencing 1 Transcript at 16 Line 15).  Karron kept good records not available to the Defense Counsel because restoration from Computer Images took almost until the start of the trial, and Counsel did not have, and could not absorb the volume of material.  CASI non program spending and Karron's non program spending were conflated into misappropriated grant spending with the erroneous assumption that all funds were federal funds.

[38] The American Institute of Certified Public Accountants (AICPA) Governmental Audit Quality Center (GAQC) promotes the importance of quality governmental audits and the value of such audits to purchasers of governmental audit services.  GAQC is a voluntary membership center for CPA firms ... that perform governmental audits.  This organization sets standards to eliminate junk auditing and accounting.

[39] U.S. Commodity Futures Trading Commission (CFTC) Press Release: PR6114-11 September 22, 2011 "CFTC Charges National Accounting Firm McGladrey & Pullen, LLP, and Partner David Shane with Failure to Properly Audit One World Capital Group, a Former Registered Futures Commission Merchant ... Firm to pay $900,000 and institute remedial measures, and Shane to pay $100,000 personally to settle CFTC action"

[40] Trial Transcript at 907 Line 1: (Spring – Cross Spring asked if was ever asked to change dates on items)

[41] Based on the assumption that it is an indirect or overhead cost, and is allocable to multiple projects and applications. See GX1 Chapter 1, Sections C.4 and C.5 of the November 2000 ATP Proposal Preparation Kit ("5. What types of costs are unallowable?)

[42] It was never allowed as 'rent' *per se*.

[43] Karron Brief at 33.  "10. The Explanation for the Karron Salary Line is to include Rent Checks"

[44] Exhibit O: Kickoff Meeting at NIST Badge and notes showing meeting agenda.  Agenda included rent.

[45] Trial Transcript at 423 Line 5: Snowden - Cross Q. How many calls did you make?  A. Quite a few.

[46] Sentencing 1 Transcript at 79 Line 11: [KARRON] I didn't want to take money unless I absolutely needed it. It was like running a little business.  The owner doesn't take the money unless you need it. I didn't want to take salary. I just wanted to take $2,000 at a pop for rent.  I thought I could charge it against salary.

[47] Trial Transcript at 127 Line 25: Lide - direct [KWOK]Q. What did you hope to accomplish going back the second time?  A. What we hoped to accomplish was to have a discussion to try to iron out the budget differences, because that had become a major issue in this grant, was to get a budget that the awardee could live with, and yet met the government rules and regulations.

[48] Exhibit E Certified Audio Trans. April 13, 2007 ATP Proposers' Conferences  NIST Red Auditorium, 100 Bureau Drive, Gaithersburg, MD 20899 A[nswer]: [MARC STANLEY, ATP PROGRAM DIRECTOR] One of the things I pride myself on in this program and with my colleagues is that: **We try not to be too bureaucratic.  We are very supportive of the companies that win awards from us,** ...

(.2)     **Why Brady Material[49] must exist**

Some 'undiscovered' exculpatory discovery "material" is already in the corpus of the discovery papers[50], "needlelike" in the proverbial "haystack"[51] [52]. Direct testimony spells out undisclosed material.[53] Circumstantial clues point to much more.[54]

(...1)     Snowden admitted destroying and withholding correspondence

Snowden admitted in open court, on the record, during cross-examination by Defense Counsel, to destroying working papers[55], and admitting to "additional correspondence"[56] evidencing understandings not shared[57] with the Defense.[58] Snowden admitted keeping clearly exculpatory material[59] from the investigators and prosecutors. Evidence will show that is because she had been helping Karron and Hayes.[60] The Prosecution clearly faulted in not providing the Defense with an advanced copy of the Rule 3500[61] tagged GX2000, and

---

[49] Brady v. Maryland, 373 U.S. 83, 87 (1963). See also Giglio v. United States, 405 U.S. 150 (1972)

[50] Not subject to the Procedural Default Doctrine because, particularly for Rubinstein, and not cognizable without extreme diligence, not due diligence. This resulted in Constitutional Ineffective Assistance of Counsel (see Karron Brief at Section "(4) viii. "Rubinstein was dangerously computer illiterate and tried to hide this until it was too late", " also argued *below*. Further, Ineffective Assistance of Counsel claims are never subject to the Procedural Default Doctrine. See Massaro v. United States, 538 U.S. 500, 503-04, 123 S. Ct. 1690, 1693, 155 L.Ed.2d 714 (2003)

[51] Cohen, J and Walsman, D. D. (2009)The 'Brady Dump': Problems With 'Open File' Discovery. New York Law Journal, Volume 242—No. 4, September 4, 2009. For Defense Counsel Rubinstein, 20,000 pages (Discovery, 100+ GXexhibits) was too much when a single text message was too much. See Karron Brief at 105, Section 12. "Rubinstein dangerously computer and accounting illiterate"

[52] Gershman, Bennett L. (2007)CASE WESTERN RESERVE LAW REVIEW, Vol. 57:3, at 13- 47

[53] Trial Transcript *below*. Snowden – cross

[54] Specifically, 1) Snowdens' admission *below*, 2) Riley's GX114 audit issues *below* 3) Benedicts' testimony pointing to utility wavers granted, *below* 4) the non-termination of the grant, *below* and Declaration of Goldberg regarding Ondriks' false Declaration *below* and *etc.*

[55] Trial Transcript at 420 Line 19: Snowden – Cross, [...]I would just **discard the old form** and put in the correct form.

[56] Trial Transcript at 424 Line 3: Snowden - cross [RUBINSTEIN]  Q. So you're telling us there are additional reports than what we have here as exhibits, within exhibit 40 through 43? A. I'm telling you that there are correspondence, additional correspondence to these exhibits

[57] Trial Transcript at 424 Line 4: Snowden – direct There's quite a few changes. I only gave you guys a couple. There are a lot of changes. I didn't think you wanted every last one of them.

[58] Trial Transcript at 424 Line 1: (Snowden – Cross [RUBINSTEIN] Q. You never turned it over to the Prosecutor? A. Yes. )

[59] Implicating she was working for or against CASI and covering her tracks.

[60] Trial Transcript at 309 Line 4 et. seq. [SNOWDEN] "There's quite a few changes. I only gave you guys a couple. There are a lot of changes. I didn't think you wanted every last one of them" She was spoon feeding CASI instructions on how to fill in the forms.

[61] Trial Transcript at 496 Line 16 ("[COURT] Now, we had some issues about whether the Government's Exhibit 2,000, and 2,001 were 3500 material that were not produced to the defendant. RUBINSTEIN: Yes, your Honor. [...] COURT: It came up in cross as a result of your cross-examination. RUBINSTEIN: Yes, because I had never been provided with those documents, so I was totally unaware.")

GX2001.[62]  The Defense clearly faulted in not pursuing the material referenced to by Snowden, revealed and admitted during Snowdens' testimony.

## (...2)   Power and Telephone were allocated and approved

Power and Telephone[63] **were allocated and approved** in audit work papers.[64]  The prosecution and their trial testimony hammered away with the argument that it was **not allowed**. Effectively, a waver had been granted.  Where are the copies of the draft budgets for approval reflecting these approvals and waver?

### (....1) Waivers

A waiver is the voluntary relinquishment of a known right.[65] [66] The granting of a waiver must be a deliberate.  A valid waiver cannot be created through inadvertence: The agency providing the waiver must be fully informed.[67]

---

[62] Trial Transcript at 454 Line 1: Snowden – redirect (at the sidebar) RUBINSTEIN: I apologize, Judge, but I didn't think that the government was going to offer something that they never turned over, that's clearly 3500 material. KWOK: Well – RUBINSTEIN: And to introduce it is inappropriate.  OK? And they violated Rule 3500, and your Honor should strike these documents from the record. COURT: I will take it under advisement and hear you after the end of the court day.

[63] Discovery Material Bates Stamped at 5274, 5348, 5347ff of 6636 and 3500 material in the tens of thousands of pages.

[64] Sentencing 1 Transcript at 17 Line 15: ("COURT: Utilities.  EVERDELL: Utilities was second.  COURT: There was some testimony on utilities.  **He got an approval.**  EVERDELL: Your Honor, I don't think there was ever testimony that he got a prior approval for utilities.  In fact, he was told repeatedly that utilities were not allowed. COURT: The difference between the utilities for the apartment before and after the upgrade for air conditioning and for the machinery -- EVERDELL: I think the only testimony we had on the record is that he tried to get an approval for the utilities, but he never received one.  COURT: Mr. Rubinstein's quotes a utilities figure using Mr. Benedict's testimony at 1057 […] COURT: And the discussions were that if he could indicate the fact that there was an increase, that they could be classified as direct expenses, not indirect expenses.  EVERDELL: It says the discussio ₁₅ were, right, that if he could demonstrate the fact that there was an increase, that they could be classified as direct expenses, not indirect expenses.  But there was never any approval of this.  So at this point none of the testimony here is talking about any approval of any additional utilities, expenses, or anything like that COURT: Sounds like approval, but not written approval. […] COURT: This does say the witness summarizes his testimony at the end of the page. **The incremental amount of additional expense caused by the grant could be classified as direct expense and not indirect expense. Direct expenses are allowed, regardless of what they are.**  Indirect expenses are not allowed.  EVERDELL: I think that that quote just says right there that they are talking about a possibility, but a possibility that was never actually approved. **[N.B. The audit allowances are evidence of reality of this, not the possibility]** And a possibility that was never actually budgeted.  So— COURT: It suggests not approved in writing. I have seen that I agree with that But it sounds as if it was approved orally.  EVERDELL: I don't know if I read that as that […] COURT: is that the criminal intent of the defendant is important here. And if he was proceeding on that basis, that seems to me – I have reason to -- it seems to me that that amount is an amount that should not be considered in the loss calculation.  EVERDELL: Your Honor, I think I have to respectfully disagree with that ")

[65] http://en.wikipedia.org/wiki/Waiver

## (....2) Because utilities wavers were indeed granted, backup documentation must exist

The Governments auditors' work papers explicitly allocated power[68] [69]. The transcript reveals discussion but no witnesses explicitly admit to the allowance approval.[70] [71] Witnesses repeatedly testified that power was not allowed (in general)[72] or never allowed (in this particular circumstance)[73]. The auditor work paper[74] also revealed explicit allowances for telephone, cable and computer communication costs. The official and professional government auditor would not have made these allocation allowances *"on a whim"*, contrary to ATP rule[75] and policy[76] [77] [78],

---

[66] Judicial and statutory definitions of words and phrases, Volume 4 By West Publishing Company

[67] EPSTEIN, R. A. (2011) Government by Waiver. National Affairs Issue #7, Spring 2011.

[68] The document allowing and allocating power was in the criminal Discovery Documents Bates stamped at 05274 and 05348. These proverbial "needles" were buried in the discovery Haystack and were never cited at trial. For discussion on the inapplicability of the Procedural Default Doctrine, see *below*.

[69] Sentencing 1 Transcript at 81 line 9 [KARRON] We did get the power approved. I did have long discussions with B.J. and Jane about how we can fix this, how we can change this, what needs to be done. I made regular visits to Washington. I tried to keep in touch with my program managers. They came and visited regularly. We were making good scientific progress. But my attitude was, the hell with the financing, as long as I kept records. I have all of the source records. And give it to the accountant and she will figure it out.

[70] Trial Transcript at 850 Line 11 [Frank Spring][Reading a letter from Karron] A. Right. This is from the defendant. You and she need to keep grinding away on disallowed items. Power, Jill Feldman, Solomon and Bernstein, Peter Berger, *et cetera, et cetera, et cetera*, are all actually and partly allowable. Rent, some cable, some telephone are not yet allowed. I may get an allowance on rental of the living room to the project, as it is clearly completely taken over by the project.

[71] Trial Transcript at 1312 Line 2 [RUBINSTEIN] SUMMATION ...oh, by the way, rent and utilities are not permitted. They're indirect costs. You know from the testimony in this case that CASI was approved to take off, to deduct utilities, a portion of the utilities. Because you'll see the e-mails and you'll see that in the exhibits they were allowed to take off electric $7600, right. Why? Because it's an indirect cost. Well, how did you get it? Because it's negotiable. They submitted the bills showing that the increase in electricity, due to the equipment, showed a rise to the extent that they felt the grant people felt that Dr. Karron was entitled to reimbursement for on his[sic].

[72] Arraignment Transcript at 19 Line 14: COURT: Not rent but what about fixings up the office so that if that -- or bringing electricity or bringing in high powered computers into the office. KWOK: That's also disallowed and the reason is simply because there is an approved budget. Every item that Dr. Karron was allowed to use was listed in that budget and if you deviate from that budget you first have to seek pre approval to do that and at no point did Dr. Karron receive that

[73] Trial Transcript at 851 Line 1: Q. (Spring – direct "To your knowledge, did the defendant ever get an allowance for rent and utilities, things like that, from the people at ATP?  A. No.")

[74] Bates Stamped Discovery at-5347ff : audit work papers showing Telephone, Cable and Computer costs allocated and allowed

[75] 15 C.F.R. §295.3 "No funding for indirect costs, profits, or management fees shall be available for awards made under this subpart.

[76] GX1, Chapter 1, Sections C.4 and C.5 of the November 2000 ATP Proposal Preparation Kit ("5. What types of costs are unallowable? Regardless of whether they are allowable under the Federal cost principles, the following are unallowable under ATP: (b.) Indirect costs for single company recipients are unallowable for reimbursement with Federal funds and must be absorbed by the company.")  [Clearly, it was and GX1 is incorrect or waved].

[77] GX2: (General Terms and Conditions /ATP/08-01: Section 10.  UNALLOWABLE PROJECT COSTS: "Those costs that are designated as being unallowable in Chapter 1, Sections C.4 and C.5 of the November 2000 ATP Proposal Preparation Kit will be unallowable under this award.")

and direct order.[79]  The waver was granted under Government rules and policies for making exceptions.[80] [81] [82] [83]  Changes are a way of life in high technology high risk research.[84]  The ATP program could not be as rigid as the OIG would have the Court and Jury believe.[85]

---

[78] Trial Transcript at 256 Line 16 ([EVERDELL] Q. And what was your response to the question, can rent and utilities be paid for with ATP funds? [SNOWDEN] A. No, they're unallowable costs.)

[79] Sentencing 1 Transcript at 21: ("[EVERDELL]: … We are not talking to the people at NIST, who actually made the approval, such as Hope Snowden. If I recall correctly, Hope Snowden's testimony about utilities was simply that there were lots of conversations that she had with the defendant himself and with others about whether or not grant funds could be used for utilities, and she said no.  COURT: Where is this? EVERDELL The cites to the record? COURT: Yes. EVERDELL Your Honor, I'm afraid I don't have.  COURT: This does say the witness summarizes his testimony at the end of the page.  The incremental amount of additional expense caused by the grant could be classified as direct expense and not indirect expense.  Direct expenses are allowed, regardless of what they are.  Indirect expenses are not allowed.  EVERDELL: I think that that quote just says right there that they are talking about a possibility, but a possibility that was never actually approved.  And a possibility 'that was never actually budgeted.  So-- COURT: It suggests not approved in writing.  I have seen that I agree with that  **But it sounds as if it was approved orally.**")

[80] GX3 (OCTOBER 1998 DEPARTMENT OF COMMERCE, FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS, .03 Federal and Non-Federal Sharing (b) b.  "The non-Federal share, whether in cash or in in-kind, is expected to be paid out at the same general rate as the Federal share.  Exceptions to this requirement may be granted by the Grants Officer based on sufficient documentation demonstrating previously determined plans for or **later commitment of cash or inkind contributions.** However, the **Recipient must meet its cost share commitment over the life of the award."**)[EMPHASIS ADDED]

[81] DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS INTERIM MANUAL (02/2002) Chapter 19, at 9,(3) Federal and Non-Federal Sharing. (b) ("The non-Federal share, whether in cash or in in-kind, will be expected to be paid out at the same general rate as the Federal share.  Exceptions to this requirement may be granted by the Grants Officer based on sufficient documentation demonstrating previously determined plans for or later commitment of cash or in-kind contributions.  In any case, recipients must meet the cost share commitment over the life of the award.")

