| G/L A/C | Type | Date | Number | Name | Memo | Class | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 1901 | Check | 10/26/01 | 2977 | DB Karron | Jan 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2978 | DB Karron | Feb 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2979 | DB Karron | Mar 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2980 | DB Karron | Apr 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2981 | DB Karron | May 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2982 | DB Karron | Jun 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2983 | DB Karron | July 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2984 | DB Karron | Aug 2000 | INC | 2,000.00 | | |
| 1901 | Check | 10/26/01 | 2985 | DB Karron | Sep 2000 | INC | 2,000.00 | | |
| 1901 | Check | 11/8/01 | 3040 | DB Karron | Oct 2000 | INC | 2,000.00 | | |
| 1901 | Check | 11/8/01 | 3064 | DB Karron | Nov 2000 | INC | 2,000.00 | | |
| 1901 | AJE | 12/31/01 | INC | Rcls Rent | | RENT | | (14,000.00) | |
| 1901 | AJE | 12/31/01 | INC | Rcls Rent | | RENT | | (8,000.00) | |
| 1901 | Check | 3/1/02 | 3142 | DB Karron | | INC | 2,000.00 | | 2,000.00 |
| 1902 | Check | 6/1/01 | 2901 | DB Karron | Draw 2001 | INC | 1,000.00 | | 1,000.00 |
| 1902 | Check | 10/14/01 | 2953 | DB Karron | Draw 2001 | INC | 300.00 | | |
| 1902 | Check | 10/26/01 | 2961 | DB Karron | Draw 2001 | INC | 300.00 | | |
| 1902 | Check | 10/26/01 | 2962 | DB Karron | Draw 2001 | INC | 75,000.00 | | |
| 1902 | Check | 12/21/01 | 3103 | DB Karron | Draw 2001 | INC | 500.00 | | |
| 1902 | AJE | 12/31/01 | INC | Rcls Rent | | RENT | | (1,000.00) | |
| 1902 | AJE | 8/2/02 | NIST | Rcls Payroll | | NIST PR | | (30,000.00) | |
| 1902 | AJE | 9/30/02 | NIST | Rcls Payroll | | NIST PR | | (22,406.08) | |
| 1902 | AJE | 9/30/02 | NIST | Rcls Payroll | | NIST PR | | (14,928.11) | 7,765.81 |
| 1903 | Check | 12/6/01 | 3093 | DB Karron | Mar 2001 | INC | 2,000.00 | | |
| 1903 | Check | 12/6/01 | 3094 | DB Karron | Apr 2001 | INC | 2,000.00 | | |
| 1903 | Check | 12/19/01 | 3100 | DB Karron | Dec 2001 | INC | 2,000.00 | | |
| 1903 | Check | 12/28/01 | 3107 | DB Karron | May 2001 | INC | 2,000.00 | | |
| 1903 | Check | 12/28/01 | 3108 | DB Karron | Jun 2001 | INC | 2,000.00 | | |
| 1903 | AJE | 12/31/01 | INC | Rcls Rent | | RENT | | (10,000.00) | |
| 1903 | Check | 1/9/02 | 3115 | DB Karron | Jul 2001 | INC | 2,000.00 | | |
| 1903 | Check | 1/9/02 | 3116 | DB Karron | Aug 2001 | INC | 2,000.00 | | |
| 1903 | Check | 1/9/02 | 3117 | DB Karron | Sep 2001 | INC | 2,000.00 | | |
| 1903 | Check | 2/4/02 | 3129 | DB Karron | Oct 2001 | INC | 2,000.00 | | |
| 1903 | Check | 2/4/02 | 3131 | DB Karron | Nov 2001 | INC | 2,000.00 | | |
| 1903 | AJE | 12/31/01 | | Rcls Rent | | RENT | | (6,000.00) | 4,000.00 |
| 1904 | Check | 2/4/02 | 3132 | DB Karron | question | INC | 2,000.00 | | 2,000.00 |
| 1905 | Check | 3/1/02 | 3144 | DB Karron | Draw 2002 | INC | 1,000.00 | | |
| 1905 | Check | 3/1/02 | 3145 | DB Karron | Draw 2002 | INC | 5,000.00 | | |
| 1905 | Check | 3/5/02 | 3151 | DB Karron | Draw 2002 | INC | 5,000.00 | | |
| 1905 | Check | 3/12/02 | 3153 | DB Karron | Draw 2002 | INC | 4,000.00 | | |
| 1905 | Check | 3/22/02 | 3155 | DB Karron | Draw 2002 | INC | 2,000.00 | | |
| 1905 | Check | 3/29/02 | 3160 | DB Karron | Draw 2002 | INC | 13,000.00 | | |
| 1905 | Check | 5/24/02 | 3184 | DB Karron | Draw 2002 | INC | 2,000.00 | | |
| 1905 | Check | 6/25/02 | 3193 | DB Karron | Draw 2002 | INC | 1,000.00 | | |
| 1905 | Check | 9/12/02 | 10451 | DB Karron | Draw 2002 | NIST ATP | 15,000.00 | | |
| 1905 | Check | 9/25/02 | 10473 | DB Karron | Draw 2002 | NIST ATP | 5,000.00 | | 53,000.00 |
| 1906 | Check | 1/10/02 | 3122 | DB Karron | Jan 2002 | INC | 2,000.00 | | |
| 1906 | Check | 3/1/02 | 3143 | DB Karron | Mar 2002 | INC | 2,000.00 | | |
| 1906 | Check | 3/29/02 | 3164 | DB Karron | Apr 2002 | INC | 2,000.00 | | |
| 1906 | Check | 5/1/02 | 3175 | DB Karron | May 2002 | INC | 2,000.00 | | |
| 1906 | AJE | 5/31/02 | | Rcls Rent | | RENT | | (10,000.00) | |
| 1906 | Check | 6/2/02 | 3185 | DB Karron | | INC | 2,000.00 | | |
| 1906 | Check | 9/12/02 | 3199 | DB Karron | | INC | 2,000.00 | | |
| 1906 | Check | 9/12/02 | 3200 | DB Karron | | INC | 2,000.00 | | 4,000.00 |
| 1908 | AJE | 7/6/02 | | Hayes error | | AJE | | (4,790.02) | |
| 1908 | AJE | 7/6/02 | | Hayes error | | AJE | | (765.24) | |
| 1908 | AJE | 8/3/02 | | Hayes error | | AJE | | (136.66) | |
| 1908 | AJE | 9/28/02 | | Hayes error | | AJE | 3,838.92 | | |
| 1908 | AJE | 9/29/02 | | Hayes error | | AJE | | (6,320.74) | (8,175.74) |
| | | | | | | | 193,938.92 | (128,348.85) | 65,590.07 |

