USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/17/12

US DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL B. KARRON

    Petitioner,

-v.-

UNITED STATES OF AMERICA

    Respondent.

File here 11-civ-1874 (RPP)
07-cr - 541 (RPP)

Revised and Resubmitted
Memorandum of Facts and
Law to accompany 28 USC
§2255 Motion to Vacate
Criminal Verdict

## 1  Introduction

The Petitioner, DANIEL B. KARRON, responding pro se at this time, respectfully resubmits the  this substantially revised Memorandum of Fact and Law, and Declarations of Dunlevy, Karron, and Eisen, in support of the Petitioners' 28 USC §2255 motion.

New evidence that, viewed in light of the evidence as a whole, is sufficient to establish that no reasonable factfinder would have found the movant guilty of the offense . 28 USC §2255 (h)(1) . These facts were not available during the trial due to:

- Ineffective assistance of the defense counselor Ronald Rubenstein under the _Strickland v. Washington,466 US 668 (1984)_ two prong test and subsequent standards and

- Withholding of exculpatory evidence by the Prosecution, in violation of Supreme Courts' Brady v. Maryland, 373 US 83 (1963) ruling.

The Defendant respectfully moves the Court to vacate or set aside the Defendant's conviction as unlawful and unconstitutional.

## 2  Contents

### (14)    TABLE OF CONTENTS

# Contents

1    Introduction ................................................................................................................... 1

2    Contents ......................................................................................................................... 2

   (14)   TABLE OF CONTENTS ....................................................................................... 2

   (15)   TABLE OF AUTHORITIES ................................................................................. 6

   (16)   List of Figures ....................................................................................................... 7

   (17)   List of Tables ......................................................................................................... 8

3    Jurisdiction ..................................................................................................................... 8

   (18)   The great writ ......................................................................................................... 8

4    Review Standards ........................................................................................................... 9

   (1)    *Pro se* pleadings ................................................................................................... 9

   (2)    Model Rules of Professional Conduct ................................................................. 10

      (1)    Standards for Ineffective Assistance of Counsel .......................................... 10

      **(2)    Criteria for Ineffective Assistance of Counsel under Strickland Standard** ...... 10

      (3)    II. Standard of Review for IAF Claims ......................................................... 11

   (3)    Brady v Maryland Issues ..................................................................................... 12

      (1)    Brady v Maryland Rule Background .............................................................. 12

      (2)    Brady Violations in the Second Circuit: result-affecting ............................. 13

      (3)    Brady Violations in the setting of a weak case .............................................. 14

      **(4)    consciousness of a weak case** ...................................................................... 14

      (5)    Nonproduction of a witness ........................................................................... 14

      (6)    Conviction Mentality ..................................................................................... 16

      (7)    Tunnel Vision, confirmation bias, selective information processing, belief perseverance, avoidance of cognitive dissonance ................................................. 16

   (4)    Federal Rule of Criminal Procedure Rule 16 ...................................................... 17

      (8)    ABA Model rules for Prosecutorial Conduct Rule 3.8 ................................... 18

   (5)    Actual Innocence ................................................................................................. 18

      (9)    18 USC 2255 .................................................................................................. 18

      (10)   New and Suppressed forensic evidence .......................................................... 18

      (11)   Frameup ......................................................................................................... 19

      (12)   Schlup v Delo Actual Innocence Gateway ..................................................... 19

(13)    House v Bell DNA and Other Evidence ................................................ 19

(14)    Co-Funding ............................................................................................ 20

(15)    Co-Mingling of Funds............................................................................ 20

(16)    Tracing of Funds .................................................................................... 20

(17)    Fungibility of Funds............................................................................... 20

(18)    Rule of Lenity ........................................................................................ 20

(19)    American Institute of CPA Code of Professional Conduct and............. 22

(20)    Independence of Auditor........................................................................ 22

(21)    Contra-account ....................................................................................... 22

(22)    Completeness in an audit ....................................................................... 22

(23)    Whitehouse Office of Management and Budget (OMB) OMB Cost Principles .... 22

(24)    Other OMB Documents Circulars regarding Auditor Independence ..................... 23

(25)    Applicable Department of Commerce general rules and regulations ..................... 23

(26)    NIST ATP specific statutes..................................................................... 23

(6)    *Mens Rea* Standards ................................................................................... 23

5    Grounds ........................................................................................................ 25

(1)    Ground One: (IAC/Actual) Funds considered misappropriated were in fact property of Karron and did not belong to the government. ................................................ 25

(27)    NIST ATP project was co-funding from Karron Wages, In-Kind, etc. ................. 26

(28)    Analysis of GX114 Errors and their meaning........................................ 28

(29)    Karron Salary ......................................................................................... 41

(30)    Karron's Co-Funding cash contribution ................................................ 44

(31)    Total Project Cost .................................................................................. 46

(32)    Project Summary Cost Figures ............................................................... 46

(33)    Quick Observations that confirm co-spending ...................................... 49

(34)    Substantive Testing of Co-Funding ....................................................... 49

(35)    Conclusions............................................................................................ 54

(2)    Ground Two: (Actual) The grant funds were not spent beyond the statutory flexibility limits. 54

(1)    Testimony of government witnesses Gurfein, Benedict and Spring, former CASI employees and consultants................................................................ 55

(2)    Had Karron Funds been used to make these payments would have this been a crime? 56

(3)    Support from Cost Principles .................................................................. 57

(4)    Co-Mingling or Co-Funding ?................................................................ 58

(5)     Bad Accounting: by Karron of Hayes/Spring/Benedict ? ........................................... 59

(6)     Check Bouncing when Bookkeeping went offsite in Year 2 ...................................... 60

(7)     Quad entry bookkeeping for a small project was featherbedding the project ............ 63

(8)     The Jackson Group billing goes out of control ........................................................... 63

(9)     Hayes turns on Karron and causes accounting nightmare to force fees from CASI .. 64

(10)    Accounting a Mess when usurped by Spring and Hayes ........................................ 65

(11)    Karron provided co-funding from initial bootstrap loan .......................................... 65

(12)    ATP worked to support their Co-Operative Agreement Awardees ........................ 65

(13)    Oral Permissions supported by GX114 Analysis in Discovery and Forensic
Analysis ........................................................................................................................ 66

(14)    NIST ATP granted Allocation of Power ................................................................... 66

(15)    Brady v Maryland Violation for Bates Stamped Page 5,274 and 5,348 of 6,636 ... 68

(16)    Telephone and Computer Costs Allowed ................................................................ 68

(17)    Naysay Witnesses impeached by GX114 Analysis ................................................ 69

(18)    Hard exculpatory evidence trumps soft inculpatory evidence ................................ 69

(19)    Conclusions .............................................................................................................. 70

(3)     Ground THREE: (Brady Violation) Conviction foundation laid on erroneous,
misleading, and false data causing plain error ........................................................... 70

(20)    Setting the stage for Brady violations by the OIG Special Agents ......................... 70

(21)    The Prosecution explicitly and implicitly suppressed exculpatory evidence and
action on the part of the OIG ........................................................................................ 70

(22)    Specific suppression of Exculpatory Actions implies suppression of Exculpatory
Evidence ....................................................................................................................... 71

(23)    Adversarial Pressures discourage Brady Compliance ........................................... 74

(24)    Prosecutors encouraged to game the system ........................................................ 75

(25)    Setting the stage for Brady Violation: Politics and the ATP program under attack,
and ultimately terminated. ............................................................................................ 76

(26)    Undue influence of Hayes on Budget and Audit Negotiations ............................... 77

(27)    Authority for Allocations negotiated ....................................................................... 77

(28)    The OIG did NOT do an audit. ................................................................................ 78

(29)    Daubert Standard Violated by Riley not raised by Rubinstein ............................... 79

(30)    OIG Auditor False Sworn Affidavits, secret joint award ........................................ 80

(31)    Other Evidence of Brady Violations ........................................................................ 80

(32)    Nondisclosure was serious enough that there is a reasonable probability that
suppressed evidence would have produced a different verdict ..................................... 81

(33)    Verdict worthy of confidence .................................................................................. 81

(34)     Conclusions..........................................................................................................81

(4)    Ground FOUR: Ineffective Assistance of Counsel ...........................................82

(35)     Background  to IAC Argument.........................................................................82

(36)     Background to Rubinsteins taking the Karron case ...................................83

(37)     OIG seizes All CASI / KARRON computers, and ALL Defense Evidence ..........83

(38)     Rubinstein's Response to initial Discovery Material and Defendant efforts to help prep    84

(39)     Rubinstein Plays "Chicken" with Defendant and Court .........................................84

(40)     Rubinstein pursued an unreasonably wrong defense strategy ...............................86

(41)     Rubinstein was dangerously computer illiterate and tried to hide this until it was too late. 86

(42)     Rubinstein failed to engage forensic expert witnesses standing by. ........................86

(43)     Rubinstein fails to notice *Brady* Violations in Riley's field note missing..............88

(44)     Rubinstein did not know about US v Urlacher .....................................................88

(45)     The "Knowing" *mens rea* standard ...................................................................88

(46)     Results of Prior Counsel arguments on Intent ....................................................89

(47)     Witnesses on Transgender Benefits under CASI Benefits plan not called ............92

(48)     Specific Failures of Counselor Rubinstein ........................................................95

(49)     OIG Crossed the line as the Statute of Limitations was about to toll? .................100

6    Conclusion .................................................................................................................107

7    APPENDIX .................................................................................................................109

(1)    Grounds Summary from A0243 MOTION FORM ...............................................109

(50)     Arguments for Relief in Summary .......................................................................109

(2)    RULES GOVERNING SECTION 2254 CASES IN THE US DISTRICT COURTS 111

(3)    The NIST ATP Cooperative Agreement Budget ....................................................111

(1)    OBJECT CLASS CATEGORY .............................................................................112

(2)    SOURCES OF FUNDS .........................................................................................112

(3)    TASKS..................................................................................................................112

(4)    NIST ATP Statute as of 2001 ...............................................................................113

(5)    CIRCULAR A-110 REVISED 11/19/93 As Further Amended 9/30/99 ....................133

(1)    1. Purpose. .........................................................................................................133

(1)    __.2 Definitions. ..................................................................................................133

(2)    ___.14Special award conditions ..........................................................................137

(3)    ___.23Cost sharing or matching ..........................................................................137

(25)    ___.25 Revision of budget and program plans...................................................139

(26)   Brady Cases and treatises .................................................................................. 141
    (1)   Recent Brady Cases in Circuit Courts of Appeal ..................................... 141
    (2)   Brady Cases in District Court where relief was granted .......................... 144
    (3)   Professional and Popular Press reports on Brady Violations .................. 144
(27)   GX 3 DoC FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS
       145
    (3)   .03 Federal and Non-Federal Sharing ...................................................... 145
    (4)   .04 Budget Changes and Transfer of Funds Among Categories ............. 145
    (5)   .07 Tax Refunds ...................................................................................... 146
8   Signature Page ...................................................................................................... 146

## (15)    TABLE OF AUTHORITIES

### Cases

28 USC §2255 .......................................................................................... 8, 9, 11
Adrian Subido, Petitioner, v. US OF AMERICA US District Court, E.D. Virginia, (2005) ....... 11
*Asgrow Seed Co. v. Winterboer*, 513 US 179 ...................................................... 21
Banks v. Dretke, 540 US 668, 696 (2004) ........................................................ 68, 75
Berger v. US, 295 US 78, 88 (1935). ...................................................................... 13
Brady v. Maryland, 373 US 83 (1963) ................................................................ 1, 12
Clifton v. US, 45 US (4 How.) 242, 247-48 (1846). ................................................ 15
Cone v. Bell, 129 S. Ct.  1769 (2009) ..................................................................... 76
Doty v. State, 7 Blackf. 427 (Ind. 1845). ................................................................ 15
Earll v. State of Wyoming 2001 WY 66 29 P.3d 787 .............................................. 29
Evans v. US, 504 US 255 (1992) ............................................................................ 21
Frazer v. US, 18 F.3d 778, 779 (9th Cir. 1994) ...................................................... 93
Giglio v. US, 405 US 150, 153–54 (1972). ............................................................. 12
Graves v. US, 150 US 118, 121 (1893) .................................................................. 15
*Haines v. Kerner, 404 US 519, 30 L Ed 2d 652, 92 S. Ct 594 (1972),* ...................... 9
Hill v. US, 368 US 424, 426-27 (1962) .................................................................. 11
House v. Bell, 547 US 518 (2006). ......................................................................... 19
*Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) ......................................... 10
Jones v. State, 735 P.2d 699, 703 (Wyo. 1987). .................................................... 29
Keifer v. State, 204 Ind. 454, 462, 184 N.E. 557, 560 (1933) ................................. 15
Kyles v. Whitley, 514 US 419, 437 (1995). ............................................................ 12
Kyles v. Whitley, 514 US 419, 439 (1995). ............................................................ 13
Lamin v. McTighe, 72 Wash. 2d 587, 593, 434 P.2d 565, 569 ............................... 15
Lee v. State, 156 Ind. 541, 60 N.E. 299 (1901) ...................................................... 15
MASSARO V. US (01-1559) 538 US 500 (2003), .................................................. 11
McNally v. US, 483 US 350 (1987) ........................................................................ 21
McNally v. US, 483 US 350 (1987); ....................................................................... 20

Miller v. US, 261 F.2d 546, 547 (4th Cir. 1958) ............................................................... 11
Morissette v. US, 342 US 246 (1952), ............................................................................... 25
Muscarello v. US, 524 US 125 (1998) ............................................................................... 20
Muscarello v. US, 524 US 125, 138-29 (1998) ................................................................. 21
North Carolina State Bar v. Michael B. Nifong, No. 06 DHC 35 (June 16, 2007). .......... 76
Scarborough v. US, 431 US 563 (1977) ............................................................................ 21
*Strickland v. Washington, 466 US 668 (1984)* ................................................................. 10
STRICKLAND V. WASHINGTON, 466 US 668 (1984) .................................................. 10
*Strickland v. Washington,* 466 US 668(1984) .................................................................. 10
*Strickland v. Washington, 466 US 668 (1984)* ................................................................. 82
*Strickland v. Washington, 466 US 668, (1984)* ................................................... 1, 82, 93
Strickler v. Greene, 527 US 263, 281 (1999) .................................................................... 12
US v. Agurs, 427 US 97, 107 (1976) ................................................................................. 12
US v. Agurs, 427 US 97, 112 (1976) ................................................................................. 13
US v. Bagley, 473 US  667, 675 (1985) ............................................................................ 12
US v. Giovannetti, 919 F.2d 1223, 1228 (7th Cir. 1990). ................................................. 75
US v. Granderson, 511 US 39, 54 (1994) .......................................................................... 21
US v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999) ..................................................... 11
US v. Oxman, 740 F.2d 1298, 1310 (3d Cir. 1984) .......................................................... 75
US v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001) (quoting Bousley v. US, 523 US 614, 622
     (1998) ........................................................................................................................... 11
US v. Santos (2008). .......................................................................................................... 21
US v. Stevens, Cr. No. 08-231 (D.D.C. April 7, 2009) ..................................................... 76
US v. Urlacher,  979 F.2d 935 ........................................................................................... 88
Williams v. Taylor, 529 US 362 - Supreme Court (2000) ................................................. 11

No table of authorities entries found.