[82] DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS INTERIM MANUAL (2002-02) (4) (A.)(b) ("The Grants Officer may approve exceptions on a case-by-case basis, regardless of the amount of Federal funding.  The regulation stipulates that an exception made on a case-by-case basis will only apply to a single award. ")

[83] DEPARTMENT OF COMMERCE GRANTS AND COOPERATIVE AGREEMENTS INTERIM MANUAL (2002-02) (4)(F)(4) 4.  "Approve, as appropriate, less restrictive requirements and exceptions pursuant to the delegation of authority from the CFO/ASA in accordance with Section A.2. of this chapter."

[84] Arraignment Transcript at 20 Line 2: ("[KWOK] […] are only  allowed to pay, for example, to hire scientists and research personnel and to buy a specified number of computers for your research.  But to renovate your apartment or office to eat out which is another item that Dr. Karron spent money on or to even pay for Internet services they are specifically disallowed under the terms of the grant.  And another big item is back rent, and that is also clear that you are not supposed to pay rent or mortgage under the grant. RUBINSTEIN: The government wants the grant to be written in granite.  The fact of the matter is that these grants they have modifications all the time.  People spend money, as long as they're spending it legitimately that's an issue at trial.")

[85] Exhibit E Certified Audio Trans. April 13, 2007 ATP Proposers' Conferences  NIST Red Auditorium, 100 Bureau Drive, Gaithersburg, MD 20899 A[nswer]: [MARC STANLEY, ATP PROGRAM DIRECTOR] One of the things I pride myself on in this program and with my colleagues is that: **We try not to be too bureaucratic.  We are very supportive of the companies that win awards from us,** …

### (...3)    GX114 reallocation supporting documentation must exist

The internal logic and structure of the GX114 number classifications, makes it is impossible to deny that the rent checks were reclassified from rent into the salary line and denominated[86] as Salary[87]. Using only GX110 numbers[88], and Riley's fringe rate[89], there are just not enough checks into and out of Karron to make up the denominated salary[90] **without including the rent checks**.[91] [92] This hard finding **vitiates** the trial stampede of naysaying circumstantial witnesses[93] [94].

---

[86] Sentencing 1 Transcript at 7 ("COURT: It's denominated salary.")

[87] 11-civ-1874 /07-cr - 541 (not docketed) Revised and Resubmitted Memorandum of Facts and Law to accompany 28 U.S.C. §2255 Motion to Vacate Criminal Verdict:  Revised and Resubmitted Version of April 28, 2011, answered by the Government/Respondents   7(1)ii. "Analysis of GX114 Errors and their meaning"

[88] *Ibid.* Footnote 41

[89] Trial Transcript at 803 Line 19. RUBINSTEIN: Q. CASI spent $200,488 on his salary.  How did you get that number? RILEY: A. By including the withholdings portion of the fringe benefits as part of the salary of what he received.  It includes the salary, it includes the difference between the loans he received and the loans he paid, and it includes the fringe benefits. [Riley does not answer this question truthfully, as the analysis of GX114 Karron Brief at 18, 33, 33 (Figure 1, "GX114 Karron Salary Component Breakdown ..."(bar chart)), 36 (Figure 2, "Karron GX114 Salary components showing proportion of rent relative to cash and fringes"(pie chart)), 36 (Table), and *et seq* ]

[90] Sentencing 1 Transcript at 7 Line 17: ("COURT: It's denominated salary.  It's a table [in GX114]   saying salary.")

[91] *Ibid.* Figure 1 GX114 Karron Salary Component Breakdown, Figure 2 Karron GX114 Salary components, Footnote 41 (perhaps this should have been a stand-alone table)  "GX110 showing only relevant section of spreadsheet data detailing checks from and to Karron for year 1 alluded to in GX114 testimony" by Riley.

[92] The Procedural Default Doctrine does not apply because a reasonable person of normal intelligence and expectations exercising due diligence would not have made this discovery.

[93] Trial Transcript at 842 Line 6: (Spring - direct A. "Well, he would point out to me that I either didn't know my job, I didn't understand what an ATP allowable expense was or wasn't, or that he was in conversation with the ATP managers in Washington to ensure that these expenses, which I understood to be not allowed by the project, would be allowed into the project as an expense. Q. Did you see anything in particular reflected in the books regarding these conversations you had with the defendant? A. Well, as the kind of person in charge of keeping the Quick Books file correct, I took it upon myself to take what was an allowable expense and put it into that category, and if it was not allowed into ATP, to put it into the general CASI expenses.  Q. And what, if anything, would the defendant do after you did that? A. Normally I would go away [...] come back for my next session and find out that the expenses that I had taken out of ATP, turned them back into a CASI only expense, had been had been reinputted as an ATP allowable expense.")

[94] Trial Transcript at 395 Line 22: (Snowden – cross [RUBINSTEIN] "Q. Now, in these discussions that you had with Dr. Karron about, rent and utilities aside, did you say anything else other than no, when he asked you about the grant money covering rent and utilities? A. I said no.  Q. Did you discuss this with Miss Goldstein, the supervisor -- A. Yes.  Q. -- the fact that Ms. Goldstein advised you that if CASI got commercial space and if they made a lease in the name of the grant ATP, DMT, that that would be an acceptable expense? A. No, it's not an acceptable expense. Q. No, no. Did you have that discussion with Ms. Goldstein? Did you -- did Ms. Goldstein tell you that? No.") [Editorial Comment: Goldstein did know, Goldstein Did not tell you that, yet she did allow it]

(...4)     Snowden admitted destroying and withholding correspondence

Snowden admitted to destroying working papers[95], and described "additional correspondence"[96] evidencing understandings not shared with the Defense.[97] [98] [99] More problems with exculpatory material arose at trial.[100] The prosecution clearly faulted in not providing the Defense with an advanced copy of the Rule 3500[101] tagged GX2000, and GX2001.[102] Snowden was keeping exculpatory material[103] from the Prosecution. This is

---

[95] Trial Transcript at 420 Line 19: (Snowden – Cross, [...]I would just **discard the old form** and put in the correct form.)

[96] Trial Transcript at 424 Line 3 (Snowden - cross at [RUBINSTEIN] "Q. So you're telling us there are additional reports than what we have here as exhibits, within exhibit 40 through 43? A. **I'm telling you that there are correspondence, additional correspondence to these exhibits"**)

[97] Trial Transcript at 424 Line 4: (Snowden – direct "There's quite a few changes. I only gave you guys a couple. There are a lot of changes. I didn't think you wanted every last one of them.")

[98] Trial Transcript at 424 Line 1: (Snowden – Cross, [RUBINSTEIN] Q. "You never turned it over to the Prosecutor?   A. Yes. ")

[99] Trial Transcript at 424 Line 12 (Snowden – Cross, [RUBINSTEIN] Q." And, in fact, the letter provides that there are five budget revisions?  A. It says there's quite a few budget revisions.")

[100] Trial Transcript at 419 Line 13 (Snowden – Cross [RUBINSTEIN] Q. Okay. Nobody commented on that to CASI, correct, that there was, these reports, these financial status reports were inconsistent and inaccurate?  A. Ye., there were comments on it.  A. Yes, there were comments on it.  Q. Where were comments made?  A. Excuse me? Q. Where were comments made?  A. Probably verbal.  They were probably -- the -- what I usually do if there is a budget that comes in that's wrong, I'll just give the company a call and say, your numbers are wrong, please revise and resend your document.  COURT: Did you make that call?  THE WITNESS: Yes. [...] Yes, even -- one -- I think the numbers are -- the dates were wrong too. Yes, I'm sure I made the call.  Q. Who did you speak to?  A. Usually when I would call the doctor -- I probably – usually I would speak to Lee Gurfein.  Q. And did you memorialize that in any way with an e-mail that you had made that call?  A. No.  Q. Did you put anything in your government file to indicate that you had made the call because you noticed these numbers were wrong?  A. The practice is that I would put this document in the file, make a note to it, and then when a new form came in, I would just **discard the old form** and put in the correct form.  Q. Well, did a new form come in?  A. This -- a new form, a new form came in. Q. How long after you claim you made this call?  A. Well, this one is a revision.  I'm not getting the question.  Q. And you say you made a note, you wrote something down in a file about it?  A. Yes.  Q. How many calls did you make?  A. Quite a few.  Q. After you got the second financial statement, I'm sorry.  After you got the third financial statement, and you had not received a revision of the second financial statement yet, correct?  A. Yes.  Q. How many calls did you make about that?  A. I made calls until it was corrected, and that is reflected in the original grant file.  Q. When was it corrected?  A. I have no idea, because the forms are not in front of me.  Q. Well, in fact, the first time you ever got a revised financial status report is reflected in the exhibits A to 40, 41, 42, 43, correct?  A. No, that's not correct.  Q. Aren't those the revision reports?  A. These are, these are revised reports, but these are not the first revised reports.  Q. Where is the first revised report?  A. In the original grant file.  Q. You never turned it over to the Prosecutor?  A. Yes.  Q. So you're telling us there are additional reports than what we have here as exhibits, within exhibit 40 through 43?  A. I'm telling you that there are correspondence, additional correspondence to these exhibits.  )"

[101] Trial Transcript at 496 Line 16  ("[COURT] Now, we had some issues about whether the Government's Exhibit 2,000, and 2,001 were 3500 material that were not produced to the defendant. RUBINSTEIN: Yes, your Honor. [...] COURT: It came up in cross as a result of your cross-examination. RUBINSTEIN: Yes, because I had never been provided with those documents, so I was totally unaware.")

[102] Trial Transcript at 454 Line XX Snowden – redirect RUBINSTEIN: I apologize, Judge, but I didn't think that the government was going to offer something that they never turned over, that's clearly 3500 material. KWOK: Well – RUBINSTEIN: And to introduce it is inappropriate.  OK? And they violated Rule 3500, and your Honor should

---

because she had been helping Karron.[104]  When the OIG Special Agents appeared on the scene, Snowden must have felt she might have implicated herself.  Snowden's admission is justification enough for 2255 discovery and a new hearing. .

### (...5)    Riley must have created contemporaneous documents

Riley must[105] have created contemporaneous field notes, e-mails and work papers from her two visits to CASI. Her exculpatory work papers were found in the discovery material[106] but too late to support exculpatory testimony at trial[107]. The testimony at trial was that these allowances were under discussion, negotiation, but were never binding.[108] The contemporaneous field notes and e-mails should have been discovered to support the work paper findings that negotiations went to fruition, but they were not.  The OIG audit reports[109] only recite disallowances by amount, and the numbers cannot be traced back to the work papers, as they should have been.[110]  Riley's' testimony was more than "weak"[111], as the Trial Judge at sentencing concluded that they were "...not something that a Court could rely on in a criminal

---

strike these documents from the record. COURT: I will take it under advisement and hear you after the end of the court day.

[103] Implicating she was working for or against CASI and covering her tracks.

[104] Trial Transcript at 309 Line 4 et. seq.. SNOWDEN: "There's quite a few changes. I only gave you guys a couple. There are a lot of changes. I didn't think you wanted every last one of them" [She was spoon feeding CASI instructions on how to fill in the forms].

[105] Government Auditing Standards July 2007 Revision GAO-07-731G 4.01 "This chapter establishes field work standards and provides guidance for financial audits conducted in accordance with generally accepted government auditing standards (GAGAS)."

[106] Criminal Trial Discovery Bates Stamped Pg. 5274, 5348, 5347ff of 6,636

[107] Sentencing 1 Transcript at 17 Line 15: COURT: There was some testimony on utilities. **He got an approval.** EVERDELL Your Honor, I don't think there was ever testimony that he got a prior approval for utilities.

[108] Trial Transcript at 1078 Line 17: Benedict – redirect THE WITNESS: I said they're not binding. If you get oral authorization, do something, until you get written authorization it's not binding.

[109] GX60, GX61, GX62, Hayes, Draft and Final Audit Reports

[110] Government Auditing Standards July 2007 Revision GAO-07-731G 4.19 "[...] Under AICPA standards and GAGAS, auditors should prepare audit documentation that enables an experienced auditor, 52 having no previous connection to the audit, to understand a. the nature, timing, and extent of auditing [...]; b. the results of the audit procedures performed and the audit evidence obtained; c. the conclusions reached on significant matters; and  d. that the accounting records agree or reconcile with the audited financial statements or other audited information...." By Riley's direct admission at trial (this was not done. Trial Transcript at 473ff (also see above): Riley – direct and also at this sidebar..." RUBINSTEIN ... It's hard to believe that someone could be an auditor and not reconcile bank accounts that probably had less than 500 checks in total, for the period that we're talking about.".

[111] Rule 33 Opinion and Order at 11. Footnote "Although the auditor assigned [to do ] audits of CASI, Belinda Riley, was a weak witness (she had never testified previously), her spread sheets (GX110, GX111) showing each item of expense and reimbursement were backed up by the bank records of CASI and of the Defendant (GX-80, 81), which show clear evidence of the payment of $18,000.00 to Dr. Karron for rent reimbursements in October 2001. (See Gov't. Mem., Ex. E.)" [Missed here is that the Rent Checks, while shown in GX110, appeared twice in GX114, once as Salary, and again as Rent. Judge Patterson would later downgrade his opinion of Riley at Sentencing.]

case."[112]. Yet they were the foundation of the Petitioners conviction[113] and Respondents' Case in Chief.[114]

Riley's' first visit to CASI in June 2003 resulted in the grant suspension. Frank Spring, the bookkeeper, never completed a set of books for her to audit.[115]. Riley copied Hayes hostile audit.[116] Riley never did an independent audit.[117] From forensic analysis of Riley's work papers revealed Hayes fingerprint of unique random errors, large and small. Riley's' record was as a punctilious award-winning auditor[118], Riley displayed honesty in admitting on the stand that she did not reconcile the audit accounts and by inference, the audit.[119] Something was obstructing her ability to conduct an audit.[120]

## (...6)   Lee Goldberg Affidavit to OIG withheld in Ondrik Declaration

The Ondrik Declaration[121] entirely omits at least one, and probably other citations to (an) exculpatory affidavit(s).[122] Petitioner Exhibit G, Declaration of Lee H Goldberg, contains a copy

---

[112] Sentencing 1 Transcript at 5 Line 4

[113] Trial Transcript at 1379 Line 24

[114] R. Brief at 1

[115] Trial Transcript at 473 Line XX: Riley – cross A. I used the records that […] Joan Hayes had provided to come up with the numbers for this. I did not take Joan Hayes' report and copy the numbers […]Q.[…] do you have, either from your own work, …. general ledger [?] A. I think there are some ledgers […] Q. Did you do a bank reconciliation of the various bank accounts of CASI? […]A. No. [This assertion by Riley is incorrect (See Dunlevy Declaration below) because Riley's audit report propagated Hayes payroll errors. Riley did not catch any Hayes payroll errors.]