Summary

| | | | Debits | Credits | Balance |
|---|---|---|---|---|---|
| Opening | 6/01/01 | | 1,000.00 | | |
| Checks | Debits | | 189,100.00 | | |
| Rcls Rent | Credits | | | (49,000.00) | |
| NIST PR | Credits | | | (67,334.19) | |
| Hayes Errors | Debits | | 3,838.92 | | |
| Hayes Errors | Credits | | | (12,014.66) | |
| | | | 193,938.92 | (128,348.85) | **65,590.07** |

**Other Reference**

**HABAC 619**
**HABAC 620**

9/30/02

# Monies to DB Karron FYE 9/30/02

AA 007

AA Pages.xls

AA 007 To DBK FYE 09 30 02

8/22/20103:24 PM

| G/L A/C | Type | Date | Number | Name | Memo | Class | Opening | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1901 | Opening | 10/1/02 | | | | | 2,000.00 | | | |
| 1901 | AJE | 12/31/02 | LLC | Rcls Rent | | RENT | | | (2,000.00) | 0.00 |
| 1902 | Opening | 10/1/02 | | | | | 8,765.81 | | | 8,765.81 |
| 1903 | Opening | 10/1/02 | | | | | 4,000.00 | | | |
| 1903 | AJE | 12/31/02 | LLC | Rcls Rent | | RENT | | | (4,000.00) | 0.00 |
| 1904 | Opening | 10/1/02 | | | | | 2,000.00 | | | |
| 1904 | Check | 11/15/02 | | DB Karron | | | | *4,530.38* | | 6,530.38 |
| 1905 | Opening | 10/1/02 | | | | | 53,000.00 | | | 53,000.00 |
| 1906 | Opening | 10/1/02 | | | | | 4,000.00 | | | |
| 1906 | AJE | 12/31/02 | LLC | Rcls Rent | | RENT | | | *(2,000.00)* | |
| 1906 | AJE | 12/31/02 | LLC | Rcls Rent | | RENT | | | (2,000.00) | 0.00 |
| 1907 | Check | 1/28/03 | 10770 | DB Karron | | NIST ATP | | 2,325.41 | | |
| 1907 | AJE | 2/7/03 | AE020703 | PJ's Surfrider | | NIST ATP | | 23.68 | | |
| 1907 | Check | 2/12/03 | 10792 | DB Karron | | NIST ATP | | 758.59 | | |
| 1907 | Check | 3/9/03 | 10845 | DB Karron | | NIST ATP | | 3,027.24 | | |
| 1907 | AJE | 3/31/03 | LLCMar 2003 | Rcls Rent | | RENT | | | (6,000.00) | |
| 1907 | Check | 4/16/03 | 10887 | DB Karron | | NIST ATP | | 4,640.10 | | |
| 1907 | AJE | 4/30/03 | LLCApr2003 | Rcls Rent | | RENT | | | (2,000.00) | |
| 1907 | Check | 7/7/03 | 10 | DB Karron | | N LLC N | | 4,107.11 | | |
| 1907 | Check | 9/26/03 | 3565 | DB Karron | | LLC | | 2,968.00 | | |
| 1907 | Check | 10/22/03 | LND 1001 | DB Karron | | N LLC N | | 11,349.68 | | |
| 1907 | Check | 11/11/03 | 3581 | DB Karron | | LLC | | 4,006.37 | | |
| 1907 | AJE | 11/30/03 | LLCNov2003 | | | RENT | | | (14,000.00) | |
| 1907 | AJE | 12/31/03 | LLCDec2003 | | | RENT | | | (2,000.00) | 9,206.18 |
| 1908 | Opening | 10/1/02 | | | | | (8,175.74) | | | |
| 1908 | AJE | 12/29/02 | | Hayes error | | | | | (3,965.06) | |
| 1908 | AJE | 12/31/02 | | Hayes error | | | | 1,397.88 | | |
| 1908 | AJE | 7/6/02 | | Hayes error | | AJE | | 1,161.26 | | |
| 1908 | AJE | 8/3/02 | | Hayes error | | AJE | | | (3,959.10) | |
| 1908 | AJE | 9/28/02 | | Hayes error | | AJE | | 260.79 | | |
| | | | | | | | | 0.01 | | |
| 1908 | AJE | 9/29/02 | | Hayes error | | AJE | | | (398.60) | (13,678.56) |
| | | | | | | | 65,590.07 | 40,556.50 | (42,322.76) | 63,823.81 |
| | Summary | | | | | | | | | |
| | | | | **Opening** | **10/01/02** | | **65,590.07** | | | |
| | | | | Checks & Other Debits | | | | 37,736.56 | | |
| | | | | Rcls Rent | Credits | | | | (10,000.00) | |
| | | | | Rcls Rent | Credits | | | | (24,000.00) | |
| | | | | Hayes Errors | Debits | | | 2,819.94 | | |
| | | | | Hayes Errors | Credits | | | | (8,322.76) | |
| | **Other Reference** | | | | | | **65,590.07** | 40,556.50 | (42,322.76) | **63,823.81** |
| | **BAC 328** | | | | | | | | | 9/30/02 |
| | **BAC 329** | | | | | | | **Debits** | **Credits** | **Balance** |