**Statutes**

§1956(a)(1)(A)(i) ............................................................................................................... 22
18 USC §666(a)(1)(A) ....................................................................................................... 57
18 USC §666(a)(1)(A), ...................................................................................................... 57
18 USC 2255 ...................................................................................................................... 19
28 USC §2255 ............................................................................................................ 1, 10, 12
28 USC §2255 (h)(1) ............................................................................................................ 1
House v. Bell, 547 US 518 (2006) ..................................................................................... 21
Osborne v. Purkett, 411 F. 3d 911 - 8th Circuit (2005) .................................................... 21
*Schlup v. Delo,*513 US 298 (1995) .................................................................................. 20
*Wright v. Quarterman, 470 F. 3d 581 - 5th Circuit (2006)* ............................................ 20

## (16)    List of Figures

Figure 1 GX114 Karron Salary Component Breakdown showing Rent is the biggest component
...................................................................................................................................... 35

Figure 2 Karron GX114 Salary components showing proportion of rent relative to cash and fringes ........................................................................................................................... 36
Figure 3 Scatterplot of Bounce Fees Project Year One and Two .................................................. 62

### (17)    List of Tables

Table 1 GX114 ................................................................................................................................ 33
Table 2 GX110 showing only relevant section of spreadsheet data detailing checks from and to Karron for year 1 alluded to in GX114 testimony. ................................................................... 38
Table 3 Gross and Net Salary Paid to Karron for Year Ending 9/30/2002 .................................... 43
Table 4 Karron Loan wage Advance Balance ............................................................................... 43
Table 5 Karron Payroll Loan Advance Balance Chart .................................................................. 44
Table 6 Karron Co-Funding For Year One ................................................................................... 46
Table 7 Project spending for First Year by Quarter cast in SF269A form. .................................. 47
Table 8 Chart of CASI Equipment Used in NIST ATP DMT Project ........................................... 48
Table 9 In Kind ............................................................................................................................. 48
Table 10 Project Accounts Payable ............................................................................................. 49
Table 11 CASI Program Check Bounces Year 1 and 2 ................................................................. 60
Table 12 Ken Jacson Billing for Year One and Two .................................................................... 64

## 3  Jurisdiction

The Defendant, Dr. Karron, was convicted in a Jury trial of misappropriation of more than $5,000 in federal funds on June 11, 2008, and sentenced to 15 months split custodial sentence and 3 years' probation on October 20, 2008. The Defendant is currently under supervision by the court probation service, until August 21, 2012, the third anniversary from her release from prison into supervision. A direct appeal to the second circuit has been concluded and the Supreme Court of the US was denied certiorari on Feb 22, 2010. The Defendant therefore may file this "collateral" post-conviction challenge to her conviction under 28 USC §2255.

### (18)    The great writ

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the US, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.  28 USC §2255

The US Constitution specifically includes the habeas procedure in the Suspension Clause(Clause 2), located in Article One, Section 9. The writ of *habeas corpus ad subjiciendum*1 is a civil, not criminal, ex parte proceeding in which a court inquires as to the legitimacy of a prisoner's custody. habeas corpus collateral review, codified as 28 USC §2255 is a longstanding tradition in American criminal justice, an important legal instrument safeguarding individual freedom against arbitrary government action. It is a separate quasi-civil proceeding, filed with the original trial court, and is not a continuation of the "direct" appellate review process. The §2255 motion is the post-conviction tool after the exhaustion of direct appeals. The §2255 motion is an important tool to rectify injustices that were not or could not have been raised on direct appeal. This is because it gives courts broad discretion in fashioning appropriate relief, including dismissal of all charges. One of the most significant differences between a direct appeal and a §2255 motion is that direct appeals are constrained to be decided on the district court record as it exists as of the time the notice of appeal is filed. In contrast, §2255 motions offer the Defendant the opportunity to present the court with new evidence.

## 4   Review Standards

### (1)      *Pro se* pleadings

As per the Supreme Court in *Haines v. Kerner, 404 US 519, 30 L Ed 2d 652, 92 S. Ct 594 (1972), pro se* pleadings are to be construed and held to a less stringent standard than formal pleadings drafted by lawyers. If the Court can reasonably read pleadings to state a valid claim on which litigant can prevail, it should do so despite failure to cite proper legal authority, confusing legal theories poor syntax, and sentence structure, or litigant's unfamiliarity with pleading requirements.

Petitioner Karron respectfully urges this Honorable Court to grant all and the most liberal considerations with respect to this 28 USC §2255 petition. Karron is not an attorney, but is proceeding *pro se*, to safeguard Karrons' Constitutional rights and in the best interests of lawful justice.

---

[1] "you should have the body for submitting"

## (2)      Model Rules of Professional Conduct

### (1) Standards for Ineffective Assistance of Counsel

The standards for Ineffective Assistance of Counsel are based on the Sixth Amendment of the Constitution of the US of America.  Further, <u>*Strickland v. Washington, 466 US 668 (1984)*</u> and subsequent relevant case law provide a foundation.  <u>The American Bar Association Model Rules of Professional Conduct</u>, 2009 Edition, Rule 1.1 *et seq* as applicable provide an objective professional standard for conduct of Defense Counsel during the course of the Defendants' trial.

### (2) Criteria for Ineffective Assistance of Counsel under Strickland Standard

Counsel's performance at trial are evaluated the two-prong test described in <u>*Strickland v. Washington*</u>, <u>466 US 668</u>(1984).  Under *Strickland,* the court must first ask whether counsel's representation "fell below an objective standard of reasonableness." *Id at 687-88*.  The court must then ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id at 694*.

#### 1)  Errors so serious

Deficient performance is rendered when counsel makes "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.at 687.*  When assessing claims of deficient performance, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id at 689* "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.at 688* The court evaluation must question, "whether counsel's assistance was reasonable considering all the circumstances." *Id* To establish deficient performance, it is not enough for the Petitioner to show that his attorney's strategy was merely wrong, or his actions unsuccessful; he must demonstrate that the actions his attorney took were "completely unreasonable".23

> *Held:* An ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal. ... A §2255 motion

---

2 *Hoxsie v. Kerby*, <u>108 F.3d 1239</u>, 1246 (10th Cir. 1997) (quotation omitted).
3 <u>STRICKLAND V. WASHINGTON, 466 US 668 (1984)</u>

is preferable to direct appeal for deciding an ineffective-assistance claim. .... A defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial[456]

### (3) II. Standard of Review for IAF Claims

Under 28 USC §2255, a prisoner in federal custody may attack his sentence on four grounds:

- that the sentence was imposed in violation of the Constitution or the laws of the US,

- that the court was without jurisdiction to impose the sentence,

- that the sentence was in excess of the maximum authorized by law, or

- that the sentence is otherwise subject to collateral attack. 28 USC §2255; [7]

To prevail under §2255, the movant bears the burden of proof by a preponderance of the evidence.[8]

Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either `cause' and actual `prejudice,' or that he is `actually innocent.'" [9]The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel.[1011]

2)  Example IAC claims

- fails to move to suppress evidence,
- conduct an adequate investigation,
- raise legal issues at trial,
- introduce exculpatory evidence

---

[4] ibid
[5] MASSARO V. US (01-1559) 538 US 500 (2003),.
[6] Williams v. Taylor, 529 US 362 - Supreme Court (2000)
[7] Hill v. US, 368 US 424, 426-27 (1962)
[8] Miller v. US, 261 F.2d 546, 547 (4th Cir. 1958)
[9] US v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001) (quoting Bousley v. US, 523 US 614, 622 (1998).
[10] US v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999).
[11] Adrian Subido, Petitioner, v. US OF AMERICA US District Court, E.D. Virginia, (2005)

(3)      **Brady v Maryland Issues**

The review standard for *Brady v. Maryland, 373 US 83 (1963)* rules violation claims are as promulgated by the Supreme Court and subsequent relevant case law.

**(1) Brady v Maryland Rule Background**

Brady v. Maryland, 373 US 83(1963) requires that prosecutors fully disclose to the accused all exculpatory evidence in their possession.  The court said "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."[12].  Subsequent Supreme Court decisions[13] have held that the government has a constitutionally mandated, affirmative duty to disclose exculpatory evidence to the defendant to help ensure the defendant's right a fair trial under the Fifth and Fourteenth Amendments' Due Process Clauses.[14]  These include

(1) impeachment evidence[15]
(2) favorable evidence in the absence of a request by the accused[16]
(3)  evidence in the possession of persons or organizations (e.g., the police)[17]

# 1.    Justice be done

In Brady v. Maryland, 373 US 83 (1963) The Court cited as justification for the disclosure obligation of prosecutors "the special role played by the American prosecutor in the search for truth in criminal trials."[18]  The prosecutor serves as "'the representative . . . of a

---

[12]373 US at 87
[13]Treatment of Brady v. Maryland Material in US District and State Courts' Rules, Orders, and Policies Report to the Advisory Committee on Criminal Rules of the Judicial Conference of the US Laural L. Hooper, Jennifer E. Marsh, and Brian Yeh. Federal Judicial Center October 2004.  http://www.fjc.gov/public/pdf.nsf/lookup/bradymat.pdf/$file/bradymat.pdf
[14]US v. Bagley, 473 US 667, 675 (1985) ("The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.")
[15]Giglio v. US, 405 US 150, 153–54 (1972)
[16]US v. Agurs, 427 US 97, 107 (1976)
[17]Kyles v. Whitley, 514 US 419, 437 (1995)
[18] Strickler v. Greene, 527 US 263, 281 (1999)

sovereignty whose interest . . . **in a criminal prosecution is not that it shall win a case**[19]**, but . . .that justice shall be done.'"** [20]

## 2.   Standard of Materiality

The *Brady* decision did not define what types of evidence are considered "material" to guilt or punishment, but other decisions(below) have.  For example, the "standard of materiality" for undisclosed evidence that would constitute a *Brady* violation has evolved over time from

- "if the omitted evidence creates a reasonable doubt that did not otherwise exist,"[21] to
- "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would  have been different,"[22]to
- "whether in [the undisclosed evidence's] absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence,"[23]to the current standard,
- "when prejudice to the accused ensues . . . [and where] the nondisclosure [is] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." [24]

### (2) Brady Violations in the Second Circuit: result-affecting

The Supreme Court in *Brady* ruled "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment."[25] The Second Circuit noted that while the Supreme Court appeared to be using the word "material" in its evidentiary context—to refer to evidence that has some probative value—subsequent Supreme Court ruling have changed its meaning.  "Material" evidence for purposes of disclosure under Brady recently has been more narrowly defined to apply to evidence that, if suppressed, would undermine confidence in the outcome of the trial.[26] The Supreme Court have held that the government violates its obligation under Brady where it has suppressed evidence that "could reasonably [have been] taken to put the whole case in such a

---

[19] Findley, Keith A., Tunnel Vision (May 11, 2010). CONVICTION OF THE INNOCENT: LESSONS FROM PSYCHOLOGICAL RESEARCH, B. Cutler, ed., APA Press, 2010 ; Univ. of Wisconsin Legal Studies Research Paper No. 1116. Available at SSRN: http://ssrn.com/abstract=1604658
[20] Kyles v. Whitley, 514 US 419, 439 (1995) (quoting Berger v. US, 295 US 78, 88 (1935)).
[21] US v. Agurs, 427 US 97, 112 (1976)
[22] Bagley, 473 US at 682.
[23] Kyles, 514 US at 434
[24] Strickler, 527 US at 281–82.
[25] Brady, 373 US at 87.
[26] 267 F.3d at 141 (discussing line of Supreme Court authority following  Brady).

different light as to undermine confidence in the verdict."[27]  The government has an absolute

duty of disclosure for "result-affecting" evidence.  This is evidence have a reasonable probability

that the suppression of a particular piece of evidence would change the outcome of the trial.[28]

### (3) Brady Violations in the setting of a weak case

In civil litigation, the fact that a litigant has purposely withheld or destroyed key evidence gives
rise to the inference that the litigant knows his case is weak and knows his cause will not prevail
if the adverse evidence is presented at trial.  This "consciousness of a weak case" inference falls
under the broad umbrella of relevant circumstantial evidence.  Applied in the context of
intentional *Brady* violations, the defendant is entitled to show that the prosecutor was conscious
of the weakness of the government's case and purposely withheld evidence that bolstered the
defense or undermined the government's case.  In a criminal case in which the government
always has the burden of proof, the "consciousness of a weak case" inference signals to the jury
that the government's case is compromised.  This can provide the jury with reasonable doubt.
Just as criminal courts have traditionally allowed the government to prove the defendant's
consciousness of guilt with evidence that the defendant attempted to suppress or destroy
incriminating evidence, the government's intentional Brady misconduct is likewise admissible to
prove the prosecutor's "consciousness of a weak case."

### (4) consciousness of a weak case

Intentional *Brady* misconduct falls within the scope of the "consciousness of a weak

case" inference. Given that the government always has the burden of proof in a criminal case,

evidence that the government's case is weak is relevant to whether the government can prove

guilt beyond a reasonable doubt.  *Brady* misconduct evidence also meets all other requirements

for admissibility under the rules of evidence.  As such, the blanket exclusion of this evidence

could infringe upon the defendant's constitutional right to present a defense.[29]

### (5) Nonproduction of a witness

The nature of the pressure upon litigants to produce the best evidence is most intense in
Criminal proceedings, and nowhere is the balance of resources more skewed.  The so-called

---

[27] 267 F.3d at 139 (quoting Kyles v. Whitley, 514 US 419, 435 (1995))

[28] Id. at 14

[29] CYNTHIA E. JONES (2010) A REASON TO DOUBT: THE SUPPRESSION OF EVIDENCE AND THE INFERENCE OF
INNOCENCE  THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY Vol. 100, No. 2

"best evidence rule" affirmatively requires production of the most cogent proof of the contents of a centrally significant writing. This rule may be stated thus:

> to prove the terms of a writing, the original writing itself is regarded as the primary evidence, and secondary evidence is inadmissible unless failure to introduce the original is satisfactorily explained.'[30]

This is generally, however, the only instance in which the pressure is in the nature of an exclusionary rule.' The pressure takes the form of criminal penalty in some instances.' In other situations the pressure is only persuasive. A plaintiff A plaintiff seeking to prove the making of an advance of money to a defendant may rely on his own testimony; the testimony of a disinterested onlooker or eavesdropper; proof of an admission by a defendant; proof of a regular business entry; or any combination thereof, together with other evidence. Similarly, in a murder case, the prosecutor may rely on eye-witness testimony; a dying declaration of the alleged victim; a confession; circumstantial evidence; or some combination of these or different proofs. The pressure in these cases to make the proponent's side strong and clear lies in the risk that a natural suspicion-sharpened by the adverse comment of astute opposing counsel-may arise from failure to adduce the most cogent proof the trier believes, or is led to believe, should be available if the proponent's contentions as to the facts are sound.

## 3.    The "Pressure Rules" as related to Best Evidence Rule

A long time ago, in 1846, Mr. Justice Nelson discussed the "pressure rules" as follows:

One of the general rules of evidence, of universal application, is, that the best evidence of disputed facts must be produced of which the nature of the case will admit.  This rule, speaking technically, applies only to the distinction between primary and secondary [written] evidence; but the reason assigned for the application of the rule in a technical sense is equally applicable, and is frequently applied, to the distinction between the higher and the inferior degree of proof, speaking in a more general and enlarged sense of the terms, when tendered as evidence of a fact.  The meaning of the rule is, not that courts require the strongest possible assurance of the matters in question, but that no evidence shall be admitted, which, from the nature of the case, supposes **still greater evidence behind in the party's possession or power**; because the **absence of the primary evidence raises a presumption, that, if produced, it would give a complexion to the case at least unfavorable, if not directly adverse, to the interest of the party**...[31]

When it is apparent that more direct and explicit proof was within the power of the party to produce, "the same caution which rejects the secondary evidence will awaken distrust and suspicion of the weaker and less satisfactory; and . . . it may well be presumed [that a] more perfect exposition . . . would have laid open deficiencies and objections which the more obscure and uncertain testimony was intended to conceal.[32]

---

[30] James E. Beaver (1978) Nonproduction of Witnesses as Deliberative Evidence. University of Puget Sound Law Review Vol. 1 Page 221

[31] Clifton v. US, 45 US (4 How.) 242, 247-48 (1846). ".  Cases also using the term "presumption" include, e.g., Graves v. US, 150 US 118, 121 (1893); Keifer v. State, 204 Ind. 454, 462, 184 N.E. 557, 560 (1933) ("raises only a presumption of fact"); Lee v. State, 156 Ind. 541, 60 N.E. 299 (1901) (presumption of fact); Doty v. State, 7 Blackf. 427 (Ind. 1845).. See also Runkle v. Burnham, 153 US 216, 225-26 (1894) (White, J.).11. Lamin v. McTighe, 72 Wash. 2d 587, 593, 434 P.2d 565, 569

[32] Id. at 248

Ultimately, when a litigants who is possession of what would appear to be a strong element of evidence declines to produce it, the possessor's intention must be questioned:

"The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." [33]

### (6) Conviction Mentality

The prosecutor's "conviction mentality," is increasingly recognized by specialists in cognitive psychology that a prosecutor's predisposition probably is to ignore *Brady*. A cognitive bias of prosecutors reveals they routinely make professional decisions based on their personal beliefs, values, and incentives, and that these decisions may result in the subversion of justice, even unintentionally. [34] These studies have examined the capacity of prosecutors to maintain their neutrality and objectivity that compliance with *Brady* requires, and have described the kinds of pressures and biases that operate on virtually all of the discretionary decisions that prosecutors make, including the ability to maintain an open mind that *Brady*-compliance requires. [35]

### (7) Tunnel Vision, confirmation bias, selective information processing, belief perseverance, avoidance of cognitive dissonance

The prosecutor who is convinced of a defendant's guilt exhibit a so-called "tunnel vision" whereby ignores, overlooks, or dismisses evidence that might be favorable to a defendant as being irrelevant, incredible, or unreliable. [36] Ogher cognitive biases that operate on a prosecutor's decision-making process include

- "confirmation bias" that credits evidence that confirms one's theory of guilt, and discounts evidence that disconfirms that theory; [37]

---

[33] Interstate Circuit, Inc. v. US, 306 US 208 (1939) at 226
[34] Keith A. Findley & Michael S. Scott, (2006) The Multiple Dimensions of Tunnel Vision in Criminal Cases, WIS. L. REV. 291, 296-307 (case studies in tunnel vision by prosecutors that subverted justice).
[35] Alafair S. Burke (2006) Improving Prosecutorial Decision-Making: Some Lessons of Cognitive Science, 47 WM. & MARY L. REV. 1587 (describing prosecutorial decision-making as often "irrational" because of cognitive biases)
[36] Susan Bandes, Loyalty to One's Convictions: The Prosecutor and Tunnel Vision, 49 HOW. L. J. 475 (2006); Findley & Scott, supra note 115.
[37] Burke, supra note 14, at 1594-96.