[116] Dunlevy Declaration at 5 of 12, and see Section "Questions About Audit and Quality of Audit" Summary schedule of payroll errors on CAC-426. Hayes Errors were copied into Riley's Work papers and into GX62 final audit report. Riley did not do an Independent Audit. She copied Hayes hostile audit.

[117] GOVERNMENT AUDITING STANDARDS Answers to Independence Standard Questions (July 2002) GAO Publication GAO-02-870G

[118] Riley Expert Witness Resume, at 5: AWARDS (Number 4 of 4 total) 2005 DOC Silver Medal Award for Meritorious Federal Service "For conducting a complex and unique **joint** audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT.[sic]".  [emphasis added]: Further, the deference of credit for this project to a 'joint' collaborator begs the question if this was Hayes.

[119] Issuing an audit report, without reconciling all affected accounts is a breach of AICPA professional ethics. AICPA Professional Standards As of June 1, 2008 Code of Professional Conduct and Bylaws.  See also D. Satava , C. Caldwell  and L. Richard(2006): Ethics and the Auditing Culture: Rethinking the Foundation of Accounting and Auditing Journal of Business Ethics, Volume 64, Number 3 / March, 2006 at 271-284. "… auditors involved have followed rule-based ethical perspectives …– resulting in … unethical conduct. … [We make] suggestions that the … profession should consider to restore public trust and to improve the ethical conduct of accountants and auditors

[120] Government Auditing Standards July 2007 Revision GAO-07-731G "7.05 Audit risk is the possibility that the auditors' findings, conclusions, recommendations, or assurance may be improper or incomplete, as a result of factors such as evidence that is not sufficient and/or appropriate, an inadequate audit process…"

[121] R. Br. Exhibit 1.

[122] R. Br. at 23 referencing Ondrik Decl. Paragraph 4: "None of the witnesses that were interviewed […] provided any exculpatory evidence."

of Goldberg's' contemporaneous exculpatory affidavit.  The Ondrik omits her interview of Goldberg and his affidavit.  Goldberg makes sworn statements that the OIG interrogators asked the about Karrons' gender change, asked lascivious questions about Goldberg's relationship with Karron,  and asked coercive and leading questions about Goldberg's financing of CASI.  Therefore, Ondrik and the Government are incorrect in asserting that they have not withheld any Brady Material; this is but one specific counter example.

### (...7)   Budget revision change base rule conflicted: 10% of what?

ATP budgets[123] were not cast[124] in stone, and could not be cast in stone.  Awardees could make use of their 10% variation 'change budget'[125] during the course of the budget year as circumstanced changed.  In order to preserve change margins[126] for next year, awardees' were asked to prepare a new budget approved sometime after at the end of each fiscal year and before audit. [127] [128]Awardees did not have the option NOT to change their budgets[129].  It was mandatory.

---

[123] 15 C.F.R. (1–1–01 Edition) §14.25 Revision of budget and program plans. (a) The budget plan is the financial expression of the project or program as approved during the award process. [...] (b) Recipients are required to report deviations from budget and program plans, and request prior approvals for budget and program plan revisions, **in accordance with this section.** (c) For noncontruction awards, recipients shall request prior approvals from the Grants Officer for one or more of the following program or budget related reasons. Approvals will be provided in writing by the Grants Officer
[124] GX1 at 64 ATP Proposal Kit Exhibit 14, Budget Worksheet Narrative Form:  Paragraph 4 (We recognize that unexpected events occur frequently in R&D projects, and that budgets **may need** to be changed as a project proceeds.  Don't fear that by providing a multi-year budget beyond the first year, you will be locked into those details. ATP allows a certain amount of flexibility in moving funds from one line item to another as circumstances change. By stating an amount for a given task, you will not be required to spend precisely that amount on that task. For example, if, in the second or third year of your project, you find that you need to spend more on one task and less on another than anticipated, that can be accommodated.)
[125] 15 C.F.R. (1–1–01 Edition) §24.30 Changes.  (a) General. Grantees and subgrantees are permitted to rebudget within the approved direct cost budget to meet unanticipated requirements and may make limited program changes to the approved project..
[126] And to stay within budget flexibility limitations.
[127] GX1 at 64 ATP Proposal Kit Exhibit 14, Budget Worksheet Narrative Form:  Paragraph 4: (Recognizing that change is inevitable, we **may** ask our recipients for a revised budget at the beginning of each year of a multi-year project. However, the total amount provided by ATP for the project cannot be increased.) [A Zero-Sum Game]
[128] March 31, 2010Missing Audit Reports from '1ST ATP Grant Recipients Final Report ATL – 19891 ("Lack of Authority")
[129] Trial Transcript at 456 Line XX: Snowden Redirect [RUBINSTEIN] Q. You were also asked some questions about revising budgets.  A. Yes.  Q. There are a few there I want to touch on. First, you said that I believe you **can** revise your budget at the end of the first year, is that right? A. Yes.  Q. But if your year one has already ended, can you revise your year one numbers at that point? A. No. Q. So, what can you revise at the end of the first year of your budget?  A. If your year one has ended, you can revise your out years, which would be years two and three.

However, NIST ATP program specific budgets change practices were not part of the ATP statute[130] and ATP rule[131]. The authority of these practices is unclear[132]. They were made part of ATP cooperative agreements by reference[133]. As of 2001, ATP practices appear to have conflicted with superior "general" Department of Commerce and National Institute of Science and Technology CFR statutes concerning the change base upon which to apply the 10% variation allowance.

ATP believed its change base was 10% of the last approved total annual budget[134] as Lide[135] and Snowden testified[136], and both the Defense and Prosecution believed. In this case GX2[137] specifies a change of plus and minus $83,650[138] without approval. Snowden testified that "Program Specific" rules overrode regulations that are more general.[139]

---

[130] 15 U.S.C. §278n ( 2001)  (http://www.gpo.gov/fdsys/pkg/USCODE-2001-title15/pdf/USCODE-2001-title15-chap7-sec278n.pdf)

[131] 15 C.F.R. §295 (2001)( http://www.gpo.gov/fdsys/pkg/C.F.R.-2001-title15-vol1/pdf/C.F.R.-2001-title15-vol1-sec295-1.pdf)

[132] Trial Transcript at 61 Line 1: (Lide – Direct A. "I helped prepare them, I used them, and they were given to me as project manager.")

[133] GX12: "This Award approved by the Grants Officer is issued in triplicate and constitutes an obligation of Federal funding. By signing the three documents, the Recipient agrees to comply with the Award provisions checked below and attached." Checked first is "Department of Commerce Financial Assistance Standard Terms and Conditions". This is apparently GX3. Penultimate checked is "General Terms and Conditions. Advanced Technology Program (ATP)(8/01), This is apparently GX2. This document is missing from the Government Exhibits: "Program Specific Audit Guidelines for ATP Cooperative Agreements with Single Companies (9/99)".

[134] GX4, Slide 12, Recipient Responsibilities, Prior Approvals, Notify Grants Specialist: Budget Line Item Change >10% of total annual approved for each Recipient in each project year.

[135] Trial Transcript at 60 Line 10 Lide - Direct, Trial Transcript at 87 Line 1, Trial Transcript at XXX Line 94, Trial Transcript at 191 Line 1,

[136] Trial Transcript at 456 Line 14: (Snowden - redirect [RUBINSTEIN] Q. And you were also asked I believe about revising budgets, specifically the ten percent rule which is on that slide. Is that right? A. Yes. Q. And you testified about what that 10 percent rule means, right? A. Yes. Q. And is that 10 percent of the total award amount or 10 percent of the annual budget that you're allowing? A. It's 10 percent of the annual budget. Q. So, if you are allowed $800,000 in the first year of your grant, how much can you move around in the first year of your grant without getting prior approval? A. $79,999.99, under $80,000.)

[137] GX2: (9. PRIOR APPROVAL REQUIREMENTS: The prior approval requirements in 15 C.F.R. 14.25, paragraph (e) MAY NOT be waived automatically by the Recipient and require written approval from the Grants Officer. In addition to the requirements specified in 15 C.F.R. 14.25, Recipients shall obtain prior written approval from the NIST Grants Officer for the following changes: a. The transfer of funds among direct cost categories must be approved in advance by the Grants Officer if the transfer exceeds 10% of the approved total **annual** budget) [original emphasis]

[138] GX23: TOTAL ESTIMATED COST and OBJECT CLASS CATEGORY H. Total Direct Cost. (Line. A thru G) of $836,500.

[139] Trial Transcript at 298 Line 17 (Snowden – direct [KWOK] Q. "We talked a bit also about the regulations governing the ATP grants yesterday. A. Yes. Q.... Are there government-wide regulations that apply to the ATP grants that are not ATP grant specific? A. Yes. Q. And do these regulations apply to more than one government grant? 1 A. Yes. Q. Are there rules specific to the ATP grant that just cover the ATP grant? A. Yes, there is. Q. And

However, governing rules15CFR§24.30 [140], 15CFR§14.25(f)[141], and GX3[142], calls out[143] a percentage base on the entire currently effective and approved budget. In this instance that is plus and minus $211,450 , for a total swing of $422,900. Further, 15CFR§14.25(e)(4) [144] claims it is the superior statute and specifies it may not be overridden without approval from the OMB No evidence of OMB approval for ATP Program Specific Rules has been offered or found. GX2 claims it is superior authority and may not be overridden without approval from the Grants Officer.

### (.3)    The Government's Case has feet of Clay.

The Governments' foundational [145]exhibits[146] and testimony[147] cited in the very first paragraphs of the respondents' brief, when viewed in this light of the Petitioners evidence presented here, are faulty.

---

which rules control if there is an ATP-specific rule versus a government-wide rule? A. Your ATP special work conditions and your general terms and conditions, they are specified within the award, so ... Q. So, if there is an A˜ rule that applies to the ATP grant and a government-wide rule -- A. Your ATP rules supersede all other rules, because they're program-specific rules, so you have your ATP rules and then other rules, but ATP supersedes everything.")

[140] 15 C.F.R. (1–1–01 Edition) §24.30 Changes. (c) Budget changes—(1) (ii) Nonconstruction projects. Unless waived by the awarding agency, cumulative transfers among direct cost categories, or, if applicable, among separately budgeted programs, projects, functions, or activities which **exceed or are expected to exceed ten percent of the <u>current total approved budget</u>**

[141] 15 C.F.R. (1–1–01 Edition) §14.25 (f) The recipient may not transfer funds among direct cost categories or programs, functions and activities for construction or nonconstruction awards in which the cumulative amount of such **transfers exceeds or is expected to exceed 10 percent of the total budget as last approved by the Grants Officer.** <u>This does not prohibit the recipient from requesting Grants Officer approval for revisions to the budget</u> [...]

[142] GX3 OCTOBER 1998 DEPARTMENT OF COMMERCE, FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS, ..04 b. Unless the Recipient is subject to 15 C.F.R. Part 24 [...] cumulative transfers of funds of an amount above 10 percent of the total award must be approved by the Grants Officer in writing. This allows the Recipient to transfer funds among approved direct cost categories when the cumulative amount of such transfers does not exceed 10 percent of the current (last approved) total budget.

[143] Trial Transcript at 86 Line 10 (GX3 introduced into evidence). This discrepancy in percentage base was not noticed. The Lide and Snowden and the Prosecution Team continued to assume that Exhibit 3 referred to a project budget year base amount instead of it actually referred to a project budget lifetime change base.

[144] 15 C.F.R. (1–1–01 Edition) §14.25 (d) ("For nonconstruction awards, **no other prior approval requirements for specific items may be imposed unless a deviation has been approved by OMB**.")[emphasis added]

[145] R. Br. at *iv*: Paragraphs 1 and 2 entitled "**A. The Government's Case**".

[146] R. Br. at *iv*: (GX10, The Gate 1 award winning proposal and obsolete budget, GX11: The award letter) ("received more than $10,000 in federal funds during a one-year period" Apparently referring to Jury Charge Element Two (Case 1:07-cr-00541-RPP Document 56-7 Filed 07/21/2008 at 19 of 33) of 18 U.S.C. 666(b)), and " defendant was ...[an] Officer.". (*ibid* Jury Charge Element 1 at 18). (GX114: This exhibit does not add up. It appears to be partially made up. It gives Rent checks included in Salary and again as Rent. It cannot be compared or reconciled back to anything. "Look at that ... A mess"; Judge Patterson, Sentencing 1 Transcript at 16 Line 15; "I don't know who compiled them, but I gather it was Ms. Riley, but we never went into the detail ... " Sentencing 1 Tr at 4 Line 6. This includes by assumption GX110 (CASI Transactions sorted by Payee but otherwise unclassified

(...8)    Collapse of *mens rea* with government knowledge defense and program cooperation

The showing (*above*) of Governments' knowledge and cooperation with Karron in finding ways to cover utility costs and re-interpret and re-classify rent raises questions about the guilty mind of the Petitioner. If, as shown, Snowden and CASI/Karron were negotiating wavers and reclassifications, then draft budgets and ancillary correspondence must have existed. These should be recovered as Brady Material. It appears that ATP Program Specific Rules override were not authorized by the OMB. The inference of the Petitioners guilt, the 'knowing' *mens rea* state of the Petitioner; to 'knowingly' misspend when advised not to; when ordered not to; and when threatened not to, **collapses** when the petitioner had certain knowledge that the ATP program management was going to, and indeed found, a way to accommodate the Petitioners requests. Because the Petitioner had certain knowledge that the requests were actually accommodated, the government's criminal case topples.[148]

---

Spreadsheet), All of the ATP Estimated Multiyear Budget Single Comp. OBJECT CLASS CATAGORIES, namely GX14-GX36, GX40-GX43A, GX47, *et seq*)(GX115 is the CASI second year spreadsheet. As the jury only considered a one year period, the second year financials are s moot except to counter balance payables from the fii st year. See Exhibit D [Dunlevy], GX61 Appendix III (Spitz)]).

[147] Trial Transcript at 122f, 259, Spring (bookkeeper), Gurfein (manager) Benedict(manager), (no accountant) (Trial Transcript 637-38, 840-42, 978-79). The Government attempts to argue that disobedience of non professional staff resulted in the" defendant's willful misapplication of the federal grant, which totaled over $1.3 million from October 2001 until it was shut down in June 2003[The project was not shut down, it is formally still suspended, the funds are still appropriated (Exhibit Browning) and Karron is not federally debarred(Excluded Parties List System) ], the Government suffered a loss of at least $120,000. (Sentencing 1 Transcript at 57f".

[148] R. Br. at *iv*: (GX10, The Gate 1 award winning proposal and obsolete budget, GX11: The award letter) ("received more than $10,000 in federal funds during a one-year period" Apparently referring to Jury Charge Element Two (Case 1:07-cr-00541-RPP Document 56-7 Filed 07/21/2008 at 19 of 33) of 18 U.S.C. 666(b)), and " defendant was ...[an] Officer. (*ibid* Jury Charge Element 1 at 18). (GX114: This exhibit does not add up. It appears to be partially made up to suit. It gives Rent included in Salary and again as Rent. It cannot be compared or reconciled back to anything. "Look at that ... A mess"; Judge Patterson, Sentencing 1 Transcript at 16 Line 15; "I don't know who compiled them, but I gather it was Ms. Riley, but we never went into the detail ... " Sentencing 1 Transcript at 4 Line 6. This includes by assumption GX110 (CASI Transactions arranged by Payee but otherwise unclassified Spreadsheet), All of the ATP Estimated Multiyear Budget Single Comp. OBJECT CLASS CATAGORIES, namely GX14-GX36, GX40-GX43A, GX47, *et seq*)(GX115 is the CASI second year spreadsheet. As the jury only considered a one year period, the second year financials are s moot except to counter balance payables from the first year. See Exhibit D [Dunlevy], Exhibit GX62 APPENDIX III)

(...9)    GX114 was partially made up.