# Monies to DB Karron FPE 12/31/03

AA 008

| G/L A/C | Type | Date | Number | Name | Memo | Class | Personal | Debit | Credit | Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2900 | Opening | 5/31/01 | | | | | | | | (89,531.00) | |
| | | | | | | | | | | | |
| 2901 | AJE | 10/1/01 | | In Kind | | | | 30,000.00 | | | |
| 2901 | AJE | 10/1/01 | | In Kind | | | | | (30,000.00) | 0.00 | |
| | | | | | | | | | | | |
| 2910 | Deposit | 6/13/01 | DBK 5148 | | | INC | | | (250.00) | | |
| 2910 | Deposit | 7/2/01 | DBK 5150 | | | INC | | | (1,000.00) | | |
| 2910 | Deposit | 7/13/01 | | | | INC | | | (250.00) | | |
| 2910 | Deposit | 7/23/01 | DBK 5158 | | | INC | | | (400.00) | | |
| 2910 | Deposit | 7/26/01 | DBK 5160 | | | INC | | | (200.00) | | |
| 2910 | Deposit | 7/31/01 | DBK 5162 | | | INC | | | (1,000.00) | | |
| 2910 | Deposit | 8/17/01 | DBK 5169 | | | INC | | | (1,000.00) | | |
| 2910 | Deposit | 8/31/01 | DBK 5172 | | | INC | | | (3,000.00) | | |
| 2910 | Deposit | 9/28/01 | DBK 5180 | | | INC | | | (900.00) | | |
| 2910 | Deposit | 10/11/01 | DBK 1006 | | | INC | | | (2,000.00) | | |
| 2910 | Deposit | 12/4/01 | DBK 5189 | | | INC | | | (5,000.00) | | |
| 2910 | Deposit | 3/21/02 | DBK 1052 | | | INC | | | (1,000.00) | | |
| 2910 | Deposit | 8/13/02 | DBK 5168 | | | INC | | | (20,000.00) | | |
| 2910 | Deposit | 8/16/02 | DBK 5165 | | | INC | | | (1,000.00) | (37,000.00) | |
| | | | | | | | | | | | |
| 2913 | AJE | 9/30/01 | OOP 093001 | | | INC | | | (156.87) | | |
| 2913 | AJE | 5/31/02 | OOP 053102 | | | NIST ATP | | | (886.18) | | |
| 2913 | AJE | 5/31/02 | OOP 053102 | | | NN CO-FUND | | 886.18 | | | |
| 2913 | AJE | 8/31/02 | OOP 083102 | | | NIST ATP | | | (485.54) | | |
| 2913 | AJE | 8/31/02 | OOP 083102 | | | NN CO-FUND | | 485.54 | | | |
| 2913 | AJE | 9/30/02 | OOP 093002 | | | N LLC N | | | (94.10) | | |
| 2913 | AJE | 9/30/02 | OOP 093002 | | | NN CO-FUND | | 94.10 | | (156.87) | |
| | | | | | | | | | | | |
| 2914 | Transfer | 6/28/01 | | From MC | | | | | (1,262.75) | | |
| 2914 | Transfer | 7/30/01 | | From MC | | | | | (1,287.16) | | |
| 2914 | Transfer | 8/29/01 | | From MC | | | | | (1,403.27) | | |
| 2914 | Transfer | 9/28/01 | | From MC | | | | | (3,843.61) | | |
| 2914 | AJE | 9/30/01 | MC DBK | Personal | | DBK | 2,589.78 | | | | (5,207.01) |
| 2914 | Transfer | 10/30/01 | | From MC | | | | | (7,566.66) | | |
| 2914 | Transfer | 11/22/01 | | From MC | | | | | (1,975.41) | | |
| 2914 | Transfer | 12/31/01 | | From MC | | | | | (3,222.62) | | |
| 2914 | AJE | 12/31/01 | MC DBK | Personal | | DBK | 5,582.32 | | | | |
| 2914 | AJE | 12/31/01 | | **Co-Funding** | | NN CO-FUND | | 7,182.37 | | | (5,207.01) |
| 2914 | Transfer | 1/29/02 | | From MC | | | | | (3,507.53) | | |
| 2914 | Transfer | 2/28/02 | | From MC | | | | | (1,785.22) | | |
| 2914 | Transfer | 3/28/02 | | From MC | | | | | (3,303.95) | | |
| 2914 | Transfer | 4/26/02 | | From MC | | | | | (3,962.10) | | |
| 2914 | Transfer | 5/29/02 | | From MC | | | | | (1,311.07) | | |
| 2914 | AJE | 5/31/02 | MC DBK | Personal | | DBK | 6,121.40 | | | | |
| 2914 | AJE | 5/31/02 | | **Co-Funding** | | NN CO-FUND | | 7,694.40 | | | (5,261.08) |
| 2914 | Transfer | 6/28/02 | | From MC | | | | | (5,231.64) | | |
| 2914 | Transfer | 7/30/02 | | From MC | | | | | (3,722.58) | | |
| 2914 | Transfer | 8/29/02 | | From MC | | | | | (6,669.95) | | |
| 2914 | AJE | 8/31/02 | MC DBK | Personal | | DBK | 4,664.99 | | | | |
| 2914 | AJE | 8/31/02 | | **Co-Funding** | | NN CO-FUND | | 10,859.18 | | | |
| 2914 | Transfer | 9/30/02 | | Personal | | | | | (5,702.08) | (11,063.16) | |
| | | | | | | | 18,958.49 | 57,201.77 | (124,380.29) | **(137,751.03)** | |
| | | | **Summary** | | | Reference | Personal | Debit | Credit | Balance | |
| | | | | | **5/31/01** | Opening | | | | **(89,531.00)** | |
| | | | | | | INC A/C1000 | | | (37,000.00) | (37,000.00) | |
| | | | | | | In Kind | | | (30,000.00) | | |
| | | | | | | In Kind | | **30,000.00** | | | |
| | | | | | | OOP | | | (156.87) | (156.87) | |
| | | | | | | OOP | | | (1,465.82) | (57,201.77) | |
| | | | | | | Co Funding | | **1,465.82** | | **57,201.77** | |
| | | | | | | Mastercard | | | (55,757.60) | | |
| | | | | | | Personal | 18,958.49 | | | | |
| | | | | | | Co Funding | | **25,735.95** | | (11,063.16) | |
| | | | | | | | 18,958.49 | **57,201.77** | (124,380.29) | **(137,751.03)** | |
| | | | | | | | | | | **9/30/02** | |