- "selective information processing," that inclines one to weigh evidence that supports one's belief in the defendant's guilt more heavily than evidence that contradicts those beliefs;[38]
- "belief perseverance," that describes a tendency to adhere to one's chosen theory even though new evidence comes to light that completely undercuts that theory's evidentiary basis;[39] and
- "Avoidance of cognitive dissonance," where a person tends to adjust his or her beliefs to conform to their behavior.[40]

All of these biases are impediments to rational decision making and make it understandable that a zealous prosecutor, will seek to win a conviction, and overestimate the strength of his case. They will underestimate the probative value of evidence that contradicts or undermines their case. Evidence that contradicts or undermines the prosecutors' case is precisely the kind of evidence that a prosecutor is required to identify and disclose under *Brady*.

### (4)    Federal Rule of Criminal Procedure Rule 16

Federal Rule of Criminal Procedure Rule 16 governs discovery and inspection of evidence in federal criminal cases. The Notes of the Advisory Committee to the 1974 Amendments expressly said that in revising Rule 16 "to give greater discovery to both the prosecution and the defense," The committee explained, "the requirement that the government disclose documents and tangible objects 'material to the preparation of his defense' underscores the importance of disclosure of evidence favorable to the defendant." Rule 16 entitles the defendant to receive, upon request, the following information [amongst others not salient in this case]

- Documents and tangible objects within the government's possession that "are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant";
- Reports of examinations and tests that are material to the preparation of the defense; and
- Written summaries of expert testimony that the government intends to use during its case in chief at trial.

---

[38] Id. at 1596-99
[39] Id. at 1599-1602
[40] Id. at 1601-02.

Rule 16 also imposes on the government a continuing duty to disclose additional evidence or material subject to discovery under the rule, if the government discovers such information prior to or during the trial.  Finally, Rule 16 grants the court discretion to issue sanctions or other orders "as are just" in the event the government fails to comply with a discovery request made under the rule.

### (8) ABA Model rules for Prosecutorial Conduct Rule 3.8

Finally, the ABA Model rules for Prosecutorial Conduct Rule 3.8 also provide a foundational objective standard for evaluation of conduct during this trial.

### (5)      Actual Innocence

Argument grounds of Actual Innocence are the most difficult to make, and depend on newly discovered, or newly presented forensic exculpatory evidence that only need to raise a reasonable doubt of guilt where previously there was no reasonable doubt of guilt.

### (9) 18 USC 2255

The standard of review is based directly on application of 18 USC 2255 *vis:*

> (b) …determine the issues and make findings of fact and conclusions of law with respect thereto.
>
> "judgment vulnerable to collateral attack"  "or is otherwise subject to collateral attack" or
>
> (h)(1) (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense" …

### (10)      New and Suppressed forensic evidence

The standard of Actual Innocence is based on the revelation of new or suppressed forensic evidence.  Because the prosecution must prove guilt beyond a reasonable doubt, a defendant asserting actual innocence need only raise a reasonable doubt as to whether they were the person who committed a particular crime, or whether the acts that they committed amount to the commission of a crime.[41]

---

[41] Jim Dwyer, Peter J. Neufeld, Barry Scheck (2000) <u>Actual innocence</u>: five days to execution and other dispatches from the wrongly convicted.

### (11)  Frameup

Actual Innocence can be the result of "Frameup"[42][43]- the where the Defendant shows that the falsification of evidence has resulted in the creation of a meritless case by persons of authority with access to the primary evidence, or by private parties hoping to profit from the defendant's misfortune.

### (12)  Schlup v Delo Actual Innocence Gateway

The "actual innocence" opens a "gateway" that the petitioner may pass through to have their claims heard on the merits under the "fundamental miscarriage of justice" doctrine in

Schlup v. Delo,513 US 298 (1995).  In *Schlup*, the Court held that a petitioner who wishes to qualify for relief under the doctrine must bring forth new evidence and establish that "it is more likely than not that no reasonable juror would have convicted him" in light of the new evidence.  If a petitioner meets this high burden, he may overcome procedural barriers that would otherwise bar his path and have a federal court consider his *habeas* petition on the merits. *Schlup* allows cases to be reopened in light of new evidence.

### 3)  Newly Discovered *vs.* Newly Presented

In *Wright v. Quarterman, 470 F. 3d 581 - 5th Circuit (2006),* the Fifth Circuit identified the split among the courts of appeals as to whether the *Schlup* standard "requires 'newly discovered' evidence or merely 'newly presented' evidence."  The Eighth Circuit's position is that the new evidence claimed by the petitioner must not have been available at trial and "could not have been discovered earlier through the exercise of due diligence." Osborne v. Purkett, 411 F. 3d 911 - 8th Circuit (2005)

### (13)  House v Bell DNA and Other Evidence

In House v. Bell, 547 US 518 (2006)  the Supreme Court found that House's arguments based on new DNA and other evidence were sufficient to meet the Schlup standard.  Forensic

---

[42] Criminal Law By Thomas J. Gardner, Terry M. Anderson. 10th Edition 2009
[43] A frameup (caused by a person of authority) or setup (caused by a person not in authority) is an American term referring to the act of framing someone, that is, providing false evidence or false testimony in order to falsely prove someone guilty of a crime. I t is possibly derived from the word frame, meaning to cause someone innocent to appear guilty by "putting the person in a picture frame of suspicion".

evidence that becomes available post-conviction can prevail in a Habeas petition where "it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt."

### (14)    Co-Funding

Co-Funding is supplying of funds from two different sources. ATP Projects are all co-funded. The funds are deposited into a single account, from which program costs are paid.

### (15)    Co-Mingling of Funds

Commingling literally means "mixing together". Used in a legal context it is a breach of trust in which a fiduciary mixes funds that he holds in the care of a client with his own funds, making it difficult to determine which funds belong to the fiduciary and which belong to the client.44

### (16)    Tracing of Funds

Tracing is a legal process by which a claimant demonstrates what has happened to his/her property and identifies its proceed.45

### (17)    Fungibility of Funds

Fungibility is the property of a good or a commodity whose individual units are capable of mutual substitution. It is interchangeability with other assets of the same type. Assets possessing this property simplify exchange, as fungibility values all goods of that class as the same. Fungible means being of such nature or kind as to be freely exchangeable or replaceable, in whole or in part, for another like nature or kind.

### (18)    Rule of Lenity

Rule of Lenity is used in construing an ambiguous statute. Under this rule, the court resolved the ambiguity in favor of the defendant.[46] The spirit of the rule of lenity – fundamental

---

44 http://en.wikipedia.org/wiki/Commingling
45 http://en.wikipedia.org/wiki/Tracing_(law)
46 McNally v. US, 483 US 350 (1987);
Muscarello v. US, 524 US 125 (1998) (declining to apply the rule of lenity);

fairness – lies at the heart the criminal justice system.[47]  At a high level of generality, all agree that ambiguous criminal statutes must be construed in favor of the accused. However, the rule of lenity is often not taken seriously.  Supreme Court itself has articulated two plainly conflicting standards.  In one formulation, the Court has stated that "where text, structure, and history fail to establish that the Government's position is unambiguously correct[,]" a court must "apply the rule of lenity and resolve the ambiguity in [defendant's] favor." [48]  In another formulation, the Court has held that a statute must contain a "'grievous ambiguity or uncertainty'" before the rule of lenity may be applied.[49]

> On collateral review, the District Court ruled that, under intervening Circuit precedent interpreting the word "proceeds" in the federal money-laundering statute, §1956(a)(1)(A)(i) applies only to transactions involving criminal profits, not criminal receipts. Finding no evidence that the transactions on which respondents' money-laundering convictions were based involved lottery profits, the court vacated those convictions.[50]

> (a) The rule of lenity dictates adoption of the "profits" reading. The statute nowhere defines "proceeds." An undefined term is generally given its ordinary meaning. *Asgrow Seed Co.* v. *Winterboer*, 513 US 179. However, dictionaries and the Federal Criminal Code sometimes define "proceeds" to mean "receipts" and sometimes "profits." Moreover, the many provisions in the federal money-laundering statute that use the word "proceeds" make sense under either definition. The rule of lenity therefore requires the statute to be interpreted in favor of defendants, and the "profits" definition of "proceeds" is always more defendant-friendly than the "receipts" definition. Pp. 3–6.[51]

Justice White wrote the opinion of the Court, holding that the federal mail fraud statute only protected money and property, not the public's intangible right to honest government:

> Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.[52][53]

---

Evans v. US, 504 US 255 (1992) (Thomas, J., dissenting);
Scarborough v. US, 431 US 563 (1977) (Stewart, J., dissenting)
[47] McBoyle v. US, 283 US 25, 27 (1931) (the principle of "fair warning" motivates the lenity rule) (Holmes, J.).
[48] US v. Granderson, 511 US 39, 54 (1994)
[49] Muscarello v. US, 524 US 125, 138-29 (1998) (quoting Staples v. US, 511 US 600, 619, n. 17 (1994))
[50] US v. Santos (2008).
[51] Ibid. Justice Scalia, joined by Justice Souter, Justice Thomas, and Justice Ginsburg, concluded in Parts I–III and V that the term "proceeds" in §1956(a)(1) means "profits," not "receipts." Pp. 3–14, 16–17.
[52] McNally v. US, 483 US 350 (1987)

**(19)      American Institute of CPA Code of Professional Conduct and**

The behavior of the two accountants is governed by the AICAP Code of Professional Conduct.

**(20)      Independence of Auditor**

Independence of Auditors governs behavior relating to the audit work.  Organization and the individual auditor, whether government or public, should be free both in from personal, external, fact and appearance and organizational impairments to independence.[54]

**(21)      Contra-account**

In double entry or fund accounting systems, an account, a contra-account which offsets another account.  A contra-asset account has a credit balance and offsets the debit balance of the corresponding asset.  This is required to maintain a balance between debits and credits in the bookkeeping process.  In this case, a purchase is debit by a Budget Line Item, and its source of funding is credit to NIST ATP or CASI/Karron

**(22)      Completeness in an audit**

Completeness Assertions about completeness deal with whether all affecting transactions and accounts that should be in the financial statements are included. Overall objective of an Audit is to provide an opinion as to whether the financial statements are fairly resented in accordance with accounting standards.  Objectives include:

- Completeness (no unrecorded transactions, assets or liabilities)
- Accuracy ( transactions and balances are accurate)

**(23)      Whitehouse Office of Management and Budget (OMB) OMB Cost Principles**

---

[53] The case was superseded one year later when the US Congress amended the law to specifically include honest services fraud in the mail and wire fraud statutes, but that statute would itself be struck down in 2010 as being too vague, reinstating the holding in this case.
[54] GAGAS Amendment 3

NIST ATP grants management staff can be evaluated based on their understanding granting of audit resolution allowances and allocations based on OMB and DOC standards at the time.

**(24)    Other OMB Documents Circulars regarding Auditor Independence**

The copying of audit information is clearly a violation of Auditor Independence standards.

**(25)    Applicable Department of Commerce general rules and regulations**

See Appendix

**(26)    NIST ATP specific statutes.**

See Appendix

**(6)    *Mens Rea* Standards**

Model Penal Code defines discussion of the different modes of culpability.

4) Purposefully: the actor has the "conscious object" of engaging in conduct and believes or hopes that the attendant circumstances exist.
5) Knowingly: the actor is practically certain that his conduct will lead to the result.
6) Recklessly: the actor is aware that the attendant circumstances exist, but nevertheless engages in the conduct that a "law-abiding person" would have refrained from.
7) Negligently: the actor is unaware of the attendant circumstances and the consequences of his conduct, but a "reasonable person" would have been aware.
8) Strict liability: the actor engaged in conduct and his mental state is irrelevant.

*a.  Subjective and objective tests*

The test for the existence of *mens rea* may be:

(a) subjective, where the court must be satisfied that the accused actually had the requisite mental element present in his or her mind at the relevant time (for purposely, knowingly, recklessly etc) (see concurrence);
(b) objective, where the requisite *mens rea* element is imputed to the accused, on the basis that a reasonable person would have had the mental element in the same circumstances (for negligence); or
(c) hybrid, where the test is both subjective and objective.

The court will have little difficulty in establishing mens rea if there is actual evidence – for instance, if the accused made an admissible admission. This would satisfy a subjective test. But a significant proportion of those accused of crimes make no such admissions. Hence, some degree of objectivity must be brought to bear as the basis upon which to impute the necessary component(s). It is always reasonable to assume that people of ordinary intelligence are aware of their physical surroundings and of the ordinary laws of cause and effect. Thus, when a person plans what to do and what not to do, he will understand the range of likely outcomes from given behavior on a sliding scale from "inevitable" to "probable" to "possible" to "improbable". The more an outcome shades towards the "inevitable" end of the scale, the more likely it is that the accused both foresaw and desired it, and, therefore, the safer it is to impute intention. If there is clear subjective evidence that the accused did not have foresight, but a reasonable person would have, the hybrid test may find criminal negligence. In terms of the burden of proof, the requirement is that a jury must have a high degree of certainty before convicting, defined as "beyond a reasonable doubt".

9) "an evil-meaning mind with an evil-doing hand."

In this classic case the defendant, a part time scrap metal dealer, entered an air force bombing range, from which he collected spent bomb casings. These casings had been lying around for years. The defendant sold the casings at a junk market, earning a profit of $84. For this, the defendant was charged with violating 18 USC §641which made it a crime to "knowingly convert" government property. The defendant conceded he had done the act. His sole defense was that he believed that the casings were abandoned property, and therefore there was no crime in taking them.[1]

After the trial, the trial judge instructed the jury with regard to the law, rejecting the defense. Thus, the jury was permitted to find the defendant guilty solely on the basis of his having taken government property. They need not have found, and were not entitled to consider, any belief he may have had with respect to the abandonment of the bomb casings - that is, whether it was government property (which is clearly defined by the plain language of the statute as a crime), or abandoned property (which is not a crime). Were this reading of the statute correct, Congress would have created a strict liability crime.

The Court of Appeals affirmed the decision of the lower court. However, the Supreme Court, reversed the decision of the trial court, concluding that the defendant must be proven to have had knowledge of the facts that made the conversion wrongful, that is that the property had not been abandoned by its owner. Justice Robert Jackson, writing for a unanimous Court, emphasized the importance of individual criminal intent (*mens rea*) in the Anglo-American legal tradition, stating famously that crime was "generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand." [55]

## 4.    Concurrence

In Western jurisprudence, concurrence (also contemporaneity or simultaneity) is the apparent need to prove the simultaneous occurrence of both *actus reus*  ("guilty action") and mens rea ("guilty mind"), to constitute a crime; except in crimes of strict liability. In theory, if the actus reus does not hold concurrence in point of time with the mens rea then no crime has been committed.