Specifically, GX114, the lynchpin of the Petitioners' conviction is innumerate[149] and appears to be partially made up to suit the Prosecution.  The Jury relied on this piece of evidence.[150]  The Jury was charged to weigh circumstantial and direct evidence equally.[151]  The Jury were never given any opposing exhibit to GX114, and or GX114 should not have been admitted into evidence.  The defense counsel did not challenge GX114 math errors with any opposing forensic direct evidence.  Counsel failed to discover any significantly new exculpatory material evidence, instead recycled Prosecutions exhibits.[152]

## (3)    Rebuttal to Respondent Arguments

### (.1)    [Respondent Argument I]. Ineffective Assistance of Counsel

The Petitioner seeks Federal *Habeas Corpus* 2255 relief because the violation of her Constitutional right to effective counsel at her criminal trial.  While Rubinstein had an impressive record where he provided effective assistance of counsel in "Blue Collar" criminal cases, he was out of his league in this particular "White Collar" "Paper Intensive" case.  Making and rebutting these arguments is very difficult personally for both Petitioner and former lawyer.[153]

Nevertheless, the net result of Rubinstein's representation of the former Defendant (now Petitioner) is that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result"[154] [155] to find true fact

---

[149]The numerical inconsistencies in GX114 are of a crude nature that would not be made by a person experienced in accounting and numerate reporting.
[150] Trial Transcript at 1379 Line 24 (Jury callback during deliberation)
[151] Jury Charge Case 1:07-cr-00541-RPP Document 56-7 Filed 07/21/2008 at 7
[152] R. Br. at 10, ("B. The Defense Case".)
[153] R. Br at 16, citing Karron Brief at 65
[154] Strickland v. Washington, 466 U.S. 668, (1984)
[155] Mosteller, Robert P., Failures of the American Adversarial System to Protect the Innocent and Conceptual Advantages in the Inquisitorial Design for Investigative Fairness (December 14, 2009). North Carolina Journal of International Law & Commercial Regulation, Vol. 36, No. 2, 2011; UNC Legal Studies Research Paper No. 1523431. Available at SSRN: http://ssrn.com/abstract=1523431

and render a trustworthy verdict. This resulted in a trial verdict that the one cannot have confidence in and the Petitioner has suffered a miscarriage of justice.[156]

Essentially, for any of a number of valid reasons, excuses or inexcusable faults, Defense counsel Rubinstein was unable (due to incompetence in critical areas[157]) or unwilling(due to the conflicted nature of the attorney-client relationship in this case[158]) to effectively fulfill his constitutionally mandated duty[159].

### (...1)   The VI[th] Amendment

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial …; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.[160]

### (...2)   Failure to Investigate and Prepare

Defense Counsel has a constitutional duty to make reasonable investigations.[161] [162] Counsel made none. The forensic recovery of the Defendants' computer data seized by the government[163] did not constitute discovery.[164] "The Sixth Amendment requires investigation and preparation". " A failure to investigate and file appropriate motions is ineffectiveness."[165] The Supreme Court has made clear the American Bar Association's Criminal Justice Section Standards of Practice of Criminal Law[166] can be used in determining the professional norms of defense preparation for purposes of *Strickland* analysis. In *Summerlin*, the Ninth Circuit pointed

---

[156] United States v. Bokun, 73 F.3d 8, 12 2d Cir. (1995).
[157] Karron Brief at 68, Footnote 204; Karron Brief at 105
[158] Karron Brief at 84
[159] American Bar Association Model Rules of Professional Conduct
[160] Sixth Amendment to the United States Constitution
[161] Strickland v. Washington, 466 U.S. 688, 691, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984)
[162] *Ibid* or to make reasonable decisions that make particular investigation unnecessary .
[163] 2007-08-08 Pre-Trial Conference, Page 2 MR. RUBINSTEIN: … They have all of these documents which are the property of Dr. Karron. They say in their letter that they haven't accessed the CD's [sic] that were in these computers. This is all we are looking for. We are looking for the records that really are his records that he is entitled to under any scenario.
[164] 2007-08-08 Pre-Trial Conference, Page 17 Line 9 COURT: I want there to be some action here in terms of the parties not only having the discovery but also having access to whatever documents they think may bear directly on their defense.
[165] Kimmelman v. Morrison, 477 U.S. 365, 91 L.Ed.2d 305, 106 S.Ct. 2574 (1986)
[166] ABA Standards for Criminal Justice: Providing Defense Services, 3d ed., © 1992 American Bar Association

out that ABA Standard for Criminal Justice 4-4.1,[167] which states in part that counsel has a duty "to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."[168]

Counsel did not engage the forensic accountant Spitz[169] who was standing at the ready, or when the Petitioner was without funds, apply to the court for CJA funding[170]. A key feature of the missed discovery was forensic accounting to verify Government numbers and produce rebutting schedules. When Counsel attempts to get Dunlevy, also standing by[171], on the stand at the 11th hour, the Judge denies the request; as "late notice".[172] From this, it is clear Counsel had no clear professional strategy, weak, strong, or consistent. He was flying by the 'seat of his pants' and he crashed the Petitioners constitutional rights.

### (...3)   Failure to Suppress

Counsel failed to file a motion to suppress GX114.[173] The prejudice that GX114 caused is clear and patently damming: The Prosecution continued to harp on GX114 all through the trial[174] and it penetrated into the Jury deliberations as a Jury Callback exhibit[175]. It was not until Sentencing that the Trial Judge *sui sponte* observed GX114 was unsupported by GX110 in particular or arithmetic in general. The numbers did not make sense.[176] In a similar case, not a

---

[167] ABA Standards for Criminal Justice: Standard 11-4.3 Obligation to obtain discoverable material (current renumbered standard as of September 11, 2011)

[168] Summerlin v. Schriro, 427 F.3d 623 (9th Cir. 2005)

[169] See Exhibit G, Declaration of Goldberg, Page 9.

[170] ABA Standards for Criminal Justice  Standard 11-6.3 Investigations not to be impeded

[171] Trial Transcript at 1168 Line 1: [KWOK] We've never known that this witness [DUNLEVY] existed.  She has been in the courtroom the whole time hearing all the testimony and we have not heard a word that she would be testifying. ...

[172] Trial Transcript at 1172 Line 19 COURT: I'm not going to allow her testimony as an expert, late notice.

[173] Trial Transcript at 550 Line 25: GX114 Accepted into Evidence

[174] Trial Transcript at 762 Line 17; Trial Transcript at 764 Line 22; Trial Transcript at 795 Line 25; Trial Transcript at 796 Line 2; Trial Transcript at 803 Line 6, 14; Trial Transcript at 804, Trial Transcript at Line 17, Line 25; Trial Transcript at 805, Line 8, Line 12; Trial Transcript at 814 Line 15, Line 22; Trial Transcript at 820 Line 506; Trial Transcript at 822 Line 6-7, 18-19; Trial Transcript at 828 Line 15-21; Trial Transcript at 829 Line 2-20; Trial Transcript at 830 Line 5; Trial Transcript at 1266 Line 16; Trial Transcript at 1269 Line 10; Trial Transcript at 1270 Line 6

[175] Trial Transcript at 1370 Line 24, Jury Callback Exhibit List.

[176] Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). at 595; United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse."); United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("[A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.").

---

single person, including the several lawyers and the trial judge, noticed key numbers in the states' forensic analysis were grossly in error. [177]   There was a reasonable probability given it was the Trial Judges' own astute observation that Counsel would have prevailed on a suppression motion.  With the collapse of *mens rea* argument made above, GX114 suppressed, and a rebutting forensic exhibit in its place, the outcome in this case would have been affected. [178]

### (...4)   Failure to confront hostile auditor Hayes as witness

Hayes is the root hostile witness against Karron, not Riley.  Riley copied the Hayes Audit as her own[179].  Riley won a Department of Commerce *Silver Medal* for this[180].  Dunlevys' Declaration confirms Hayes payroll errors in the OIG figures.[181]  Hayes was the true author of the OIG audit numbers [182] and fringe allocation of GX114 Salary lines.[183]

### (....3) The Confrontation Clause

The Confrontation Clause of the Constitution of the United States the provides that:'"[I]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him."[184]  That right is to have a face-to-face confrontation with witnesses who are offering testimonial evidence against the accused in the form of cross-examination during a trial.

---

[177] Thompson v. Com., 177 S.W.3d 782 (KY, 2005)

[178] Kimmelman v. Morrison, 477 U.S. 365, 385–87, 106 S. Ct. 2574, 2588–90, 91 L. Ed. 2d 305, 326–27 (1986) (finding ineffective assistance when counsel failed to move to suppress evidence because of counsel's failure to investigate); People v. Wallace 187 A.D.2d 998, 998–99, 591 N.Y.S.2d 129, 130 (4th Dept. 1992) (finding attorney's failure to object to admission of evidence was ineffective assistance);

[179] Trial Transcript at 473 Line XX: Riley – cross A. I used the records that […] Joan Hayes had provided to come up with the numbers for this. I did not take Joan Hayes' report and copy the numbers […]Q.[…] do you have, either from your own work, …. general ledger [?] A. I think there are some ledgers there. […] Q. Did you do a bank reconciliation of the various bank  accounts of CASI? […]A. No. This assertion by Riley is factually incorrect(See Dunlevy Declaration below) because Riley's audit report propagated Hayes payroll errors. Riley did not catch any Hayes payroll errors. Riley, as an IRS Auditor, should have verified the payroll first but because she missed all of the myriad errors, she did not.

[180] Expert Witness Notification Letter May 16, 2008 From Kwok and Everdell to Rubinstein Re: FRCrP 16 (a) (1) (G) and FRE 702, Hazel Belinda Riley Resume Page 5: DOC Silver Medal Award for Meritorious Federal Service "For conducting a complex and unique joint audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT[sic]."

[181] Exhibit D and Case 1:08-cv-10223-NRB Document 32 Filed 08/23/10 Dunlevy Declaration Pg. 5 of 12, and see Section "Questions About Audit and Quality of Audit" Summary schedule of payroll errors on CAC-426. Hayes Errors were copied into Riley's Work papers and into GX62 final audit report. Riley did not do an Independent Audit. She copied Hayes hostile audit.

[182] GX60, GX61 and GX62

[183] The part that is not made up.

[184] Sixth Amendment to the United States Constitution

The Supreme Court in *Davis v. Washington* defined "testimonial" refers to any statement that an objectively reasonable person in the declarant's situation would believe likely to be used in court.[185] The Supreme court in *Melendez-Diaz v. Massachusetts* held that it was a violation of the Sixth Amendment right of confrontation for a prosecutor to submit a chemical drug test report without the testimony of the person who performed the test.  The court ruled that the then-common practice of submitting these reports without testimony was unconstitutional. [186]

       (....4)   Because Riley copied Hayes audit report the cross examination of Riley was not confrontation of the true witness against the Petitioner.

    In this case Riley only transmitted the Hayes audit report, she was not the actual accuser. Submission of these audit report without testimony is unconstitutional.  Rubinstein's cross-examination of Riley revealed she was re-submitting Hayes report under another name.[187] [188] [189] [190] [191] [192]

---

[185] Davis v. Washington, 547 U.S. 813 (2006)

[186] Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009)

[187] See Above ("Did you reconcile these accounts? A. No.", … I did not […] copy Hayes Numbers") <<CITATION>>

[188] [188] Trial Transcript at 468 Line 25 ("Q. And what did you do with the materials that Joan Hayes provided you? A. I used, I used them as a source of my audit.")

[189] Trial Transcript at 471 Line 15 ("Q. Is it correct, ma'am, that you used Joan Hayes' work papers to do your -- this report? A. I used the work -- the general ledgers, the cash disbursement registers, the -- whatever information, the books that were prepared by -- some things that Joan Hayes provided. The books that were being reprepared by Frank Spring. He also -- I also talked to him while I was there, to do - to  come up with the work papers from this report. Q. Did you create any work papers, ma'am? A. Yes, I did. Q. Did you create a general ledger? A. For this report? Q. Yes. A. No. I mean no. Q. You used Joan Hayes' -- A. I didn't use Joan Hayes' audit for this as a, my - the final number for this report. Q. You testified that you used Joan Hayes' information, correct? A. I used Joan Hayes' -- I used it, the information that Joan Hayes -- that CASI under Karron had asked Joan Hayes to provide to me for this audit.
Q. Did you independently check whatever documentation Joan Hayes provided for you, to you? A. I did select a sample of the invoices to trace the sample of the ledger entries to trace to the invoices for this report. Q. Isn't it a fact that Joan Hayes had no general ledger? There was no general ledger for CASI; is that a fact? A. There were -- CASI used Quick Books, and so whatever the system of quick books there were -- there were -- there were things for Quick Books. Frank Spring, I guess Frank Spring

### (....5) Rubinstein Error

Rubinstein made an error of constitutional proportions that petitioner now seeks relief from. Rubinstein should have not let the Prosecution drop Hayes as a witness from the trial. He should have put her on as a hostile Defense witness. Clearly, with his demonstrated skill at cross-examination he would have revealed many exculpatory facts from her testimony under oath. Only-if he had he prepared. However, he was not prepared. He did not put her on the stand. His failure to do so prejudiced the trial. The outcome of the proceedings would have been, in all probability different.

### (....6) Claim not frivolous

The Respondent argues that "On that basis alone ("Petitioners expression of pride" in one element of Counsel's performance), the Court should dismiss this particular claim of ineffective assistance as frivolous."[193] Trial Court has already certified the petitioner to proceed *in forma pauperis* [194] which also carries a certification of good faith and 'non frivolity'. As there are factual allegations, and an arguable basis [195] the claim may not be dismissed as frivolous.

### (....7) Rubinstein did not go far enough to confront "Junk Auditor" in time for Jury Deliberations

The Respondent asserts that the Government had to spend a significant portion of its summation re-explaining "Riley's" GX110.[196] This is a disingenuous and misleading re-interpretation of what happened on the summation transcript. The Government had to retreat

---

was creating a new general ledger or a new ledger system or journal entry system for CASI at the time I was there")
[190] Trial Transcript at 475 Line 7 ("She clearly relied upon other people's work to determine the cost. It's hard to believe that someone could be an auditor and not reconcile bank accounts that probably had less than 500 checks ...")
[191] DECLARATION OF DEBORAH A. DUNLEVY . Docket 08 Civ. 10223 (NRB) Document 32 Filed 08/23/10 at AA 001 A ("Riley, took as gospel, bad numbers and did nothing to correct them.")
[192] DECLARATION OF DEBORAH A. DUNLEVY . Docket 08 Civ. 10223 (NRB) Document 32 Filed 08/23/10 HABAC 500 to HABAC 593("Questions about Audit" Analysis of Hayes Payroll Errors uncaught by Riley. Man of these errors propagated into Riley's audit. The pattern of errors is evidence of Riley copying.)
[193] R. Br. at 16, quoting from Karron Brief at 65.
[194] 28 U.S.C. §1915
[195] Neitzke v. Williams, 490 U.S. 319, 109 S. Ct. 1827, 104 L.Ed.2d 338 (1989) (a complaint filed *in forma pauperis* is not automatically frivolous within the meaning of §1915(d) because it fails to state a claim.)
[196] R. Br. at 16 citing Trial Transcript at 1262-65 and Trial Transcript at 788-809

from GX114.  In Kwok's summation he tried to re-represent GX110 as an analysis.  It was not; it a listing by payees without classification; a basic accounting function.  Kwok was babbling somewhat incoherently at the Jury from 1262 for the 3 pages cited; The Judge had enough problems with Jurors almost passing out[197].  Kwok went on and on conflating and confusing audit terms.  Most vapidly, he started reciting entries from GX110.