# Monies from DB Karron FYE 9/30/02

AA 009

| G/L A/C | Type | Date | Number | Name | Memo | Class | Opening Balance | Personal | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2900 | Opening | 10/1/02 | | | | | (89,531.00) | | | | (89,531.00) |
| | | | | | | | | | | | |
| 2910 | Opening | 10/1/02 | | | | | (37,000.00) | | | | |
| 2910 | Deposit | 10/4/02 | DBK 1129 | | | INC | | | | (5,000.00) | |
| 2910 | Deposit | 11/14/02 | DBK 1142 | | | INC | | | | (5,000.00) | |
| 2910 | Deposit | 12/4/02 | DBK 1152 | | | INC | | | | (2,500.00) | |
| 2910 | Deposit | 12/10/02 | DBK 1153 | | | INC | | | | (2,500.00) | |
| 2910 | Deposit | 12/12/02 | DBK 1154 | | | INC | | | | (2,500.00) | |
| 2910 | Deposit | 1/23/03 | | | | INC | | | | (2,000.00) | |
| 2910 | Deposit | 3/18/03 | | | | INC | | | | (2,000.00) | (58,500.00) |
| | | | | | | | | | | | |
| 2911 | AJE | 10/15/03 | DBK 1253 | | | LLC | | | | (472.00) | |
| 2911 | AJE | 12/3/03 | DBK 5376 | | | LLC | | | | (2,000.00) | |
| 2911 | AJE | 12/3/03 | DBK 5375 | | | LLC | | | | (1,000.00) | |
| 2911 | AJE | 12/5/03 | DBK 1268 | | | LLC | | | | (2,000.00) | |
| 2911 | AJE | 12/8/03 | DBK 1275 | | | LLC | | | | (500.00) | |
| 2911 | AJE | 12/17/03 | DBK 5379 | | | LLC | | | | (2,500.00) | |
| 2911 | AJE | 12/17/03 | DBK 5380 | | | LLC | | | | (2,500.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (1,050.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (1,000.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (200.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (130.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (2,000.00) | |
| 2911 | AJE | 12/31/03 | DBK 123103 | | | LLC | | | | (200.00) | (15,552.00) |
| | | | | | | | | | | | |
| 2913 | AJE | 9/30/01 | OOP 093001 | | | | (156.87) | | | | |
| 2913 | AJE | 5/31/02 | OOP 053102 | | | N LLC N | | | | (523.52) | |
| 2913 | AJE | 5/31/02 | OOP 053102 | | | N LLC N | | | 523.52 | | |
| 2913 | AJE | 8/31/02 | OOP 083102 | | | N LLC N | | | | (1,810.48) | |
| 2913 | AJE | 8/31/02 | OOP 083102 | | | N LLC N | | | 1,810.48 | | |
| 2913 | AJE | 9/30/02 | OOP 093002 | | | LLC | | | | (1,402.64) | (1,559.51) |
| 2913 | AJE | 9/30/02 | OOP 093002 | | | | | | | | |
| | | | | | | | | | | | |
| 2914 | Opening | 10/1/02 | | | | | (11,063.16) | | | | |
| 2914 | Transfer | 10/29/02 | | From MC | | | | | | (3,857.79) | |
| 2914 | Transfer | 11/29/02 | | From MC | | | | | | (1,197.80) | |
| 2914 | Transfer | 12/30/02 | | From MC | | | | | | (1,379.09) | |
| 2914 | AJE | 12/31/02 | MC DBK | Personal | | DBK | | 8,577.21 | | | |
| 2914 | AJE | 12/31/02 | | Co-Funding | | NN CO-FUND | | | 3,559.55 | | |
| 2914 | AJE | 1/29/03 | MC DBK | Personal | | DBK | | 5,544.86 | | | |
| 2914 | Transfer | 1/31/03 | | From MC | | | | | | (7,404.04) | |
| 2914 | AJE | 1/31/03 | | Co-Funding | | NN CO-FUND | | | 1,229.00 | | |
| 2914 | Transfer | 2/28/03 | | From MC | | | | | | (3,305.96) | |
| 2914 | AJE | 2/28/03 | MC DBK | Personal | | DBK | | 386.27 | | | |
| 2914 | AJE | 2/28/03 | | Co-Funding | | NN CO-FUND | | | 2,484.94 | | |
| 2914 | Transfer | 3/31/03 | | From MC | | | | | | (4,350.88) | |
| 2914 | AJE | 3/31/03 | MC DBK | Personal | | DBK | | 1,258.55 | | | |
| 2914 | AJE | 3/31/03 | | Co-Funding | | NN CO-FUND | | | 2,588.06 | | |
| 2914 | Transfer | 4/30/03 | | From MC | | | | | | (1,772.66) | |
| 2914 | AJE | 4/30/03 | MC DBK | Personal | | DBK | | 727.33 | | | |
| 2914 | AJE | 4/30/03 | | Co-Funding | | NN CO-FUND | | | 81.50 | | |
| 2914 | Transfer | 5/29/03 | | From MC | | | | | | (1,674.47) | |
| 2914 | AJE | 5/30/03 | MC DBK | Personal | | DBK | | 1,013.07 | | | |
| 2914 | AJE | 5/31/03 | | Co-Funding | | NN CO-FUND | | | 261.61 | | |
| 2914 | Transfer | 6/28/03 | | From MC | | | | | | (1,159.23) | |
| 2914 | AJE | 6/30/03 | MC DBK | Personal | | DBK | | 656.17 | | | |
| 2914 | AJE | 6/30/03 | | Co-Funding | | NN CO-FUND | | | 81.50 | | |
| 2914 | Transfer | 7/29/03 | | From MC | | | | | | (1,173.79) | |
| 2914 | AJE | 7/30/03 | MC DBK | Personal | | DBK | | 270.95 | | | |
| 2914 | Transfer | 8/28/03 | | From MC | | | | | | (6,763.55) | |
| 2914 | AJE | 8/30/03 | MC DBK | Personal | | DBK | | 661.45 | | | |
| 2914 | Transfer | 9/29/03 | | From MC | | | | | | (1,568.38) | |
| 2914 | AJE | 9/30/03 | MC DBK | Personal | | DBK | | 868.98 | | | |
| 2914 | Transfer | 10/29/03 | | From MC | | | | | | (2,456.81) | |
| 2914 | AJE | 10/30/03 | MC DBK | Personal | | DBK | | 1,679.31 | | | |
| 2914 | Transfer | 11/28/03 | | From MC | | | | | | (1,536.98) | |
| 2914 | AJE | 11/30/03 | MC DBK | Personal | | DBK | | 373.39 | | | |
| 2914 | Transfer | 12/30/03 | | From MC | | | | | | (2,352.25) | |
| 2914 | Transfer | 12/30/03 | MC DBK | Personal | | DBK | | 1,595.15 | | | (19,117.99) |
| | | | | | | | (137,751.03) | 23,612.69 | 12,620.16 | (82,742.32) | (184,260.50) |

## Summary

| | Reference | Balance | Personal | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 10/1/02 | Opening | (89,531.00) | | | | (89,531.00) |
| A/C 2910 | INC A/C1000 | (37,000.00) | | | (21,500.00) | (58,500.00) |
| A/C 2911 | LLC Post Grant | | | | (15,552.00) | (15,552.00) |
| A/C 2913 | OOP | (156.87) | | | (1,402.64) | (1,559.51) |
| | OOP | | | | (2,334.00) | (12,620.16) |
| | Co Funding | | | 2,334.00 | | 12,620.16 |
| | Mastercard | (11,063.16) | | | (41,953.68) | |
| | Personal | | 23,612.69 | | | |
| | Co Funding | | | 10,286.16 | | (19,117.99) |
| | | (137,751.03) | 23,612.69 | 12,620.16 | (82,742.32) | (184,260.50) |
| | | | | | | 12/31/03 |

# Monies from DB Karron FPE 12/31/03

AA 010

**(.3) EXHIBIT G GOLDBERG**

# EXHIBIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL B. KARRON

Petitioner,

-V.-

UNITED STATES OF AMERICA

Respondent.