## 5  Grounds

### (1)    Ground One: (IAC/Actual) Funds considered misappropriated were in fact property of Karron and did not belong to the government.

Defense Counsel Rubinstein provided Ineffective Assistance of Counsel (IAC) in failing to provide and convincingly argue a forensic foundation upon which to trace ownership of funds used to pay for indirect or unallowable payments.  The full IAC argument is developed under Grounds Four, *below*.

## 5.    Reasonable Doubt

The focus in Ground One is to raise **reasonable doubt** as to the ownership of funds. Further, we prove that the Defendant's payment of rent was reclassified as Salary/Wages by NIST ATP.  There must be additional documentation in support of this evidence[56].  This

---

[55] Morissette v. US, 342 US 246 (1952),
[56] Trial Transcript Page 155 : Lide – cross, RUBINSTEIN Questioning, Lide Answering
15 Q. And how voluminous would you say that project file is?
16 A. In the Advanced Technology Program secure site where its

exculpatory documentation was not provided to the Defense the Prosecution at trial when it should have been.

**(27)      NIST ATP project was co-funding from Karron Wages, In-Kind, etc.**

*b.  Defense failed to engage forensic accounting support*

The Defense counsel failed to engage the proffered forensic accounting experts Spitz and Dunlevy because of conflicts over counsel and accounting fees.  The exculpatory evidence, which Defense should have proffered, but did not, was that NIST ATP had in fact allocated CASI everything Karron asked for and showed was needed and lawful, as was the NIST ATP policy[57].

*c.  Hard evidence of re-class and other negotiated allocations withheld from Defense*

The hard evidence of these negotiations was not made known to the Defense.  The prosecution prevailed with soft evidence of witnesses relating "naysaying" testimony about Karron's intransigence and hard forensic evidence of materially flawed exhibit GX114.  Karron was convicted of paying indirect costs such as rent using government funds when in fact that cost was reclassified as direct salary to Karron.

## 6.      Rent was reclassified as Salary

The main inculpatory line item in government exhibit GX114 was the rent line item[58]. The Defendant's persistence was considered as evidence of criminal intent[59] at trial.  However,

---

17 documents are held, it's probably two feet long. The official
18 file resides in our grants office though, and I don't know how
19 large theirs is.
20 Q. You have never seen that?
21 A. I have seen it. I have no clue how large it is.
[57] Trial Transcript Page 128: Lide – direct ; LIDE Answering
1 A. What we hoped to accomplish was to have a discussion to try
2 to iron out the budget differences, because that had become a
3 major issue in this grant, was to get a budget that the awardee
4 could live with, and yet met the government rules and
5 regulations.
[58] Sentencing Transcript Page 72 MR. KWOK
14 The defendant was repeatedly told to stop. The
15 government wasn't in this to trip someone up. The trial
16 testimony established that the people who administered the
17 grant wanted to succeed.

re-analysis of the GX1114 numbers reveals Karron in fact had good reason to perseverate.  ATP acceded to Karron's request to reclassify the rent.  This significantly weakened the prosecution's case.

### d.  Checks tagged at rent are counted twice

The checks tagged as rent are counted twice.  In the **first instance, this is done implicitly, as salary and the second instance explicitly, as tent**.  This shows that the rent **must** have been previously reclassified by the NIST ATP grants staff as Budget Line Item A, Personnel, an **exculpatory action**.  There **must** be more supporting documentation.  Additional 3500 discovery supports this[60], as does hints in the trial transcript[61].

## 7.    Co-Funding from PI's Salary Theory

During the grant proposal budget discussions, the Defendant raised the issue of how to co-fund the grant.  The consensus at the NIST ATP Program people and others[62] who were advising Karron during the early pre-proposal stages was that the proposer's principal investigator (Karron) salary line, budget form line item A, was suitable source of co-funding.

### e.  Co-Funding from Salary amounts

Karron co-funded this project by turning back $<<CITATION>> of her first year tax paid salary, $<<CITATION>> of her second year tax paid salary, for a total co-funding out of personal funds of $<<CITATION>>.  These figures do not include co-funding from in-kind contributions, Accounts payables, or other sources.

---

[59] Trial Testimony Page 77 MR KWOK
4 For all of those reasons, because the defendant's
5 conduct is intentional and repeatedly so,
[60] GX2502-J Supporting spreadsheets fragments,, apparently from Riley, apparently in support of GX114, ignored at trial.
[61] Ibid "The Government wasn't in this to trip someone up".  But they clearly were doing precisely that here.
[62] at the Baltimore National Meeting in 2001, including Benedict who would later join CASI and then join the OIG.
Trial Transcript Page 963,  Benedict - direct
21 A. I was at an ATP proposers conference in the Spring of 2001.
22 Dr. Karron stood up in the conference during part of the
23 presentations in the Q. and A. session and he said that he had
24 just received a grant and was wondering if anybody had any idea
25 where he could get some financial guidance with the grants.

## 8.    "Hayes and Salary-ification"

Hayes created the "Salary-ification" process where unallocable or disallowed costs would be classified under salary for the purposes of the NIST ATP project, and classed under payroll for the purposes of taxation. The tax liability transfers the ownership of the funds. "Salary-ification" consisted of a series of journal entries in the then extant CASI Quick Books to keep track of the program direct and indirect costs being charged to Karron's personnel costs on budget line   The accounting concept of 'contra-account' means that for each credit in the co-funding a contra, or a debit would be made in the salary account.

### f.   Salary-ification was ignored in Hayes audit

At the time, the Defendant thought it was an imaginative and non-invasive method to let the research proceed without undue restraint from the accounting. Little did the Defendant realize this process would also be used for setting up the Defendant for an audit disaster from the very same accountant acting later as auditor (and possible thief).

### g.   Criminal court accepted the Journal Entries for Payroll Loan Advance Repayments

The criminal trial court accepted the use of journal entries in the issue of the initial 75,000 loan and its repayment. There is no reason the court should not accept co-funding by more journal entries missed at the criminal trial. When the full value of these adjustments is applied, it will become clear there was no actual crime and the defendant is actually innocent.

### (28)    Analysis of GX114 Errors and their meaning[63]

That Government Exhibit GX114 is in error is self-evident. It appears to be partially made up. The Prosecution and the Prosecution Witnesses called CASI's books a mess[64], and

---

[63] Close Enough for Government Work? (Cotton, 2000)
[64] Trial Transcript Page 872  Spring - cross
10 Q. And is it fair to say that the Quick Books at CASI were a
11 mess?
12 MR. EVERDELL: Objection.
13 THE COURT: Overruled. I will get his judgment.
14 A. Yes. I mean that's kind of relative, but they could have
15 been in better shape.
16 Q. And the books, it was your opinion that the books were not
17 in good condition, right?

implied that this mess hid inculpatory evidence. In fact, it is the Prosecutions own GX114 evidence that the Court called as "a mess"[65]. Under this "mess" lay hidden exculpatory evidence of NIST ATP reclassification and fringe allowances. Is this harmless error[66], and without deeper meaning? On the other hand, are these plain errors[67] that belie deeper exculpatory truths? What do the patterns of errors reveal about the NIST ATP project?

## 9.    Contradictory nature of GX114 errors

The natures of the errors in GX114 are clumsy and innumerate[68], not errors an experienced accountant such as OIG Auditor Riley would make[69]. However, Riley is repeatedly held forth as the author of this exhibit[70]. From analysis of Riley's work papers, and her

---

[65] Sentencing Transcript Page 16
13 THE COURT: He underspent budget through those fringe
14 benefits by $4,000 it says right above it. Look at that. This
15 is a mess.
[66] A harmless error is a ruling by a trial judge that, although clearly mistaken, does not meet the burden for a losing party to reverse the original decision of the trier of fact on appeal, or to warrant a new trial. Harmless error is easiest to understand in an evidentiary context. Evidentiary errors are subject to harmless error analysis, under Federal Rule of Evidence 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.")[1]. The general burden when arguing that evidence was improperly excluded or included is to show that the proper ruling by the trial judge may have, on the balance of probabilities, resulted in the opposite determination of fact.
In the case of Earll v. State of Wyoming 2001 WY 66 29 P.3d 787, the Wyoming Supreme Court distinguished between reversible error (which requires a conviction be overturned) and harmless error (which does not), as follows: "... Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. Jones v. State, 735 P.2d 699, 703 (Wyo. 1987).         " In the evidentiary context, a harmless error is usually one where the evidence had no relevance to the issues to be decided by the trier of fact, evidence admitted actually helped the party seeking the reversal, or the remaining evidence was overwhelmingly against the party seeking reversal.
[67] "plain error". "Clearly Erroneous" Standard. Under the "clearly erroneous" standard, where a lower court makes a finding of fact, it will be reviewed for "plain error". It will not be reversed unless the lower court has made a decision that has its basis in a plainly erroneous understanding of the facts. For example, if a court finds that the defendant was standing 30 feet from the curb, the appeals courts will not reverse this finding unless it is obviously in contradiction to the clear and undisputed facts. In US federal court, if a party commits forfeiture of error, e.g. by failing to raise a timely objection, then on appeal, the burden of proof is on that party to show that plain error occurred. If the party did raise a timely objection that was overruled, then on appeal, the burden of proof is on the other party to show that the error was harmless error. This approach is dictated by Federal Rule of Criminal Procedure 52, which holds, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded...Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." It should be noted that the appellate court has discretion as to whether or not to correct plain error. Usually the court will not correct it unless it led to a brazen miscarriage of justice.
[68] Innumerate: A term meant to convey a person's inability to make sense of the numbers that run their lives. Innumeracy was coined by cognitive scientist Douglas R Hofstadter in one of his Metamagical Thema columns for Scientific American in the early nineteen eighties. Later that decade mathematician John Allen Paulos published the book Innumeracy. (Paulos, 2001)
[69] Sentencing Transcript Page 4
6 ... I don't know who compiled them, but I gather it
7 was Ms. Riley, but we never went into the detail about, ...
[70] Sentencing Transcript Page 4
11 They involved loans made which someone, I

experience as a punctilious award-winning auditor[71], and her honesty in admitting the [72] omission of reconciliation of her audit under oath[73], the Defense posits here that one person could NOT be simultaneously honest, numerate, a professional accountant, a CPA, and simultaneously innumerate, and as clumsy with numbers as the execution of GX114 belies.

## 1) The two author in isolation hypothesis of GX114

The Petitioner proposes that two authors had their hands on GX114 without knowledge of what the previous person had deigned to denominate as Karron's wages. Before examining the *prima facie* issues with GX114, let us review the Courts' observations. We will refine this in advancing the **"Two Authors in Isolation"** hypothesis. Below we observe as the District Court struggles to determine Karron's salary and issues of loss from GX114, *viz*:

```
THE COURT: … I might say that I've had some concerns about the
loss computation.  It's not clear to me that a failure to get
approval of expenditures from the grant officer amounts to the
same as an intentional misapplication of funds.  …  So I have
difficulties. For instance, looking at Exhibit 20 and 22 and the
fringe benefits being allowed at 34 percent of salary, as I see it in
the documents.  I have difficulty also with the tabulation
contained in Government Exhibit 114 and 115 because they are just
rough calculations, as I see it. I don't know who compiled them,
but I gather it was Ms. Riley, but we never went into the detail
```

---

12 don't know whom, I presume Ms. Riley, determined the equivalent
13 of salary
71 Riley Expert Witness Resume, Page 5, AWARDS (Number 4 of 4 total)
2005 DOC Silver Medal Award for Meritorious Federal Service "For conducting a complex and unique **joint** audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT.[sic]"[emphasis added]: Further, the deference to credit for this project to a 'joint' collaborator begs the question if this was the CASI Accountant and Auditor Hayes being referenced as the joint author of her OIG audit for which she won commendation for.
72 Issuing an audit report, without reconciling all accounts is a breach of AICPA professional ethics American Institute of Certified Public Accountants, AICPA Professional Standards As of June 1, 2008 Code of Professional Conduct and Bylaws. http://www.aicpa.org/Research/Standards/CodeofConduct/DownloadableDocuments/2008CodeofProfessionalConduct.pdf See also Ethics and the Auditing Culture: Rethinking the Foundation of Accounting and Auditing by David Satava1 , Cam Caldwell2 and Linda Richard, Journal of Business Ethics, Volume 64, Number 3 / March, 2006 Pages 271-284. " Recent high profile events indicate that the accountants and auditors involved have followed rule-based ethical perspectives and have failed to protect investors and stakeholders – resulting in a wave of scandals and charges of unethical conduct. In this paper we describe how the rule-based traditions of auditing became a convenient vehicle that perpetuated the unethical conduct of firms such as Enron and Arthur Andersen…. [We make] suggestions that the accounting and auditing profession should consider to restore public trust and to improve the ethical conduct of accountants and auditors.
73 Trial Transcript Page 473ff Line 24 et seq.
MR. RUBINSTEIN: Q. Did you do a bank reconciliation of the various bank accounts of CASI?
MS. RILEY: A. For this, for this audit?
Q. Right.3
**A. No**
For the full context of this witness admission and the resulting defense objection and sidebar discussion, see below.

```
about, for instance, the statement in the tabulation that Dr. Karron's
salary budgeted.at 175, various cash.  He spent 200,486, according
to that tabulation.  Those amounts, as I saw them, err were salary.
They involved loans made which someone, I don't know whom, I presume
Ms. Riley, determined the equivalent of salary.  As I alluded to
earlier, the fringe benefits figure in this tabulation -- I'm looking
at 114 says that Dr. Karron didn't spend $40,337 in fringe
benefits, and yet in the same tabulation it says that the fringe
benefits were not allowed and spent $4,081.  That whole scenario
.of fringe benefits is somewhat illusive to me.  The testimony, as I
recollect it, was CASI, the corporation, did not have a formal benefit
plan and they were endeavoring to compile one during the time of the
grant.  And instead what Dr. Karron did was to pay benefits just as he
was accustomed to paying them, for whatever medical expenses the
various employees had for their wives. I have some difficulty in,
finding that there was criminal intent with respect to these
expenditures, which are all on Government 114, and with the manner in
which those over expenditures were computed.  It seems to me this is
just a rough calculation and not something that a Court
could rely on in a criminal case.  I'll hear from you.  That's my
assessment of that proof.[Emphasis Added]
Sentencing Transcript Page 3-5 ff Line 1 et seq.
```

The following section is the prosecution digging deeper and deeper into a mess much

worse than they realize.  No one at that time realizes the full and real meaning in the figures.

The Prosecution is being evasive on the backup for GX114 for the spreadsheets GX110 as

discussed below.  The two prosecutors Kwok and Everdell attempt to argue and insist, with no

factual rational, that GX114 has any basis in reality or in GX110.  Here the Judge realizes he

cannot make some combination of the numbers from GX110 come out on GX114.  Something is

wrong, viz:

```
THE COURT: But it doesn't meet it because in her spreadsheet she
doesn't have any payment like $248,000 worth of salary in year one.
MR. KWOK: Your Honor, she does. [really ?]  That number is the net
transfers.
THE COURT: I've looked at salary, I think.
MR. KWOK: Including the tax withholding, I believe is the testimony
that she testified to. When you take into account all the money that
Dr. Karron took out from CASI, minus the amount that he paid back --
THE COURT: That isn't salary. We are talking about salary. I don't
see salary. There is nothing like salary in those documents that
equals 248 -- $200,488.
MR. KWOK: Salary is just a heading. What she meant by this is money
that defendant took, pure money, not in terms of expenditure; cash that
he took from CASI, whether in the form of quote unquote loan or whether
in terms --
THE COURT: Show me. She has no tabulation putting [GX]114 into
context with her [GX]110, Exhibit [GX]110.
    ...
```

THE COURT: **I guess we will have to get 110, because I don't think I have it here, but I'm fully familiar with it. I think it's in Mr. Rubinstein's submission, as a matter of fact.**

...