Rubinstein should have punctured the big lie that is GX114.  That would have changed the Jury Verdict[198].  But he did not.  Instead, the Trial Judge had to do it after months after the Jury verdict, in the sentencing phase, when he had to deal with calculating a loss quantity and try to make some real sense of GX114 and GX110.  He could not and he said so.  Judge Patterson astutely saw partially through the "Junk Audit" when it was too late.  The Prosecution again tried to smoke the Judge but wisely, the Judge would have none of it.[199]

### (.2)    [Respondent Argument II] Brady Violations

### (...5)    The "Procedural Default" Doctrine

If a section 2255 movant could have raised a claim at trial or on direct appeal but did not, §2255 relief on that claim may be barred by the "Procedural Default" Doctrine[200].  A "§2255 petition may not be used as a substitute for direct appeal". [201]  A claim is "procedurally defaulted" if it is the type of claim that "can be fully and completely addressed on direct review based on the record created" in the trial court, but was not raised on direct appeal.[202]  "In order to raise a claim that could have been raised on direct appeal, a §2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error."[203]  "[F]ailure to raise a claim on direct appeal is itself a default of normal appellate procedure, which a defendant can overcome only by showing cause and prejudice."[204]  These claims are waived unless the petitioner can show actual innocence or show cause excusing the procedural

---

[197] Trial Transcript at 811 Line 25 ("This is terrible.  Juror 3 has got her eyes[sic, this must be because the court reporter was snoozing as well] awake all the time, but I keep an eye on her because she lies back in that chair")
[198] Trial Transcript at 1270ff Line 24 (The Jury recalled GX114 during its deliberations.)
[199] Sentencing 1 Transcript at 1-10, quoted in small parts all over this brief.  Now have a look at the beginning 10 pages.
[200] United States v. Frady, 456 U.S. 152, 168, 102 S. Ct. 1584, 1594, 71 L.Ed.2d 816 (1982)
[201] Marone v. United States, 10 F.3d 65, 67 (2d Cir.1993) (citing United States v. Frady, 456 U.S. 152, 165 (1982)).
[202] Bousley v. U. S., 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L.Ed.2d 828 (1998)
[203] Yick Man Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010);
[204] Campino v. United States, 968 F.2d 187, 190 (2d Cir.1992)

default, and then actual prejudice resulting from the error[205] Finally, demonstrating "fundamental miscarriage of justice" can overcome all.[206]. An issue that was raised and decided on direct appeal bars defendant from raising it again in a §2255 motion, absent extraordinary circumstances, such as an intervening change in the law or newly discovered evidence.[207]

These hurdles are intentionally high ones to surmount, as the Supreme Court has concluded that respect for the finality of judgments demands that "a collateral challenge may not do service for an appeal," except in exceptional circumstances[208]

### (....8) Procedural default doctrine does not apply to Brady claims

The procedural default doctrine applies only to claims that <u>could</u> have been raised at trial or on direct appeal.  **It does not apply to claims cannot be raised in a direct appeal and that require development of facts outside the trial record[209]**.  The procedural default doctrine never bars a claim of ineffective assistance of counsel raised in a §2255 proceeding, even if that claim could have been, but was not, raised on direct appeal[210].

### (...6)   The Petitioners Brady claims are not Procedurally Defaulted

The Petitioners Brady claims are not Procedurally Defaulted for two reasons.  First , because no Brady claims were raised during the trial, they were not preserved by Defense Counsel at the trial for direct appeal.[211]  Second, because the record on direct appeal is sealed, and because Brady claims by their very nature would enlarge the trial record, they are not generally raised in direct appeal.  The appropriate venue to raise Brady Claims is in a 2255 Collateral Attack because Rule 7[212] deals with Expanding the Record.

---

[205] United States v. Frady, 456 U.S 102 S. Ct. 1584, 1594, 71 L.Ed.2d 816 (1982) at 152, 168.
[206] Murray v. Carrier, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)
[207] Davis v. United States, 417 U.S. 333 (1974)
[208] United States v. Frady, 456 U.S. 102 S. Ct. (1982) at 1593-94 at 165, 167-68,
[209] Bousley v. U.S., 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)
[210] Massaro v. United States, 538 U.S. 500, 503-04, 123 S. Ct. 1690, 1693, 155 L.Ed.2d 714 (2003)
[211] To verify this scan of the entire corpus the trial transcript does not reveal the use of the word "Brady" or synonyms, cognates or related phrases.
[212] RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS (EFFECTIVE FEBRUARY 1, 1977, AS AMENDED TOFEBRUARY 1, 2010)

### (...7)   Direct Evidence of Brady Material

### (....9) Brady Claim Elements

A Brady claim has three elements: (1) Prosecution suppressed evidence; (2) Evidence suppressed was favorable exculpatory; (3) evidence suppressed was material.  The Prosecutor's failure to notify defense counsel of material exculpatory evidence and arguing false evidence to the jury was misconduct serious enough to warrant the granting of a writ of *habeas corpus.* [213]

### (....10)   Snowden testified she had more draft budget forms and correspondence

That Snowden admitted destroying budget forms and withholding correspondence.  This must now be examined to determine because there is a reasonable possibility that this material was exculpatory or impeaching evidence that would have had the potential to affect the outcome of the trial.

#### (....1)   Government Knowledge Defense obviates Criminality.

If Snowden was negotiating with CASI/Karron to grant the allowances for utilities and power,  evidence would exist in the draft and interim budget forms and correspondence[214].  In many areas of white collar crime, fraud or criminality cannot exist if the government knows about the situation and is actively working to resolve it; this is the so called "Government Knowledge Defense"[215].  This theory is supported by these pieces of evidence provided by Snowden herself at trial.

#### (....2)   Elements of Theory of Snowden sourced Brady Material

1)  Snowden was calling CASI "a lot"[216] [217]

---

[213] Brown v. Borg, 951 F.2d 1011 (9th Cir . 1991)
[214] U.S. ex rel. Ubl v. IIF Data Solutions, 2011 WL 1474783 (4th Cir. April 19, 2011) (if the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false.)
[215] DAVIDSON, M. J. (2009) THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT45 Idaho L. Rev. 41 2008-2009
[216] Trial Transcript at 419 Line 20: Snowden  - cross A. Probably verbal.  They were probably -- the -- what I usually do if there is a budget that comes in that's wrong, I'll just give the company a call and say, your numbers are wrong, please revise and resend your document.

2) CASI/Karron/Gurfein was calling Snowden a lot[218]

    a. The topic of conversation could not always be "no".  To support so much apparent conversation the topic must have been something else.  It seems reasonable that they were negotiating.[219]

    b. The negotiations were moving forward and successful to some degree because of the auditor allowances must have depended on the negotiations.

        i. The OIG came in late 2002 or early 2003 in secret[220].  The OIG must have halted the documents in the approval process for a new budget[221]  The OIG must have suppressed evidence of the approvals in the approval pipeline process.  The OIG halted ATP process again, with their letter halting of Audit Resolution.[222]

        ii. The approvals had already been forwarded somewhere the OIG missed and managed to get to auditor who used them in her analysis.

        iii. The approvals were forwarded to CASI/Karron and scanned and lost, removed from the computers, or never forwarded.

---

[217] Trial Transcript at XX Line 10: Snowden - cross Q. And you say you made a note, you wrote something down in a file about it?  A. Yes.  Q. How many calls did you make?  A. Quite a few.

[218] Trial Transcript at XX Line 10: Snowden - direct **Error! Bookmark not defined.** Q. And about how many times were you contacted about this? [Rent and Utilities] A. Numerous times. Between Lee and Dr. Karron, they would tag taking team. They would both call me and ask the same questions like a day apart, and they would consistently get the same exact answer. Q. What answer was that? A. They were unallowable costs and, no, you can not use federal funds.

[219] Trial Transcript at 850 Line 9: Spring – direct Q. Would you please read that second paragraph, the defendant's response? A. Right. This is from the defendant. You and she need to keep grinding away on disallowed items. Power, Jill Feldman, Solomon and Bernstein, Peter Berger, et cetera, et cetera, et cetera, are all actually and partly allowable. Rent, some cable, some telephone are not yet allowed. I may get an allowance on rental of the living room to the project, as it is clearly completely taken over by the project. Q. Say again what's the date of that e-mail was? A. November 30th, 2002.

[220] Trial Transcript at 810 Line 16: Riley – cross RUBINSTEIN: Q. You told us that they're the ones that should have the final say-so of what's allowable and what's not allowable in a grant, right? A. Correct. Q. And what happened here is that the special agents jumped in on this back in 2003, right? KWOK: Objection. COURT: Objection sustained. Q. And they made this from a civil matter into a criminal matter, correct?

[221] Trial Transcript at 811 Line 3: Riley – cross Q. Well, is the audit resolution a civil procedure? A. It's just a procedure. Q. Yeah, where you sit down with the grant officers and discuss whether or not certain expenses are allowed or allowable or not? A. Correct. Q. That never happened here, right? A. Sorry. What? Q. It never happened here? COURT: He says that never happened.  WITNESS: Correct.  COURT: You never sat down with him? …RUBINSTEIN: I retire. I'm finished.

[222] Exhibit B

If Karron and Snowden were indeed negotiating resolution of budget disputes, any correspondence between Karron and Snowden that would tend to impeach her "naysaying" testimony must be brought forward or if destroyed, the Court must consider adverse inference.

Because Snowden was a witness, any material, inculpatory or exculpatory must be given to the Defense prior to Snowden's testimony, so called §3500 material[223]. Because there was already one instance of government violation, and an unnoticed second Brady violation, we have reason to believe that the Prosecution or the OIG suppressed more documents.

### (...8)    Indirect Evidence of Brady Material

Indirect evidence of material exculpatory documents not brought to trial was brought out above. Logic demands that where the numbers reveal allowances, there must be supporting documentation. To win a new 2255 hearing, we only need to show one strong instance of Brady Material we have reason to believe exists,

### (.3)        [Respondent Argument III] Actual Innocence

The Petitioner makes reasonable argument that material evidence exists that shows misappropriation, in fact, did not occur using government funds: Because of that evidence, the Petitioner would be Actually Innocent.[224]. A hearing must be held to evaluate this factual allegation; because if true, would entitle the Petitioner to relief.

This is not a freestanding claim for *habeas* relief. This is as a direct result of the Constitutional Violations that occurred at trial, namely, Ineffective Assistance of Counsel, and attendant Failure to Confront the Petitioners true accuser, the former CASI accountant and hostile auditor Hayes. Finally, it should be impossible to convict an Actually Innocent defendant if key exculpatory evidence was withheld. Evidence of but a few withheld exculpatory fragments are presented here. Goldberg swears, his exculpatory Affidavit was completely ignored by the Prosecution, and Snowden admits under oath to withholding and destroying budget documents.

---

[223] The Jencks Act, 18 U.S.C. §3500. See Trial Transcript Page 454 and 496ff
[224] Karron Brief at 70

(...9)    Four Counter Arguments

1) The Rent was reclassified as salary, as evidenced by the new forensic analysis of GX114. As such, no federal funds were used to pay Rent.[225] [226]

2) Karron (over)funded the project[227] by sufficient margins[228] to cover direct costs even if the above Rent (1) is not included[229]. As such, no Federal funds to pay Budget Line J, Program Indirect Costs or CASI general costs (Rent).

3) Government Knowledge (ATP Management) of the situation[230] and their effort with Karron to find a legal solution[231] (such as reclassifying rent, *above*) obviates the criminal "intentionally misapplies"[232] clause. This is true if there was reasonable expectation of resolution by both parties.[233]

4) The Petitioner was not out of budget with a permissible budget tolerance of $422,900. Over budget (and the converse necessary under budget[234]) line items, otherwise legitimate direct

---

[225] Karron Brief Exhibit 1, Dunlevy Declaration, at 10, "RENT". Exhibit D, Dunlevy Lead Sheets AA001A, AA2, AA6, and *etc*

[226] Karron Brief at 26 "6. Rent was reclassified as Salary"

[227] Co-funding direct costs (Budget Line J) and funded the overhead, (Budget Line K), Federal funds were not used for Budget Line K, Karron Funds were used for Budget Line J; this is what tracing of funds would have revealed at trial except for Rubinstein's Ineffective Assistance of Counsel in failing to engage forensics support..

[228] Misappropriation greater than $5,000 (18 U.S.C. §666(a)(1)(A)(i)) required for conviction under 18 U.S.C. §666(a)(1)(A).

[229] Exhibit D: Dunlevy Forensic Reconstruction; this is made without accounting for the Rent classification issue.

[230] Bootstrap Payroll Loan, Rent, Reclassification into new budget.

[231] Trial Transcript at 128 Line XX: Lide – direct, "Livable Budget" Trial Transcript at 387 Line 1: Snowden – cross "Initial Bootstrap Loans Paid Back"

[232] 18 U.S.C. §666(a)(1)(A)

[233] Government knowledge can defeat a False Claims Act action, see Collateral Civil Attack 08-CV-10223 (NRB). See U.S. ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971 (E.D. Wis., 1998), aff'd 168 F.3d 1013 (C.A.7 (Wis.), 1999), ("Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived."), U.S. ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("no [False Claims Act] violation exists where the government has not been deceived.")

[234] It is a 'zero sum game', The total amount always remains the same. Amounts moved by spending on one side necessary removes it by reducing that amount from somewhere else in the closed system. $178,764. of Karrons' gross tax paid wages/salary of $334,004.12 was turned back into the project. This increased the total amount of funding in the total actual budget to $1,524,264. See Exhibit D, Dunlevy, Lead Sheets. That portion of salary turned back to cover Co-funding direct costs (Budget Line J) and funded the overhead, (Budget Line K). Overspending in Equipment (D), inclusive or exclusive of site preparation, necessary reduced spending in other categories. See GX62 Appendix III, Spitz Exhibit 1 Schedule Note "(B)

costs, approved or otherwise[235], in the first year[236] can be compensated in following years as long as they are paid over the life of the award.[237] [238] Because the project was suspended[239] [240] and not terminated[241], with an expectation of resumption on resolution of budget issues, any out of budget but otherwise legitimate direct expenses[242] could have and can be properly resolved without implicating criminality, such as designating CASI a "high risk" grantee.[243]

All of this begs the questions: Why did the government stop cooperating with Karron in the negotiation of the end of first year budget revision? [244]At this point, only a new hearing can find the underlying cause of this.

### (...10)   Evidence is irrefutable

The type of evidence presented about GX114 is irrefutable.  The prosecution cannot show how[245] all (or any) the figures used in GX114 were derived from GX110.[246]  The Judge Patterson recognized this fact despite the fact that one of the prosecutors tried to talk the Judge out of it with an obvious "snow job".[247]  The same "snow job" used on the Jury.  The analysis of the

---

[235] Trial Transcript at 446 Line 17: Snowden - redirect COURT: The issue is whether or not they properly come within that framework of Exhibit D; it's just that they were not approved. Is that right? EVERDELL Correct, your Honor.  COURT: That's what I want to find out. [The further testimony meandered off this topic and the courts questions was not directly answered]

[236] Trial Transcript at 348 Line 16: Snowden - Cross Q. If the grantee doesn't spend the 800,000 in the first year, what happens to the money? A. If he doesn't spend all of the $800,000, he can request a revised budget. His first year will have the actual amounts, and the out years which will be year two and three. He can incorporate the money that was unspent into years two and three.