11-civ-1874 (RPP)
07-cr - 541 (RPP)

DECLARATION OF
LEE H GOLDBERG

STATE OF NEW YORK
COUNTY OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK:

LEE H. GOLDBERG, pursuant to Title 28, United States Code, Section 1746[1], hereby declares under penalty of perjury the following:

[1] **United States Code** § 1746. Unsworn declarations under penalty of perjury
Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
**(1)** If executed without the United States:[not applicable here]".
**(2)** If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)"

THE VISIT BY THE O. I. G. SPECIAL AGENTS

1.  On 25 October 2004, I was visited by three well dressed federal Special Agents. I have since come to learn their names were Kirk M. Yamatani and Rachel Garrison, now known as Rachel Ondrik, along with at least one other special agent(s) at my home in 202 Mather Avenue, West Windsor, New Jersey.

2.  They arrived around 2:00 and left just before 3:00

3.  I noticed that the agents had positioned themselves around my door in a strategic fashion. They were arrayed about my door in a manner that brought to mind tactics that police use when approaching a potentially armed and dangerous situation or subject.

4.  Among other things, the two agents furthest from my door appeared to be in a hands-ready stance that would allow them to quickly draw weapons.

5.  I noticed the agent's posture because I have several friends and acquaintances within the law enforcement community. In addition, I am a trained first responder and member of the Community Emergency Response Team (CERT) in West Windsor, New Jersey.

6.  Due to the aforementioned relationships and the exposure I've had during my activities with CERT, I am somewhat familiar with the hands-ready techniques used by military and law enforcement personnel.

7.  While my experience these matters is limited, the agents' stance, with relaxed shoulders and hands placed forward and close to the waist, gave every indication to me that they were in a hands-ready posture and prepared to draw weapons if needed.

8.  I do not know if the bulges I thought I saw on their clothing were real or just artifacts of my imagination coupled with my knowledge that active duty federal special agents are usually armed.

9.  They identified themselves as Department of Commerce Special Agents who wanted to ask some questions with regard to a criminal investigation of Dan Karron.

10. I felt there must be a misunderstanding.

11. I thought I could defuse the high tension inherent in having several potentially armed police agents arrayed in an assault formation at my door.

12. I invited the special agent team into my home.

13. I made tea for my guests with the intent of reducing tension and correcting any misunderstandings they held by providing them with whatever information that I could offer.

14. I did this on the assumption that it could help put their concerns about Dr. Karron to rest.

15. My assumption, in retrospect, was wrong.

THE INTERROGATION

16. The agents questioned me at length about my relationship with Dr. Karron.

17. They specifically asked about the nature of my relationship with Dr. Karron's and Dr. Karron's change in gender.

18. At multiple times during the interrogation Mr. Yamatani asked me why I loaned Dr. Karron money.

19. I repeatedly explained that we were friends from Jr. High School and that we had helped each other out many times over the years.

20. They agents seemed unsatisfied with my answer.

21. The agents pressed for more details.

22. I did not feel there that there were any issues to hide.

INAPPROPRIATE QUESTIONS DURING INTERROGATION

23. A question about any possible romantic involvement came from one of the two males (I think it was the non-Asian one) who accompanied Ms. Garrison.

24. He specifically asked me if I'd had any romantic involvement with Karron.

25. The agent asked me if I had sex with Dr. Karron.

26. Ms. Garrison then asked me if I paid to have sex with Dr. Karron.

27. I was surprised and confused at the insinuation of impropriety on my part or Dr. Karrons' part.

28. I did not understand what this line of questioning had to do with their investigation.

29. While I do not recall the exact words, but the male agent specifically implied that, my alleged romantic activities could have been with Dr. Karron in either of his/her two genders.

30. I repeatedly answered to the effect that I had not been involved romantically with Dr. Karron at any time.

31. I found this repeated line of questioning bizarre and unsettling.

32. Their focus on this aspect of the case gave me the impression that they had an untoward interest in Dr. Karrons' sexuality and / or sexual preferences.

33. I did not understand what it had to do with the criminal investigation and asked why they wanted to know this.

34. They said that my loaning you these large sums of money with such loose conditions caused them to wonder how deep our relationship went.

DISSATISFACATION WITH MY ANSWERS

35. At some point after continuing to not accept my answers, Mr. Yamatani (the male Asian agent) asked me if I was paying for sex with Dr. Karron, or if Dr. Karron was paying to have sex with me.

36. I clearly remember Mr. Yamatanis' sarcastic comment:

    i. "Gee, I sure wish I had a friend like you."

37. The tone and wording of Mr. Yamatani's response clearly indicated to me that he did not believe or like my answer.

38. He then asked if I could be his friend (I do not remember the exact wording).

39. I explained that I only had a few friends I trusted like that and it usually took 10 or 20 years before someone I knew earned that level of trust.

40. In an attempt to further clarify the matter, I explained that over the course of my life I had made a few close and trusted friends and that we helped each other out from time to time in monetary and non-monetary ways.

    i. In this context, I'd loaned significant sums of money to some members of my inner circle, mostly for the purpose of supporting their businesses.

    ii.  I also explained that these loans were almost always repaid in a timely manner.

    iii.  I shared a few stories about how my friends had helped me.

    iv.  I then re-iterated my previously-statement that I loaned money to Dr. Karron to help an old friend launch his business.

41.   The other special agents also seemed unsatisfied with that answer.

42.   They did not seem to accept my answer that I gave the money to Karron because (then he) asked me, and I believed in him and his business, and that he had paid me back when he was working.

43.   It was my impression that they wanted me to admit to reasons (a sexual *quid pro quo)* that I knew were not true.

44.   I hand wrote a statement and gave it to them.

45.   That affidavit I wrote on that day is attached as Exhibit 1

46.   I also gave the agents my records of the loans I made to Karron and Karrons' repayments to me.

47.   I re-affirm my statements made in 2004 again in 2011, under penalty of law.


SUBTLE COERCION

48.   While the agents did not overtly threaten myself, their tone and choice of words clearly indicated that were and unhappy with my answers.

49.   At the conclusion of the interrogation, they asked me to write up an affidavit.

50.   They indicated that if I did not submit it, I would probably called to their offices to testify and that there might be other, unspecified consequences.

51.   I was uncomfortable in their presence because

b. they were unhappy with my answers,

c. asked repeatedly about any romantic involvement with Dr. Karron, and

d. kept implying that I might be implicated if I did not cooperate.

52. My impression was that they wanted the answers they wanted, not the truth.

MY REQUEST FOR RETURN OF DOCUMENTS

53. On November 16, 2004 and after the interrogation, I e-mailed Rachel Garrison (now known as Rachel Ondrik).

54. In that e-mail I requested the original documents back and a copy of my affidavit for my records.

55. A copy of that e-mail is attached as Exhibit 4

56. November 17, I received back my original documents and a copy of my affidavit, attached here as Exhibit 1.

57. Soon after the agents departed, I called Dr. Karron informing him of the interview.

58. I wrote an e-mail to Dr. Karron memorializing the conversation with the Special Agents and the gender/sexual issues they raised.