THE COURT: They are certainly not in those records, a showing of $200,488 in salary.

MR. KWOK: If I can explain how she got that number.

THE COURT: **It's denominated salary. It's a table saying salary. I don't care how she got the number.**

Sentencing Transcript Page 5-7[Emphasis and Editorial Added]

10)Specific Problems with GX114

1. The line item categories in GX114 appear *ad hoc* and do not correspond with the NIST 1262 official budget object class categories[74].

2. There is no congruence between the NIST 1262 budget categories and the GX114 line item categories one which to calculate percentage changes relative to the budget.

3. The % Column is incorrectly based. The base for percentage changes relative to budget is by statute to be 10 % of the federal **and** non-federal share.

4. The pie charts showing percent excess budget changes are therefore misleading and incorrect.

| Amendment # 2 - 1/4/02 | | 10/1/2001 - | 10/10/2002 | |
|---|---|---|---|---|
| | | | | % |
| | **Budget** | **CASI Spent** | **Difference** | **Difference** |
| Subcontractor | $250,000 | $75,962 | (174,038) | -69.62% |
| Dr. Karron Salary | $175,000 | $200,488 | 25,488 | 14.56% |
| Other Employees' Salaries | $150,000 | $141,922 | (8,078) | -5.39% |
| Equipment | $110,000 | $189,819 | 79,819 | 72.56% |
| Dr. Karron Fringe Benefits | $59,500 | $19,163 | (40,337) | -67.79% |
| Other Employees' Fringe Benefits | $51,000 | $20,222 | (30,778) | -60.35% |
| Travel | $20,000 | $10,914 | (9,086) | -45.43% |
| Materials / Supplies | $11,000 | $26,364 | 15,364 | 139.68% |
| Audits | $10,000 | $5,000 | (5,000) | -50.00% |
| Dr K Rent | $0 | $60,000 | 60,000 | |
| Other- (Bookkeeping / Auto Exp / Bank Processing Consultants / Lawwers / Dues | $0 | $43,592 | 43,592 | - |
| Utilities | $0 | $16,341 | 16,341 | |

---

[74] NIST 1262 Budget Form Categories  A. Personnel Salaries Wages,
B. Personnel Fringe Benefits,
C. Travel,
D. Equipment,
E. Materials/Supplies,
F. Subcontracts,
G. Other

| Dr. Karron Fringe | | | | |
|---|---|---|---|---|
| Benefits -Not Allowed Other Employees' | $0 | $4,081 | 4,081 | - |
| Fringe Benefits - Not Capital Improvement | $0 | $5,751 | 5,751 | - |
| | $0 | $11,248 | **11,248** | - |
| Cleaning - D. Ferrand | $0 | $5,019 | 5,019 | - |
| Meals | $0 | $1,936 | 1,936 | - |
| Total Direct Costs | $836,500 | $837,822 | | |

**Table 1 GX114**

## 10.  The Explanation for the Karron Salary Line is to include Rent Checks

The **only** explanation that can account for the $200,488 salary figure is to add in the **rent** and the **net loan** proceeds and apply 8.08% estimated tax loading on THE RENT ONLY[75].  The very low net salary figure is also off because it ignores large journal entries for salary advances taxes, made up by reclassifying early payroll loans as salary here as well[76].  That implies that the **rent** was reclassified to salary, at least at some past period in this saga.

11) The RENT paid to KARRON was reclassified as SALARY.

Under the terms of the Cooperative Agreement, ATP was substantially involved in CASI affairs, as opposed to this being a regular grant[77].  There were no 'secrets', there was no 'fraud', perhaps except for Karron's gender dysphoria[78]. ATP and CASI were actively negotiating various budget and allowance issues from the very start of the project. It now appears that all of these requests [power, internet, and benefits] were effectively granted, as revealed here and in

---

[75] RILEY: A. By including the withholdings portion of the fringe benefits as part of the salary of what he received. It includes the salary, it includes the difference between the loans he received and the loans he paid, and it includes the fringe benefits. Trial Transcript Page 803 Line 22 *et seq.*

[76] MR. RUBINSTEIN: Q. Do you have any documentation to show $165,000? [in additional salary]. RILEY: A. This chart was prepared from the check register. The 200,000 comes from the loan -- the difference between the loan, the loan pay back and the amount of salaries that he received, plus the withholdings from applicable payroll, withholdings, ...
Trial Transcript Page 806 *ff* Line 21 *et seq.*
However, this testimony is still misleading and incorrect, because net loan proceeds by her register GX110 shows $(92,850.00) in net loan proceeds.  $(60,000) is needed to bring the total unloaded salary to $(152,850.00). Loading that with fringes of $(12,345.01) brings the salary to the stated  $(200,488.59).  The actual gross salary is higher still if we remove the taxes on the net salary to make it gross. Dunlevy gives her analysis in her affidavit attached. Riley must have known knew about the rent and her answers were evasive.

[77] Trial Transcript Page 120 *ff* Line 19 *et seq.*, quoted previously.

[78] Gender Dysphoria: Gender identity disorder (GID) is the formal diagnosis used by psychologists and physicians to describe persons who experience significant gender dysphoria (discontent with the biological sex they were born with). It is a psychiatric classification and describes the attributes related to transsexuality, transgender identity, and transvestism. (Wikipedia, 2010)

the original Riley audit work papers.  Further, as we will show further on, the aggregate budget changes did not rise to meet the plus or minus 10 percent, budget permission threshold if the appropriate base is used<<REFERENCE TO SECTION>>.  We see this in many pieces of evidence discussed previously, including the Orthwein Kickoff Meeting agenda memo (Orthwein, 2001), Snowden Trial Testimony[79] and in Progress Reports 1 through 6 (CASI, 2002), (CASI, 2002) (CASI, 2002) (CASIq, 2002) (CASI, 2002) (CASI, 2003) (CASI, 2003) as well as various e-mail threads(see section "ATP Substantial Involvement").  Hayes, the ATP 'independent' auditor devised the ill-fated scheme to solve all of Karron's initial 'draws' by reclassifying them as salary and calculated the payroll taxes on these re-classes[80.]  She also discussed this with Snowden, of ATP of this early on[81], as discussed in Snowden's testimony about initial advances made to Karron[82.]  Then at some point in early 2003 Hayes decided to

---

[79]MS. SNOWDEN Q. Now, you told us that you had these discussions with Gurfein about the rent, correct? A. Yes.
MR RUBINSTEIN: Q. And that was early on in the grant?
A. The discussion was before the kick-off presentation and after the kick-off presentation, so in October and in November.
Q. 2001.
A. 2001.
Q. And then --
THE COURT: You had those with Gurfein.
THE WITNESS: With both Gurfein and Dr. Karron.
Trial Transcript Page 379 ff Line 25 et seq.
[80]MR. SPRING: ... I was aware once I sat down with Dr. Karron that there were corrections that needed to be made for the books in preparation for the audit by the ATP-appointed person Joan Hayes.
MR. RUBINSTEIN: Q. It was your understanding that Joan Hayes was appointed by ATP?
Trial Transcript Page 871 Line 1 et seq.
[81]MR. RUBINSTEIN: Q:. And is it fair to say that Hayes called between September 30, 2002 and the end of that year 2002 and asked you about the deductibility of the rent, correct?
MS. SNOWDEN:  A. It's fair to say that within that time period I was called by Joan Hayes and she did ask about the rent.
Q. And in your discussions with either Lee Gurfein or Dr. Karron about the deductibility of the rent did you suggest to either of them that they could increase Dr. Karron's salary and he could pay the rent out of an increase in salary?
A. No.
Q. I mean he could do anything he wants with his $175,000 that he gets paid in the initial year, correct?
A. If he gets a paycheck, just like me and you when we get our paycheck, you can do whatever you want with it.
Trial Transcript Page 381 Line 5 et seq.
[82] MR. RUBINSTEIN: Q. Now, did there come a time that you learned that Dr. Karron had taken any loan from the funds, the ATP funds of $75,000?
MS. SNOWDEN: A. I heard -- I wasn't --
THE COURT: No. Did you --
THE WITNESS: Did I ever hear that?
THE COURT: In your capacity.
THE WITNESS: I heard that.
Q. And did you have any conversations with Dr. Karron about that $75,000?
A. No.
THE COURT: When did you hear it?
THE WITNESS: From Joan Hayes.
THE COURT: What?
THE WITNESS: From Jones Hayes the auditor.

forget her journal entries in her Audit and disavowed all of the re-classes and even attempted to disavow her knowledge of the rent in her audit report language[83] despite her having prepared Karron's personal taxes and the CASI 1099 forms reflecting the payment rental income from CASI[84] to Karron.



**Figure 1 GX114 Karron Salary Component Breakdown showing Rent is the biggest component**

---

Trial Transcript Page 382 Line 10 *et seq.*

83 During our[Hayes] examination of cancelled checks, we noted that certain expenditures of the award recipient, which were not directly related to the ATP project, were paid with federal funds provided for the ATP project. These payments were made to the Principal Investigator for rental expense, at the monthly rate of $2,000, for the use of his apartment as office space. GX 050 Page 11, First 'Item'.

84 See Karron Affidavit AC <<DBK PERSONAL TAXES PREPARED BY HAYES>>



**Figure 2 Karron GX114 Salary components showing proportion of rent relative to cash and fringes**

It now appears that this reclassification plan was approved, but no formal written budget change was required as no budget changes reached the minimum plus minus 10 percent threshold magnitude. Approval was not required or this but this discussion was suppressed or just not considered important at the time.

*h. A second author on GX114*

A second person desired to highlight rent and fringe on GX114. This second authors' edits were was innumerate in character. This second author did not prepare accounting data for this exhibit. Had they done so, they would have known what elements were already in the Karron salary total. Because of this clumsy addition to GX114 without the concomitant subtracting the rent and fringes from the other items, we can now demonstrate this as evidence of this initial exculpatory reclassification.

Using only GX110 numbers, and Riley's attempted rationalization of fringe benefit rate[85], it is an inescapable conclusion that the "denominated" salary figure of $200,488 must necessary include the $60,000 initially classified by Karron as rent on the paper invoices and checks.  See relevant entries of GX110 below.

---

[85] MR. RUBINSTEIN: Q. CASI spent $200,488 on his salary.  How did you get that number?
MS. RILEY: A. By including the withholdings portion of the fringe benefits as part of the salary of what he received.  It includes the salary, it includes the difference between the loans he received and the loans he paid, and it includes the fringe benefits. Trial Transcript Page 803 Line 19.

| | | | | Sum | $ (188,143.58) |
|---|---|---|---|---|---|
| Dr. Karron | | (60 detail records) | | Sum | $ (129,850.00) |
| 1058 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/17/2001 | 2953 | Per Check Register -Capital Loan | $ (300.00) | |
| 1083 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/23/2001 | 2961 | Emergency Loan | $ (300.00) | |
| 1059 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/29/2001 | 2962 | Per Check Register - Salary Advance | $ (75,000.00) | |
| 1061 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/21/2001 | 3103 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (500.00) | |
| 1072 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3144 | Per Check Register - DBK (Vendor) Capital Loan NIST (per GL Loan Repay-CASI ACCT) | $ (1,000.00) | |
| 1073 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3145 | Per Check Register - DBK (Vendor) Capital Loan NIST(per GL Loan Repay-CASI ACCT) | $ (5,000.00) | |
| 1074 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/7/2002 | 3151 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (5,000.00) | |
| 1075 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/12/2002 | 3153 | Per Check Register - DBK (Vendor) Capital Loan NIST | $ (4,000.00) | |
| 1098 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/25/2002 | 3155 | (Karron Draw)(per GL DBK Loan) | $ (2,000.00) | |
| 1076 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 4/1/2002 | 3160 | Per Check Register - DBK (Vendor) A/P (per GL Karron Draw - DBK Loan) | $ (13,000.00) | |
| 1079 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/24/2002 | 3184 | Per Check Register - DBK (Vendor) A/P (Per GL - DBK Loan) | $ (2,000.00) | |
| 1080 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/25/2002 | 3193 | Per Check Register - DBK (Vendor) A/P (per GL Karron Draw - DBK Loan) | $ (1,000.00) | |
| 1106 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 8/19/2002 | 10407 | (Per GL - DBK Loan) | $ (750.00) | |
| 1107 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 9/13/2002 | 10451 | (Per GL Karron Draw - DBK Loan) | $ (15,000.00) | |
| 1108 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/4/2002 | 10473 | (Per GL Karron Draw - DBK Loan) | $ (5,000.00) | |
| Loan Repay | | (7 detail records) | | Sum | $ 37,000.00 |
| 1047 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 10/11/2001 | | Emergency Loan - Ck # 1006 (prior to NIST First Deposit 10/26/2001) | $ 2,000.00 | |
| 1051 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 12/4/2001 | | Loan to Corp - chk # 5189 | $ 5,000.00 | |
| 1050 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 2/25/2002 | | Emergency Loan to Corporation - Chk # 1052 | $ 1,000.00 | |
| 1042 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 8/13/2002 | | loan to company - chk # 1121 | $ 20,000.00 | |
| 1043 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 8/16/2002 | | loan to company - chk # 1122 | $ 1,000.00 | |
| 1054 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 9/4/2002 | | (Check # 5301) (Per GL - DBK Loan repay NIST) | $ 3,000.00 | |
| 1045 Check or Online Bnkg Trnsf From Chk # 131-0684916-65 (Dr. Karron) | 10/4/2002 | | chk # 1129 (Per GL - DBK Loan repay CASI) | $ 5,000.00 | |
| Payroll | | (8 detail records) | | Sum | $ (35,293.58) |
| 1057 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/13/2002 | 10192 | ( 7/7/2002 - 7/7/2002 Pay Period) | $ (5,019.84) | |
| 1115 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/3/2002 | 10212 | 5/1/2002 - 5/31/2002 pay period | $ (5,002.25) | |
| 1127 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/2/2002 | 10280 | (6/1/2002 - 6/30/2002 pay period) | $ (25,023.17) | |
| 1130 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/2/2002 | | Check Reversal 10280 (6/1/2002 - 6/30/2002 pay period) | $ 25,023.17 | |
| 1117 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/2/2002 | 10290 | (10/1/2001 - 10/31/2001 Pay Period) | $ (5,552.01) | |
| 1120 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/5/2002 | 10291 | (11/1/2001 - 11/30/2001 Pay Period) | $ (4,756.38) | |
| 1121 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/5/2002 | 10292 | (12/1/2001 - 12/31/2001 Pay Period) | $ (9,288.07) | |
| 1055 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 8/13/2002 | 10401 | (7/1/2002 - 7/31/2002 Payperiod) | $ (5,675.03) | |
| Rent on Office | | (30 detail records) | | Sum | $ (60,000.00) |
| 1087 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2977 | Rent on Office - (Jan 00 Rent) | $ (2,000.00) | |
| 1088 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2978 | Rent on Office - (Feb 00 Rent) | $ (2,000.00) | |
| 1089 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2979 | Rent on Office - (per GL -March 00 Rent) | $ (2,000.00) | |
| 1090 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2980 | Rent on Office - (per GL, -April 00 Rent) | $ (2,000.00) | |
| 1091 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2981 | Rent on Office - (per GL -May 00 Rent) | $ (2,000.00) | |
| 1092 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2982 | Rent on Office - (per GL - June 00 Rent) | $ (2,000.00) | |
| 1093 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2983 | Rent on Office - (per GL -July 00 Rent) | $ (2,000.00) | |
| 1094 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2984 | Rent on Office - (per GL -Aug 00 Rent) | $ (2,000.00) | |
| 1095 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/26/2001 | 2985 | Rent on Office - (per GL -Sept 00 Rent) | $ (2,000.00) | |
| 1084 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 11/9/2001 | 3040 | Rent on Office- (per GL -Jan 01 Rent) | $ (2,000.00) | |
| 1096 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 11/23/2001 | 3064 | Rent on Office - (per GL -Feb 01 Rent) | $ (2,000.00) | |
| 1085 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/11/2001 | 3093 | Rent on Office - (per GL -Mar 01 Rent) | $ (2,000.00) | |
| 1086 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/11/2001 | 3094 | Rent on Office - (per GL - Apr 01 Rent) | $ (2,000.00) | |
| 1060 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/14/2001 | 3100 | Per Check Register - DBK Rent - (per GL -Dec 01 Rent) | $ (2,000.00) | |
| 1062 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/28/2001 | 3107 | - (per GL - June 01 Rent) | $ (2,000.00) | |
| 1063 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 12/28/2001 | 3108 | - (per GL - May 01 Rent) | $ (2,000.00) | |
| 1064 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3115 | Per Check Register - DBK Rent (Per GL July 01 Rent) | $ (2,000.00) | |
| 1067 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3116 | Per Check Register - DBK Rent (per GL Aug 01 Rent) | $ (2,000.00) | |
| 1066 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/9/2002 | 3117 | (Per GL Sept 01 Rent) | $ (2,000.00) | |
| 1065 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 1/11/2002 | 3122 | Per Check Register - DBK Rent (Per GL Jan 02 Rentl | $ (2,000.00) | |
| 1068 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3129 | Per Check Register - DBK Rent (Per GL Oct 01 Rent) | $ (2,000.00) | |
| 1069 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3131 | Per Check Register - DBK Rent (Per GL Nov 01 Rent | $ (2,000.00) | |
| 1070 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 2/1/2002 | 3132 | Per Check Register - DBK Rent (Per GL Feb 02 Rent) | $ (2,000.00) | |
| 1071 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3143 | Per Check Register - DBK Rent (Per GL March 02 Rent) | $ (2,000.00) | |
| 1097 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 3/1/2002 | 3142 | (December 00 Rent) | $ (2,000.00) | |
| 1077 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 4/1/2002 | 3164 | Per Check Register - DBK Rent (per GL April 02 Rent) t | $ (2,000.00) | |
| 1078 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 5/2/2002 | 3175 | Per Check Register - DBK Rent (per GL May 02 Rent | $ (2,000.00) | |
| 1099 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 6/4/2002 | 3185 | (Rent) | $ (2,000.00) | |
| 1105 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 7/15/2002 | 10323 | (per GL July 02 Rent | $ (2,000.00) | |
| 1081 Check or Online Bnkg Trnsf To Chk # 131-0684916-65 (Dr. Karron) | 10/7/2002 | 3200 | Per Check Register - DBK Rent (per GL Aug 02 Rent) | $ (2,000.00) | |

**Table 2GX110 showing only relevant section of spreadsheet data detailing checks from and to Karron for year 1 alluded to in GX114 testimony.**

12) Is there any other explanation?