[237] GX3 "DOC, STANDARD TERMS AND CONDITIONS" (10 1998), .03 Federal and Non-Federal Sharing (b) b.

[238] Trial Transcript at 407 Line 15: Snowden – cross

[239] See Exhibit B, Browning Letter from ATP of November 5, 2007.

[240] 15 C.F.R. §A (1–1–01 Edition) §24.3 Definitions.  Suspension.

[241] 15 C.F.R. §A (1–1–01 Edition) §24.3 Definitions.  Termination.

[242] Sentencing 1 Transcript at 18 Line 12: ("Direct expenses are allowed, regardless of what they are. Indirect expenses are not allowed.")

[243] 15 C.F.R. (1–1–01 Edition) §24.12 Special grant or subgrant conditions for ''high-risk'' grantees.

[244] Trial Transcript at 455 Line 18: Snowden was furiously calling CASI about 'math problems' well into the 5th and 6th quarter of the project ( Winter 2002-2003)

[245] It is impossible to reverse engineer all of the figures in GX114 back as sums of figures in GX110. The Petitioner has written computer code to attempt to recreate 114 from every possible combination of every number in GX110 to regenerate the sums in GX114. The petitioner or any reasonable person who studies this problem, must conclude that GX114 contains significant elements of numerical fiction.  Karron's salary has some foundation in GX110, and then it is insufficient unless the rent checks are included.

[246] In engineering school, we try to teach students to show all work so we all can understand what a did, how they did it, and why.  See "Riley must have created contemporaneous documents" *above*

[247] Sentencing 1 Transcript at 6 Line 3 ("[COURT] Show me.  She has no tabulation putting [Exhibit] 114 into context with her […] Exhibit 110. [KWOK] If your Honor could look at Government Exhibit 110. […] [COURT] I

forensic accounting of CASI's expenditures that Karron sets forth in her memorandum is extremely clear. Judge Patterson will not be fooled again. Dunlevys' forensic reconstruction is designed to enable another competent forensic accountant to reconstruct every step Dunlevy took to arrive at her key figures[248], The evidence sufficient to convince every rational juror.

The Petitioner presents the type of evidence that would convince "each and every rational juror"[249] that the Petitioner is innocent of the crime of conviction. The petitioner has put forth an obviously superior analysis of the CASI and Karron expenditures that stands up to more than cursory examination, unlike the Governments so called "analyses". The comparison of the two analysis, and the methods used by the two auditors, so clearly discredits the Government's own analysis that no rational juror considering both analyses could have convicted Karron.

### (.4)   [Respondent Argument IV] Dismissal would be an abuse of judicial discretion and a hearing should be granted.

When the petitioners' §2255 allegations raise an issue(one or even more) of material fact, the Court is required to hold an evidentiary hearing in order to make findings of fact and conclusions of law[250].Rule 6 under §2255 Proceeding *(above)* provide that, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure."

The Supreme Court has said that:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.[251]

---

did look at Exhibit 110.[…] I'm fully familiar with it. […] That's loan and loan repay. That's not salary […] I understand. It's just not salary. [KWOK] If I can just correct a misimpression, Government Exhibit 114[GX114] is not a rough calculation. It's not a guess. It's based entirely on Government Exhibit 110 which, In turn, is based entirely on the bank records that she reviewed. **[COURT] They are certainly not in those records, […]")[emphasis added]
[248] Government Auditing Standards July 2007 Revision GAO-07-731G AICPA GAGAS auditors should prepare documentation that enables an experienced auditor having no previous connection to the audit to understand ... [the results].
[249] R. Br at 26
[250] Walker v. Johnson, 312 U.S. 275, 285 (1941); United States v.Costanzo, 625 F.2d 465, 468 3d Cir. (1980)
[251] Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (ellipsis in original; quoting Harris v. Nelson, 394 U.S. 286, 300 (1969))(emphasis added).

Thus, the district court abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief[252].

If [the] petition allege[s] any facts warranting relief under §2255 that are not clearly resolved by the record, the District Court [is] obligated to follow the statutory mandate to hold an evidentiary hearing.

The Fifth Circuit has warned that,

While the district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is 'indispensable to a fair, rounded, development of the material facts.'[253]

In exercising the discretion of whether to grant such a hearing, the court must accept the truth of the factual allegations[254][255].

When a motion is made under 28 U.S.C. §2255 the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion **the court must accept the truth of the movant's factual allegations**[256][257] unless they are clearly frivolous on the basis of the existing record. Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.[[258][259]] [Emphasis Added]

Depositions, in particular, are an important mechanism for such factual development.[260] In the *habeas* case of *Hodges v. Epps*, Chief Judge Michael Mills allowed the petitioner to conduct four depositions.[261]

---

[252] [*Id.* at 131, 134 original citation removed to below]
[253] East v. Scott, 55 F.3d 996 (C.A.5 (Tex.), 1995), Hodges v. Epp (1995) (quoting Coleman v. Zant, 708 F.2d 541, 547 11th Cir. (1983) (quoting Townsend v. Sain, 372 U.S. 293, 322 (1963))(emphasis added)
[254] Government of the Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1980)
[255] See the "Testimony of a Dozen Bishops vs. One Known Liar" standard from Summary Judgment Decision Standards.
[256] Frivolous litigation is the practice of starting or carrying on law suits that, due to their lack of legal merit, have little to no chance of being won. The term does not include cases that may be lost due to other matters not related to legal merit. In legal usage "frivolous litigation" consists of a claim or defense that is presented where the party (or the party's legal counsel) had reason to know that the claim or defense was manifestly insufficient or futile. The fact that a claim is lost does not imply that it was frivolous.
[257] Washington v. Alaimo 934 F. Supp. 1395 (S.D. Ga. 1996) contained 75frivolous "motions", all of which required the attention of the Court.
[258] Government of the Virgin Islands v. Bradshaw, 726 F.2d 115, 117 (3d Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984)
[259] *ibid*
[260] *ibid*
[261] See Case No. 1:07CV66-MPM, Docket Entry 38, Feb. 1, 2010.

The court in *Dollar v. Long Mfg* described as "vital" the role of depositions in particular, and holding that it was an abuse of discretion for the court to refuse to compel them[262]

## (...11)    Quality of the Evidence

It is a fact that the numbers in GX114 don't add up.  It is inarguable that GX114 appears at least in part, to be made up[263].  Sworn Statements by Dunlevy (Exhibit D) are supported by financial statements already in evidence (GX80 through 90, DXXXX DXXXX-1, DXZ, DXZZZ, DXZZZ-1).  Sworn Statement of Goldberg(Exhibit G) re-affirms a prior exculpatory sworn Affidavit withheld by the Prosecution.  Sworn trial testimony by Snowden admits to "additional correspondence to these exhibits"[264] she withheld from the Prosecution[265] and other documents she would routinely "discard"[266].  Finally, the very authority of ATP program specific practices is contradicted by superior  DoC statutes require OMB waver for specific programs.(*above*)

## (...12)    Trial Judge *sua sponte* expressed critical doubts about GX114

Trial Judge Patterson *sua sponte* pointed out unsuitability of the only direct evidence against the defendant, GX114:  is "… not something that a Court could rely on in a criminal case" [267], "this is a mess"[268].  Despite this assessment, GX114 was in fact relied upon by the jury to render a conviction. [269] [270] [271], the reliability of the trial verdict[272] is in doubt.  This satisfies the "Good Cause[273]" standard, a requirement for further factual development.  The Petitioner raises plausible claims for *habeas corpus* relief, each raising specific controverted facts supported by copious admitted and admissible evidence (*above*).  These detailed and controverted issues of

---

[262] See generally, Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 615-617 5th Cir., (1977)
[263] Karron Brief at 26, "(28) Analysis of GX114 Errors and their meaning"
[264] Trial Transcript at 424 Line 5
[265] Trial Transcript at 424 Line 1
[266] Trial Transcript at 420 Line 20
[267] Trial Transcript at 5 Line 4.
[268] Sentencing 1 Transcript at 16 Line 14et seq: COURT: He underspent budget through those fringe  benefits by $4,000 it says right above it. Look at that [GX114]. This is a mess
[269] Trial Transcript at 1377 Line 1
[270] Trial Transcript at 1371
[271] Sentencing 1 Transcript at 5 Line 3: It seems to me this is just a rough calculation and not something that a Court could rely on in a criminal case.
[272] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963)
[273] *Habeas Corpus* Rule 6. Discovery: 1 (a)

fact which, if proved at a hearing, would clearly entitle the Petitioner to relief.[274] [275] Refusal to grant a hearing in this case in light of the judges own observations on record would be abuse of sound judicial discretion.[276] Because of this, a hearing must be granted.

## (4)     Signature

Signed on this day December 2011

Long Beach, New York

_____
Daniel B. Karron
Petitioner
*pro se*

348 East Fulton Street,
Long Beach, New York 11561
E-Mail to drdbkarron@gmail.com
Facsimile +1 (516) 308-1982
Voice +1 (516) 515-1474

---

[274] Machibroda v. United States, 368 U.S. 487, 494-95 (1962)
[275] Newfield v. U.S., 565 F.2d 203 C.A.2 (N.Y.), (1977)
[276] Burns v. Thiokol Chemical Corporation,483 F.2d 300 5th Cir. (1973)( "We are mindful that the scope of discovery lies within the sound discretion of the trial court. ") Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613 C.A.5 (Ga.), (1977) ("However, in his order denying plaintiff's motion to compel, the trial Judge declined to state any reasons for his order limiting the scope of discovery. We have found no sound reason for the denial of plaintiff's motion to compel. We thus hold that the trial Judge abused his discretion in denying plaintiff's motion to compel. ")

**(5)      Appendix**
**(6)      AFFIRMATION OF SERVICE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL B. KARRON | 11-civ-1874 (RPP) |
| Petitioner, | 07-cr - 541 (RPP) |
| -V.- | AFFIRMATION OF SERVICE |
| UNITED STATES OF AMERICA | |
| Respondent. | |

I, D. B. KARRON, declare under penalty of perjury that I have served a copy of the attached

1. Covering Letter to Judge Patterson
2. "CORRECTED Sur-Reply Memorandum of Fact and Law in support of Petitioners' 28 U.S.C. §2255 Motion to Vacate Criminal Verdict "
3. Exhibit Appendix for the above, consisting of

   I.    Exhibit B: Browning Letter
   II.   Exhibit E: Eisen
   III.  Exhibit D: Dunlevy
   IV.   Exhibit G: Goldberg
   V.    Exhibit O: Orthwein

upon

    Mr. Christian R. Everdell

    Assistant United States Attorney

    Terrorism and International Narcotics Unit

    Southern District of New York


    whose physical address is


    One St. Andrews Plaza,

    New York, New York, 10007

    And a copy by e-mail to
    <christian.everdell@usdoj.gov>

D. B. Karron
Petitioner, *pro se*
348 East Fulton Street,
Long Beach, New York 11561
E-Mail to drdbkarron@gmail.com
Facsimile +1 (516) 308 - 1982
Voice +1 (516) 515 - 1474


    Dated: Long Beach, New York
    December 2011

## (7)    Exhibits

### (.1)    Guide to Exhibits

❖ Exhibit B is a letter from Mr. James M. Browning who was the successor Grants Specialist to Ms. Hope Snowden at NIST. The letter is addressed to Peter Ross, who was the last ATP Program manager accepted by the ATP program. In this letter he reveals that the residual funds from the ATP grant were sitting unused and available in the CASI treasury draw account for 4 years waiting to be paid out. The letter solicits CASI to submit invoices for reimbursement of costs. This is evidence that ATP was not so concerned about CASI that it terminated the ATP program and 'took back' or returned grant funds encumbered for expected project costs back to the government.

❖ Exhibit E is sworn Declaration from Eric Eisen, Esq. in which he certifies his transcription of the last NIST ATP program solicitation meeting in 2007 hosted by then ATP program director Marc Stanley. Mr. Stanley makes a number of comments about how flexible and 'un-bureaucratic' his program is. This supports the existence of negotiated wavers for nominally un-allowed and un-allocable costs such as utilities and rent.

❖ Exhibit D consists of the excerpted forensic reconstruction 'lead sheets' from the voluminous sworn "DECLARATION OF DEBORAH A. DUNLEVY IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT", docketed under Case 1:08-cv-10223-NRB Document 32. The main point of this document is to provide key figures regarding the total cost of the project, and the sources of funding. This is important because the project costs are **more than** the government funding. The total cost of the project as $1,524,264[277], of which the Federal Share is $1,345,500 and the CASI co-funding contribution was $178,764.[278]

❖ Exhibit G consists of the sworn Declaration of Goldberg regarding the investigation by Special Agents of Karron. The Exhibit brings forward an example of Brady Material that

---

[277] Dunlevy Exhibit D at AAC109 Line 18(Lead Sheet 9),
[278] Dunlevy ExhibitD  Lead Sheet at AA-001-C,

should have been included by the Prosecution but was not.  The circumstances are fully explained by Goldberg in his Declaration narrative.

❖ Exhibit O consists of the kickoff meeting agenda and security badge from Karrons' attendance.  This kickoff meeting was hammered away at by the Prosecution as where the 'Rules' were laid down for Karron.  This meeting was taken as evidence that Karron was fully knowledgeable about these rules and willfully disregarded the rules in how Karron conducted the project.  However, the meeting agenda memo shows that this is not the case. The Rent and other issues were on the negotiating table and known by ATP from the very beginning.  Orthwein and ATP program management tried to accommodate CASI and Karron's requests and needs.

**(.1)      EXHIBIT B BROWNING LETTER**



Karron 2255 Sur-Reply Memorandum of Fact and Law    Appendix



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Institute of Standards and Technology**
Gaithersburg, Maryland 20899-

November 05, 2007

Mr. Peter Ross
Computer Aided Surgery, Inc.
300 East 33rd Street, Suite 4N
New York, New York 10016

RE: NIST Cooperative Agreement No.: 70NANB1H3050

Dear Mr. Ross:

The above referenced cooperative agreement ended on September 30, 2004 with a balance in the grant account totaling $54,500. We want to be sure our records agree with yours before we proceed to deobligate these funds.

If there were additional claims made against the account, please so indicate and we will proceed to deobligate the remaining balance and finalize the closeout of this project.

You may submit the requested information to me via E-mail at the address noted below.

If we do not hear from you by November 30, 2007, we will assume that the information we have is correct and will proceed to deobligate the remaining funds in the grant account.

Sincerely yours,

James M. Browning
Grants Specialist
GAMD/DA/CFO/NIST
100 Bureau Drive, MS 1650
Gaithersburg, MD 20899-1650
Phone: 301-975-8088
FAX:  301-840-5976
E-mail: james.browning@nist.gov

C: Heather Mayton
   Grant File

**NIST**

Exhibit B                                    2                                    Exhibit B

**(.1)      EXHIBIT E EISEN DECLARATION**



# EXHIBIT

# E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,                                            08 Civ. 10223 (NRB) (DFE)

- v. –                                                DECLARATION OF ERIC A. EISEN,
                                                      ESQ. IN RE OPPOSITION TO
DANIEL B. KARRON,                                     PLAINTIFF'S MOTION FOR
                                                      SUMMARY JUDGMENT
Defendant.

-----------------------------------------------------------------

     I, ERIC A. EISEN, ESQ, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury as follows:

1.     My name is Eric A. Eisen. I am a principal of the law firm of Eisen & Shapiro, which is located at 10028 Woodhill Road, Bethesda, Maryland 20817.