59. A copy of that email is attached as Exhibit 3.

MY RELATIONSHIP WITH CASI AND DR. KARRON

60. Although I never requested it, I was granted a one percentage ownership in CASI.

i. At the time, I was told it was an acknowledgement for my support of the company during its inception.

ii. As my testimony at Dr. Karron's trial indicates, my only involvement with CASI was occasionally reviewing proposals and technical documents and providing occasional technical consultation.

iii. All this was done on a pro-bono basis much as Dr. Karron had provided me with technical assistance in my own work.

iv. Although I was a minor shareholder, I never attended any internal l business meetings nor was I directly involved in any of CASI's day-to-day operations.

SPECIAL AGENT ONDRIK DECLARATION OMITS MY EXCULPATORY AFFIDAVIT

61. I most recently reviewed a copy of Special Agents Ondrik's Declaration provided to me by Dr. Karron.

62. A copy that Declaration which is attached as Exhibit 2.

63. My affidavit (Exhibit 1, submitted to Garrison/Ondrik), to the best of my knowledge, was not submitted by the Prosecution to the Karron defense lawyers prior to or at trial.

64. I firmly believe that Mr. Rubinstein, Karron's defense counsel, would have asked me questions about the document had he been made aware of my affidavit and made it part of my direct examination as a witness at the trial.

65. I was unaware of the Governments obligation to submit any exculpatory evidence in their possession prior to trial and prior calling witnesses during the trial.

66. I did testify for the defense at Dr. Karrons' trial.

67. I do not recall any specific conversation where I talked to Rubenstein about the above OIG agent's visit.

68. I do not recall briefing Rubinstein about my old OIG affidavit.

69. A copy of my trial testimony is included in Exhibit 5

70. Therefore, I must conclude that Rubinstein and the Karron defense were unaware of its existence.

SUPRESSION AND FUMBLEING OF EXCULPATORY ACCOUNTING

71. I was present at several meetings with Dr. Karron's lawyer Mr. Rubenstein, and Mr. Spitz, Dr. Karron's forensic accountant. Also present was Deborah Dunleavy, Dr. Karron's bookkeeper. During these meetings we compared the accounting evidence being presented by the OIG and the independent forensic compilations prepared by Dunleavy and Spitz.

72. These working sessions and conversations led me to conclude

    v. The accounting facts under discussion clearly proved that that the prosecution's evidence was factually tainted, and

    vi. that it appeared to have been deliberately misinterpreted by the prosecution.

    vii. If the misinterpretation was deliberate,

        a. the only reasonable motivation for deliberate suppression of the fact that almost all of monies received by Karron as salary / rent were used for the NIST grant were actually spent on program activities is prejudice against Dr. Karron.

MY BELIEF IN DR KARRON AND THE PREJUDICE EXHIBITED BY THE GOVERNMENT

73. I have since contributed more than $15,000 to the Karron defense fund for Mr. Rubinstein and on behalf of Dr. Karron, subsequent to the collapse of the CASI grant and over and above my loans to CASI.

74. This is more than I ever loaned CASI and Dr. Karron.

75. I believe, based on my personal experience with the Department of Commerce Special Agents, that some of the Department of Commerce's motivation for its prosecution of Dr. Karron is because she is a Transsexual, and not because of any wrongdoing on her part.

76. I have personally observed this prejudice in the Special Agents.

77. This prejudice resulted in

    e. an investigation which produced inaccurate and untruthful evidence

    f. that was presented at her trial and

    g. which resulted in the miscarriage of justice that is the conviction of Dr. Karron.

78. The failure of the of the Government to turn over **my** exculpatory evidence at trial is direct evidence of this prejudice.

INEFFECTIVE ASSISTANCE OF MR. RUBINSTEIN as DEFENSE COUNSEL

79. I believe that Dr. Karron's lawyer, Mr. Ron Rubenstein, was insufficiently knowledgeable about the accounting practices and regulatory statutes related to the case and therefore did not provide effective assistance in her defense.

80. In my observations of, and in my many conversations with Mr. Rubinstein, Ron seemed to devote nearly as much energy and concern regarding raising funds and getting paid for his work as for defending Dr. Karron.

81. A significant part of time I spent with Mr. Rubenstein involved discussing various aspects of getting more money from me and Dr. Karron's family.

82. I attended meetings with Mr. Rubinstein and Mr. Spitz and Ms. Dunlevy, for the purpose of obtaining their expert testimony on Karron's handleing of her own and the ATP funds.

83. These negotiations broke down because Mr. Rubinstein would not commit to funding these experts.

84. I can only surmise that this was because Mr. Rubinstein was not certain of his own funding from the Karron family.

    a. Mr. Rubinstein was clearly conflicted in his defense of his client, Dr. Karron.

    b. At that point the government had already seized

        i. all of Dr. Karron's property and

ii. the computer equipment which contained all the records relevant to his defense.

iii. Dr. Karron was broke, unemployed, and without funds.

WHO I AM

85. I am an electrical engineer and a technical journalist.

86. I have known Dr. Karron since I was in the 9th grade, sometime around 1968, when we went to Sands Point Academy, a small private school on the North Shore of Long Island.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 12, 2011
West Windsor NJ

Lee Goldberg
Digitally signed by Lee Goldberg
DN: cn=Lee Goldberg, o, ou, email=lgoldberg@green-electronics.com, c=US
Date: 2011.09.12 19:51:34 -04'00'

Lee H. Goldberg

# EXHIBIT 1

**AFFIDAVIT**

STATE OF NJ

COUNTY OF Mercer

I, Lee Goldberg, being duly sworn, hereby make the following affidavit to KIRK M. YAMATANI, who has identified himself to me as a Special Agent with the U.S. Department of Commerce, Office of Inspector General, Office of Investigations.

I leant Dan Karron money as a normal matter of course as a part of a 30+ year friendship. The most recent occasions were $10,000 in 1996 and $10,000 in 1999. Dr Karron made dilligent efforts to repay both loans, with the first one being paid off sometime before 1999 and had made a significant dent in the second loan. ~~I think the payments started~~ LG the payments were sporadic ~~The above sta~~ LG as Dr Karron had the cash to make payments. This was a loan I made to Dr Karron to help his business going. LG

Id like to add that ~~both~~ in my 30+ years of knowing Dan, he has been one of the most honest people I know and that any misappropriation of government funds is, in my judgement, a matter of inexperienze or lack of business expertise rather than deliberate deception or malice.

Affiant's Initials LG

Ex Libris Dr. Karron

/1 04 11:55a Kirk Yamatani 703...1264 p.2

Page 2 of 2

I have read the foregoing affidavit consisting of 2 pages. I fully understand this affidavit and it is true, correct, and complete to the best of my knowledge and belief. I have initialed all the corrections and placed my initials at the bottom of each foregoing page.