Does this implicit reclassification represent an ATP harmless error of arithmetic or evidence of good faith negotiations of the NIST ATP to help Karron quashed by the OIG?  The only apparently supporting spreadsheet is Government Discovery *Exhibit 3502-J*.  Let us look at

the possibility that the rent is not included in the elements summed to arrive at the putative total salary of $200,488.  The only other free salary or wage like element, are the fringes.

### i.    Can fringes make up the missing $60,000?

We cannot reasonable assume a fringe value approaching $100,000, almost half of the total value.  Such a large fringe rate and value is unreasonable and not justified by the available pool of fringe-like cost elements from which to choose.

We also note that fringes were separately listed and 'not allowed', which brings up another contradiction of simultaneous inclusion and exclusion of same element transactions.[86] This also bothered the Court.[87]  Therefor it is unreasonable to hypothesize that fringes can expand to fill up the gap left if we do not include $60,000 worth of rent reclassified as salary.

### ii.   Can this be an innocent harmless error?

Is this is an innocent Harmless error?  Two salary elements, rent and fringes, are double counted.  The goal of the author was to make line items out of classes of items that author considered egregious crimes.  However, the author did not subtract the items they were highlighting One would hope that the 15 months of incarceration suffered by the Defendant were not because of careless arithmetic or spreadsheet error.  One can only hope that the Plaintiff fact checked and reviewed carefully exhibits used in the criminal trial.  Clearly, the adversarial nature of criminal trial should have caught these errors, instead of the trial judge.  In this case, they did

---

[86] Sentencing Transcript Page 15
21 THE COURT: Look. Let's go right to an item that
22 bothers me, fringe benefits. They were approved at 34 percent
23 of salary. No one said what constitutes a valid, as far as I
24 could find in the papers in the court, what was a valid fringe
25 benefit and what wasn't. How can I have any confidence that
1 not approved fringe benefits of $4,000 is something that is a
2 willful disregard of the Rules?
13 THE COURT: He underspent budget through those fringe
14 benefits by $4,000 it says right above it. Look at that. This
15 is a mess.
[87] Sentencing Transcript Page 4
14 As I alluded to earlier, the fringe benefits figure in
15 this tabulation -- I'm looking at 114 says that Dr. Karron
16 didn't spend $40,337 in fringe benefits, and yet in the same
17 tabulation it says that the fringe benefits were not allowed
18 and spent $4,081. That whole scenario .of fringe benefits is
19 somewhat illusive to me.

not.  Considering the expectation of higher standards of care and safeguards in criminal trials relative to civil trials, that if this "careless hypothesis" were the actually, one must then consider this negligence beyond harmless error because of the dire consequences of this error for the Defendant.

### iii.    Are these figures made up?

Some categories of GX114 appear to be made up, along with the numbers in the category line items.  They do not correspond to any of the NIST ATP budget object codes.  We must also consider the possibility that the Karron salary number, and possibly that some or all of the numbers in GX114, are made up and have no basis in any of the numbers in GX110.  Given the inability to find any combination of GX110 Karron transactions that sums exactly to this value of $200,244, and that we are forced to apply a portion of unspecified fringes, we must also consider the possibility that **some** the number(s) is (are) maliciously, made up and without any basis in the tabulation in GX110.

### 13) Two authors in isolation are the only reasonable explanation for the errors in GX114

If one attempts to reconstruct how these figures were arrived at, one is brought by arithmetic and logic to the inescapable conclusion that GX114 was constructed by two different people working successively and in isolation.  The first author, probably Riley, attempted to capture all of the grant spending and could not make it add up to the disbursed amount.  This is because they were ordered or, refused to consider any other spending accounts (Credit Cards, PayPal Debit Cards, Cash, Gas Travel, Car Rental card amongst others).  Another person subsequently took this list and just added in items, without regard to backup documentation and without the realization that some items were already in the partial first total, to bring the total to the ATP grant disbursed amount.  If this is indeed the case, this second person did not realize, or perhaps care, that the rent, already reclassified into salary, as negotiated a long time ago, was re-entered a second time as rent without being subtracted from Salary.

### 14) GX114 is Evidence of a Prior Negotiated Reclassification or Allowance

During negotiations to arrive at a new budget, the CASI worked closely with the ATP grants office through the efforts of the CASI Business Manager Peter Ross, PhD.  Peter Ross was

interviewed by the OIG sometime after 2006.  Defense Counsel attempts to get him to testify for the Defense at the criminal trial were to no avail.  Ross must have made a statement at his interview.  The field agents must have field notes of their encounter with Ross.  Defense Counsel Rubinstein characterized Ross'es attitude during his phone call as too scared to make coherent responses to Rubinstein's questions.  One must consider the possibility that Ross was coercively questioned to be too frightened to participate in Karron's trial.  The failure of the Prosecution to submit Ross's affidavit or the Special Agents field notes is a *Brady v. Maryland* rule violation.

A number of understandings and accommodations were reached during the final days of the project budget negotiations.  These were in the process of being codified in a grant budget amendment.  These consisted of a number of specific exceptions and allowances, as well as a reclassification of certain payments as Wages/Salary.  This is because the payments were considered misclassified as Rent, and were better characterized as Wages/Salary because they were made to the PI, in the same way as other Personnel costs were.  The funds were considered as income to the PI, and captured on the Defendant's income taxes by the CASI Accountant and Auditor Hayes.

Budget fixes were reached, but for some reason never made it to a new budget being negotiated by Peter Ross, the project manager at the time.  Other factors triggered the suspension.  One of them was unstable actual figures.  Hayes was feeding Ross audit numbers, who was submitting them as budget actuals to Karron for submission to Snowden.  Unknown to Karron or Ross, Hayes was changing the audit figures week to week.  This instability in budget numbers was what ostensibly triggered an audit.[88]  We now know that Hayes was a terrible accountant, and her audit figures were not only unstable, but hostile and patently wrong is almost every way the forensic bookkeeper Dunlevy tested them.  *Dunlevy Decl Lead Sheets*

**(29)      Karron Salary**

---

[88] Trial Transcript Page 141Line 2 on. Lide discusses problems with getting actual figures.
3 A  Because we found it difficult to reconcile these budgets,
4 especially the actuals for year one, we were concerned that the
5 company was not able to account for government spending, and we
6 prepared a document for our supervisor to send to the grants
7 office requesting an audit.

At the trial, the Government cites Karron year one salary figures ranging from a low of $ 35,293.58. [89][90], $175,000[91] $200,488[92] to $253,913[93].  Hayes prepared the Defendants 2002 Tax return, but abruptly quit and it was completed by Solomon and Schwartz[94]  Dunlevys' forensic analysis shows Karron's total Tax Paid salary for the entire project period was $334,004.12[95]

The above discrepancies' in Karron's salary can be reconciled by looking deeper into what Karron was paid and where it went.  The net cash Proceeds of $35.983 (below) reflect the small net amount that Karron actually 'got'.  Most of the money went to two 'destimations': Taxes and to pay back the initial Salary Cash $75,000 Cash advance with which Karron boot strapped the project with.  This is the 'Loan receivable Colum, Which was tracked as account 'DBK AC 190' in Dunleys' Forensic Reconstruction.  *Dunlevy Declaration*

Karron salary, under ATP rules consisted of more than Taxes and Loan Repayments. Non Tax fringes, by statute   include medical and other benefits.  This is an unusual feature of the ATP statute, in which fringes are considered direct costs.  This was done to help smaller businesses pay for Personnel with ATP funds.  Usually they are related to indirect costs.

---

[89] THE COURT: She[RILEY] has got a salary category.  She shows it.  Go on a couple of pages.  Payroll, next page, $35,293.58. *Sentencing Transcript Page 9 Line 18-19.*
[90] MR. RUBINSTEIN: and you see his payroll checks which I put into evidence as P-1 through P-6, where his total amount for the year is about $35,000. Ask yourself, he gets $175,000, how does he only have $35,000? *Trial Transcript Page 1293 Lines 20-24*
[91] GX50,*Hayes audit report*
[92] GX114 OIG
[93] <<CITATION>>the CASI Payroll Tax Returns as prepared by Hayes.  Note that Karrons' Personal 2001 returns were prepared by Hayes<<CITATION>>.  Hayes prepared the Karron 2002 and 2003 W2's for CASI<<CITATION>>.
[94] Hayes completed Karron's 2002 tax return in July 2003, but refused to file it; she returned it to Karron but signed the extension request and completed the W2 forms before she "submitted" the ATP audit report in August 2003. *Karron Declaration Exhibit 110.*
[95] *Declaration of Dunlevy Ex. CAC 291*, mid page right.  Copies of Karron's applicable tax returns are included in *Declaration of Karron.*

| Date | Check # | Gross | FWT | FICA | Medicare | NY State | NY City | NY DBL WH | Loan Receivable DBK AC 190 | Check |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/11/02 | 10192 | 8,333.33 | (1,909.00) | (516.67) | (120.83) | (493.56) | (270.83) | (2.60) | | (5,019.84) |
| 6/3/02 | 10212 | 8,333.33 | (1,909.00) | (516.66) | (120.84) | (493.56) | (288.42) | (2.60) | | (5,002.25) |
| 7/5/02 | 10290 | 14,583.33 | (3,555.00) | (2,970.83) | (976.69) | (987.78) | (538.42) | (2.60) | | (5,552.01) |
| 7/5/02 | 10291 | 14,583.33 | (3,555.00) | (4,531.69) | (211.46) | (987.78) | (538.42) | (2.60) | | (4,756.38) |
| 7/5/02 | 10292 | 14,583.33 | (3,555.00) | 0.00 | (211.46) | (987.78) | (538.42) | (2.60) | | (9,288.07) |
| 8/2/02 | 10401 | 61,918.07 | (17,104.00) | (2,091.63) | (462.81) | (4,351.00) | (2,231.00) | (2.60) | (30,000.00) | (5,675.03) |
| | | 122,334.72 | (31,587.00) | (10,627.48) | (2,104.09) | (8,301.46) | (4,405.51) | (15.60) | (30,000.00) | (35,293.58) |
| 9/30/02 | AJE | 61,918.00 | (17,104.00) | 0.00 | (897.81) | (4,351.00) | (2,231.00) | | (37,334.19) | 0.00 |
| | Total Paid | 184,252.72 | (48,691.00) | (10,627.48) | (3,001.90) | (12,652.46) | (6,636.51) | (15.60) | (67,334.19) | (35,293.58) |

**Table 3 Gross and Net Salary Paid to Karron for Year Ending 9/30/2002**

15) Early Salary Advances and repayments; Proceeds used to bootstrap startup costs

| Date | Num | Description | Memo | Amount | Balance |
|---|---|---|---|---|---|
| 9/1/2001 | | Opening Balance | | $       - | $       - |
| 9/28/2001 | DEP5180 | Deposit | 2001-10-22 statement | $    (900.00) | $    (900.00) |
| 10/1/2001 | | | | | $    (900.00) |
| 10/11/2001 | DEP1006 | Computer Aid Surgery Inc | 2001-10-22 statement | $  (2,000.00) | $  (2,900.00) |
| 10/14/2001 | 2953 | D B Karron, Ph.D. | | $     300.00 | $  (2,600.00) |
| 10/26/2001 | 2962 | D B Karron | 2001-11-23 statement | $  75,000.00 | $ 72,400.00 |
| 10/26/2001 | 2961 | D B Karron, Ph.D. | 2001-11-23 statement | $     300.00 | $ 72,700.00 |
| 12/4/2001 | DEP5189 | Computer Aided Surgery | 2001-12-21 statement | $  (5,000.00) | $ 67,700.00 |
| 12/21/2001 | 3103 | D B Karron PhD | 2001-12-21 statement | $     500.00 | $ 68,200.00 |
| 8/2/2002 | 10401 | D B Karron | BELINDA Ex 110 pg 39 of 44 | $ (30,000.00) | $ 38,200.00 |
| 8/16/2002 | DEP1122 | Deposit | 2002-08-23 statement | $    (865.81) | $ 37,334.19 |
| 9/30/2002 | JRNL | D B Karron | no pay paycheck | $ (37,334.19) | $       - |

**Table 4 Karron Loan wage Advance Balance**



**Table 5 Karron Payroll Loan Advance Balance Chart**

**(30)      Karron's Co-Funding cash contribution**

Karron has the right to fund her grant out of her tax paid salary.  This is not 'double dipping'[96], because the funds are *bona fide* after tax paid funds.  *Dunlevy Decl Page AA003, midpage*

16) Karron Co-Funding should have been obvious as related party transaction

In small company audits, there is particular focus on related parties- officers, partners, major shareholders.  Karron was 90% owner of Computer Aided Surgery, Inc; Special attention should have been paid to the monies that went to and from Karron for the benefit of CASI.  This

---

[96] *Trial Transcript Page 1066 Line 22 et seq. Benedict Cross, See Karron Declaration Exhibit 57.*

co-funding is $ 78,204.28 is 9.77% of the grant amount for the first year of $800,000.  The Prosecution incompletely suppressed this evidence.

17) Co-Funding Elements

The minimum required co-funding, was  %4.75, incorrectly calculated in the initial budget, corrected in amendment XXX, or some $35,000.  The forensic reconstruction from Dunlevy (*Dunlevy Declaration Page AA004*) shows that $78,204.28 was

- deposited into CASI bank accounts, or a
- personal check was used to pay for business expenses or
- MasterCard paid for fringe expenses.