2.     I am admitted to practice law in the District of Columbia and Maryland. I am also admitted to practice in several United States District Courts, Courts of Appeal, and the United States Supreme Court.

3.     Dr. Daniel Karron is an acquaintance of a friend of mine from childhood. I first met him shortly before his criminal trial and was asked to provide him help.

4.     Dr. Karron had no funds to my knowledge and the last time I had been involved in any criminal matter was over thirty years ago. Based on this I was unable to provide him assistance.

5.     Recently Dr. Karron asked me to review for accuracy a transcript he had prepared from a video of what he told me was a presentation made by a government agency and to certify the accuracy of excerpts he had transcribed from that video.

6.     As a pro bono action and a service to the court and the administration of justice, I agreed to review the transcript, correct it, and certify the accuracy of the corrected transcript.

7,     I was presented with a video and transcript excerpts. For each excerpt, I located the corresponding time in the video, listened to the speakers, and corrected the transcript so that it was as accurate as possible. I did not select the excerpts to be transcribed and I did not listen to

what was said before and after the excerpts, focusing only on the accuracy of what was transcribed.

8.      Because I did not know the names of the speakers, I omitted names, which Dr. Karron had sometimes placed in his draft. Where more than one person on the podium responded to a question, I reflected the multiple responses by putting more than one answer to a question in the order in which the answers were given.

9.      The attached transcript is the result of that effort. It contains a total of 11 excerpts, each identified by the time reported on the video of when the excerpt begins. The identifiers, preceded by Dr. Karron's exhibit numbers, are:

| | |
|---|---|
| 115. | 1:54:00 |
| 116. | 2:02:45 |
| 117. | 2:37:33 |
| 118. | 2:42:26 |
| 119. | 2:45:35 |
| 120. | 21:51:30 |
| 121. | 2:58:30 |
| 122. | 2:59:30 |
| 123. | 3:03:15 |
| 124. | 2:28:27 |
| 125. | 2:31:14 |

I certify that the attached transcription is accurate and complete as to the material it contains, with no elisions (except immaterial stuttering and the like such as are typically removed from transcripts) in the text produced.

SO SWORN:_____                    August 30, 2009

                    Eric A. Eisen
                    Eisen & Shapiro
                    10028 Woodhill Rd.
                    Bethesda MD 20817
                    301-469-8590

**BEGINNING OF EXCERPTS**

**1:54:00**

A:      Well, now you're all experts in ATP, hopefully.

We are going to conclude with a few remarks. I'll ask my colleagues to approach the table for the Q and A section. Just to repeat a few comments the competition is currently open, we've announced on April 4, we are accepting proposals, again, in all technology areas, but we're also interested in receiving proposals in the 4 cross cutting areas of national interest, described earlier.  Again, Let me repeat, that deadline at 3pm on May 21, is exact; no exceptions.

[…]

-1-

**2:02:45**

Q:     I have two quick questions.

       First question is that if you're a single company, and I understand that the limit of the budget is 2 million dollars for three years, does that include the cost sharing that can be up to 30 percent. So...

A:     The Federal share is limited to 2 million dollars.

Q:     So that if you submit 2 million you can..., that doesn't count the cost sharing; you can add to that.  Right? So the total budget is more than 2 million.

A:     That's correct.

Q:     Thank you.

       Second Question. Is that you didn't mention about the fringe benefit could be looked at as direct for those companies  in which that  is normally counted as direct and not included for those companies that doesn't included include that. Is that in the regulations in the kit?

A:     Well we stipulate in the budget that you can charge fringe benefits as a direct cost. However if your company normally charges them as an indirect,  you have to leave them as an indirect and if you're a single company you will have to absorb those costs.  And when your project is audited, the auditors will be looking to insure that you've charged the cost in the appropriate category.

Q:     I see because that's a huge difference in the application. But anyway... it's in the kit that's stated. Thank you.

       […]

-2-

**2:28:27**

Q:      My question has to do with how broad your definition is of 'technology'. Our company
        works in medical informatics developing classification schemes, thesauri, mapping
        strategies, and then we subcontract out a lot of the computer work.  Would our work
        qualify for an ATP proposal?

A:      It can.  We've actually funded a fair amount of in medical informatics.  If you go to our
        web site and look under the funded projects you might see some examples.  Basically you
        need to make it very clear to as to what..., where is the high technical risk and who is
        working on those high technical risk tasks so that it doesn't look like it is an entire pass
        through to the subcontractor for all the high technical risk issues.  But you need to make
        the business case and the technical case as to why this is the best way to put a project
        together.
        Ok so it is possible, but I think you have to make the case as to what is the technical risk .
        And what innovation approach do you have to overcoming those barriers.

Q:      And who is assuming the technical risk, primary application and not the subcontractor?

A:      Well, I think we like to see that it's not all in one place and not in the other. I think that
        we do get a little bit concerned if all the high-risk tasks are in the subcontractor and not .n
        the primary awardee.  But to be honest, you have to explain why that may be the only way
        to do this project. You know it really depends on your rationale based on how companies
        are structured in your business sector and how they construct their businesses, that might
        be the only way anybody could do it. You need to explain that to us as to why this
        approach is the best technical way to address the risks and innovation.
        And I would encourage you to call one of our information technology folks; is there
        anyone in the room that could raise their hand that would love to chat with this guy later?
        Well, call Barbara Cuthill... and Ammet. Ammet is in the back there. So there will be

-3-

Exhibit E                                                    Exhibit E: Eisen

some folks who can talk to you about that.

-4-

**2:37:33**

Q:      I have a two part question.

        Part 1. If a small company is subcontracting with a university does the company have to cost share other than indirect costs?

A:      The University or any subcontractors are allowed to charge indirect costs. It's the prime recipient that is submitting the proposal as a single company that is not allowed to charge indirect costs.

Q:      Does the small company have to do cost sharing other than the indirect costs?

A:      No. No they do not.

        [...]

-5-

**2:42:26**

Q:     With a startup company, we are generally pretty lucky if we can accurately forecast what's
       going to happen in 96 hours in the future... if a...a sort of a two part question..,
       How detailed does the planning have to be, if we reach a decision point, and we go A-B,
       or is it A-B-C and then second point is, How flexible is the funding if we end up pursuing
       some route that we didn't even envision to begin with.

A:      OK, basically I would have to say on average, most decisions points in the technical
       plans, we rarely see people with more than two or three alternative directions. We are
       looking for where do you think are the highest priority things to go after that are also still
       consistent with our criteria of high risk and innovation
       OK, so. basically what you can't do, or hope to do is, is 'OK we'll get to this decision
       point, and if it looks like we can't do A, which is the highest risk thing, we'll go right to
       B, which is product development,' because we'll say, 'Ah no you won't,' because we can't
       fund product development.
       OK, so basically your alternatives that you might be considering in a decision point have
       to also be meritorious against the scientific and technological criteria.
       Sometimes, though, things happen along the way, in a high-risk research project where
       you say 'You know ...' or something may have happened out in the community, that a new
       discovery that makes you want to rethink a particular direction or part of your proposal.
       If you ever want to make a recommendation for a major technical scope change,
       depending on how major it is, sometimes companies have requested to suspend the
       project in order to stop the clock because we don't want your three years to run out while
       it gets evaluated and then they would send us in a 'This is how we would like to change
       the technical scope. Depending on how big of a change it is -it could be something that
       the technical and business project managers can evaluate and decide 'yes' or 'no'- they may
       decide they want additional peer review from federal technical folks to see if it still makes
       sense. And in a few cases, though it has happened rarely in ATP's history, sometimes

-6-

we've had a oral review for that particular company on their major technical scope change to see if the SEB would have -if the Source Evaluation Board- would have selected it had it been submitted that way.

Because we want to see that whatever change that you propose is of equivalent or higher merit to the original proposal.  So it depends on the scope change -how big it is, how much of a change- but we can accommodate those things, but sometimes it can take a suspension of the award in order to stop the time period and give us time to evaluate it. It's not a negative against you to suspend an award for that because it just stops the clock so you don't lose any of your time.

-7-

**2:45:35**

A:     [STANLEY] I would take one more crack at that.  One of the things I pride myself on in
       this program and with my colleagues is that:
       We try not to be too bureaucratic.
       We are very supportive of the companies that win awards from us, and you actually have
       a management team that we assign, as Linda Beth has described.
       So to the degree it maintains the true fidelity of the original proposal, in terms of the
       innovation and the risk, we recognize that, we're not going to give up on you if you can
       present appropriate evidence.  It may have to go through various quick reviews, to make
       sure that you're not creating a whole new opportunity that we didn't hear of, because that
       would be unfair for people who have already gone through the process.
       But it's not unusual for us to go through that process. It's not unique, and to the extent
       possible we all are in agreement that this would add strength to it, it's in line with general
       fidelity with the original proposal we certainly will do all we can with you giving us
       appropriate information to continue that project along.  Because we have obviously
       determined that it has great value to our country.
       And as for your future look in terms of the business plans things of that sort, we also
       understand, we don't expect you to be a gipsy ball reader either.  So you have to indicate
       to us against the criteria, why and where, and what the commercial pathway is, but we
       have our own ways of reviewing that and we have ways of clarifying that with you before
       we make that award.  But, we understand some of the things, nobody knows yet.  But you
       should be able to nail some of those things because you know one of the real problems,
       and I've talked to a lot of VC is… well, is, inventors are wonderful people, particularly
       in the United States.  Entrepreneurs are just wonderful to talk to. But there is a disconnect
       sometimes between clearly what the technology is going to be and how you are going to
       penetrate the market .  The nuance in this program is we don't support basic science.
       There's lots of federal programs that do that .  What we are interested in is capturing that
       innovation, defining the risk and the feasibility and the commercialization plan and

                                            -8-

having it getting to the market here, before anyplace else in the world, so we maintain increased US competitiveness and jobs etc.  So, that's the gap we play in, and that's what you have to address in that proposal . You can ask very serious hundred thousand foot questions before you submit the proposal. If you don't completely understand what we have talked about today we welcome those opportunities to talk to you . The difference here is we can't write the proposal for you.  But you can always ask for points of clarification.  And you'll find many people, including  the people I've got out in the employees lounge for those who are not staying here, that can highlight on some if the things we've talked about right now.

-9-

2:51:33

Q:      Yes please.  Our product consists of three components.

        One of them is the high risk - technically high risk- component, the other two are there is

        some risk, but not the same degree. So the first component is necessary [garbled] but not

        sufficient.  I was wondering if, as part of the project, obviously that would be part of the

        project, would the development of the other two components, and more importantly, the

        integration of the all three components be fair game for the tasks of the project?

A:      Absolutely.

Q:      On both questions?

A:      Yes.

        It's very common for us to see...,  that's one reason that a lot of companies do come to

        ATP, we are looking for the whole risk profile. But we're also looking for projects that

        where we define risk as not just the point risk but it's also if there's risk associated with

        that integration where it can fail,  that's an element of risk that, you know, for example,

        maybe your components aren't that compatible with each other right now.  Why is that?

        Why do you hope you can make them compatible  So I think that we look at risk as not

        just by-component; We are looking at the whole profile of risk , of the whole project.  So

        there are often lower risk aspects of a project and higher risk aspects of a project.  We

        want you to identify for us in each task where you think all the risks are, y'know high,

        medium, and low, something to that regard, because then we can evaluate the profile of

        the whole project.

-10-

**2:58:30**

Q:      [Unidentified Questioner 3] Yes sir, this is a cost-share question
        Would you clarify the use of fringe benefits being part of or not part of your overhead
        rate.
        I don't have my DCAA disclosure in front of me, here but  I know that we typically will
        refer to fringes as part of our overhead but I also know that they are broken out as a
        separate line item in our disclosure. So how does that work?

A:      It depends on how your..., you said you have a DCA ?

Q:      Yes.

A:      It depends on how they established it. If it is part of your indirect cost pool, you must
        charge it as an  indirect cost and cannot charge it as a direct. We do allow it as a direct,
        because we do have a lot of small businesses, a lot of startups, who don't have big
        accounting  systems and they are able to charge it as a direct expense.

Q:      Thank you.

A:      You're welcome. Strange new face.

-11-

**2:59:30**

Q:    I'll try to ask yet again another new question this time.

A:    Go ahead.

Q:    About past performance:  The kit does not specify past performance as part of the
      evaluation criteria, either past performance with the NIST ATP or with other similar
      externally funded programs . So I'm wondering, is there in some subtle way, past
      performance factored into evaluations?

A:    Well, in terms of evaluating your qualifications and experience I'd say in that context it
      does,  but to be honest, from a real negative point of view, only if you have been debarred
      is that going to be a really negative thing overall.  We are really just going to look at your
      experience based on how it relates to this award and do we think that you have the
      qualifications to perform the work that you're doing .  Past federal awards might not have
      been in this area, so it really wouldn't be an indicator of whether or not you can perform
      research in this particular area.  So we're looking for relevant experience and
      qualifications that relate to this proposal.

Q:    So just as a quick follow up if we do have prior NIST ATP experience but it isn't
      necessarily relevant to this proposal, there's no need to include that  in the write up. Is that
      what I'm hearing more or less?

A:    I would say it's only relevant in terms of you know how to manage projects, you're good
      at managing, talking to your collaborators, and from that perspective if it's not specifically
      relevant to the R and D area that you're working on on this particular proposal , but you
      know  we're looking at your business qualifications  as well as your technical, so I think it
      can relate but having had a past ATP award doesn't necessarily mean you're more

-12-

qualified for this award. OK? But you need to really make the case; what are the qualifications. 'cause sometimes we have had companies that have had more than one ATP award and for example a particular company would come to an oral review and they always would bring a particular scientist who is very eloquent in explaining the science and at one point we had to say 'OK, you've really explained it well but are you gonna really be the PI on this project, or as soon as it starts are you gonna be gone?' Alright? The old Bait and Switch on qualified personnel doesn't go over really well, so sometimes just putting a familiar face on a proposal if your intention is to not really have that person on it for the entire time won't go over very well.  So we are looking for how are..., what are the best resources that you're allocating qualifications to this project.

Q:     Let me do a favor here, in the effort to those who want to stay and talk to Dr. Utag or want to go on and talk to my business people and some who are just, hungry.  I'm going to say the remaining three are the remaining three. But all of us here, up on the table, there's a lot of program managers I see standing up at the back end of the auditorium, we're all going to be sticking around. But I think in order to make sure we cover all the parts we promised I'm going to limit these last three.

       [...]

**3:03:15**

Q:     This question [is] about the personnel that can be involved with the project.  Some startups spring out of university research.  [Garbled] To what extent can they wear their hats as company personnel and at the same time retain their university affiliation and not be frowned upon on by NIST?

A:     It depends on the rules of the university. If the university has no restrictions on employees having their own companies or doing work in other companies, and as long as they are employed by that company as well as the university, there is no problem.  But it does depend on the university restrictions.

Q:     Okay. So NIST doesn't have to specify how this going to be arranged?

A:     Correct.

A:     There can't be a conflict of interest between the two relationships so you have to really make sure there is no financial conflict of interest.

Q:      So if its ok with the university, its ok with you?

A:     It's actually addressed in the kit in more detail so we might want to find the page and it gives you the regulation to look at just to make sure there's no conflict of interest.  So, for example if you're the small company and you're the professor and you're gonna come out here and have a company and then you wanna be able to subcontract back to your group that might…, we might ask a few questions cause we want to make sure there's really no conflict of interest, and that might not work out.  Ok so it really depends on what your role is and do you want the university to be part of the project as well as your company .  That's where it could get a little confusing and the kit actually does have some

-14-

information on that to make sure that you avoid those conflicts of interest.  Ok?