I have made this affidavit freely and voluntarily, without any threats or rewards, or promises of reward having been made to me in return for it.

Signature

Subscribed and sworn to before me this 25th day of October 2004 at

Princeton, New Jersey.

Kirk M. Yamatani
Special Agent

Rachel Garrison
Special Agent

Affiant's Initials

Ex Libris Dr. Karron

[Page 1 of 2]

AFFIDAVIT

STATE OF NJ

COUNTY OF MERCER

I, Lee Goldberg, being duly sworn, hereby make the following affidavit to KIRT M. YAMATAMI, who has identified himself to me as a Special Agent with the U. S. Department of Commerce, Office of Inspector General, Office of Investigations.

I leant[sic] Dan Karron money as a normal matter of course as a part of a 30+ year friendship. The most recent occasions were $10,000 in 1996 and $10,000 in 1999. Dr. Karron made diligent efforts to repay both loans, with the first one being paid off sometime before 1999 and had made a significant dent in the second loan. [LG]The payments were sporadic as Dr. Karron had the cash to make payments. This was a loan I made to Dr. Karron to help his business going. [LG].

I'd like to add that in my 30+ years of knowing Dan, he has been one of the most honest people I know and that any misappropriation of government funds is, in my judgment, a matter of inexperience of lack of business expertise, rather than deliberate deception of malice.

[Page 2 of 2]

I have read the foregoing affidavit consisting of 2 pages. I fully understand this affidavit and it is true, correct, and complete to the best of my knowledge and belief. I have initialized all corrections and placed my initials at the bottom of each foregoing page.

I have made this affidavit freely and voluntarily, without any threats or rewards, or promises of reward having been made to me in return for it.

<handwritten signature>

Lee H. Goldberg

Signature.

Subscribe and sworn to before me this 25th day of October, 2004 at Princeton, New Jersey

<blank signature line>

Kirt M. Yamatani

Special Agent

<handwritten signature>

Rachel Garrison

Special Agent

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

DANIEL B. KARRON, : **DECLARATION**

Petitioner, : 11 Civ. 1874 (RPP)
07 Cr. 541 (RPP)

- v. - :

UNITED STATES OF AMERICA, :

Respondent. :

- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK )
COUNTY OF NEW YORK ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

RACHEL ONDRIK, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury:

1. I am a Special Agent with U.S. Department of Commerce, Office of the Inspector General ("DOC-OIG"). I have been employed by DOC-OIG for approximately ten years.

2. I was one of the lead case agents for the case of <u>United States</u> v. <u>Daniel B. Karron</u>, 07 Cr. 541 (RPP). As such, I was personally involved in the investigation of this case.

3. As part of my responsibilities as one of the lead case agents, I reviewed documents relevant to this case, including all of the files maintained by the National Institute for Science and Technology ("NIST") pertaining to the Advanced Technology Program ("ATP") grant awarded to Dr. Karron's company, Computer Aided Surgery, Inc. ("CASI"), in October 2001. During the course of the investigation, I thoroughly reviewed all of the

documents pertaining to CASI's ATP grant, including the files maintained by Hope Snowden, the grant specialist who handled budget and finance issues related to the grant, and the files maintained by Bettijoyce Lide and Jayne Orthwein, who handled the technical aspect of the grant, and did not find any exculpatory evidence.

4. Also as part of the investigation, I contacted a number of potential witnesses and conducted several witness interviews. Among the individuals that I interviewed were Marc Stanley, Jayne Orthwein, Chaya Levin, Peter Ross, and James Cox. I did not speak to or interview Amiee Karron, Nathaniel Karron, Jill Feldman, or Margaret Ferrand. None of the witnesses that were interviewed, including Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, provided any exculpatory evidence.

5. At no time during any of the interviews or phone calls that I conducted, including the interviews of Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, did I or any of the other DOC-OIG agents attempt to coerce, threaten, frighten, or intimidate the witnesses, nor did I or any of the other agents attempt to persuade them not to testify at trial.

6. In addition to conducting the investigation of this case, I also assisted with the preparation for trial. In or about May 2008, a few weeks before the trial began in June 2008, I sent the entire original grant file for the CASI ATP grant to

prosecutors in New York so that it could be available for trial.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
             July 15, 2011

RACHEL ONDRIK
Special Agent
U.S. Department of Commerce
Office of the Inspector General

# EXHIBIT 3

**From:** Lee Goldberg
**To:** karron@casi.net
**Subject:** RE: new CASI trucking company logo
**Date:** Thursday, November 18, 2004 12:15:00 AM

The question about any possible romantic involvement came from one of the two men (the non-Asian one) who accompanied Ms. Garrison. They specifically asked me if I'd had any romantic involvement with you (almost verbatim). And while I do not recall the exact words, they specifically implied that they could have been with you in either of your two genders. I said no, and asked why they wanted to know and they said that my loaning you these large sums of money with such loose conditions caused them to wonder how deep our relationship went. I don't recall the specific language, but will try to reconstruct what I can.

LEE

-----Original Message-----
**From:** dr d b karron [mailto:karron@casi.net]
**Sent:** Wednesday, November 17, 2004 11:37 PM
**To:** lgoldberg@green-electronics.com
**Subject:** RE: new CASI trucking company logo

We need the exact words of the questions asked, specifically, was there sexual innuendo by Ms. G? Who made these remarks ? Ms. G?

-----Original Message-----
**From:** Lee Goldberg [mailto:lgoldberg@green-electronics.com]
**Sent:** Tuesday, November 16, 2004 9:14 AM
**To:** karron@casi.net
**Subject:** RE: new CASI trucking company logo

Very cute!

And BTW, call me when you can - I'm around till 10:30.

LEE

-----Original Message-----
**From:** dr d b karron [mailto:karron@casi.net]
**Sent:** Sunday, November 14, 2004 3:43 PM
**To:** karron@casi.net
**Subject:** new CASI trucking company logo

here is our new logo for our vehicles...

# EXHIBIT 4

From: Lee Goldberg [mailto:lgoldberg@green-electronics.com]
Sent: Tuesday, November 16, 2004 10:32 AM
To: rgarrison@oig.doc.gov
Cc: Lee H. Goldberg
Subject: follow-up on this morning's call

Hi Ms. Garrison,

Thanks for taking my call this morning and agreeing to send me copies of the
records I submitted to you when you came to interview me a couple of weeks
ago. I just have a couple of things I'd like to ask when you make those
copies. First, I'd ask that you please be sure to include copies of all the
documents I gave you when you. Second, please include a copy of the
statement that I made and signed that day so I can have it for my records.