The MasterCard was paid by Karron personally, and as such became source Co-Funding, conserving startup cash.  Here is a summary of program expenses that were paid for by Karron's funding in this fashion, *viz:*

| A/C No. | Account Name | Total Co-Funding | NCR Exp Reimb | Out of Pocket | Master-Card | In-Kind Equipment | Check to Bank | Check to Vendors |
|---|---|---|---|---|---|---|---|---|
| 1010 | NCR Check | $ 207.51 | $ 207.51 | | | | | |
| 1010 | DB Karron   Check | $ 3,000.00 | | | | | $ 3,000.00 | |
| 6000 | Accounting | $ 500.00 | | | | | | $ 500.00 |
| 6010 | Auto | $ 301.16 | | $ 194.15 | $ 107.01 | | | |
| 6019 | Books | $ 410.67 | | | $ 410.67 | | | |
| 6020 | Communications | $ 1.00 | | $ 1.00 | | | | |
| 6040 | Computer Installatio | $ 689.23 | | | $ 689.23 | | | |
| 6050 | Conference | $ 300.00 | | | $ 300.00 | | | |
| 6053 | Dues & Subscriptio | $ 91.06 | | | $ 91.06 | | | |
| 6060 | Employee Benefits | $ 36,112.55 | | $ 30.00 | $ 18,787.55 | | | $ 17,295.00 |
| 6120 | Miscellaneous | $ 147.01 | | | $ 147.01 | | | |
| 6130 | Office | $ 357.06 | | | $ 357.06 | | | |
| 6175 | Postage & Delivery | $ 31.35 | | $ 31.35 | | | | |
| 6178 | Repairs | $ 248.10 | | $ 75.00 | $ 173.10 | | | |
| 6330 | Research & Develo | $ 32,114.25 | | | $ 2,114.25 | $ 30,000.00 | | |
| 6349 | Stationery | $ 191.02 | | | $ 191.02 | | | |
| 6370 | Travel | $ 3,502.31 | | $ 1,134.32 | $ 2,367.99 | | | |
| | Total | $ 78,204.28 | $ 207.51 | $ 1,465.82 | $ 25,735.95 | $ 30,000.00 | $ 3,000.00 | $ 17,795.00 |

**Table 6 Karron Co-Funding For Year One**

### (31)      Total Project Cost

The project total cost was estimated by Karron to be $2,110,400 in the Gate 4 paperwork.[97] The Total Project Cost was estimated at one point in the proposal process as costing a total $2,114,500 with $2,000,000 coming from ATP, and the balance coming from CASI, and indirectly Karron.[98]   The projected CASI cost was some $114,500.   *Karron Decl. Exhibit 8. GX31* .

### (32)      Project Summary Cost Figures

The ATP project was co-funded and over funded by the Defendant from Oct 1, 2001 through July 1, 2003that it was Federally Funded.  It actually ran through Dec 31, 2003 out of Karron's pocket.

---

[97] GX10, Karron Decl. Ex. 14, Page 3.
[98] *Ibid. Dunlevy Decl. Exhibit BAC-301.*

- The total cost of the project is **$1,524,264** (Budget Line Item L), of which the
- Federal Share is **$1,345,500**  (88.68%) (Budget Line Item I) and the
- CASI contribution was **$178,764** (11.32%)  (Budget Line Item H and K).  *Dunlevy Decl. Karron Decl. Exhibit 17.*

## 11.   First Year Quarterly Spending

| SF269A Review | | | | | | |
|---|---|---|---|---|---|---|
| Corrected Figures | | Q1 | Q2 | Q3 | Q4 | x sum |
| a | Total Outlays | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| b | Recipient Share of Outlays | $  41,682.00 | $    1,365.00 | $  17,053.00 | $  18,104.00 | $  78,204.00 |
| c | Federal Share of Outlays | $ 210,000.00 | $ 240,000.00 | $ 140,000.00 | $ 210,000.00 | $ 800,000.00 |
| d | Total Unliquidated Obligations | $   6,638.00 | $ (51,329.00) | $  57,018.00 | $  (4,559.00) | $   7,768.00 |
| | b+c+d | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| | Zero Check(b+c+d-a) | $          - | $          - | $          - | $          - | $          - |
| | Original Date Signed | 1/31/2002 | 4/21/2002 | 7/12/2002 | 10/28/2002 | $ 149,660.00 |
| a | Total Outlays | $ 219,573.00 | $ 188,203.00 | $ 208,727.00 | $ 212,977.00 | $ 829,480.00 |
| b | Recipient Share of Outlays | $   9,573.00 | $    8,214.00 | $    8,727.00 | $    2,979.00 | $  29,493.00 |
| c | Federal Share of Outlays | $ 210,000.00 | $ 180,000.00 | $ 200,000.00 | $ 210,000.00 | $ 800,000.00 |
| | Over Cofunding | $  48,320.00 | $ (49,964.00) | $  74,071.00 | $  13,545.00 | $  85,972.00 |

Table 7 Project spending for First Year by Quarter cast in SF269A form.

This chart is the CASI-ATP spending by quarter for the first year.[99]  The co-funding exceeded the spending except for Q2.  The overall co-funding exceeded the ATP funding by the end of Year 1 by $85,972, well in excess of the required year 1 co funding requirement called out in the budget of %4.57, or $30,500.  The original SF269A were not accurate, but the error was not to the harm of ATP, but understated CASI cofounding by $48,711.00.

## 12.   Equipment In Kind Contribution

Under ATP specific statute companies are encouraged to use their pre-existing equipment whenever possible, and not spend ATP funds to buy new equipment where pre-owned equipment can be used. As such, CASI is entitled to a $30,000 in-kind contribution at the start of the project for already owned computer equipment.

---

[99] *Karron Decl. Exhibit 17-21* contains these figures in restated SF269A Short Forms

| Vendor | Description | Fair Market Value | Invoice |
|---|---|---|---|
| LAKE DSP | Rackmount PC with DSP (Digital Signal Processor) | $ 40,363.00 | $ 51,599.98 |
| SGI | Indigo x2 | $ 900.00 | $ 5,000.00 |
| SGI | Indigo 2 Extreme Graphics | $ 1,200.00 | $ 5,000.00 |
| SGI | SGI Software Developer Software Bundle | $ 10,000.00 | $ 10,000.00 |
| WACOM | Large Pressure Sensitive Digitizer Pad | $ 1,200.00 | $ 1,200.00 |
| Polhemus | Navigation 3Draw Pro | $ 5,200.00 | $ 5,200.00 |
| Polhemus | Navigation additional stylus | $ 500.00 | $ 500.00 |
| Polhemus | Navigation Insidetrack Digitizer | $ 1,495.00 | $ 1,495.00 |
| American Media Pro | Server Class Dual Xenon PC | $ 5,000.00 | $ 5,000.00 |
| Seagate | 15 Disk RAID | $ 5,000.00 | $ 12,000.00 |
| | TOTAL | $70,858.00 | $96,994.98 |

**Table 8 Chart of CASI Equipment Used in NIST ATP DMT Project**

CASI brought significant In-Kind value to the project, conservatively valued here at $ 70,858.00. These figures were proposed to NIST ATP following project suspension to negotiate refund and new co-funding with grants administrator Marilyn Goldstein. There was plenty of reserve value to give CASI credit for this contribution. The value here is well in excess of the 30,000 in-kind credit claimed here at the start of the project[100]. The base of the allowable co-funding in-kind valuation is the CASI/Karron of Budgeted contribution of $110,000.

### IN KIND Contribution of Equipment was ignored by 2 auditors - Hayes and Riley. Amount of Co-Funding is $30,000.

| | Per HABAC 581 Combination Sheet | |
|---|---|---|
| HABAC 604 | Amex Software | 3,294.54 |
| HABAC 604 | Amex Tech | 349.55 |
| HABAC 604 | Amex Tools | 387.25 |
| HABAC 603 | Amex Computer Installation | 3,944.91 |
| HABAC 603 | Amex Equipment | 10,802.85 |
| HABAC 605 | NIST ATP Computer Installation | 3,684.23 |
| HABAC 606 | NIST ATP Paypal | 329.75 |
| | | 22,793.08 |

**Table 9 In Kind**

---

[100] 15 CFR §295.2 ... **ATP restricts the total value of in-kind contributions that can be used to satisfy the cost share by requiring that such contributions not exceed 30 percent of the non-federal share of the total project costs**

## 13.   Accounts Payable is an In Kind Contribution

GAAP (Generally Accepted Accounting Principles) uses accrual basis accounting.  In this basis there are accounts receivable (owed to the CASI) as well as accounts payable (monies CASI owes to their suppliers).  CASI owed Silicon City $16,532.55 from 5/31/02.  CASI also owed Silicon Graphics $30,726.15 from 1/9/02.  Since these two companies have been CASI suppliers since 1996 they were not overly concerned about being owed money and being paid later than was customary.

|  | To Recap: | | |
|---|---|---|---|
|  | *Per Hayes  HABAC 593* | **223,503.00** | Audit Report |
|  | Per HABAC 624-626 | 212,884.59 | Cash Paid to Vendors |
|  | Per HABAC 625 | 16,532.55 | A/P Silicon City |
|  | Per HABAC 625 | 30,726.15 | A/P Silicon Graphics |
| HABAC 607 | Total per HABAC 626 | 260,143.29 | A/C 6330 |
| HABAC 607 | Per HABAC 627 | 30,000.00 | In Kind |
|  | Per HABAC 581 | 22,793.08 | See Schedule Below |
|  | **Total costs incurred by CASI HABAC 581** | **312,936.37** | |
|  | **Difference** | **89,433.37** | |

Table 10 Project Accounts Payable [101]

(33)      **Quick Observations that confirm co-spending**

18) Total Spending is greater than the Governments Contribution
19) Total direct spending is greater than the Governments Contribution
20) Source of Funds is Karron Salary and Credit

(34)      **Substantive Testing of Co-Funding**

Dunlevy conducted substantive[102] testing to validate Karron's co-funding.  Substantive testing of the expense of fringe benefits also proves the inherent and corresponding co-funding by Karron..

---

[101] *Dunlevy Decl AA005 Lower*

Therefore, the drumbeat of 'no co-funding in the trial testimony is provable false'. That the court concluded that there was no co-funding is a material error. This error should have been effectively challenged by Rubinstein. Rubinstein failed to engage the forensic experts and let this error persist to the client's detriment.

21) Hayes and Riley Audit substantial agreement on Fringes element requires acceptance of Co-Funding

Funding for Medical Fringes was accepted and was paid by Karron, not by NIST ATP, and must be construed as co-funding.

22) Salary/Wage Advance Loans were repaid, but bulk of loan proceeds went to co-fund project

## 14.   There is sufficient co-funding that even without rent, Karron's contribution above minimum co-funding pays for the rent.

The two arguments in Grounds One is that the rent was reclassified as Salary. There is sufficient co-funding that even without this reclassification the grant is sufficiently co-funded to meet the budget obligation.

## 15.   Whose idea was this to pay for co-funding this way?

Hayes calculated and executed the no-pay paychecks based on the contemporaneous e-mail traffic. DX FFF Hayes did the co-funding by MasterCard and credit card payments. Hayes tracked the co-funding by accounts payable. ATP allows any accounting system as long as it is consistent. Hayes was creating new quad entry books; she apparently switched to a cash basis

---

[102] Substantive testing are those activities performed by an auditor during the substantive testing stage of the audit that gather evidence as to the completeness, validity and/or accuracy of account balances and underlying classes of transactions. Substantive audit procedure is a direct test of a financial statement balance designed to detect material misstatements at the assertion level. Substantive procedures comprise tests of details (classes of transactions, account balances, and disclosures), and substantive analytical procedures.

without management consent.  She included it in her audit figures without realizing it was a double booked entry, once as fringe, the other as contribution.

## 16.   WILLFULL IGNORANCE BY PROSECUTION OF KARRON CONTRIBUTION

The proof of Karron/CASIs' funding is presented in the Affidavit of Dunlevy. Illustrated above are some quick and simple substantive tests of the reality of the co-funding.  .  Various tests that show Karron / CASI Co-funding in elements of the Hayes and OIG figures within themselves.  The main example is given in GX114 above.  Other examples are fringe funding for Karron accepted by Hayes and the OIG, where the source of funds was Karron's personal funds..  Acceptance of the fringes necessitates the acceptance of the co-funding, yet this was resolutely ignored by the Prosecution.

Every payment accepted by the OIG that was not paid directly from NIST ATP source funds must be paid by Karron/CASI.  The source of funds must be counted as co-funding.  These kinds of errors independent accountants would make.  These contradiction means the acknowledgement of co-funding was suppressed against accounting and logic standards.

As time went by, and under pressure from the OIG, reclassifications and allowances negotiated by the Defendant were forgotten, and the made-up audit results and misunderstandings were accepted as replacements for fact.

What started out as negotiated allowances for Internet, telephone, co-funding in kind, salary allowances in lieu of rent, in-kind and cash co-funding became willful disobedience and criminal, fraudulent and for treble punitive penalties.

What evidence remains of these negotiated understanding?  Where are the supporting documents?  The implicit evidence of the rent reclassification survives in plain sight, like fossils in exposed shale, in the corpus of trial records

The question of other allowances and allocations that have been suppressed is now credible in light of the above evidence.  Supporting documentation is missing or suppressed by the Prosecution.

## 17.  Reclassification of Rent to Personnel Line Item class Vitiates Government Witness Testimony on Rent

The Jury was given a question of guilt to answer beyond a reasonable doubt.  The jury decided the Defendants' guilt on the trial testimony, and exhibits.  They gave particular weight to evidence they called back during their brief deliberations[103].  Specifically read back of the cross Examination of Benedict and a 'blow-up' copy of GX114[104].

It was not the Jury's job to check the arithmetic and find counting errors in the exhibit.  The jury found as fact that the exhibits were true.  Nevertheless, the jury was plainly in error because the evidence was in error and it is not a harmless math error.  It was not the jury's job to verify the arithmetic.  It is not the Jury's job to verify that the exhibits author did not count the same costs multiple times.  That job belongs to the Prosecution, and the Defense counsel.  They both clearly failed to perform their duty in this case.  The Prosecution had a duty to the truth, not winning.  The Defense counsel failed to challenge the exhibit as a true and correct exhibit, free of double counts.  The court noticed this at Sentencing[105].  At the very least, the exhibit should be auditable and verifiable.  The authors should show their work, they should show how they arrived at these figures.  They did not.  There is no way to reconstruct or reverse engineer the exhibit.  The reason they did not was because they were attempting to hide exculpatory facts.

---

[103] Trial Transcript Page 1371
18 THE COURT: Maybe I better read it[the note from the jury] into the record.
19 This is Court Exhibit 5, received from the jury at
20 3:12, and signed by Ms. Young. It says.
21 "1. Bob Benedict's testimony.
22 "2. Number 110.
23 "3. Number 111.
24 "4. 114
25 "5. 115.
Trial Transcript Page 1371
1 "6. Original budget.
2 "7. Revised approved budget.
3 "8. Nonapproved subsequent budget revisions."
[104] Trial Transcript Page 1377
1 MR. KWOK: OK. Your Honor, I think we have an
2 agreement. The transcript is redacted with the approval of
3 Mr. Rubinstein and the government, and I think we also should
4 send in the blow-ups, because they are the actual exhibits,
5 these big boards, Exhibits 114 and 115.
6 THE COURT: I sent in 114 and 115.
[105] Sentencing Transcript Page 1. The COURT:
1 So I have difficulties.

The jury was left to take on faith that the exhibit was correct. Had the jury known the exhibit double counted the Rent, and that the rent has been implicitly reclassified from an unallocable indirect cost to allowable personnel cost they would have not reached the guilty verdict they did. Had they realized that the ATP had explicated allocated the power and utilities in their audit workpapers, and that this evidence was their attention, they would not have reached the verdict that they did.

The entire issue of Karron's intent would have been different, had it been known that despite all of the naysaying witness testimony, the program did make the requested allocations before the OIG intervened[106] and short-circuited budget and audit negotiations.

The exculpatory supporting documentation for the reclassification must be brought forward, even at this late date. That is not brought forward during the trial is grounds for discovery. That this exculpatory supporting documentation was not disclosed during the trial is a *Brady v Maryland* rule violation.

The meaning of this failure has far-reaching implications. It corroborates other hints that NIST ATP was struggling to accommodate Karron's requests. The *Declaration of Eisen*, a transcript of the last ATP proposers' conference in 2007, shows it was the policy of ATP to work hard to accommodate its grantees; it was loathe to say "no". It shows that ATP had in fact accommodated Karron before the project was suspended. The implicit reclassification it reveals that the NIST ATP had explicitly reclassified payments made to Karron originally classified as rent into Wages/Salary, moving it from an indirect cost line item K into a Personnel Line item A. There must be more explicit evidence to support this previously unnoticed implicit exculpatory reclassification.