A:      There are also codes of conduct standards in the federal regulations that I had up on the slides... 14 CFR..., 15 CFR Part 14; you may want to look at those.

-15-

**2:31:14**

Q:     I have two questions concerning budgets.

       How much budget justification details are required?  Do we have to explain also where
       we gonna get the money for indirect for small business.

A:     You don't have to identify the source of your indirect costs unless you're getting  on... on
       the 1262 page 3, in the middle portion of the page 3, it identifies the cost-sharing, so most
       of the companies do have it within their own company. But if you're getting it from state
       funding then you would identify the state.

       [...]

**END OF EXCERPTS**

**(.2)        EXHIBIT D DUNLEVY Lead Sheets**



# EXHIBIT

# D

# Overview

AA  001A,B,C    Index & Introduction to Summary of Discrepancies
AA  002         Comparison of Budget, Actual and Hayes Audit

AA  003         DB Karron Gross Salary Discrepancy
AA  004         DB Karron Co-Funding Discrepancy
AA  005         Equipment & In-Kind Contribution Discrepancy

AA  006         Monies to & from DB Karron
AA  007         Monies to DB Karron FYE 9/30/02
AA  008         Monies to DB Karron FPE 12/31/03
AA  009         Monies from DB Karron FYE 9/30/02
AA  010         Monies from DB Karron FPE 12/31/03

These twelve pages summarize the major differences from the audited
Hayes numbers and the reconstructed numbers prepared at the
end of 2004 and during 2005 (after the time period in question).

There is almost a wonton disregard for reconciliation(s) and pure
numeric facts.

There was either no audit done by Hayes, or a very poor quality,
extremely shoddy audit as shown by variances in several "key"
accounts.  In small company audits, there is a concept of related
parties - officers, partners, major shareholders. DB Karron was
100% owner of Computer Aided Surgery Inc.; special attention
should have been paid to the monies that went to and from Karron
for the benefit of CASI.

Riley, as a former IRS agent, should have caught the rent income
that was reported on Karron's personal income tax return.  Riley,
as OIG auditor, should have been well aware of the In Kind
Contribution allowed for using previously owned equipment for
grant purposes.  Riley, took as gospel, bad numbers and did nothing
to correct them.

The areas of sloppiness cover officer's salary, Co-Funding, In-Kind Contribution and Accounts Payable as well as the previously mentioned monies to and from DB Karron.

My declaration is so large because it gives a professional auditor all the information they would need to discern these facts.

Aside from this **overview** and the **index** that follows, there are the **B & C sections** which are the amended quarterly reports, SF 269 A.  The **D section** is the monies to and from DB Karron.

**E 1 section** shows Co-Funding of over $78,000.
**E 2 section** shows all cash transactions.  Every penny has been accounted for - by date as well as by payee.

**Section F** (Balance Sheet) and **Section G** (Income and Expenses) are the individual General Ledger accounts.
The volume of pages is due to a software constraint.
The software only lets you can print an individual account when printing a period longer than one fiscal year.  CASI's fiscal year ended in May, so that this was the only way to show ALL the activity that happened.

**Section H** covers the corporate American Express credit card, the personal Mastercard (that was used over 50% for business); as well as payroll analysis for the extremely messed-up payroll tax returns.

**Section I** goes into questions about the audit;  specific areas such as payroll, accounts payable, employee benefits.  There is a class function of Quickbooks - which allows you to segregate and allocate the various sources and uses of funds.
This section also covers the entity change form a corporation to a LLC which was also professional tax negligence (due to a pre-existing Net Operating Loss on the corporation).

**Section J** shows the discrepancies on pages HABAC 617 and HABAC 621. There was Co-Funding of 78,204.28; as opposed to zero that is reflected in both Hayes and Riley reports. This variance, by itself, is over 9.77 % of the grant amount for the first year of $800,000.

The officer loan accounts, to Karron (A/C 1900) and from Karron (A/C 2900), accurately reflect transfer activity from DB Karron. As an aside, in the second grant year until wrap-up; $100,560 was co-funded. I am confused - co-funding of $178,764 versus -0-. I guess it was a rounding error???

Last, but not least, Karron was never afforded the opportunity for an audit resolution. You also could change dollars between categories without prior approval from NIST. The grant went from payroll heavy to technology heavy. Change in category - that's all.

My cursory review of Hayes workpapers and general ledger shows inconsistencies. There is co-funding of 29,500 on the profit & loss; as well as 111,000 as salary advance. Advances are usually shown as other assets - they are not profit & loss items. I also question the allocation of Karron salary. If you have a full-time business manager,Gurfein, your time should only be spent on scientific research. There should be no allocation to administration. Secondly, the government has time sheets for research work. Any night and weekend work could be admin time.

Before the grant started CASI owned equipment of $73,507. During the grant, hardware and software of $312,936 was acquired. This is a total of $388,443. **ALL** of this equipment was seized by the governemnt in June 2007. Government seized equipment that was not theirs. More important than the physical equipment is the **intellectual property, work product & custom software** that Karron and company team developed - this was seized as well.

# Amended SF 269 A Report of Spending

| | | BUDGET | ACTUAL | Per Hayes Audit Report |
|---|---|---|---|---|
| | **INCOME** | *HABAC 592* | *HABAC 591* | *HABAC 593* |
| | Co Funding | 36,500.00 | 78,204.28 | 0.00 |
| | NIST ATP | 800,000.00 | 800,000.00 | 800,000.00 |
| | **Total Funding** | 836,500.00 | **878,204.28** | 800,000.00 |
| | **EXPENSES** | | | |
| A | Payroll | 325,000.00 | 331,789.92 | 322,537.00 |
| B | Benefits | 110,500.00 | 87,927.26 | 84,669.00 |
| C | Travel | 20,000.00 | 15,655.21 | 18,450.00 |
| D | Equipment | 110,000.00 | 312,936.37 | 223,503.00 |
| E | Supplies | 11,000.00 | 7,066.30 | 15,302.00 |
| F | Outside Service | 250,000.00 | 78,228.99 | 99,129.00 |
| G | Other | 10,000.00 | | |
| | Dues and Subscriptions | | | 736.00 |
| | Professional | | 15,870.00 | 10,195.00 |
| | Rent (Error) | | 2,000.00 | |
| | Repairs & Maintenance | | 4,315.52 | 1,425.00 |
| | Utilities | | 10,829.33 | 13,895.00 |
| | **Total Expenses** | 836,500.00 | **866,618.90** | 789,841.00 |
| | **Excess Funding** | | **11,585.38** | |
| | Funds Carried to Next Year | | | 10,159.00 |
| | N LLC N | | 94.10 | |
| | NIST ATP | | 818,729.80 | |
| | NN Co Funding | | 47,795.00 | |
| | Total Expenses | | 866,618.90 | |
| | Co Funding | | 78,204.28 | |
| | Excess Expenses | | (66,618.90) | |
| | Excess Funding | | 11,585.38 | |

I met DB Karron in the fall of 2004. I was doing per diem work for Jill Feldman, his current accountant at the time.   I proceeded to reconstruct the CASI company records.  In doing this reconstruction of records I used source documents. These documents were copies of bank statements and credit cards.   There were four company bank accounts and a revolving credit line at Chase Bank, the corporate American Express, and a personal Mastercard that was used at least 50% of the time for business expenses.  There was also a small amount of out of pocket cash (petty cash) that was advanced by DB Karron.

One of the major problems in small business accounting is the problem of an owner using the right pocket of personal monies for the left pocket of business monies. And, of course, the opposite of using the left pocket of business monies for right pocket personal expenses.  Generally, as long as you, the owner, are owed more money by the corporate entity than you are owing to the corporate entity you have what the tax accountants call "basis" in your company.

In reconstructing these records there are 4 major differences in my actual numbers and the numbers of the Hayes audit. The audit period was 10/01/01 to 9/30/02.

1    The actual **Gross Salary** received by DB Karron was $184,252.72
     This salary was comprised of 6 checks and one journal entry.
     For simplicity, I am listing those items here.

| Date | Check No. | Payee | Amount |
|------|-----------|-------|--------|
| 5/11/02 | 10192 | DB Karron | 8,333.33 |
| 6/3/02 | 10212 | DB Karron | 8,333.33 |
| 7/5/02 | 10290 | DB Karron | 14,583.33 |
| 7/5/02 | 10291 | DB Karron | 14,583.33 |
| 7/5/02 | 10292 | DB Karron | 14,583.33 |
| 8/2/02 | 10401 | DB Karron | 61,918.07 |
| | | Sub-Total Checks | 122,334.72 |
| 9/30/02 | AJE | DB Karron | 61,918.00 |

**Total Gross Salary Received**     **184,252.72**

*Salary per Hayes*     *175,000.00*

*Difference*     *9,252.72*

**Additional References**
     **HABAC        501 to 506**

**These 7 numbers were not added up correctly by Hayes, Riley, Kwok as well as any other supervisors that were involved.**

# DB Karron Gross Salary Discrepancy



2   The second difference is the Co-Funding. Hayes audit report shows zero in Co-Funding. I show that the $78,204.28 was either deposited to CASI bank accounts, or a personal check was used to pay for business expenses, or Mastercard paid for expenses. The Mastercard was paid by DB Karron personally. Here is a summary of expenses that were paid for by DB Karron's funding.

| A/C No. | Account Name | Total Co-Funding | CAC 113 NCR Exp Reimb | BAC 311 Out of Pocket | HABAC 629 to 631 Master-Card | HABAC 632 In-Kind Equipment | CAC 115 Personal Check to Bank | HABAC 632 Personal Check to Vendors |
|---|---|---|---|---|---|---|---|---|
| 1010 | NCR Check | 207.51 | 207.51 | | | | | |
| 1010 | DB Kerron Check 5173 | 3,000.00 | | | | | 3,000.00 | |
| 6000 | Accounting | 500.00 | | | | | | 500.00 |
| 6010 | Auto | 301.16 | | 194.15 | 107.01 | | | |
| 6018 | Books | 410.67 | | | 410.67 | | | |
| 6020 | Communications | 1.00 | | 1.00 | | | | |
| 6040 | Computer Installation | 689.23 | | | 689.23 | | | |
| 6060 | Conference | 300.00 | | | 300.00 | | | |
| 6063 | Dues & Subscriptions | 91.06 | | | 91.06 | | | |
| 6060 | Employee Benefits | 36,112.55 | | 30.00 | 18,787.55 | | | 17,295.00 |
| 6120 | Miscellaneous | 147.01 | | | 147.01 | | | |
| 6130 | Office | 357.06 | | | 357.06 | | | |
| 6175 | Postage & Delivery | 31.35 | | 31.35 | | | | |
| 6178 | Repairs | 248.10 | | 75.00 | 173.10 | | | |
| 6330 | Research & Development | 32,114.25 | | | 2,114.25 | 30,000.00 | | |
| 6349 | Stationery | 191.02 | | | 191.02 | | | |
| 6370 | Travel | 3,502.31 | | 1,134.32 | 2,367.59 | | | |
| | Total | 78,204.28 | 207.51 | 1,466.82 | 25,735.95 | 30,000.00 | 3,000.00 | 17,795.00 |
| | | Total Co-Funding HABAC 602 | A/C 4010 | A/C 4013 | A/C 4014 | A/C 4015 | A/C 4712 | A/C 4912 |

# DB Karron Co-Funding Discrepancy

| Hayes Audit Co-Funding | 0.00 |
|---|---|
| GX 114 Co-Funding per Riley | 0.00 |
| **Actual Co-Funding** | **78,204.28** |
| Materiality Percentage (to $800,000 Grant) | 9.78% |

**Co-Funding of 5 % was met and ignored by 2 auditors - Hayes and Riley**

5 % of $800,000 is $40,000.     $78,204.28 exceeds $40,000.

AA 004 Co-Funding

AA Pages.xls

8/22/2010 3:22 PM

AA 004

3    The third difference is the dollars spent on equipment.   Again Hayes has $223,503.00 and the amount in the CASI General Ledger is $290,143.29 This is a difference of $66,640.29.   Thirty thousand of this difference is due to ignoring the Co-Funding of In-Kind Equipment. Under the Grant Rules you may consider prior owned equipment to be used for grant purposes, no need to buy new equipment if you can use what you already own.

GAAP (Generally Accepted Accounting Principles) uses accrual basis accounting.   In this basis there are accounts recievable (owed to the CASI) as well as accounts payable (monies CASI owes to their suppliers). CASI owed Silicon City $16,532.55 from at least 5/31/02.   CASI also owed Silicon Graphics $30,726.15 from 1/9/02.  Since these 2 companies have been suppliers since 1996 to CASI they were not overly concerned about being owed money and being paid later than was customary.

To Recap:

|  | *Per Hayes  HABAC 593* |  | ***223,503.00*** | Audit Report |
|---|---|---|---|---|
|  | Per HABAC 624-626 | 212,884.59 |  | Cash Paid to Vendors |
|  | Per HABAC 625 | 16,532.55 |  | A/P Silicon City |
|  | Per HABAC 625 | 30,726.15 |  | A/P Silicon Graphics |
| HABAC 607 | Total per HABAC 626 | **260,143.29** |  | A/C 6330 |
| HABAC 607 | Per HABAC 627 | **30,000.00** |  | In Kind |
|  | Per HABAC 581 | **22,793.08** |  | See Schedule Below |

| Total costs incurred by CASI HABAC 581 | **312,936.37** |
|---|---|
| **Difference** | **89,433.37** |

**IN KIND Contribution of Equipment was ignored by 2 auditors - Hayes and Riley. Amount of Co-Funding is $30,000.**

|  | Per HABAC 581 Combination Sheet |  |
|---|---|---|
| HABAC 604 | Amex Software | 3,294.54 |
| HABAC 604 | Amex Tech | 349.55 |
| HABAC 604 | Amex Tools | 387.25 |
| HABAC 603 | Amex Computer Installation | 3,944.91 |
| HABAC 603 | Amex Equipment | 10,802.85 |
| HABAC 605 | NIST ATP Computer Installation | 3,684.23 |
| HABAC 606 | NIST ATP Paypal | 329.75 |
|  |  | 22,793.08 |

# Equipment & In-Kind Contribution Discrepancy



4 The fourth  difference is the *officers loan acccounts* .  The monies
 taken out of CASI, put into CASI, and reclassified to other
 expenses such as Rent and DB Karron Gross Salary.

 The 1900 A/C'S are the monies taken out by DB Karron.
 These monies should have been considered "net salary" and
 "grossed-up" to the correct salary amount.   Since the initial checks
 that were taken in October 2001 were not "fixed" until August &
 September 2002, ten and eleven months after they were taken out
 this should be considered serious neglegience by accountant Hayes.

 The 2900 A/C's are the monies put in by DB Karron, as well as the
 4000 A/C's that should have been considered as Co-Funding.

 One of the major problems in small business accounting is the problem of an owner
 using the right pocket of personal monies for the left pocket of business monies.
 And, of course, the opposite of using the left pocket of business monies for right
 pocket personal expenses.  Generally, as long as you, the owner, are owed more
 money by the corporate entity than you are owing to the corporate entity you have
 what the tax accountants call "basis" in your company.

 The following pages reflect the activity in the respective accounts.

 AA  007  Monies to DB Karron FYE 9/30/02
 AA  008  Monies to DB Karron FPE 12/31/03

 AA  009  Monies from DB Karron FYE 9/30/02
 AA  010  Monies from DB Karron FPE 12/31/03

# Monies to & from DB Karron