Thanks,

LEE


Lee H. Goldberg - Sr. Editor
analogZONE - www.analogzone.com
202 Mather Ave.
Princeton, NJ 08540
+01 (609) 720-0014 - Office
+01 (609) 575-7669 - Mobile
lgoldberg@green-electronics.com

---
Incoming mail is certified Virus Free.
Checked by AVG anti-virus system (http://www.grisoft.com).
Version: 6.0.786 / Virus Database: 532 - Release Date: 10/29/2004

# EXHIBIT 5

(Jury present)

THE COURT: All right. Please be seated.

Mr. Rubinstein?

MR. RUBINSTEIN: We're ready to proceed, your Honor. Thank you. We call our next witness.

LEE H. GOLDBERG,

called as a witness by the defendant,

having been duly sworn, testified as follows:

DEPUTY COURT CLERK: Please state your name for the record and spell your last name slowly.

THE WITNESS: Lee H. Goldberg.

DIRECT EXAMINATION

BY MR. RUBINSTEIN:

Q. Good morning, Mr. Goldberg.

A. Good morning.

THE COURT: G-O-L-D-B-E-R-G?

THE WITNESS: Yes, sir.

THE COURT: All right.

Q. Where do you reside, sir?

A. I live in Princeton, New Jersey. Do you need an address? 2002 Mayfair Avenue.

Q. How long have you resided there?

A. A little over ten years.

Q. Is that where you came from this morning?

A. Yes, sir, and that's why I'm late. I apologize to the

court. The trains, I don't want to talk about it.

Q. Now, what is your business or occupation, sir?

A. I'm a recovering engineer. I used to be an aerospace engineer. Now I'm a journalist.

Q. How long have you been a journalist?

A. About 14 years.

Q. Is there a particular area that you --

A. I cover high technology. Technology and the environment are my two specialties, mostly networking communications.

Q. Do you know the defendant Daniel Karron?

A. Yes.

Q. Do you see the defendant in court?

A. Yeah. Right there.

THE COURT: The witness has identified the defendant.

Q. And how long do you know the defendant?

A. I'm trying to think of how many years. I guess since I was 13 or 14. We went to junior high together.

Q. And have you maintained a relationship with the defendant?

A. We were in close contact for a long time. Then I fell off the face of the planet. I was doing some research. We weren't in touch for a couple of years. Danny tracked me down probably in 1979 and 1980, and we have been in contact ever since.

Q. And do you know a company called CASI?

A. Yes, sir.

Q. And have you had any involvement with CASI?

A. I was nominally at least on the board of directors, and I did some initial funding.

Q. Did you ever go to a board meeting?

A. No, sir.

Q. Over the time that you have known Dr. Karron, have you been able to form an opinion as to his truthfulness and honesty?

A. Yes, sir.

Q. What is your opinion, sir?

A. He is one of the people I trust in this world.

MR. RUBINSTEIN: Thank you very much.

THE COURT: Cross-examination.

MR. EVERDELL: Yes, your Honor.

CROSS EXAMINATION

BY MR. EVERDELL:

Q. Good morning, Mr. Goldberg.

A. Good morning.

Q. You said that you were on the board of directors nominally for CASI?

A. Yeah.

Q. So you didn't attend any board meetings.

A. No.

Q. And you never were a part of the day-to-day workings of CASI, were you?

A. No. I reviewed some documents, you know, when he was making proposals, I would go over those things. I spent some

time giving advice for whatever it was worth, you know, but a lot of times when it was a technical paper I would take a look at it to make sure that it was at least in some sort of order or in English, comprehensible.

Q. So on the technical side of things, reviewing documents, is that what you said?

A. Basically it.

Q. So you didn't have any involvement with the finances of CASI?

A. No, sir.

Q. You have no idea how they spent their money?

A. Not particularly.

Q. And you don't know anything about the rules of the ATP grants in particular, do you?

A. Not -- I'm certainly not well versed in it.

Q. And you didn't actually work in the CASI work space in 2001 to 2003, did you?

A. I spent time there, but mostly, you know, mostly as a friend and whatever, but I wasn't -- I was in the work space a fair amount. I was in there for various reasons that I would be there.

Q. Now, Mr. Goldberg, you own stock in CASI, don't you?

A. I believe that there is a piece of paper in my files that says something to that effect.

Q. You own stock?

A. I guess so. I haven't looked at it in I don't know how many years. It was given to me. I never asked.

Q. Right. You said also that you have known the defendant since you were 13 or 14, right?

A. Yes, sir.

Q. So, he is a junior high buddy of yours, right?

A. Yeah. And?

Q. And you wouldn't want anything bad to happen to your friend, right?

A. No. And your point is?

Q. Simply that. No further questions.

THE COURT: Any redirect?

MR. RUBINSTEIN: No, your Honor.

THE COURT: All right. You are excused. Next witness.

(Witness excused)

(Continued on next page)

**(.4) EXHIBIT O ORTHWEIN**

# EXHIBIT

**Subject: Agenda for Kickoff Meeting**
**Date:** Mon, 22 Oct 2001 11:43:18 -0400
**From:** Jayne Orthwein <jayne.orthwein@nist.gov>
**To:** egurfein@earthlink.net
**CC:** bjlide@nist.gov, hope Snowden <hope.snowden@nist.gov>

Lee, here is a tentative agenda for our planned kickoff meeting. Please get back to me when you, Dr. Karron and Dr. Satava coordinate a potential date for the meeting.

Thanks for your time and attention to this matter.

Jayne Orthwein
ATP
301-975-3176

CASI's Presentation

Project Overview
Updates
Changes

Getting Started

General ATP information
Understanding ATP's perspective

Establishing Expectations

Project Management and Planning
Managing Change
Reporting Requirements
IPR, Human & Animal Subjects, Change in Name or Ownership
Grant Administration Requirements

11/8/01
NIST
VISITOR
D. KARRON

November 5th Agenda for CASI - ATP meeting

Project Overview:

Re-Organization of CASI

First Quarter Goals

MMVR Meeting in January 2002 as first quarter report
Extension on First Quarterly report due Jan 1 to MMVR Meeting, report will be paper published at meeting.

Budget Changes retroactive to Oct 1.

Increase Travel budget for first year. Increase by +16,000 to 20,000

Make supplies budget (omitted in first budget).
- Thorn : 100.00 month
- Webworqs.com : 400.00 month

  Include Internet costs,
  DSL / Dedicated dial up for
  - Gurfein,
  - Idan,
  - Planetary CASI HQ

  Increase 0 to 12K/year.

First Year subcontractor:
Move George

Amiee Idan title: Assistant Project Fiscal Manager

Move subcontract with NYU to second year.

Move CUNY Contract start in 3rd Quarter.

Approval for Bruce Ellerin as consultant/contractor.

Approval for George Wolberg as consultant/contractor.