This exculpatory information was not brought forth by the Prosecution at trial. Had this and the other reclassifications' and allowances made by NIST ATP, and alluded to in the Discovery and Trial Transcript been made plain and fully known to the Jury, there is a significant probability they would have not rendered the verdict they had.

---

[106] Trial Transcript Page 811, Riley – cross, RUBINSTEIN Questioning, RILEY Answering:
20 Q. And what happened here is that the special agents jumped in
21 on this back in 2003, right?

The entire issue of knowing misappropriation is called into question because Karron had good cause to "know" that the allowances would be granted. They in fact had been granted.

(35)     Conclusions

# 1. Government numbers in GX114 are at best negligent with hostile intent, at worse intentionally fraudulent

**2.     Government exhibit GX114 cannot be considered reliable enough to support a reliable jury verdict**

**3.     The government's forensic exhibit GX114 should have been attacked defense counsel and impeached.**

**4.     Karron's first year contribution was $78,204.00 (SF269A Line (b) Recipient Share of Outlays)**

**5.     In light of these arguments and forensic proofs, the verdict must now be set aside.**

(2)     Ground Two:  (Actual) The grant funds were not spent beyond the statutory flexibility limits.

NIST ATP projects were designed to be very flexible to accommodate the changing requirements.[107] [108]

> ...cumulative transfers of funds of an amount above 10 percent of the total award must be approved by the Grants Officer in writing.  This allows the Recipient to transfer funds among approved direct cost categories when the cumulative amount of such transfers does not exceed 10 percent of the current (last approved) total budget.[109]

The 'last' total budget was $2,114,500[110],to $2,111,000[111]. That means that, by the above authority, there was a permitted shift of as much $211,450 between Object Class Categories A through G.  In the trial, the base of the variation was variously cited as $80,000[112][113][114][115],

---

[107] Eisen Declaration Page 6,

[108] Eisen Declaration Page 10 A: [STANLEY] I would take one more crack at that.  One of the things I pride myself on in this program and with my colleagues is that: We try not to be too bureaucratic.

[109] Government Exhibit GX3; DEPARTMENT OF COMMERCE FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS. Section 04 Budget Changes b.

[110] Government Exhibit GX31 Undated.

[111] Government Exhibit GX33, Hand Annotated 12/2/02

[112] Trial Transcript Page 190, Line 23: Rubinstein Questioning, Lide Answering:  Q. Now, in the budget you're allowed to move any item --increase it by 10 percent, is that correct? A. If you decrease something else by the equivalent amount, 1 and if it's within 10 percent of that year's budget. So cumulatively over year one, only $80,000 could have been moved without prior approval.

incorrectly based on the only governments contribution of $800,000.  This ignored Karron/CASI's contribution of $85,972[116], and a total first year spending was $885,972, providing a change base of plus and minus $88,597, a difference of $131,450.  As stated in the[117] spitz

The main inculpatory evidence cited by the Government at trial were the testimony of Gurfein, Benedict, Spring, and Government Exhibit 114.  The Main point of Ground 2 is that the true change base is $211,450, not $80,000, and it is a transfer of Plus to Minus, meaning total variation is $422,900, meaning 211,450 may come out of and into existing categories A-G.  The main shift was the increase in Equipment and Decrease in Contractors of some 100K.

### (1) Testimony of government witnesses Gurfein, Benedict and Spring, former CASI employees and consultants.

The theme of their testimony was that they repeatedly told the Defendant not to make certain expenditures because they were not allowed under ATP Statute and Rules, and as such were unauthorized and therefore illegal.  Witnesses used the same language and semantics in their sage admonishments to the Defendant.  This laid the foundation for the "knowing" requirement 18 USC §666(a)(1)(A), implying that the Defendant 'knowingly'[118] broke the law.

---

Q. Can you -- in other words, they doesn't utilize the 10 percent, the ten million -- the two million rather?
A. No. It's on a year-to-year basis.
Q. And is that specified in some of this material?
A. Yes. I believe it's actually in the special award condition, which I can try to find, but that's articulated very clearly in -- at all these meetings and kickoffs and proposers conferences, et cetera. It could also be in Exhibit 4 in those slides.
[Lide is incorrect. She was referring to Government Exhibit GX4, Page 7 which contradicts GX3 (above), which clearly contradicts her testimony]
[113] Sentencing Transcript Page 30, Line 15 "THE COURT: You got this 80,000 figure that you can 16 move around. But that seems to me is already taken care of when you look at the overdrawn equipment and the overdrawn18 materials and supplies. That takes care of the 80,000 pretty well.
[114] Sentencing Transcript Page 37, Line 5: THE COURT: But you are allowed the $80,000, but then 6 the $80,000 has been used up.
[115] Sentencing Transcript 58 Line 17: THE COURT: In that tabulation I agree with you, that the entry includes salary and loans as they calculated it, but it doesn't make much difference because the 80,000 odd dollars that the defendant was entitled to redistribute are incorporated in the equipment --
[116] See Table 7 Project spending for First Year by Quarter cast in SF269A form
[117] Government Exhibit 62, Final Audit Rebuttal Appendix III Page 14 of 38, A shift of $120,000 from Personnel to Equipment
[118] But not Fraudulently. See *mens rea* discussion in Review Standards.

**(2) Had Karron Funds been used to make these payments would have this been a crime?**

A pivotal aspect of this case is the nature of the 'illegal' payments made under 18 USC §666(a)(1)(A).  Congress enacted 18 USC. § 666 to protect the integrity of the vast sums of money distributed through Federal programs.  Section 666 is designed to facilitate the prosecution of persons who steal money or otherwise divert property or services from state and local governments or private organizations that receive large amounts of Federal funds. [119]

- Clearly, assuming, *arguendo*, if these payments were made by the Karron using personal funds they would not have been illegal under this program and could not serve as grounds to convict the Defendant.

- Alternatively, also assuming, arguendo, if these payments had been expressly allowed by the NIST ATP sponsor, they would not have been illegal and grounds to convict the Defendant.

## 6.    Misapplication of funds and source of funds

Payments for clearly illegal items, such as illegal drugs, pornography, or weapons would therefore be illegal without regard to the source of the funds.  Payments made, using federal funds for otherwise legitimate costs, without authorization, is also illegal as was the holding under *US v Urlacher*.  Payments by Karron owned funds of legitimate costs is obviously legal.  Payments funded by Karron post tax earned salary are clearly Karron funds.  Therefore, the nature of the payments, in and of themselves, by themselves, in isolation, is not by its nature illegal.  What makes these payment illegal is:

- the **source of funds** used to make these payments and
- the **budget and the budget flexibility standards** of the funding agency that granted funds

---

[119] US Attorney Manual 9-46.000 PROGRAM FRAUD AND BRIBERY

to make the project succeed.  The funding agency required co-funding and the CASI/Karron paid indirect costs (Budget line item K).  Is it possible that co-funding can be interpreted co-mingling ?  This is discussed below.

### (3) Support from Cost Principles

The Federal Cost Principles on Cost Sharing gives the applicable general principles for the application of cost sharing

(1) Are verifiable from the recipient's records.
(2) Are not included as contributions for any other federally-assisted project or program.
(3) Are necessary and reasonable for proper and efficient accomplishment of project or program objectives. [120]

## 7.    Application of Cost Principles: Power

Clearly, power and other utilities are necessary and reasonable. The increment that can be attributed to the program is clearly allocable to the project.  The records exist and are verifiable. As there was no other source of funding other than Karron's Wages/Salary, the program decided to help, instead of destroy.  The test of 'necessary and reasonable for proper and efficient accomplishment of project' is without power the project would halt.  This is the sine qua non test; without the particular element, the project cannot continue.

## 8.    Application of Cost Principles: Rent

Rent is a payment to Karron, and is almost indistinguishable from budget line A, Personnel wages and salary, especially because it is a payment to Karron,  and because  Karron deferred wages because of an advance loan.

## 9.    Application of Cost Principles: Site Preparation

Site preparation construction is *sine qua non* to use the equipment the grant funded. Clearly, as argued at trial, there was no benefit to Karron to destroy the apartment.  The court argued that Karron may have gold-plated the equipment.  This argument ignores the fact that this was high end professional custom built computer equipment for its day.  By that argument, the

---

[120] Office of Management and Budget (OMB) Circular A-110 Section 23

purchase of anything other than cheap consumer grade computers could be considered gold plating; but the use of cutting edge computers would have met the Cost Principles standards, there for the installation of this equipment also meets the Cost Principles. By analogy, shipping and taxes are *sine qua non* parasitic costs of the equipment and are also well accepted by the Cost Principles. Therefore, site preparation can be considered as part of the parasitic co-costs of putting high end professional computers into service of the project.

## 10.  Excess co-funding created a buffer

There are reasonable arguments for cost sharing allocability of many of these costs, and if the arguments are rejected, the project is sufficiently overfunded by Karron that Karron funds can be classified as the source of funds. Apparently, this was part of budget negotiations and assumed by the program. Someone else steped in and suppressed these understandings and criminalized these payments.

### (4) Co-Mingling or Co-Funding ?

The court cited co-mingling of funds as a complicating issue in the tracing of funds.[121]
[122]As we can see from the budget forms[123] and the kickoff slides[124] there was an expectation and

---

[121] Trial Transcript Page 942
MR. EVERDELL: ... I
23 think the law is clear that you don't actually need
24 to trace the funds to the actual purchases, so that if they
25 were commingled with actual separate CASI funds, we could still
Trial Transcript Page 943
1 prove that he spent -- improperly spent CASI money. However,
2 in this case, because all the funds are ATP funds, it doesn't
3 really raise an issue.
[122] Trial Transcript Page 1203, Mr. RUBINSTEIN:
21 "The fourth element the government must prove beyond a
22 reasonable doubt is that the money was intentionally
23 misapplied."
24 MR. KWOK: Your Honor --
25 MR. EVERDELL: Your Honor, this is starting to sound
Page 1204
1 suspiciously like a tracing requirement. This element simply
2 talks about where the money was housed, where the funds that
3 came in were put. They were put in CASI's bank accounts. The
4 evidence at trial was ample. They all went into CASI's bank
5 accounts, the company bank accounts. There is no tracing
6 requirement under the Second Circuit law.
[123] GX10b, GX114, GX 031, to cite only a few.

requirement that the proposer provide funds to match the government funds by a certain percentage. This was observed by Benedict in his direct testimony, only he termed it co-mingling[125]. Benedict choose to ignore the 4 CASI checking accounts Karron had setup in an attempt to get the CASI bookkeepers to respect the segregation of funds on which to draw checks upon for payments.[126]

The nature the illegal payments were more precisely determined by the Court at sentencing were all for otherwise legitimate indirect costs, specifically[127] as

1) Rent (to Karron),
2) utilities (telephone, cable Broadband data communication)
    a. site preparation construction (Bata Bintor) and
    b. cleaning / clerical contractor Ferrand

These payments were not illegal had they been made with Karron/CASI funds. The Defendants' argument is these were specifically allowed. The exculpatory evidence of these allowances was suppressed .

### (5) Bad Accounting: by Karron of Hayes/Spring/Benedict ?

---

[124] GX 4, page 13, showing an illustration of three pots. Funds being poured from two pots into a third pot. The leftmoust pot is labeled "ATP Funds". The rightmost post is labeled "Cost Share". The two pots are shown contributing to a third pot labeled "Total ATP Project Budget", from which program costs are funded out of. There is a cryptic legend on the page saying "Cost Sharing or matching means that portion of project or program costs not borne by the Federal Government.

[125] Trial Transcript 973, Benedict Direct:
15 A. I noticed that all of the funds were commingled, which is
15 not allowed by ATP.
16 MR. RUBINSTEIN: Objection. Move to strike, your
17 Honor.
18 THE COURT: Disregard the part "which is not allowed
19 by ATP."
20 Q. Just to clarify. You said you noticed the funds were
21 commingled, is that right?
22 A. Yes, sir.

[126] Trial Transcript Page 1052, Benedict cross by Rubinstein.
8 Q. But isn't it a fact the rent check was written from a CASI
9 Inc. account which was a green check?
10 A. All of the money that was in all of the accounts was NIST
11 money, so the color of the check didn't matter.

[127] Sentencing Transcript Page 91, the COURT:
7 It's clear to me that there was an intentional
8 misapplication of the rent money. The defendant was told time
9 and time again not to use the rent funds for rent or for
10 utilities. That's what the record here substantiates.

Bad accounting was attributed to Karron's meddleing and obstructing the proper and professional bookkeeping of Hayes. Indeed this was a foundational element at the beginning of the trial. The experts were going to testify that Karron was cooking the books. This did not hold up during trial. It was Hayes who made a mess of things to hide her meddleing and theft of payroll.

### (6) Check Bouncing when Bookkeeping went offsite in Year 2

Karron gave Hayes everything she wanted. She wanted bookkeeping to go offsite. Karron granted it. Karron ended up having to run to the bank to get refunds of check bouncing fees. Here is a chart of check bouncing fees through the two years the project ran:

| Date | Days | Account | Memo | Bank Fee |
|------|------|---------|------|----------|
| 10/1/2001 | 0 | project start | | |
| 8/14/2002 | 317 | CASI INC CHASE CHK 96-65 | Insufficient Funds Service Fee | ($25.00) |
| 9/5/2002 | 339 | CASI INC CHASE CHK 96-65 | Overdraft Fee Adjustment | $25.00 |
| 11/19/2002 | 414 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($50.00) |
| 11/19/2002 | 414 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($30.00) |
| 11/25/2002 | 420 | CASI INC NIST ATP 35-65 | Overdraft Fee Adjustment | $30.00 |
| 12/11/2002 | 436 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($135.00) |
| 12/12/2002 | 437 | CASI INC NIST ATP 35-65 | Overdraft Fee Adjustment | $135.00 |
| 3/17/2003 | 532 | CASI INC CHASE CHK 96-65 | Insufficient Funds Service Fee | ($25.00) |
| 3/26/2003 | 541 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($60.00) |
| 3/27/2003 | 542 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($60.00) |
| 4/10/2003 | 556 | CASI INC NIST ATP 35-65 | Overdraft Fee Adjustment | $60.00 |
| 4/17/2003 | 563 | CASI INC NIST ATP 35-65 | Bank Miscellaneous Credit | $60.00 |
| 5/1/2003 | 577 | CASI LLC CHASE CHEK 31-65 | Insufficient Funds Service Fee | ($30.00) |
| 5/2/2003 | 578 | CASI LLC CHASE CHEK 31-65 | Insufficient Funds Service Fee | ($30.00) |
| 5/7/2003 | 583 | CASI LLC CHASE CHEK 31-65 | Overdraft Fee Adjustment | $30.00 |
| 5/7/2003 | 583 | CASI LLC CHASE CHEK 31-65 | Overdraft Fee Adjustment | $30.00 |
| 6/27/2003 | 634 | CASI LLC CHASE CHEK 31-65 | Bounce Charge | ($30.00) |
| 7/11/2003 | 648 | CASI INC NIST ATP 35-65 | Insufficient Funds Service Fee | ($30.00) |
| 7/15/2003 | 652 | CASI INC NIST ATP 35-65 | Overdraft Fee Adjustment | $30.00 |
| 7/9/2003 | 646 | CASI LLC CHASE CHEK 31-65 | Bounce Charge | $30.00 |
| 11/18/2003 | 778 | CASI LLC CHASE CHEK 31-65 | Insufficient Funds Service Fee | ($75.00) |
| 11/19/2003 | 779 | CASI LLC CHASE CHEK 31-65 | Overdraft Fee Adjustment | $75.00 |

**Table 11 CASI Program Check Bounces Year 1 and 2**

We can see that no checked bounced in the first three quarters or so of the project (days 0 to 300), and when the bookkeeping went offsite to the Jackson Group office, checks started bouncing en masse. The stars below the horizontal axis are bounce fees charged (negative debits) and the stars above the axis (positive credits) are refunds that Dr. Karron obtained by running to the bank and negotiating refunds. Who is making a mess of program accounting ?



**Figure 3 Scatterplot of Bounce Fees Project Year One and Two**