## 11.  Payroll Taxes went missing when bookkeeping went offsite in year 2

Year two payroll taxes went missing.  The IRS has been investigating since then.  Civil liens have been filed against Karron. [128]

### (7) Quad entry bookkeeping for a small project was featherbedding the project

Hayes colluded with Spring and the Jackson Group to setup an extraordinary expensive quad entry bookkeeping system[129].  Karron, as an academic manager, did not realize how inappropriate such a system was to manage and operate.  From the extraordinary amounts of billing Jackson Group's contractor Spring was submitting, it became clear this project was becoming 'featherbedding' [130]at its worst.  Spring never did succeed in creating these 'new books' because they required so much work.[131]  Later, Spring would testify that it was Karron's meddling that cause him not to complete this Sisyphean task[132].  Later that year in December 2003, the successor auditor Spitz handily reconciled and created new books for the CASI re-audit, which Riley gave a positive exit interview.

### (8) The Jackson Group billing goes out of control

---

[128] Declaration of Karron Exhibit <<CITATION>>
[129] Dunlevy, the long-term CASI forensic bookkeeper, that this novel system was actually a kind of "Fund Accounting" used by governmental agencies and was completely inappropriate for small businesses and for implementation on Quick Books.  Each line item required 4 counterbalancing entries Because of this this project was doomed to extraordinary cost and failure.
[130] Featherbedding (also called make-work) is the practice of hiring more workers than are needed to perform a given job, or to adopt work procedures which appear pointless, complex and time-consuming merely to employ additional workers.
[131] Trial Transcript Page 472 – Riley – direct
3 When I arrived, the new books weren't completed yet,
4 so they were going to be completed the next day so I waited
5 till the next day.
6 The -- I used the records that they provided and,
7 including Joan Hayes, what Joan Hayes had provided to come up
8 with the numbers for this. I did not take Joan Hayes' report
9 and copy the numbers to come up with this. [ **this is precisely wrong, because she copied Hayes numbers with their tell tail errors**]
 Trial Transcript Page 976, Benedict - direct
9 A. Not before I left. They were working on it[new books], but they never
10 completed it.
[132] In mythology Sisyphus was a king punished by being compelled to roll an immense boulder up a hill, only to watch it roll back down, and to repeat this throughout eternity.  The word "sisyphean" means "endless and unavailing, as labor or a task"

The total number of CASI and CASI NIST ATP program checks was 1425 for the period
of October 1, 2001 through Sept 30, 2003.  This is period of 24 months CASI wrote an average
number of 60 checks a month.  This is not an overwhelming number of checks.  For this period
the Jackson Group billed $26,217 to book these checks, or a cost of $18 per check.  They never
finished.  Spitz and Greenstein managed to reconcile and book these checks and the Credit Card
and Karron's personal contributions in one week and prepare for the second OIG audit for
$14,000.

### Register Report:2
10/1/2001 through 12/31/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|---|---|---|---|---|---|---|---|---|
| 8/8/2002 | Ken Jackson G...02-CA-01 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -1,360 |
| 8/27/2002 | Ken Jackson G...02-CA-02 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -920 |
| 9/17/2002 | Ken Jackson G...02-CA-03 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -1,000 |
| 9/27/2002 | Ken Jackson G...02-CA-04 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -1,650 |
| 10/10/2002 | Ken Jackson G...02-CA-06 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -1,990 |
| 10/11/2002 | Ken Jackson G...02-CA-05 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | c | -1,680 |
| 11/16/2002 | Ken Jackson G...02-CA-07 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -2,230 |
| 12/6/2002 | Ken Jackson G...02-CA-08 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,037 |
| 1/26/2003 | Ken Jackson G...03-CA-01 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,120 |
| 2/14/2003 | Ken Jackson G...03-CA-02 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,070 |
| 3/6/2003 | Ken Jackson G...03-CA-03 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -790 |
| 4/23/2003 | Ken Jackson G...03-CA-04 | | The Jackson G... | | ATP_OTHER:... | NIST_AT... | | -1,030 |
| 5/8/2003 | Ken Jackson G...03-CA-07 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -2,530 |
| 5/10/2003 | Ken Jackson G...03-CA-05 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,830 |
| 5/22/2003 | Ken Jackson G...03-CA-08 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,790 |
| 5/25/2003 | Ken Jackson G...03-CA-06 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -2,160 |
| 6/30/2003 | Ken Jackson G...03-CA-09 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -1,130 |
| 7/31/2003 | Ken Jackson G...03 CA 11 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | 0 |
| 8/17/2003 | Ken Jackson G...03 CA 10 | | Ken Jackson | | ATP_OTHER:... | NIST_AT... | | -900 |
| **10/1/2001 - 12/31/2003** | | | | | | | | **-26,217** |

### Table 12 Ken Jacson Billing for Year One and Two

### (9) Hayes turns on Karron and causes accounting nightmare to force fees from CASI

The Petitioner can only surmise that Hayes' multiplicity of CASI roles led to the
prosecution to withdraw Hayes as an expert witness.  Or, as alluded to above, Hayes may have
actually committed crimes.  Hayes was simply too dirty and vulnerable to Rubinsteins' withering
cross-examination.  While Rubinstein may have been unable to manage a sprawling white collar

forensic case like this, he was masterful at the art of cross-examination. He was successful enough at impeaching other Prosecution witnesses so as to convince the Prosecution not to put their lead witness on the stand against him. Was there more exculpatory evidence relative to Hayes that should have surfaced that did not?

### (10)    Accounting a Mess when usurped by Spring and Hayes

### (11)    Karron provided co-funding from initial bootstrap loan

The two underlying assumptions made by both the Prosecution and the Defense were that

- The Defendant used ATP funds to pay for Un-allocable/Un-allowed costs; that these costs were not otherwise reclassified into allowed costs.
- The Defendant had not contributed any personal funds to pay for costs.

Rubinstein showed in his cross examination of the Government Auditor Riley that the initial $75,000 salary advance loans were repaid within 5 months.[133] This was accepted by the court.[134] Rubinstein failed to continue with the forensic analysis to show that the proceeds of the loan, which were personal funds, were used to pay project direct and indirect costs, Budget Line J and K. As the forensic analysis of Dunlevy shows, these costs were overfunded, not underfunded or not funded at all. Therefor the issue of source of funds to pay for Line J was Karron, not ATP.

### (12)    ATP worked to support their Co-Operative Agreement Awardees

ATP worked hard to grant the requests to make specific variances Karron asked for. It was their stated policy at their proposers meeting in 2007, the proceedings of which are presented as transcribed in the Declaration of Eisen. ATP was loathe to say "no", and attempted

---

[133] Trial Transcript Page 800, Riley – cross, RUBINSTEIN is Q(Questioning), RILEY is A (Answering)
6 Q. And so if he borrowed $75,000 in October, within five months he basically would pay that back, correct?
8 THE COURT: Answer, please.
9 Q. 14 times five is 70, correct?
10 A. Yes.
11 Q. And October, November, December, January, February, by the end of February he would have basically paid back the 75,000, correct?
14 A. For the gross, correct.
[134] Sentencing Transcript Page 7[

to foster innovators.[135]  There was no documentation of denials.  The documentation in support of Karron has gone missing.  The ATP had its own political problems.  ATP was terminated by an act of Congress in 2008.

### (13)     Oral Permissions supported by GX114 Analysis in Discovery and Forensic Analysis

That ATP had given permission to Karron for allowances was noted by the Judge in the criminal trial.[136].  Where is the supporting documentation?  What was not known at the time of the trial was the OIG had given CASI explicit power allocation in its audit workpapers.[137]  Similarly, the OIG had granted CASI a reclassification of rent(budget line item K, indirect) to payroll(budget line item A, personnel).  The implicit reclassification means that at some point the program had explicitly reclassified the rent, and there must be memos, worksheets, e-mail, and other records of the discussion associated.  This evidence, which must exist to support the reclassification, was suppressed.  Only the OIG forgot to suppress the evidence of that reclassification in its numerical evidence.  From this clue, we must call for discovery to find these suppressed exculpatory documents.  If they were destroyed, then an inquiry must be made to determine who and how this miscarriage could have happened.

### (14)     NIST ATP granted Allocation of Power

NIST ATP granted allocation for power.  This is despite the contrary testimony of the CASI bookkeeper Spring[138] and NIST ATP grant specialist Snowden.  They maintained that this was not allowable.[139]  Nevertheless, it was allowed.  It was later revealed in Riley's[140] and

---

[135] Eisen Decleration Page 8
[136] Sentencing Transcript Page 19
19 THE COURT: It suggests not approved in writing. I
20 have seen that. I agree with that. But it sounds as if it was
21 approved orally.
[137] Prosecution Criminal Discovery Document Bates Stamped Page 05274, never cited at trial.
[138] Trial Transcript Page 910; Spring – cross RUBINSTEIN Questioning, SPRING Answering
10 Q. By the way, you also said that you had discussed with Dr.
11 Karron the unallowability of utilities, correct?
12 A. Correct.
13 Q. And, in fact, are you aware of negotiations as to having as
14 an expense deductible from NIST for utilities?
[139] Trial Transcript Page 256, Snowden – direct, SNOWDEN Answering
20 A.  For one thing, they're considered indirect costs, and
21 they're -- indirect costs for us is general and administrative
22 costs like water, electricity, heat, something that ATP and

Benedict's[141] testimony and accepted by the court[142][143] over the Prosecutions objections.

Ultimately, NIST ATP would allow ostensibly disallowable costs as revealed in the OIG audit

---

23 federal funds we do not pay for.
[140] Trial Transcript Page 708ff Riley – cross RUBINSTEIN Questions, RILEY Answering
12 Q. You disallowed utilities, did you not?
13 A. Disallowed utilities?
14 Q. Yes.
15 A. Yes.
16 Q. Are you aware that there were discussions between Dr.
17 Karron and NIST as to whether to allow a portion of the
18 utilities?
19 A. Yes.
20 THE COURT: When? All right.
21 Q. And is it fair to say that you determined that a portion of
22 the utilities should be allowable?  [Riley never gave a direct answer to this question]
[141] Trial Transcript Page 1057 Benedict  - cross, BENEDICT Answering, RUBINSTEIN Questioning
10 A. I don't recall the specific discussions, but I do remember
11 there were, yes. And the discussions were that if he could
12 demonstrate the fact that there was an increase, that they
13 could be classified as direct expenses, not as indirect
14 expenses.
15 Q. Even though normally speaking utilities were never allowed,
16 correct?
17 A. Correct.
18 THE COURT: He could get the increase or the entire
19 utility amount?
20 THE WITNESS: The incremental amount of additional
21 expense caused by the grant could be classified as a direct
22 expense and not an indirect expense. Direct expenses are
23 allowed regardless of what they are. Indirect expenses are not
24 allowed.
[142] Sentencing Transcript Page 17
THE COURT: There was some testimony on utilities. He
18 got an approval.
19 MR. EVERDELL: Your Honor, I don't think there was
20 ever testimony that he got a prior approval for utilities. In
21 fact, he was told repeatedly that utilities were not allowed.
22 THE COURT: The difference between the utilities for
23 the apartment before and after the upgrade for air conditioning
24 and for the machinery --
25 MR. EVERDELL: I think the only testimony we had on
1 the record is that he tried to get an approval for the
2 utilities, but he never received one.
3 THE COURT: Mr. Rubinstein's quotes a utilities fi~~re
4 using Mr. Benedict's testimony at 1057 .. I can't find it. Here
5 it is, 1057.
6 MR. EVERDELL: I'm looking at the page he cited. Here
7 it just says -- his question is, this is Mr. Rubinstein's
8 question, and he is questioning --
9 THE COURT: And the discussions were that if he could
10 indicate the fact that there was an increase, that they could
11 be classified as direct expenses, not indirect expenses.
12 MR. EVERDELL: It says the discussions were, right,

workpapers found in the 6,636 pages of unexamined criminal discovery. Despite the drumbeat of naysaying witness testimony, at the end of the day, the witnesses were wrong, or worse, lying on the witness stand under oath. Rubinstein failed to impeach their "soft" testimony with "hard" numbers from contemporaneous documentary business record forensic evidence.

### (15)    Brady v Maryland Violation for Bates Stamped Page 5,274 and 5,348 of 6,636

The specific document allocating power was in criminal discovery document Bates stamped page 05274 and 05348, which were never cited at trial. The Prosecution was playing "hide and seek" with this material[144].[145]  This is a dual failure. It is a failure of the Defense counsel to read through and digest all 6,636 pages of discovery material. It took 5 years post indictment. This is also failure of the Prosecution because under the *Brady v Maryland* doctrine. This is because the Prosecution had a duty to bring these documents to the attention of the Defense and the Court as an exculpatory document, particularly when the discussion came up during sentencing phase of the trial by the Court  The Prosecution effectively hid the evidence in plain sight; a needle in a haystack.

### (16)    Telephone and Computer Costs Allowed

---

13 that if he could demonstrate the fact that there was an
14 increase, that they could be classified as direct expenses, not
15 indirect expenses. But there was never any approval of this.
16 So at this point none of the testimony here is talking about
17 any approval of any additional utilities, expenses, or anything
18 like that.
19 THE COURT: Sounds like approval, but not written
20 approval.
There was written approval in the audit workpapers, contrary to the Prosecutions assertions. The prosecution should have brought these audit workpapers to the Defense and Courts attention, but they did not. The schedule of allowances is in the Prosecutions' Discovery, Bates Stamped Page Prosecution Criminal Discovery Document Bates Stamped Page 5,274, and again at 5,348 never cited at trial.
[143] Sentencing Transcript Page 19
09 THE COURT: This does say the witness summarizes his
10 testimony at the end of the page. The incremental amount of
11 additional expense caused by the grant could be classified as
12 direct expense and not indirect expense. Direct expenses are
13 allowed, regardless of what they are. Indirect expenses are
14 not allowed.
[144] Banks v. Dretke, 540 US 668, 696 (2004)
[145] Id. at 695 ("Our decisions lend no support to the notion  that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.").

Once the 6,636 pages of prosecution discovery was OCR'ed (Optical Character Recognition) and could be searched for keyboards, a number of allocations and allowances made by the OIG became findable. The auditor's workpapers showed Telephone, Cable and Computer costs allowed or allocated.[146]

### (17)    Naysay Witnesses impeached by GX114 Analysis

The quality of the prosecution 'naysay' witness testimony is impeached by the hard forensic evidence revealed here. Defense Counsel only partially impeached trial inculpatory witnesses. Had Defense Counsel adequately prepared for this case the witnesses would have been completely impeached. The implicit new evidence the GX114 analysis above contradicts the prosecution various witnesses' assertions that Karron acted illegally and without authorization or justification. The existence of these documents should not have remained buried in the discovery. This information must have been known to the Prosecution.

### (18)    Hard exculpatory evidence trumps soft inculpatory evidence

The existence of payments for indirect costs is not evidence of a crime.

The use of federal funds in the custody of Karron for unauthorized payments is a crime under §666.

Because the nature of the ATP budgeting process, costs are shared by co-mingled government and personal funds.

The existence of payments for indirect costs is not meaning these payments were disallowed.

The payments need to be made with ATP funds.

Total costs exceeds Government funding by XXXXX; Karron funding is the only source.


This needs work; witnesses say illegal payments

Proof of allowances

Payments are not illegal/not allowed

---

[146] Bates Stamped Discovery Pages a-5347ff

**Witness impeachment**, in the <u>law</u> of <u>evidence</u>, is the process of calling into question the credibility of an individual who is testifying in a <u>trial</u>.

    (19)      Conclusions

## 12. No government funds were misappropriated
## 13. Karron Funds were used to make the Budgeted Match on Direct Costs
## 14. Karron Funds were used to pay Indirect Costs
## 15. Many normally Unallocable Costs were reclassified or otherwise allowed or considered allowable
## 16. No Crime actually happened due to Karron co-funding

    (3)      **Ground THREE: (Brady Violation) Conviction foundation laid on erroneous, misleading, and false data causing plain error**

    (20)      **Setting the stage for Brady violations by the OIG Special Agents**

The OIG special agents, after 5 years of fruitless investigation, revealing no prosecutable crime, crossed the ethics line sometime in early 2007. Prior to the expiration of the Statute of Limitations, Defendants' predecessor counsel Peeler managed to convince a succession of prosecutors that there was no case, but at extraordinary cost to the Defendant and Defendant's family. The defendant also discovered she was being blackballed and badmouthed in the Washington rumor mill. This was as the statute of limitations was about to expire.

    (21)      **The Prosecution explicitly and implicitly suppressed exculpatory evidence and action on the part of the OIG**

Possible actions on the part of the DoC OIG to induce the Department of Justice Prosecutors and Grand Jury would include the creation of inculpatory evidence, and the suppression exculpatory evidence. These actions may have rewarding the OIG auditor Riley for creating a false or copied 'joint'[147] audit with a Silver Medal in 2005[148]. One can reasonably

---

[147] Joint implies Hayes, because of the copied system of errors discovered.

consider that the OIG coerced witnesses' inducements or threats to Hayes, and Benedict. At the very least, the government compensated these witnesses to appear at trial. The record of compensation, *qui tam*[149] agreements, or non-prosecution agreements was never brought to the attention of the Defense. The payment of witnesses, understandings, and protection afforded or implied to witnesses must be documented. The OIG may have suggested, rehearsed, cajoled or coerced false inculpatory testimony from Lide, Benedict, Snowden, Gurfein and Spring[150], and suppressed exculpatory affidavits or scared off exculpatory testimony from Marc Stanley, Jayne Orthwein, Amiee and Nat Karron, Chaya Levin, Jill Feldman C.P.A., Peter Ross, Margret "Daniel" Ferrand, and Professor James Cox. Some of these potential witnesses later reported to Karron in details their interviews with OIG Special Agents. Some Defense witnesses were "spoliated" by being called to the court by the Special Agents, and not knowing any better, and sat through the trial proceedings. The field notes for these contacts must examined to evaluate if a *Brady* violation did occur.

**(22)   Specific suppression of Exculpatory Actions implies suppression of Exculpatory Evidence**

The OIG created the misappropriation crime when it saw ATP trying to assist Karron and CASI. ATP prided itself on helping is grant recipients, and stated so as a matter of policy at its public solicitations.[151] Had these allowances been admitted by the ATP and a new budget been granted, there would be no crime and no case against Karron. The Jury considered these issues in its callback request for ""...no[n] approved subsequent budget revisions...",[152] Had the evidence and knowledge of specific documented exculpatory actions, evidence and decisions been known to the Jury there would have been no criminal foundation for the Petitioners' conviction.

---

148 57th Honor Awards (2005), Letter May 16, 2008 from Prosecution to Defense. "This letter provides notice, pursuant to Federal Rule of Criminal Procedure 16 (a) (1) (G) and Federal Rule of Evidence 702, that the Government may offer the expert testimony of Certified Public Accountants 1) Joan Hayes and 2) Belinda Riley. ... 2005 DOC Silver Medal Award for Meritorious Federal Service "For conducting a complex and unique **joint** audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT."

149 "*qui tam pro domino rege quam pro se ipso in hac parte sequitur, meaning* "[he] who sues in this matter for the king as [well as] for himself." A writ of *qui tam* is whereby a private individual who assists a prosecution can receive all or part of any penalty imposed. *e.g.* False Claims Act, 31 USC.§3729 *et seq*

150 The witness testimony vitiated or rendered false by implicit allowances in the Audit papers and GX114

151 See Marc Stanley Lecture and Question and Answer session of April 15, 2007 in the Declaration of Eisen.

152 Trial Transcript Page 1371 Line 3

## 17.   OIG Wedged Budget Negotiations

Prior to the expiration date that CASI had to respond to its adverse Draft Audit Report,[153] and after it made an initial inquiry to request an Audit Resolution Conference with ATP Grants Office, the OIG ordered all contact with CASI to go through them.  E-mail traffic reveals the OIG Special Agents were behind the scenes and had wedged budget negotiations as early as Winter/Spring 2003.

## 18.   OIG Starts formal grand jury investigation

This remarkable piece of e-mail became known during the Trial under cross-examination of Lide by Rubinstein, *viz:*

```
Q. …  Can you read the entirety of that e-mail?
A. Certainly. The date is October 1, 2004. "The Department of Justice
has formally initiated a grand jury investigation regarding the NIST
ATP award made to Computer Aided Surgery.  In order to ensure that DOJ
and the Inspector General's office are able to complete a thorough and
timely investigation, we are requesting that all NIST" -- "all" is all
in caps -- "NIST personnel cease contact with Computer Aided Surgery
(CASI), Dr. Karron and all CASI representatives. ..
A. "Additionally please do not proceed with the audit resolution for
CASI.  It is extremely important that a bill not be generated for the
funds that CASI misappropriated from the award. Please contact me if
there are any further concerns or questions. I look forward to working
with all of you over the next few months. Thank you."
Q. And who wrote that e-mail?
A. Rachel A Garrison, special agent.
THE COURT: For the Department of Commerce?[154] [Emphasis Added]
```

What this "instruction"[155] reveals is that the OIG was already seeking to lay a foundation for a criminal case, even when virtual all of the sought exculpatory understandings and agreements were already granted.[156]  The OIG specifically sought to block any civil remedy, and force the criminal case.  The OIG was seeking to criminalize otherwise previous allowed non-

---

[153] Government Exhibit GX62:  Memorandum Aug 25, 2004, Final Audit Report No. ATL-16095-4-0002. "We are attaching a copy of the subject audit report for your action in accordance with DAO 213-5, "Audit Resolution and Follow-up." The original report has been sent to the auditee / recipient, who has thirty (30) days from the date of the transmittal to submit comments and supporting documentation to you." ..[comments and supporting documentation was forwarded, as well as verbal requests for Audit Resolution Conference ...and then sixty (60) days to respond... Taking this well past the October 1, 2004 e-mail above.
[154] Trial Transcript Page 242 Starting at Line 2
[155] Trial Transcript 247 Line 22, Lide .. My instructions were to cease contact. And I follow instructions
[156] Rent, Power, Computer Communication and Telephone, Office Clerical and some misc.  Over-co-funding vitiates all other reimbursement claims against the government funds.

criminal permissible civil behavior.[157]   The evidence of these suppressed allowances demonstrates that the OIG expertly managed its' witnesses parade against Karron to recant exculpatory e-mail and memorandum's they produced[158], may have perjured themselves *en mass*, a remarkable *fete* of social engineering on the part of the OIG.

## 19.   OIG did not suppress all clues of prior exculpatory understandings

The Defendant/Petitioner argues here that the OIG did not manage to suppress all clues of exculpatory evidence, including ATP audit allowances and preparation for a civil Audit Resolution.  The **entire** foundation for the Defendant's **refusal to heed the advice from unqualified bookkeepers and uninformed project managers** would have been vitiated had evidence that Karron's negotiations on rent and utilities was actually acted upon and was part of the next proposed budget.  There **must exist evidence** of that proposed budget.

## 20.   Hayes unstable figures to OIG covered Hayes payroll misappropriation

The smoke and "Hayes" created confusion only covered her possible culpability in potential crimes on Hayes' part, namely theft of withholding taxes[159] and deftly setting up Karron to take the fall for the actions of Hayes as CASI/Karron accountant and 'independent' auditor.

## 21.   Had budgets in process been approved there would be no criminal case

Had that budget with the allocation been approved, there would be no case against Karron. There was no reason they could not have been approved.  There was no sound reason

---

[157] Overcriminalization" describes the trend in America ...to use the criminal law to "solve" every problem, punish every mistake (instead of making proper use of civil penalties), and coerce Americans into conforming their behavior to satisfy social engineering objectives. Criminal law is supposed to be used to redress only that conduct which society thinks deserving of the greatest punishment and moral sanction.  But as a result of rampant overcriminalization, trivial conduct is now often punished as a crime.  Many criminal laws make it possible for the government to convict a person even if he acted without criminal intent (i.e., *mens rea*). http://www.overcriminalized.com/

[158] In particular GX 3506-A and especially GX3506-B; following through GX3506-E

[159] A nagging problem is the collateral IRS investigation as to the second project year payroll taxes, which Hayes personally managed, and who blocked resolution of, that was never brought to light in this matter and which is now a quarter million dollar tax lien against Karron. <<CITATION>>

that this case had to become the travesty of justice it now appears to be. Why did so many non-professional people turned on Karron? Does **discrimination** play when they discovered that the male Dr. Karron was a female to male transsexual? Did they feel Karron lied to them? Was there an element of moral outrage in the success of the prosecution social engineering?    No professional colleagues turned on Karron. Prof. Cox reported the OIG attempted to coerce him to say things he refused to say. They spoliated his potential testimony to the Defense by telling him to report to court, where he sat in the audience for the trial proceedings.   Had the hard evidence of these allowances been brought to the attention Jury, they could not have found the Petitioner guilty. The OIG created an injustice by gaming the system to the detriment of the Defendant.

### (23)    Adversarial Pressures discourage Brady Compliance

Adversarial pressures on prosecutors discourage *Brady*-compliance,. Further *Brady* compliance is discouraged by the judiciary's permissive interpretation of the prosecutor's duty under *Brady*, which required a prosecutor to make a prospective, pretrial determination as to the probative value of certain evidence in his possession that might be materially favorable to the accused and to immediately disclose that evidence.[160]   However, this prospective duty of the prosecutor mutated into a retrospective, post-conviction determination by an appellate court as to whether the prosecutor's nondisclosure, in the context of the entire record at trial, makes it reasonably probable that, had the evidence been disclosed, the defendant would have been found not guilty.[161]   By adopting this retrospective, post-trial standard to define the scope of the defendant's constitutional right to certain evidence prior to trial, the Court made it increasingly easy for prosecutors to evade their *Brady* duty.   This can be done by simply by claiming that given the strength of their case, and the confidence they had in the quality of their evidence, they believed that it would be inconceivable that any evidence they possessed might 'reasonably' be viewed as so favorable to the accused that this evidence could cause a not guilty verdict.[162]

---

[160] US v. Coppa, 267 F.3d 132, 141 (2d Cir. 2001)(suggesting that Court in Brady "appears to be using the word 'material' in its evidentiary sense, i.e., evidence that has some probative tendency to preclude a finding of guilt or lessen punishment").
[161] Bagley, 473 US 699-700 (Marshall, J., dissenting)(Brady duty defined "not by reference to the possible usefulness of the particular evidence in preparing and presenting the case, but retrospectively by reference to likely effect the evidence will have on the outcome of the trial").
[162] Scott E. Sundby, Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland, 33 MCGEORGE L. REV. 643, 653 (2002).

(24)        Prosecutors encouraged to game the system

Under this perverse standard of constitutional due process, a prosecutor is encouraged to play games,[163] i.e., to

- "gamble" and
- "play the odds,"[164] to
- "bury his head in the sand,"[165] play
- "hide and seek" with the accused,[166] and require the accused to undertake a
- "scavenger hunt" for hidden Brady clues.[167]

And further emboldening a prosecutor to evade Brady with impunity is the knowledge that the undisclosed evidence probably will remain hidden forever,[168] and that even if the evidence ever does surface, the obstacles to a defendant successfully using it are daunting.[169] Brady violations are the a principal cause of convictions of innocent persons.[170] the widespread incidence of Brady violations is also a matter of increasing concern to the courts. Dozens of

---

163 Bennett L. Gershman, Litigating Brady v. Maryland: Games Prosecutors Play, 57 CASE W. RES. L. REV. 531 (2007).
164 Bagley, 473 US at 701
165 US v. Giovannetti, 919 F.2d 1223, 1228 (7th Cir. 1990). See Gershman, supra note 125, at 551 ("The prosecutor's claim of ignorance as an excuse for compliance with Brady resembles a defendant's claim of ignorance as an excuse to avoid criminal liability.").
166 Banks v. Dretke, 540 US 668, 696 (2004)("A rule thus declaring 'prosecution may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendant due process.").
167 Id. at 695 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.").
168 Imbler, 424 US at 443-444 (White, J., concurring)("The judicial process will by definition be ignorant of the violation when it occurs; and it is reasonable to suspect that most such violations never surface."); US v. Alvarez, 86 F.3d 901, 905 (9th Cir. 1996)("the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable");
US v. Oxman, 740 F.2d 1298, 1310 (3d Cir. 1984)("[W]e are left with the nagging concern that material favorable to the defense may never emerge from secret government files."), vacated sub nom. US v. Pfaumer, 473 US 922 (1985)(mem.). See also Elizabeth Napier Dewar, A Fair Trial Remedy for Brady Violations, 115 YALE L. J. 1450, 1455 (2006)("Defendants only rarely unearth suppressions"); Stephen A. Saltzburg, Perjury and False Testimony: Should the Difference Matter So Much?, 68 FORDHAM L. REV. 1537, 1579 (2000)(arguing that in most cases "withheld evidence will never see the light of day"); Bibas, supra note 106, at 142 ("Because Brady material is hidden in prosecutors' and police files, defense lawyers probably will never learn of its existence. Most defendants lack the investigative resources to dig up Brady material.").
169 Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)(imposing stringent pleading requirements imposing on plaintiff need to show that claim is facially plausible and contains sufficient factual content that allows court to draw reasonable inference that defendant is liable for misconduct).
170 Weinberg, supra note 134 at 2 (noting that in 28 cases involving 32 defendants, misconduct by prosecutors, including suppression of exculpatory evidence, led to the conviction of innocent persons); US v. Jones, 620 F. Supp.2d 163, 170 (D. Mass. 2009)(noting that 'in response to a disturbing number of wrongful convictions resulting in death sentences, in 2002 the Illinois Commission on Capital Punishment recommended that the Illinois Supreme Court 'adopt a rule defining 'exculpatory evidence' in order to provide guidance to counsel in making appropriate disclosures."); Bennett L. Gershman, Reflections on Brady v. Maryland, 47 S. TEX. L. REV.685, 688 n. 18 (2006)(listing several cases in which a prosecutor's suppression of exculpatory evidence led to the conviction of innocent persons).

cases in the federal courts since 2007 have found serious Brady violations.[171]*Brady Cases and treatises, below*

   In US v. Jones,[172] US District Judge Mark L. Wolf castigated the federal prosecutor for her "egregious" Brady violation, stating that "this case extends a dismal history of intentional and inadvertent violations of the government's duties to disclose in cases assigned to this court."[173] Judge Wolf appended Appeals and Federal District Courts in which the courts vacated convictions for serious *Brady* violations.[174] And in two recent highly-publicized prosecutions – the Duke Lacrosse case and the federal trial of then-Senator Ted Stevens – Brady violations were discovered that were so serious as to result in the conviction of criminal contempt and disbarment of the Duke prosecutor, Michael Nifong, [175]. A most egregious further example is the federal district court's vacating of Senator Stevens' conviction, dismissing the charges, the commencing criminal contempt proceedings against six prosecutors for obstruction of justice.[176]

   **(25)    Setting the stage for Brady Violation: Politics and the ATP program under attack, and ultimately terminated.**

   The NIST ATP program, a child of the Clinton Administration, came under attack of the first Bush White House[177]. The administration's goal is to improve the program out of existence. Program staff was afraid for their jobs. A number of other grant recipients were similarly attacked in audit findings. Prior to Karron's conviction, no grant recipients were ever convicted.

---

[171] For recent cases in the US Supreme Court involving Brady violations, see Cone v. Bell, 129 S. Ct. 1769 (2009)(remanded for hearing into prosecutor's suppression of evidence regarding seriousness of defendant's drug problem); Youngblood v. West Virginia, 547 US 867 (2006)(suppression of evidence indicating that testimony of key witness was false).

[172] 620 F. Supp.2d 163 (D. Mass. 2009).

[173] Id. at 165

[174] Id. at 185-193

[175] Duff Wilson, Hearing Ends in Disbarment For Prosecutor in Duke Case, N.Y. TIMES, June 17, 2007, at 21; Shaila Dewan, Duke Prosecutor Jailed; Students Seek Settlement, N.Y. TIMES, Sept. 8, 2007.  See North Carolina State Bar v. Michael B. Nifong, No. 06 DHC 35 (June 16, 2007).

[176] US v. Stevens, Cr. No. 08-231 (D.D.C. April 7, 2009)(Motion Hearing)(Docket No. 372). (district court appoints special prosecutor to investigate and prosecute the matter). Id. at p. 46-47.

[177] WWW.expectmore.gov : The purpose of the Advanced Technology Program is to fund the development and commercialization of high-risk technologies through co-funding R&D partnerships with the private sector.  RATING: There is little need for the program. There are other available funding sources for the development of high-risk technologies, including venture capital and other private-sector sources. It is not evident that the program has a unique or significant impact on its intended purpose. IMPROVEMENT PLAN We are taking the following actions to improve the performance of the program:  Working with the Administration and Congress to terminate this program.

Following Karron's conviction, and without the protection of the defunct ATP program other grant recipients have since pled guilty to felony misappropriation. As OIG Auditor Riley mentioned at her site visit "We get most of our business from ATP". Only Auditor Riley, despite two field audits, never did an audit in this case. Is this politics?

### (26)    Undue influence of Hayes on Budget and Audit Negotiations

Hayes, seeking to protect herself from Karron for bad accounting, may have attempted to turn on Karron and become a whistleblower. She apparently contacted the OIG sometime in the early winter or spring of 2003, while simultaneously endlessly extending and promising completion of the ATP audit. Prior to this time, negotiations were progressing well, with most issues being resolved during negotiations. Power, utilities, and rent were reclassified. A new budget was about to be ratified.

However, Hayes was not happy. She wanted excessive control over Karron and CASI. During this period, Hayes was gossiping with ATP's Snowden and OIG's Garrison-Ondrik, and keeping this secret from her client, CASI and Karron. Hayes continuing to meddle with CASI affairs well after the project suspension through the winter of 2003[178]. She had given a copy of the hostile audit report to the OIG auditor Riley at her first site visit in June 2003<<CITATION INTO TRANSCRIPT>>, while continuing to claim to Karron that the report was not done until the last day it could be submitted under AICPA rules, Sept 29, 2003<<CITATION>>.

### (27)    Authority for Allocations negotiated

The authority for these early ATP allocations comes from the White House office of Management and Budget rules for Allocability. For example, under OMB A-21, Cost Principles, costs charged to a project must meet the following criteria:

1. Allowable under the cost principles of A-21 and under the terms of the specific award;
2. Allocable in that the cost can be associated with a high degree of accuracy to the sponsored project; and
3. Reasonable in what a prudent person would pay for the item in a like circumstance

---

[178] CASI Payroll Checks, funded by Karron, started appearing with Hayes name on the masthead.<<CITATION>>

All of the Allocations and Allowances NIST ATP granted CASI meet these requirements. As a small single project entity, with complete primary records, NIST ATP had no reason not to do so.

**(28)      The OIG did NOT do an audit.**

Did Hayes do an audit of CASI? She plainly wore too many hats to be independent, and she was downright hostile. Did Riley copy the Hayes Audit? Curiously, Riley volunteers this affirmation despite it not being asked by Rubinstein.

> `"I did not take Joan Hayes' report and copy the numbers to come up`
> `with this."` [179]

Riley admits she did not even to the most basic step of an audit, reconciliation of bank statements.

```
24 Q. Did you do a bank reconciliation of the various bank accounts
of CASI?
1 A. For this, for this audit?
2 Q. Right.
3 A. No.
1 (At the sidebar)
2 MR. KWOK: Grounds?
3 MR. RUBINSTEIN: The grounds -- these are some summary, some
documents that she [RILEY] doesn't have, that she's unaware of, and
she came up with these numbers from where we will never never know
because we don't have original source documents to look at, judge.
She clearly relied upon other people's work to determine the cost.
It's hard to believe that someone could be an auditor and not
reconcile bank accounts that probably had less than 500 checks in
total, for the period that we're talking about. [180]
```

Rubinstein was wrong. We can now know the source of Riley's numbers because she copied Hayes numbers with their tell tail errors into her report without verification. The unique system of errors in Hayes' number 'fingerprint', like DNA analysis, the source of Riley's numbers. Dunlevy, Defense forensic bookkeeper noted in her forensic analysis, the first thing an

---

[179] Trial Transcript Page 473 Riley - direct
6 The -- I used the records that they provided and,
7 including Joan Hayes, what Joan Hayes had provided to come up
8 with the numbers for this. **I did not take Joan Hayes' report**
**9 and copy the numbers to come up with this.**
[180] Trial Transcript Page 473ff: Riley - direct

auditor would do is verify the Payroll expenses, the largest expense of a project. Clearly, Riley copied previous results, or someone else did for her. Her annotated trial testimony transcript is in the appendix below.<<CITATION>>

We can conclude that Riley, as the OIG designated field auditor did not actually do an audit of CASI, she copied large sections, if not the entirety of it. Was Riley's' conscience bothering her? Hard numbers from Dunlevy's forensic reconstruction and analysis say she copied. The patterns of Riley OIG errors match the pattern of Hayes errors, much as hard forensic fingerprints or DNA evidence can overcome soft witness testimony and result in the overturning of convictions. The OIG did not do an Audit. It was a lynching.

(29)    **Daubert Standard Violated by Riley not raised by Rubinstein**

The Daubert standard[181] is a rule of evidence regarding the admissibility of expert witnesses' testimony during trial. Pursuant to this standard, a The Defense should have raised a Daubert motion when Riley revealed she had not done an audit[182]., A Daubert motion is a special case of motion *in limine* raised the presentation of unqualified evidence to the jury by expert witnesses. Expert testimony with Daubert/Federal Rule of Evidence 702's requires that all expert testimony be subject to a stringent reliability test. Rubinstein clearly failed to inhibit Riley's testimony in the face of her stunning admission.[183]

## 22.  Daubert Gaps in experts chain of inference

As Daubert jurisprudence evolves, it becomes clearer and clearer that the debate is frequently about "gaps" in the expert's chain of inference. Failure of the government auditor to reconcile accounts is such a gap. Trial courts have little or no discretion in determining whether a jury could legitimately bridge them. Riley's testimony should have been stricken from the record. Rubinstein let it stand and retired in disgust<<CITATION>>. For multiple reasons, Riley had no basis in a forensic audit for her assertions without having reconciled accounts for

---

[181] Bernstein, David Eliot, Expert Witnesses, Adversarial Bias, and the (Partial) Failure of the Daubert Revolution (February 2007). Iowa Law Review, Forthcoming; George Mason Law & Economics Research Paper No. 07-11. Available at SSRN: http://ssrn.com/abstract=963461
[182] Trial Transcript Page 473  Line 24 Q. Did you do a bank reconciliation of the various bank accounts of CASI? A "For this audit ?" Q: Right A: No
[183] Peter J. Neufeld, JD. (July 2005) The (Near) Irrelevance of Daubert to Criminal Justice and Some Suggestions for Reform , Vol 95, No. S1 | American Journal of Public Health S107-S113 DOI: 10.2105/AJPH.2004.056333

which she based her assertions.  Reconciliation of bank and credit card accounts as the very first step in any audit.  After an audit is made then an auditor can conclusory statements from her audit findings.  The problem is Riley made conclusions without reconciliation, and by copying statements from Hayes (including errors).

### (30)      OIG Auditor False Sworn Affidavits, secret joint award

OIG Auditor Riley won a secret silver Department of Commerce Medal award in 2005.  This was not listed on the award publicity brochure.  It was listed on the expert witnesses' resumes.[184]

### (31)      Other Evidence of Brady Violations

The OIG interviewed everyone in Karron's life during and prior to this period.  Some of these people reported their contact with the OIG to Karron.  Many of these interviewees reported signing affidavits.  Some of these affidavits were exculpatory in nature and never brought to the attention of the Defense.  Witness Lee Goldberg memorialized his coercive interview in a memorandum to Karron, in which he said the OIG asked leading questions about his investment in CASI and Karron.  Further he reported being questioned about sex with Karron and if there was a *quid pro quo* for sex with Karron. Other interviewees' reported that they were made fearful that they would get in some kind of "trouble" if they did testify in court.  The OIG coerced witnesses to 'get on board' against Karron or succeeded scared them off and denying their exculpatory evidence at the trial.  The following potential witnesses reported OIG interviews and may have provided exculpatory evidence not provided to the Defense at trial.

- James Cox, Ph.D. (CASI colleague and Brooklyn College CUNY Professor extensively and coercively interviewed by OIG)
- "Caren" Chaya  Levin (Former CASI Bookkeeper who contacted Karron after being Interviewed by OIG)
- Peter Ross, PhD (Described OIG interviewing)
- Margret Ferrand (CASI Cleaning and Clerical Contractor)
- Jill C. Feldman (CASI Accountant)
- Amiee Karron-Idan (Family)
- Nathaniel Karron (Family, deceased)

---

184

The OIG should have revealed the existence of other affidavits and witnesses to the Defense, even if they felt that the testimony was immaterial or false[185]

### (32)   Nondisclosure was serious enough that there is a reasonable probability that suppressed evidence would have produced a different verdict

The Prosecution failed to disclose the ATP reclassification of the Rent checks and the allocation of the power invoices.  These two issues are among the most the two most serious of the that convicted Karron, creates the very real probability, if not possibility, that Karron was convicted of 'stealing' her own funds out of the Personnel Budget Line A.

### (33)   Verdict worthy of confidence

The post-conviction revelation of clues that point to suppressed exculpatory evidence casts the jury's guilty verdict into question.  Had the Jury known that the NIST ATP had in fact acceded to Karron's requests they would not have rendered the same verdict.

### (34)   Conclusions

A materially erroneous audit admitted at trial as expert testimony[186].  A final audit report OIG, which is festooned with math errors small and large.  The audit expert wins a silver medal for doing this faulty joint audit copied from a hostile audit.  What kind of accounting organization does this?  Was this political or discriminatory?

There was never an independent done audit by anyone in this case: until now.  The audit was a lynching.  The few foundational numbers presented by the Prosecution at trial are now suspect.  The evidence of previously agreed to allocations and reclassifications was suppressed by the OIG, and by the Prosecution.  The Defense counsel never attacked these material errors to his clients' detriment.  Nevertheless, The OIG and the Prosecution must have suppressed a lot of

---

[185] Disimone v. Phillips, 461 F.3d 181, Docket No. 05-6893-pr (2d Cir. Aug. 22, 2006). Prosecutor cannot avoid Brady obligation by claiming that he did not believe witness's exculpatory statement.  Op. 23 "If the evidence is favorable to the accused, then it must be disclosed, even if the prosecution believes the evidence is not thoroughly reliable." Id. "To allow otherwise," the Circuit concludes, "would be to appoint the fox as henhouse guard." Id.
[186] Trial Transcript Page 475:  Riley – direct: at sidebar conference with COURT
12 MR. KWOK: Your Honor, we offer her as an expert
13 witness under Federal Rules of Evidence 703. Underlying
14 documents that an expert rely upon does not have to be
15 admissible.

evidence, but not so thoroughly enough that some prior truth is still visible in the crudely hacked numbers in GX114 with only a little bit of thinking and arithmetic. Now is the time to review this missing suppressed material.

Had the Jury know about all of this goings on behind the scenes would they have had the same confidence beyond a reasonable doubt in the government numbers as to indict the Defendant?

### (4)    Ground FOUR: Ineffective Assistance of Counsel

In all criminal prosecutions, the accused shall ...; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.
***Amendment VI of the Bill of Rights***

The Constitution guarantee of Assistance of Counsel was denied the Defendant trial defense. The Defendants' Sixth Amendment right to effective assistance of counsel <u>fails</u> under the two-pronged test set forth in *Strickland v. Washington,466 US 668 (1984)*, which requires a convicted defendant to show that

(1) "that counsel's representation fell below an objective standard of reasonableness...under prevailing professional norms," and
(2) "that the deficient performance prejudiced the defense," *i.e.,* "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

By each and every of the applicable ABA models rules of professional conduct[187], at pivotal trial events, Rubinstein fails. By Because of these failures, he directly caused a miscarriage of justice.

### (35)    Background to IAC Argument

Early in the case the Court and Karron had no sense of what direction Rubinstein was going to pursue in his Defense. He missed key pre-trial opportunities to conduct Discovery, and to prepare a comprehensive forensic accounting defense. He kept assuring the Defendant that her innocence was apparent, and the government had no real case. That is because, as it would

---

[187] Model rules of professional conduct By ABA Center for Professional Conduct, Center for Professional Responsibility (American Bar Association) 2009 Edition

later become clear, Rubinstein had no idea himself. Rubenstein thought he could "fly by the seat of his pant", or "wing it" in the face of the Prosecution. Because of this, he missed the many holes and contradictions in the OIG accounting, or where he did notice it, he did not make advantage of the many flaws in the Government's case. Absolute worse, he rested at the fateful sidebar on Tracing of Funds and the OIG Auditor revealed she, essentially, did not do an audit.[188] He rested when he surrendered at the key juncture that should have fought.[189]

### (36)    Background to Rubinsteins taking the Karron case

Rubinstein was retained by Karron on May 8, 2008[190]. In retrospect, Rubinstein underbid the case to Karron, to win Karron as a client, or out of a quixotic sense of Justice. Karron never considered the possibility of a criminal conviction because of the assurances Spitz[191] and Dunlevy[192] who had worked on the case for years. They assured Rubinstein that there was no basis for misappropriation based on their analysis of Karron's spending and funding. They were approved by the court as experts[193], but Rubinstein failure to engage these experts.

> Mel Spitz is a C.P.A., Certified Public Accountant. The government has notified defense counsel ofits intention to offer the testimony of both Joan Hayes and Belinda Riley, who will be testifying about "generally accepted accounting principles and auditing procedures that they followed and applied in the course oftheir work relating to Computer Aided Surgery Inc. ("CASI"). *See* Exhibit A "Letter dated May 16,2008, attached hereto."

> In 2003, CASI hired Mel Spitz as an accountant. At one time, Mel Spitz, on behalf of CASI, met with Belinda Riley, the government's expert witness, to compare and try to reconcile his accounting results performed for CASI with the accounting results achieved by Belinda Riley. It is anticipated he will testify to the discrepancies between his work and the government's expert witness. The government and Belinda Riley have in their possession and are familiar with the work product that Mel Spitz achieved as it was attached as Appendix III to the Final Audit Report prepared by Belinda Riley and the OIG.[194]

### (37)    OIG seizes All CASI / KARRON computers, and ALL Defense Evidence

---

[188] Trial Transcript Page 473ff Line 24 *et seq*
[189] Trial Transcript Page 811 Line 18
[190] , with personal check 5241 for 5,000.00, Karron Exhibit <<CITATION>>
[191] GX62, CASI  Response to OIG Draft Audit Report, Prepared by Spitz, Appendix III, Page 26ff of 68
[192] DX XXX, DX-XXX-1, DX Z, DX ZZZ, DX ZZZ-1, Trial Transcript Page 24 Line 10, Page 1164ff Line 19 on, Page 1172 Line 18, Dunlevy Declaration
[193] US v. Daniel Karron, 07-cr-00541 Docket Item 46
[194] Ibid Page 2, Paragraphs 6 and 7

Karron had 16 terabytes of contemporaneous business and personal records in her Defense. Then the Government seized all of the Defendant's records in the guise of recovering program computers and civil forfeiture. They took every computer in the Defendant's apartment, along with the Backup tapes, without regard to the source of funds that paid for it[195]. The cost of defense started to explode.

### (38)   Rubinstein's Response to initial Discovery Material and Defendant efforts to help prep

Rubinstein's reaction to the initial discovery disclosure of some 6,636 pages, declared he would not spend out of pocket. The Defendant sought to assist Rubinstein in all ways possible. The Defendant is highly skilled in computer science. The Defendant endeavored to prepare Rubinstein for the trial. The Defendant scanned and OCR'ed[196] the entire submission. The Defendant was able to navigate the discovery and made important findings. Rubinstein did not or would not pay attention until it was too late.. Rubenstein ignored the Defendant's computer forensic help as well as the Defendant's recovered data from the OIG Disk images, Completed in March 2007. Rubinstein instead chose a cheap intent based defense, instead of a more expensive forensic accounting based defense strategy.

### (39)   Rubinstein Plays "Chicken" with Defendant and Court

Rubinstein blundered into this case unprepared. He was unprepared on purpose. He was playing a dangerous 'game of chicken'[197] with his client and clients family. He repeatedly stated would not do any preparation on this case until he was paid.[198] He was betting his professional reputation and standing in the court to pressure the Karron family for more money. The Defendant was furiously sending him e-mail containing key documents, statutes, material to put into evidence. He made a show of not doing his pre-trial homework to pressure the defendant until he was paid. He further upped the stakes by applying to the court to be relieved of the case unless he was paid[199]. He was apparently conflicted by his desire to defend and greed that

---

[195] GX 120
[196] Optical Character Recognition, or Rendered the page images into searchable text.
[197] The game of chicken is a model of conflict between two players in game theory. The principle of the game is that while each player prefers not to yield to the other, the worst possible outcome occurs when both players do not yield.
[198] Affidavit of Abe Karron<<CITATION>>
[199] See Below

crippled his defense by lack of preparation.  He then made an unprofessional public showing of refusing to prepare for trial until he got an additional retainer via the court through the sale of the Defendant's apartment.  On March 17, 2008 asked the court to be relieved as Defense counsel, *viz:*

> ...Trial is presently scheduled for June 2, 2008, and substantial time must be spent on preparation. I am not confident the sale will take place before the start of trial and I find it unconscionable to prepare and try this case without prior compensation.
>
> Thus, [i]n light of the foregoing facts, I respectfully request to be relieved from defending this case because of the heavy financial burden and time it will take away from my other clients'[200]

The apartment was contracted for sale as of April 2, 2008[201] On May 21, Rubinstein wrote the Court, *viz*

> Dr. Karron's contract to sell was executed and the closing date is May 28, 2008. At the May 19,2008, status conference, counsel requested the Court modify its prior order to permit the firm of Rubinstein & Corozzo, LLP, to receive at the closing a check in the amount of $1 00,000 out of the proceeds of the sale with the balance, after closing costs, to be paid to the US Marshal's service subject to further order of this court.
>
> Counsel agreed to accept this amount for the pre-trial work already performed and all work up to trial on June 2, 2008. The defendant in open court consented to the Court granting this order. The government has no objection.
>
> Please accept this letter as a request for an order granting the direct payment 0£$100,000 to Rubinstein & Corozzo, LLP, for the firm's pre-trial services, from the proceeds of the sale of Dr. Karron's apartment, 4 N, 300 East 33'd Street, New York, New York, 10016.

This closing was May 28.  The trial commenced June 2, 2007.  This left only **Four** days for Rubinstein to become prepared.  This created an irreconcilable conflict between Counsel and Client.  Rubinstein went into the trial with only four days preparation.  The pre-trial preparation was paid for per above.  Rubinstein resented running up a bill for the trial days.  Rubinstein did not keep any timesheets or time records prior or since.  Rubinstein was under his own gun to conclude the trial early, cheaply and quickly.  This led to a succession of completely unreasonable weak and poor defense strategies and decisions to the detriment of the Defendant. Rubinstein grossly underestimated the cost of defending his client, and made poor decisions about how to defend Karron based solely on preserving his own portion fee at the expense of his clients.  Rubinstein bet that he could get more money from the Karron family.  Rubinstein bet the court to get his the proceeds from Court ordered sale of Karron's apartment, and got the funds

---

[200] *US v. Daniel Karron, 07-cr-00541 Docket Item 34*
[201] *US v. Daniel Karron, 07-cr-00541 Docket Item 36*

too late.  Rubinstein lost because he sacrificed his client, and ultimately his professional reputation.  Counsel was conflicted, and would not focus even during the trial.  Because of this Karron was denied her constitutional right to Counsel.

### (40)      Rubinstein pursued an unreasonably wrong defense strategy

The overarching theme of Defense Counsel's strategy was to prove that the Defendant had no criminal intent[202].  This was a fatal strategic flaw in this case.  It is an unreasonably wrong strategy under the *Strickland* criteria[203] in light of *Urlacher*.  Rubinstein made a unreasonably wrong and unprofessional decision not to prepare for the case.  He rejected help from the Defendant and from the Defendant's forensic team.  Further, he did not do any legal research.  Had he done so, he would have been prepared to deal with the *Urlacher's* precedential standard and not blundered into it and whine about how unjust it is.

### (41)      Rubinstein was dangerously computer illiterate and tried to hide this until it was too late.

Rubinstein's desperate computer illiteracy, which he tried to conceal, also caused him to make unreasonable decisions.[204]  Rubinstein, in retrospect, should have pursued a forensic based defense to show that there unaccounted costs or misappropriations.  But it is now apparent that Rubinstein was incapable of managing the amount of paper common in evidence intensive modern white collar defense.  Rubinstein did not study or understand the forensic defense.  He had no clue about how to use the data on the Defendant's computer.  His reputation as a blue-collar criminal lawyer was legendary within the family.  However, the defendant has come to learn his deserved reputation for white-collar defense is bad.

### (42)      Rubinstein failed to engage forensic expert witnesses standing by.

---

[202] Trial Transcript Page 5
10 MR. RUBINSTEIN: Yes, your Honor. The defense is very
11 simply that Dr. Karron had no intent to do anything -- to do
12 anything that rises to the level of criminal responsibility.
[203] To establish deficient performance, it is not enough for a Petitioner to show that his attorney's strategy was merely wrong, or his actions unsuccessful; he must demonstrate that actions his attorney took were "completely unreasonable." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) [quotation omitted]
[204] Rubinstein never had his own e-mail address; he uses his wife's e-mail.  She prints out messages for him to read before he goes to work.  This was not revealed to the Client/Petitioner until after the trial, when it became clear Rubinstein did not read, even get any of the hundreds exculpatory items Karron was attempting to e-mailing him.  After Ruinstein was engaged, Goldberg coined the term 'e-mail refractory' because sending Rubinstein e-mail was like trying to burn asbestos with an alcohol torch.

The defendant's co-funding vitiated the central prosecution assumption of no-co-funding. Rubinstein raised the issue of in-kind co-funding[205] and cash contributions at did not pursue it. Because of the conflict caused by underfunding, Rubinstein decided not to pursue the more expensive CPA driven forensic based defense. Rubinstein would have had to share his fee with Melvin Spitz, CPA. Spitz, as the forensic accountant who had (at the time) successfully convinced the OIG Auditor, on her re-audit visit in December 2003, that the project was not the train wreck Hayes was trying to make it into. OIG Auditor Riley, on her exit interview told Spitz she felt the project would resume. Because Spitz was not called to the witness stand, this important exculpatory evidence never made it to the Jury consideration.

---

[205] Trial Transcript Page 209 : Lide - cross
25 Q. Now, CASI had equipment when they received the grants that
Trial Transcript Page 210
1 they owned prior to receiving the grants, did they not?
2 A. Yes.
3 Q. And there is a concept in co-funding that you could use
4 equipment or in kind, other than cash, as your contribution for
5 co-funding, correct?
6 A. Only to a certain level.
7 Q. But you can use it. In other words, if someone has
8 $100,000 worth of equipment when the grant starts, they could
9 utilize that hundred thousand dollars to a percentage of the
10 hundred thousand as their contribution to the grants in lieu of
11 money?
12 A. No. It would not be a percentage of the hundred thousand.
Trial Transcript Page 240 : Lide – recross
24 THE WITNESS: I should have confidence in myself. The
25 total value of any "in kind" contributions used to satisfy the
1 cautionary requirement may not exceed 30 percent of the
2 nonfederal share of the total project costs. And I had said a
3 third.
Trial Transcript Page 246ff Lide - recross
21 The budget slide, of course equipment plays a big role
22 in the budget, especially in a project such as this.
23 The audit would have to audit the equipment.
24 An audit problem is estimated versus actual costs
25 requested or failure to document cost share. Both of those1
1 could -- a price-based value of contribution, all of those
2 could relate to equipment, if that's what's in question.
3 And I suspect it won't be under the technical and
4 business project management, so --
5 Q. So, it's fair to say there is no place in your slide
6 presentation that says you can only use equipment up to 30
7 percent as to nonfederal expenses, right? There is nothing
8 that says that.
9 A. Not in that document, but it occurs in many other
10 documents.
[Rubinstein never got an estimate of the allowable co-funding and Lides Testimony on this point was never followed up]

**(43)      Rubinstein fails to notice *Brady* Violations in Riley's field note missing.**

The prosecution never offered, never made the defense aware of and therefore suppressed Riley's exculpatory field notes and e-mail from her re-audit visit.  Spitz related this positive exit interview to Karron, who then continued the project with borrowed funds despite continued meddling from Hayes during this period with the full expectation in 2004 that the project would be resumed.  The existence of 'new' hard clues in the *GX114* numbers means more supporting evidence must exist.

**(44)      Rubinstein did not know about US v Urlacher**

Rubinsteins lack of preparation became clear during the trial when the prosecution surprised Rubinstein with their interpretation of the foundational precedential case, US v. Urlacher, 979 F.2d 935  ABA Model Rule 1.1[206] calls out for competent representation of a client.. The rule also calls for reasonable diligence and promptness in client matters.  Finally, *Rule 1.1* requires an adequate level of preparation and investigation.  Passing familiarity the presidential case law is clearly part of adequate preparation.  Rubinstein was blindsided by *Urlacher* when cursory research would have revealed its existence.  To become cognizant of *Urlacher* so late in a criminal trial pulled the foundation out of the Defense case-in-chief[207].  Rubinstein flew by the seat of his pants and did not have a safety net; a forensic schedule as proof of co-funding and counter forensic exhibits.  This is clearly a glaring exhibition of ineffective preparation by counselor Rubinstein.  The Rule 33 Motions and the Circuit Court Appeal both failed because of *Urlacher* standard.

**(45)      The "Knowing" *mens rea* standard**

As the changing tide in white collar criminal prosecutions makes abundantly clear, classical *mens rea,* or criminal intent is no longer required for a criminal conviction.[208]  Entire advocacy organizations are strenuously attacking the overcriminalization of federal statutes,

---

[206] Model rules of professional conduct By ABA Center for Professional Conduct, Center for Professional Responsibility (American Bar Association) 2009 Edition
[207] Trial Transcript Page 5
10 MR. RUBINSTEIN: Yes, your Honor. The defense is very
11 simply that Dr. Karron had no intent to do anything -- to do
12 anything that rises to the level of criminal responsibility.
[208] Harvey A. Silverglate(2009): Three Felonies A Day: How the Feds Target the Innocent. Amazon.com

books are written, and congress is writing and rewriting laws to the 'Knowing' standard without regard to the criminal mental state of the Defendants. In addition, as the Defendant discovered, the prison where she was 'visiting' was filled with people convicted without any traditional criminality; Convictions are won on strict liability standards of knowing without criminal intent.

Karron was astounded to find the Federal Prison Camp populated with physicians, physician scientists, CPA accountants, surgeons, entrepreneurs, dentists, lawyers, criminal lawyers, government contractors and government contract specialists, legal secretaries, paralegals, civil servants, politicians: all sorts of professionals. Rubinstein had not done his homework and prepared the wrong defense strategy.

### (46)   Results of Prior Counsel arguments on Intent

Previous Counsel Peeler had convinced a succession of Assistant US Attorneys on the basis that Karron did not have provable criminal intent for 4 years. During the past 4 years the role of criminal intent had almost disappeared in white collar crime convictions[209][210][211]. Rubinstein, had he done his homework would have realized that this defense strategy would not work anymore.

## 23.   Deficient Numerical Analysis by Prosecution

23) Move to grounded argument

*House v Bell* forensic evidence meet the *Schlup* standard. New forensic re-analysis and evidence meet the standard to re-open the case similar to forensic DNA evidence. However this 'new' evidence is not DNA evidence, it is evidence that the OIG's Deficient Numerical Analysis[212] covered up or framed the Defendant.[213]

---

[209] http://www.overcriminalized.com/default.aspx or
[210] 'Overcriminalization', Erik Luna, THE OVERCRIMINALIZATION PHENOMENON, AMERICAN UNIVERSITY LAW REVIEW Vol. 54:703. Or
[211] Without Intent How Congress Is Eroding the Criminal Intent Requirement in Federal Law, by Brian W. Waslh and Tiffany M. Joslyn, published by the Heritage Foundation SPECIAL REPORT #77 2010. http://www.heritage.org/Research/Reports/2010/05/Without-Intent
[212] D. N. A.
[213] Daniel S. Medwed, *Up the River Without a Procedure: Innocent Prisoners and Newly Discovered Non-DNA Evidence in State Courts*, 47 ARIz. L. REv. **655,659 (2005).** See generally 1 DONALD E. WILKES, JR., STATE POSTCONVICTION REMEDIES AND RELIEF HANDBOOK § 1:1-1:9 **(2007)**

24) Failure to engage

Because Rubinstein failed to engage forensic experts, this evidence was not available during trial. This new evidence required intensive analysis post-conviction, and could not be determined before trial by due diligence because Rubinstein's Ineffective Assistance of Counsel. Prior Forensic Analysis was focused on primary documentation, not on secondary analysis of the government exhibits. The Government Exhibits, as such was not subject to forensic scrutiny, even if it forensic experts had been retained in a timely fashion. The focus was on the primary defense exhibits.

25) Failure to mount Forensic Accounting based defense.

Counsel's failure to mount a forensic accounting defense directly led to the jury's being unable to find the Defendant innocent because no alternate theory of Karron's spending was presented to the Court or Jury. Rubinstein only managed to show that the initial Salary advance was paid back, but neglected to show that about of the cash proceeds were spent on program costs. Rubinstein noticed that GX114 did not add up

Even the court noticed problems with this, but despite this Rubinstein did not bring up these issues to the Court and have the Exhibit stricken from the Record and offering a correct spending schedule. As this Exhibit was pivotal in the jury's decisions, as evidenced by the jury read back/callback of this exhibit during its brief deliberations, had the jury had been given a basis to find Karron innocent on a correct schedule, instead of guilty on a plainly erroneous schedule, the outcome of Karron's trial would have been innocent instead of guilty.

Failed to realize that ATP acceded to all of Karron's requests to reclassify and allocate normally indirect costs as direct.

- Rent
- Power
- Telephone
- Computer Communication
- Failed to realize that the cleaning contractor Ferrand was allocated by Karron.
- Failed to realize that the project was beyond sufficiently co-funded (Over Co-Funded).
- Failed to realize that the audit was fraudulent and pursue the issue.
- Failed to conduct discovery to further support the forensic evidence of allowances and reclassification.

26) Defense counsel tried to reduce costs and maximize his fee lost

One can only assume that defense counsel failure to engage a forensic defense was require paying significant proportion of defense counsel fee to the forensic accounting subcontractors Spitz and Dunlevy. Spitz was the original successor forensic accountant Karron had brought in in 2003 to rebut the faulty OIG audit. Had Rubinstein brought key forensic points to the attention of the Court and Jury that would have resulted in an innocent verdict.

27) Rubinstein insults forensic accountant and bookkeeper

Spitz, an orthodox Jew, would not testify during the upcoming Jewish holidays at the Trial. Rubinstein insulted Spitz by refusing to accommodate Spitzes' request the court for a adjust the trial dates to accommodate Spitz. Rubinstein ultimate failed engage Spitz to testify against the government's auditor Riley and the CASI Accountant Hayes. Dunlevy had prepared extensive forensic exhibits and analysis of CASI spending and Karron funding that Counsel refused pay for and pay attention to.

## 24.   Rubinstein tells Dunlevy to come to court but does not tell her not to attend sessions

Rubinstein instructed Dunlevy to come to court but did not specifically tell her NOT to come into the courtroom while court is in session.[214] The prosecution cites Dunlevy's presence in the courtroom while the trial is in session. While the judge accepts Dunlevy as an 'expert in retrospect', the Prosecution argues she is poisoned as a witness because she heard testimony from other witnesses. The court denied Rubinsteins' late request for new expert witnesses Dunlevy.[215] Despite the preparation of many charts and graphs showing loans balances, daily grant balances, percentage variance, and budget under and over figures to rebut the governments' clearly self-contradictory exhibits, Rubinstein fails to enter anything other than a few checks and receipts. Rubinstein submitted registers of other spending accounts late as the trial closes. Dunlevy cites Rubinstein's rudimentary understanding of the accounting issues directly led to his failure to understand the issues of the ATP co-funding.

---

[214] Trial Transcript Page 1168 Line 2-3
[215] Trial Transcript Page 1173 Line 19

## 25.  Rubinstein insults witnesses and supporters

Rubinstein insulted more than just the forensic accounting consultants by not paying them or using their already proffered work products.  Witnesses reported to the Defendant that they were treated poorly.  While serving as a defense witness requires standing by until called by the defense lawyer, witnesses reported difficulty contacting Rubinstein or his assistant to get a reference to when they needed to make themselves available to testify.  Rubinstein also failed to spend any time with witnesses to prepare them for possible prosecution questions.. Witnesses walked directly into prosecution trap questions about Karron's business practices they should have been prepared to answer.

### (47)     Witnesses on Transgender Benefits under CASI Benefits plan not called

Many witnesses about transgender benefits were recruited, but not were called, but should have.  Many supporters made donations of hundreds of thousands. Rubinstein derided donors for not contributing tens of thousands of dollars, causing some donors to report to Karron that they felt insulted and others to decline to donate to Rubinstein.  More than one friend and prospective donor reported to Karron that Rubinstein had insulted them.  Clearly, Rubinstein's conflict over court funding overflowed to private Karron defense funders withdrawing support.

### 28)The trial Jury should have had an alternative exculpatory defense forensic counter-exhibits

The jury was given only the Prosecutions faulty exhibit of CASI mis-spending without a counter exhibit on which to base any theory of innocence upon.  Rubinstein was betting the clients life that the jury would disregard the law and jury instructions and find the client innocent based on lack of intent, despite being instructed to disregard intent. **Without intent, and with only the Prosecution evidence presented, even the defendant, had she been a member of the jury, would have been obliged to find herself guilty.**  Given the evidence presented and the jury instructions, the jury had no choice but to find the defendant guilty because they were not given any alternative theory or evidence of co-funding.  Ineffectiveness must be assumed because of this actual conflict of interest between the client and the counsels preservation of his fee created an irreconcilable conflict between counsel and the defendant.

## 1) Standards for IAC met by Rubinsteins' representation of Karron

The defendant has a right to expect that his attorney will use every skill, expend every energy, and tap every legitimate resource in exercise of independent professional judgment on behalf of defendant and in undertaking representation.
Frazer v. US, 18 F.3d 778, 779 (9th Cir. 1994);

29) Rubinstein was Conflicted

Defense Counsel Rubinstein was conflicted in his representation of Defendant Karron. Instead of expending every energy, he refused to expend sufficient time and energy to prepare for the defense of the defendant. Because he was not happy with the rate that the apartment sale was proceeding, he bullied the client by refusing to confer with his client in preparation for the case. He further threatened his client by making application to the court to be relieved from the case he had engaged to defend. He compromised his own professional standards by focusing first on payment and second on the client, to his and his client's detriment. The real estate broker had to keep lowering the price below market value to satisfy the court and Rubinstein, to the detriment of the client.

30) Rubinstein performance was deficient by an objective standard

To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington, 466 US 668 (1984)* 687

## 26. Rubinstein performance was sufficiently deficient to overcome presumption of reasonable professional assistance

There is a strong presumption that an attorney's conduct "falls within the wide range of reasonable professional assistance". *Id. at 689.* To establish prejudice, the defendant must show that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington, 466 US 668 (1984)* at 694

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, at 686.

> *a. Rubinstein unprofessional errors, had they not occurred, would have changed the results of the proceedings*

The "defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case," *Strickland, at 693,* but rather "must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland, at 695-96.*

Prejudice requirement does not require petitioner to prove that he would not have been found guilty. Prejudice in *pro se* motions is not strictly construed. In cases which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," ineffectiveness will be presumed under *US v. Cronic, 466 US 648, 80 L.Ed.2d.657, 140 S.Ct. 2039 (1984).*

> *b. Rubinstein did not practice loyalty and avoid conflicts on interest*
> *c. Rubinstein did not sufficiently advocate the defendant's cause*
> *d. Rubinstein did no consult the defendant on important developments prior to the trial*
> *e. Rubinstein did not consult sufficiently with the client and the clients forensic team during the course of the trial*
> *f. Rubinstein did not sufficiently bring to bear such skill and knowledge as will render the trial as a reliable adversarial testing procedure*

The "Strickland Standard," of review of IAC performance consists of two parts: "In determining a claim of ineffective assistance of counsel, an appellant must show that:

1) Counsel's performance was deficient and that
2) deficiencies in performance prejudiced his defense [216]

A review of Counsel mistakes (deficiencies) must then must show how said mistakes harmed the client by having an adverse effect on case's outcome (prejudice).

---

[216] Strickland v. Washington, 466 US 668 1984 "The right to counsel is the right -to effective assistance of counsel."

Not providing the jury with an alternate forensic theory was insufficient to overcome reasonable doubt of some kind of misappropriation of at least $5,000.

A hearing must be held unless the claims are vague, wholly incredible, or even if true, would merit no relief. Claims can be made in a section 2255 motion or motion for new trial.217

 

 

(48)     **Specific Failures of Counselor Rubinstein**

31) Failure 1: Failed to provide a reasonable forensic accounting defense despite availability of ample forensic support by Spitz and Dunlevy
32) Failure 2: Failed to confront Hayes, especially with the wealth of forensic support he had available.
33) Failure 3: Failed to use his considerable skill in cross examination to impeach Hayes
34) Failure 4: Unreasonably bad defense strategy, especially in light of the Case Law, had he studied it prior to trial, and especially in light of the forensic support the Defendant had available.
35) Failure 5: Did not pursue clear Brady Violations
36) Did not Pursue issues in GX114
37) Did not use Forensic Schedules and Graphs provided for him by Dunlevy
38) Did not get all of the Spending accounts into evidence until the very end of the trial, where they served no purpose and would not help in an Rule 33 Motion or Direct Appeal

## 27.  Grant suspended for non-compliance

After the NIST ATP grant was suspended for non-compliance, Karron visited Marilyn Goldstein, the NIST grants manager, to try work out how to get the project restarted and to explain the CASI side of the story.  Goldstein was sufficiently impressed that she ordered a OIG Re-Audit[218].  Karron engaged Melvin Spitz to represent CASI in the re-audit.  Spitz handily reconciled and audited CASI.

Hayes had continued to meddle in CASI affairs while Karron was attempting to disengage from Hayes and paid the payroll out of pocket[219].  Hayes seemly attempted to take

---

[217] Visciotti v. Woodford, 288 F.3d 1097 - Court of Appeals, 9th Circuit 2002

[218] Declaration of Karron Exhibit <<CITATION>>
[219] Declaration of Karron Exhibit <<CITATION>>

over CASI as paychecks started showing up with Hayes's name instead of CASI.  Melvin Spitz, CPA to represented CASI at the second ATP audit revisit in December 2003.

## 28.  Spitz re-creates CASI books without problem

Spitz had no problem reconciling a new set of spreadsheet CASI books. Hayes and Spring labored expensively and endlessly on trying to re-create CASI books without succeeding. Why ?

## 29.  Karron re-engaged Feldman CPA to do the CASI Taxes

During this time, Karron re-engaged Jill Feldman to do the CASI taxes that Hayes had started but abandoned, and succeeded in filing 2001 corporate taxes.  Dunlevy, working as a subcontractor, working in parallel but independently from Spitz, also recreated CASI books in Quick Books in order to do the corporate taxes, payroll taxes, and do an independent reconstruction of the CASI NIST ATP project.

*1. Strange behavior from NIST ATP as a secret investigation is launched*

The last correspondence from Snowden was cryptic, as it seemed to create an impossible condition "Payments would only count for costs incurred during the active program".  NIST statutes allow accounting under the company's own standards, being cash or accrual.  It seemed reasonable that using the cash to pay program payables would satisfy the immediate issue of co-funding and that the issues that the co-funding had actually been made already could be settled later.

Unknown to Karron was that the OIG Special Agents were already on the scene, called by Hayes, the accountant, and had fatally poisoned the project and halted all civil negotiations by June 2003.

## 2.   Karron visits NIST and Grants Manager Goldstein to get an Audit Resolution Conference

Karron visited NIST and met with Goldstein face to face. A long memorandum was explained what happened.  A re-audit visit was made in December 2003 by Riley and she met with the successor NIST Auditor Melvin Spitz, a specialist in audit disputes.  Riley spent a week in Spitzs' office, and her exit interview was upbeat and positive. She told Spitz to the effect that "I see no reason this project can be re-started".[220]  Karron continued the research out of pocket, with borrowed money.  As Prof. Cox was already working for CUNY, he continued working *pro bono*. As Rothman would be otherwise unemployed, Karron kept his payroll going out of pocket on the misplaced hope that NIST would resume funding.  This would not happen.

39) Draft audit report issued

The Draft audit report was issued and completely contradicted Riley's exit interview. Strangely, the draft and final audit report reverted to Hayes payroll numbers, by the pattern of errors.  Karron, with Spitz, wrote a rebuttal audit report, and Spitz was prepared to go to Washington for an Audit Resolution meeting.

40) NIST Clams Up and Formal OIG Investigation starts

Then NIST Grants managing people started acting very strange; They started telling Rothman and Spitz that they were not allowed to talk to CASI or Karron at all.  Then, on October 25, 2004, Karron got a call from his best friend and investor, Lee Goldberg that "a group of federal agents with guns appeared at his house and were asking strange questions about Karron sexual proclivities.  The OIG Special Agents had launched a criminal investigation unbeknown to Karron, without a formal 'Target Letter'[221] and for the next five years everyone in Karron's circle of friends and professional colleagues who worked on Digital Morse Theory would be sucked into a vortex of criminal investigation.

g.  *2003 Dec Melvin Spitz CPA does CASI re-audit for second OIG Auditor field audit with Riley*

---

[220] As relayed to Karron by Spitz at the time.
[221] The US Attorney's Manual gives a sample letter as We advise you that the Grand Jury is conducting an investigation of possible violations of federal criminal laws involving ..." None was ever issued in this case.

Belinda Riley, the OIG auditor made a second field visit to CASI at Spitz office, where she worked for yet another week.  Spitz by this time had deftly reconciled and re-audited the CASI finances.  Riley reviewed this data in detail with Spitz over the course of her weeklong second visit.  Her exit interview with Spitz was upbeat and she indicated that she now understood how the money flowed and that there was no problem restarting the grant.  However, as we now know, the OIG agents were already on the scene and poisoned any resumption negotiations In an e-mail message buried in the discovery, Orthwein said she was crying over this situation.[222]

### 3.    Draft Audit report issued, Rebuttal Filed.

The Draft report was issued, and Karron and Spitz wrote a rebuttal to the issues raised.

### 4.    The final OIG Audit report issued and formal Investigation launched

The Draft Audit Report Rebuttal requested an Audit Resolution Conference.  The DOC OIG ordered ATP not to communicate with Karron and CASI, and especially not to make any actions that may be construed as a civil bill with CASI.  This was only disclosed at Trial.

*h.  2004 The OIG Final Audit report copies hostile Hayes Audit report figures including tell tail error "fingerprints"*

Dunlevy and Spitz review the final OIG audit and come to the conclusion that Riley did not do the audit she promised, instead copied her audit figures from the hostile Hayes audit. Riley copied the errors as well, leaving a 'fingerprint' as to its origin, much like DNA evidence.

*i.  2004 OIG targets Karron and interviews Goldberg*

When the OIG Special Agents started interviewing Karron's friends and colleagues, one of them, Goldberg, called Karron to inform him that he had coercively interviewed by Special Agents with guns.  Goldberg signed an exculpatory interview affidavit, but told of being asked completely inappropriate questions about *quid pro quo* for sex with the Defendant.  Karron

---

[222] Orthwein

started shopping for criminal counsel and the family agreed to help pay for the services of M. Scott Peeler then at the firm of Arent-Fox LLP.

    *j.   2005 Riley is awarded a Silver Medal in secret for unique jointly auditing CASI.*

Unbeknown to Karron or counsel, the OIG auditor Riley is awarded 2005 DOC Silver Medal Award for Meritorious Federal Service

> "For conducting a complex and unique **joint** audit investigation of costs claimed against a scientific research cooperative agreement awarded by NSIT [*sic*]." [emphasis added].

This was revealed when Riley's resume was submitted as an expert witness for the criminal trial. Under cross-examination Riley revealed she never reconciled the numbers she presented, and indeed virtually admits she did not do an audit of CASI.[223]   Rubinstein retired in disgust instead of having Riley completely impeached. [224]

41) June 2003 First OIG Audit

The first OIG field visit was in June 2003, and that resulted in the suspension of the CASI grant for, what at the time was cited as lack of co-funding. The then grants manager Snowden sent a letter requesting reimbursement of $60,000. Karron borrowed approximately $45,000 from various lines of credit and deposited the funds in the CASI NIST ATP program bank account. Karron then offered the fractional value of equipment already owned by CASI used in the project as in-kind funding (up to 30% of the total CASI contribution can be in-kind) Snowden, the NIST ATP grants specialist was informed of this fact and countered with the argument that "depositing money in a bank account would not count toward the co-funding requirement. Karron counted with the fact that there were well in excess of $60,000 in payables that needed payment as of the date of suspension. Karron had the money in the bank and paid Program Payables, but this was never acknowledged by the OIG toward co-funding, but should have been.

---

[223]
[224] Trial Transcript Page 811 Line 18.

1) Department of Commerce OIG gets more aggressive as time runs out to indict

Sometime in 2007, as the clock was about to toll and render this 5 year investigation untimely, something was added into the mix of evidence the OIG was presenting to yet another AUSA that tipped the balance of evidence enough to convince the US Attorney's office that they could win this case.

**(49)    OIG Crossed the line as the Statute of Limitations was about to toll?**

The Defendant believes the deciding factor that triggered the indictment was the willingness of the OIG to cross the professional prosecutorial ethics line into creating inculpatory evidence. During the five year investigation, The OIG Special Agents were interviewing and re-interviewing everyone connected with the Karron. Defense counsel Peeler was successfully convincing prospective prosecutors that there was no case. Some witnesses, from the evidence submitted at trial, were interviewed multiple times. Something happened during that period that convinced them to recant previous contemporaneous exculpatory e-mail and memos written during the grant and telling inculpatory stories 5 years later.

## 5.    OIG Getting Witnesses 'on board'

From statements made by the Special Agents to prospective witnesses, they were told to 'get on board' because they had the CASI accountant and she had 'nailed' Karron. Witnesses were asked leading questions such as "were you paid to have sex with Karron", or "early investors were asked if they invested in Karron for sex". Exculpatory witnesses, generally PhD professionals who worked with CASI were intimidated into not talking to the Defense counsel when approached. The previous CASI bookkeepers were intimidated by leading questions into not providing exculpatory testimony. Relentless leading interviewing and re-interviewing winnowed the remaining witnesses into only those willing to tell the same inculpatory story. Tellingly, they told the story in the same way with the same words. Were they rehearsed and coached what to say ?

42) 2005 M. Scott Peeler as first criminal attorney convinces 4 US Attorneys that no crime occurred.

CASI never won another federal project after the NIST ATP project. Scuttlebutt in the Washington DC beltway was that Karron was the target of an intense investigation. The Karron abandoned CASI and worked for ATK as a staff scientist for 3.5 years doing military Traumatic Brain Modeling and research. Karron could not apply for Secret Clearance during this time because of the ongoing investigation by the OIG. During the 4 years he represented the Defendant he had a team of paralegals collate and organize the myriad of government issues with the terabytes of defense data. This culminated in a site visit to CASI with NIST computer experts who were apparently satisfied that CASI was legitimate and doing advanced computer research, 4 years after the project suspension.

1) 2007 ATP is terminated by Congress

NIST ATP program had a remarkable history of being sat on by Congress and yet repeatedly returning to life, to grant innovative ideas direct funding to benefit American Innovation. However, this program had enemies, much as Karron would discover she had enemies. Perhaps this termination prompted the OIG to indict Karron; there would be no one left at ATP to defend or even remember the original exculpatory negotiations.

k.   2007 The statute of limitations closes in and Karron is indicted

The Statute of Limitation was closing in and something changed in the intensity of the OIG's pursuit of Karron. ATP was terminated. Many original staff left. Goldstein left. Orthwein retired. Stanley retired. We believe in their prosecutorial zeal, the OIG Special Agents crossed the line and started creating false inculpatory exhibits to convince prosecutors to indict Karron, and suppressed exculpatory evidence.

l.   2007 Peeler insists that Karron find substitute Criminal Trial Counsel

During the 4 years that Peeler had successfully held off the indictment of Karron, pressure was building within the OIG to get Karron, quite possibly at any cost. The ATP program was terminated, and the program staff were retiring or leaving NIST. Karron followed

the advice of a former student and engaged a wonderful criminal lawyer with a stellar track record against the Federal Government, Ronald Rubinstein. Karron met with him and gave him a retainer. At that point, Karron owed Peeler some $25,000.

   *m. 2008 Peeler hands Rubinstein the Karron case to enable Peeler to withdraw as counsel.*

Prior to the indictment, it did not appear that this case would be expensive defend. There was an abundance of exculpatory forensic evidence. No one could argue that Karron intended to defraud the government, because Karron had so much records and e-mail pointing to the contrary.

   *n. Substitution of Counsel created conflict with Rubinstein*

Peeler was an extraordinary expensive white-collar attorney who billed much more than Rubinstein did. Peeler had arranged site visits with predecessor AUSA's to CASI to show them that CASI was continuing to do research after the grant suspension and was not fraudulent, and had successfully battled indictment through a succession of prosecutors.

   *o. Rubinstein succeeds Peeler as Defense Counsel after a 5-year investigation*

Predecessor counsel, R. Scott Peeler, ESQ had successfully held off indictment for 5 years by convincing a succession of Assistant US Attorneys that there was no crime until the statute of limitations on the case was about to run out in 2007. Rubinstein believed, and told Karron that no one could find. Karron guilty of a crime, mainly because of the obvious lack of intent and the long and deep forensic data trail.

## 6.   What changed to convince the Department of Justice to prosecute?

Peeler discovered that the Department of Justice had accepted the Karron case for prosecution just as the Statute of Limitation was to have run out (tolled). Peeler explained to Karron that the only reason, Peeler believed, they had changed their corporate mind to indict was that they were willing to take a more aggressive stand. Peeler did not know, as we would learn after the trial, that the OIG had suppressed exculpatory evidence and created inculpatory exhibits

(GX114). However, the OIG Special Agents were not numerate enough to realize that they could not just change numbers without changing other numbers and leaving tell tail clues. Just as the OIG Auditor could not just copy numbers from Hayes without also carrying along tell tail clues in Hayes unique pattern of errors. The fingerprints are in the numbers, not the bodies.

   *p. Rubinstein's fatal defense theory flaw defending on intent, not fact*

Rubinstein did not realize that the tide in white collar criminal convictions had moved away from fraudulent criminal intent to a much thinner knowing intent, to a strict liability intent, without any reliance on the actor's mental state. This was the fatal flaw in Rubinsteins pricing of the case.

## 7.   Hayes misappropriated payroll taxes and Karron takes the fall

No one at this point realized that the OIG was possibly colluding with the CASI auditor Hayes to cover tax withholding misappropriation by Hayes. The payroll taxes have been missing from the second year of the grant. Was Hayes granted immunity for the perfect crime by setting up Karron?

   *q. 2007 All of Karron's computers and evidence is seized by OIG Special Agents*

Then in June 2007 indicted Karron and the OIG seized all of Karron's computers and evidence. The cost of the defense then skyrocketed.

## 8.   Rubinstein was blindsided by the OIG seizure of Karron's defense data in the computers

Rubinstein had already accepted Karron as a client when the OIG seized all of Karron's records prior to the trial. Karron had to sell her apartment and pay $30,000 to recover her computers, and apply to the court to pay Rubinstein from the apartment sale, and then had to buy and build new computers on which to reconstruct her own data. Karron lost her job at ATK. Karron on unemployment from April 2008 until reporting to prison in 2009 Karron became homeless and destitute at the start of the criminal trial, and had to move in with her decrepit mother..

## 9.    Rubinstein Failure to Confront Hayes

Rubinstein failed to confront the hostile CASI /KARRON accountant and ATP auditor Hayes, who initiated this mess. He also failed to realize Hayes' own culpability for creating an enduring tax mess for Karron by misappropriating the second year withholding taxes in a botched noviation from an INC to an LLC.

## 10.    Karron unable to file Taxes or Respond to IRS collateral investigation

Because Karron was a target of a criminal investigation, Peeler advised Karron NOT to file taxes, which could then pierce the 5th Amendment veil against self-incrimination. This rendered Karron unable to defend herself against the IRS investigation into the missing payroll taxes from the ATP project.

1)  The CASI whistleblower auditor and accountant Hayes was too dirty to testify.

When prosecution withdrew Hayes as a witness against Karron, Counsel should have called her to the witness stand as a hostile witness and confronted her with the myriad of falsehoods and lies she promulgated against Karron to protect her own career. But he did not. However, he should have. This failure to confront ("**Confrontation Clause**") should have, at the very least resulted in the withdrawal of all Hayes authored or related based evidence. As we show, this would also include the OIG Audits, which were copied from Hayes with their Deficient Numerical Analysis ('D.N.A.') fingerprint of errors.

## 11.    Rubinstein failed to master key details of case

Rubinstein needed an inordinate amount of coaching from Dunlevy and Karron for this case. Key forensic accounting details just bounced off of him. He just would not seem to understand certain key issues in GAAP (Generally Accepted Accounting Principles).

## 12.   Rubinstein dangerously computer and accounting illiterate

Rubinstein was also dangerously computer illiterate. Rubinstein threatened Karron and made Karron promise never to send Rubinstein a text message again  Rubinstein did not know how to read text messages and was too embarrassed to ask Karron for help.  Rubinstein never read his own e-mail; the open secret was to get e-mail to Rubinstein one had to e-mail his wife. Rubinstein also never learned to use a spreadsheet. He insisted on doing all of the arithmetic by long hand on scratch paper.  Rubinstein, to his credit, did notice the discrepancies in GX114 but the labor to do so was exhausting and cost many hours of Rubinsteins and his staff's time.

## 13.   Dunlevy tried to brief Rubinstein on key forensic details

Dunlevy had prepared forensic reconstructions and analysis, but Rubinstein could not understand then unless he laboriously redid the addition on a yellow scratch pad.  He never learned to use a spreadsheet and could not personally verify all of Dunlevy's spreadsheets by hand.  He never should have taken this white collar case if he could not read standard forensic analysis and spreadsheets.  Dunlevy made charts and graphs which also bounced off of Rubinsteins understanding and consciousness.

## 14.   Rubinstein cognitive blocks noted by other witnesses

Other Karron supporters and witnesses would notice and report that no matter how many times they told Rubinstein facts in the case, he never seem to understand certain kinds of facts. Repeating facts and evidence did not help.  Rubinstein grasped certain kind of storyboard and timeline facts, but was indurate to exculpatory fiscal principles.

## 15.   OIG coached and coerced witnesses to 'get on board'

The OIG coached witnesses to tell the same story against Karron knowingly disobeying the 'law' of NIST ATP rules and statutes.  Later witnesses would relate to Karron, post-

conviction that they were 'asked' to 'get on board' against Karron, and some felt coerced to do so.

43)Rubinstein bets and loses Karron's career

That the OIG was willing to withhold exculpatory information, threaten exculpatory witnesses, and coerce inculpatory witnesses, if not create inculpatory evidence was not known to the defense. Rubinstein was not prepared for this depth of prosecutorial zeal.

This significantly increased the cost of defense beyond what was estimated by Rubinstein. Rubinstein bet and lost he could defend Karron on lack of intent defense cheaply and without expensive subcontracting any forensics support. Rubinsteins' cheap streak surfaced when

1) Rubinstein failed to mount a forensic accounting based defense
   a. instead relied solely on "lack of intent to defraud based defense". This was a serious error, in that he ignored the body of case law derived from *Urlacher* that intent was not an element in a successful conviction.
   b. This did not overcome the 'knowing" standard common in recent criminal convictions.

   a. *Rubinstein decided $100,000 awarded by the court was insufficient to mount adequate defense forensic*
   b. *Rubinstein failed to do any discovery, recycled only on prosecution data, did not study defense provided forensic data.*
   c. *Missed Accountant Auditor Exculpatory Prepared Tax Returns.*
   d. *Did not acknowledge Co-Funding, or Karron Salary.*
   e. *Bored and confused Judge and Jury.*
   f. *Key points were lost on Judge and Jury.*
   g. *Did not push for Tracing of Funds requirement when objected to by judge.*
   h. *Because co-funding issue was not pursued,*
   i. *Court did not have any foundation on which to base a decision to permit funds tracing.*
   j. *Did not push to Examine Joan Hayes CPA when withdrawn as expert witness by Prosecution.*
   k. *Her confusing and contradictory evidence trail.*
   l. *Key stupid comments by Frank Spring were stricken from record and not objected to or pursued. "I have a PhD in Cost Principles"*
   m. *Did not pursue Government Auditor Riley on failure to audit.*
   n. *Did not pursue contradictions in GX114 despite acknowledgement by Court of problems.*

o. *Did not raise issue of missing year two withholding taxes when prosecution offered to not raise issues from Year 2;*
p. *Hayes misapplied/stole the withholding taxes.*
q. *Distinguishing URLACHER*

15 Urlacher testified only about minor expenditures for legitimate police purposes. These expenditures only totaled approximately $10,000, a small fraction of the $313,868.81 that was missing. No evidence was introduced to show that the rest of the money was spent for legitimate purposes, and therefore, there was simply not an evidentiary foundation for the jury to find in Urlacher's favor on the basis of his proposed §666(c) instruction. Judge Telesca properly refused the charge on the grounds that there was no basis in fact for the jury to conclude that the statutory exception applied to exempt Urlacher from criminal liability.[225]

## 6   Conclusion

The statutory standard for to set aside of a criminal verdict under 2255 requires demonstration that Karron's conviction resulted from at least one fundamental defect resulting in a complete miscarriage of justice.

Two fundamental defects resulted in an otherwise straightforward defense of Karron.

- Ineffective Assistance of Counsel:  Rubinstein choose the unreasonably wrong defense strategy.  He ignored a strong fact driven hard number forensic defense.  Instead, he opted for a soft intent based defense weak on facts.  Had he studied *Urlacher*, and other more modern white collar convictions, he would have realized the prosecution would win on a strict liability standard, despite the best of intentions on the part of the Defendant.  Rubinstein had at his disposal two forensics experts (Spitz and Dunlevy) with years of experience with the critical forensic numbers.  He would have learned at the start of the trial that the OIG inculpatory figures were fantasy.  Rubinstein was too conflicted over reducing costs to share his fee with experts who could have won the case for him.
- Brady Violations: After trial, additional forensic analysis of all of the Government Exhibits showed that the Government withheld key exculpatory evidence and witnesses affidavits, as well as potential exculpatory witnesses from the Defense, in violation of the *Brady v Maryland* doctrine.

The miscarriages of justice this resulted in are

- The defendant was convicted of "misappropriating" her own money in support of a government program.

---

[225] US of America, Appellee, v. Gordon URLACHER, Defendant-Appellant. 979 F.2d 935 -

- The defendant was convicted of "knowingly" spending money for purposes for which she knew she in fact had permission to do so, had the written permission not been suppressed and in the support of subornation of inculpatory perjury by government witnesses.

For these reasons, justice demands this verdict to be set aside.

Further, justice cries out for an investigation of the real facts reveal the true cause of this unfortunate situation come to light.

## 7  APPENDIX

### (1)    Grounds Summary from A0243 MOTION FORM

### (50)    Arguments for Relief in Summary

Ground One)        (Ineffective Assistance of Counsel), Defendant was convicted for
spending own funds.

Ground Two)        (Ineffective Assistance of Counsel) Defendant was convicted of spending
that was within budgetary authority to do so.

Ground Three)     (Brady v Maryland violation) for withholding evidence of allocations and
reclassifications

Ground Four)        (Ineffective Assistance of Counsel) Wrong Defense Strategy and Conflict
of Interest Claims

1)  Grounds One

*1) Defendant A0243 Statement*

Personal earned salary and wages, budgeted, advanced and tax paid, are personal property of Karron.
These were the funds used by Karron to pay project overhead and personal costs. Evidence consists of
(but not limited to) approved budgeted Personnel Salaries/Wages cost line A, contemporaneous signed
time sheets, signed paychecks, withholding shown on paychecks, withholding tax transmittal checks and
forms (state and federal), quarterly withholding tax returns (State and Federal), and journal entries on CASI
books and  adjustments on withholding tax returns made in subsequent quarters. Finally, the rent paid by
CASI, using after tax Karron funds, forwarded to CASI, written on CASI general corporate funds and drawn
on CASI corporate checks, payable to Karron, were reclassified as Salary by the government in its own
exhibit Ex 114.  Karron was convicted mainly if not exclusively by Exhibit 114 but analysis of the numbers
did not reveal this fact until after the trial and was not part of any appeal.

*r.  Defendant A0243 Reason not Issues not Directly Appealed*

Appeals attorneys were constrained by the lack of forensic evidence and analysis by the two forensic
expert witnesses standing by for the trial.  Issues in ineffective assistance of defense counsel *vis-a-vis*
failure of defense to mount forensic accounting defense detailed below.

2)  Grounds Two

*2) Defendants' A0243 Statement*

The total spending was within the acceptable statutory and ATP variation limits of plus and minus 10% between any budget categories. The main basis for Grounds two is that the base for the percentage variation must necessary and logically be the grant budget, not solely the government's funded amount, but the first year budget including co-funding and all direct costs and indirect costs. On that full the grant is within budget. If the change basis is the federal share advanced to date only, then most would be out of budget in the beginning, when the percentage basis is small and as the change base expanded, would gradually fall within budget as total spending accumulated.

   *s.  Reason Issues not Directly Appealed*

None

   3) Grounds Three

*1.  A0243 Statement*

The foundation of the Defendant's conviction rested on GX110 and GX114. GX114 does not add up, and appears to be made up. Hints of this were acknowledged by the trial judge, but the full extant was not known until after conviction with a comprehensive forensic accounting by Dunlevy, admitted into evidence in the collateral civil attack cited in the attached Memorandum of Fact and Law..

   *t.  Reason Issues not Directly Appealed*

Not previously raised.

   4) Grounds Four

*1.  A0243 Statement*

The defense counsel asked to be relieved of the case just prior to the start of the case for insufficient funding. The Defendants only significant asset, Karron's apartment was liened, and every computer, hard drive and laptop in the apartment were seized in a prior raid, without regard to the ownership of the equipment or its source (grant or personal funds). Because of that, the Karron had to pay 30,000 to a government computer forensic data recovery company to recover Karron's own business records and defense data from Karron's own computers. Karron had to build new computers to house and reconstruct the 10 terabytes of disk images from the Karron's company computer RAID (Redundant Arrays of Independent Disks). Defense counsel applied to be relieved from the case because of lack of sufficient payment. Karron's apartment was sold to fund data recovery, but the proceeds were insufficient to pay both the data recovery and the requested fee for counsel. Counsel did not engage the two forensic accounting experts brought in to audit and review the grant, did not challenge lack of tracing of funds requirement, and did not present alternative spending theory to counter Exhibit 114.

*u. Reason not Issues not Directly Appealed*

These issues were not raised in the direct appeal because:

Appeals attorneys were selected by counsel, and they choose to attack the law rather than facts. When asked why in private conversations, both young attorneys stated they got too much work from defense counsel to go up against him in public and risk damaging their main referrer.

## (2)   RULES GOVERNING SECTION 2254 CASES IN THE US DISTRICT COURTS

The Rules [226] address the following issues:

Rule 1.     Scope.
Rule 2.     The Petition.
Rule 3.     Filing the Petition; Inmate Filing.
Rule 4.     Preliminary Review; Serving the Petition and Order.
Rule 5.     The Answer and the Reply.
Rule 6.     Discovery.

Rule 6 of the Rules Governing §2255 Proceedings allows defendants as well as the government to conduct discovery pursuant to the Federal Rules of Civil Procedure - but only with permission from the court. The rule gives the district court discretion to grant discovery requests 'for good cause shown, but not otherwise'

Rule 7.     Expanding the Record
Rule 8.     Evidentiary Hearing
Rule 9.     not applicable as this is the first Petition
**Rule 10.**   not applicable as this is the first Petition
**Rule 11.**   not applicable as this is the first Petition.
Rule 12.     Applicability of the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure

The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules.

## (3)     The NIST ATP Cooperative Agreement Budget

The CASI-NIST ATP cooperative agreement budget breaks down project costs in three different ways. They are

1.   OBJECT CLASS CATEGORY

---

[226] Revisions and notes are at Office of Law Revisions Counsel's website

2. SOURCES OF FUNDS
3. TASKS

## (1) OBJECT CLASS CATEGORY

There are 12 Object Classes under the Object Class Category (1) above.

| | |
|---|---|
| Object Category A. | Personnel Salaries / Wages |
| Object Category B. | Personnel Fringe Benefits (34%) |
| Object Category C. | Travel |
| Object Category D. | Equipment |
| Object Category E. | Material / Supplies |
| Object Category F. | Subcontractor |
| Object Category G. | Other |
| Object Category H. | Total Direct Costs (Lines A through G) |
| Object Category I. | Total Direct Costs Requested from ATP |
| Object Category J. | Total Direct Costs Shared by Proposer |
| Object Category K. | Total Indirect Costs Absorbed by Proposer |
| Object Category L. | Total Costs (Lines H + K) |

Here we focus on Line L, the Total Cost [of the entire project by year].

Line L (Total Cost) is the sum of lines H and K, i.e., the total direct costs of the project and the Total Indirect Costs absorbed by the Proposer (CASI in this case). Line K gives the total indirect costs as a line item, and restates that these costs are absorbed the proposer.

Line H (Total Direct Costs) is the sum of all of the Object Class Category items A through G. Lines I and J represent the source of funds to pay the costs in Line H. The Total Direct Costs are paid by funds from two sources, Line I, "Total Direct Costs requested from ATP" and Line J, "Total Direct Costs Shared by the Proposer". Each Line Item is broken out for Project Years (PY) 1, 2 and 3, as well as in Total.

## (2) SOURCES OF FUNDS

| | | |
|---|---|---|
| A. | ATP (Same as line I) | $2,000,000 |
| B. | PI | 110,500 [error] |
| C. | PI Indirect | 4,000 |
| D. | (not used) | |
| E. | Total Sources of Funds (Same as Line L) | $2,114,500 |

## (3) TASKS

| | | |
|---|---|---|
| A. | Server Hardware install and config | $412,500 |
| B. | Public Client design mock-up | $111,000 |
| C. | Program SpiderWeb surface gen | $111,000 |
| D. | Recog. Sort Crits. Graph display | $202,000 |
| E. | Write Union/Intersection operator | $210,500 |

| | | |
|---|---|---|
| F. | Write Saddle Crit navigator/editor | $210,000 |
| G. | Write DICOM, up/down load compres/crypt | $210,500 |
| H. | Node Warping Code | $214,500 |
| I. | Write Level of Detail Management Code | $211,000 |
| J. | Install Clickstream technology on client | $221,500 |
| K. | Total Costs of All Tasks (Same as Line L) | $2,114,500 |

**(4)      NIST ATP Statute as of 2001**

# 1. Sec. 15CFR295.1 Purpose

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.1]

[Page 453-454]

                 TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                          OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                    Subpart A--General

Sec. 295.1  Purpose.


    (a) The purpose of the Advanced Technology Program (ATP) is to
assisted US businesses to carry out research and development
on high risk, high pay-off, emerging and enabling technologies. These
technologies are:
    (1) High risk, because the technical challenges make success
uncertain;
    (2) High pay-off, because when applied they offer significant
benefits to the US economy; and
    (3) Emerging and enabling, because they offer wide breadth of
potential application and form an important technical basis for future
commercial applications.
    (b) The rules in this part prescribe policies and procedures for the
award of cooperative agreements under the Advanced Technology Program in

[[Page 454]]

order to ensure the fair treatment of all proposals. While the Advanced
Technology Program is authorized to enter into grants, cooperative
agreements, and contracts to carry out its mission, the rules in this
part address only the award of cooperative agreements. The Program
employs cooperative agreements rather than grants because such
agreements allow ATP to exercise appropriate management oversight of
```

projects and also to link ATP-funded projects to ongoing R&D at the
National Institute of Standards and Technology wherever such linkage
would increase the likelihood of success of the project.
    (c) In carrying out the rules in this part, the Program endeavors to
put more emphasis on joint ventures and consortia with a broad range of
participants, including large companies, and less emphasis on support of
individual large companies.

[62 FR 64684, Dec. 9, 1997]

## 2.    Sec. 295.2  Definitions

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.2]

[Page 454-456]

                TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                           OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                       Subpart A--General

Sec. 295.2  Definitions.

    (a) For the purposes of the ATP, the term award means Federal
financial assistance made under a grant or cooperative agreement.
    (b) The term company means a for-profit organization, including sole
proprietors, partnerships, limited liability companies (LLCs), or
corporations.
    (c) The term cooperative agreement refers to a Federal assistance
instrument used whenever the principal purpose of the relationship
between the Federal Government and the recipient is the transfer of
money, property, or services, or anything of value to the recipient to
accomplish a public purpose of support or stimulation authorized by
Federal statute, rather than acquisition by purchase, lease, or barter,
of property or services for the direct benefit or use of the Federal
Government; and substantial involvement is anticipated between the
executive agency, acting for the Federal Government, and the recipient
during performance of the contemplated activity.
    (d) The term direct costs means costs that can be identified readily
with activities carried out in support of a particular final objective.
A cost may not be allocated to an award as a direct cost if any other
cost incurred for the same purpose in like circumstances has been
assigned to an award as an indirect cost. Because of the diverse

characteristics and accounting practices of different organizations, it is not possible to specify the types of costs which may be classified as direct costs in all situations. However, typical direct costs could include salaries of personnel working on the ATP project and associated reasonable fringe benefits such as medical insurance. Direct costs might also include supplies and materials, special equipment required specifically for the ATP project, and travel associated with the ATP project. ATP shall determine the allowability of direct costs in accordance with applicable Federal cost principles.

(e) The term foreign-owned company means a company other than a US-owned company as defined in Sec. 295.2(q).

(f) The term grant means a Federal assistance instrument used whenever the principal purpose of the relationship between the Federal Government and the recipient is the transfer of money, property, services, or anything of value to the recipient in order to accomplish a public purpose of support or stimulation authorized by Federal statute, rather than acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government; and no substantial involvement is anticipated between the executive agency, acting for the Federal Government, and the recipient during performance of the contemplated activity.

(g) The term independent research organization (IRO) means a nonprofit research and development corporation or association organized under the laws of any state for the purpose of carrying out research and development on behalf of other organizations.

(h) The term indirect costs means those costs incurred for common or joint objectives that cannot be readily identified with activities carried out in support of a particular final objective. A cost may not be allocated to an award as an indirect cost if any other cost incurred for the same purpose in like circumstances has been assigned to an award as a direct cost. Because of diverse characteristics and accounting

[[Page 455]]

practices it is not possible to specify the types of costs which may be classified as indirect costs in all situations. However, typical examples of indirect costs include general administration expenses, such as the salaries and expenses of executive officers, personnel administration, maintenance, library expenses, and accounting. ATP shall determine the allowability of indirect costs in accordance with applicable Federal cost principles.

(i) The term industry-led joint research and development venture or joint venture means a business arrangement that consists of two or more separately-owned, for-profit companies that perform research and development in the project; control the joint venture's membership, research directions, and funding priorities; and share total project costs with the Federal government. The joint venture may include additional companies, independent research organizations, universities, and/or governmental laboratories (other than NIST) which may or may not contribute funds (other than Federal funds) to the project and perform research and development. A for-profit company or an independent research organization may serve as an Administrator and perform administrative tasks on behalf of a joint venture, such as handling receipts and disbursements of funds and making antitrust filings. The following activities are not permissible for ATP funded joint ventures:

(1) Exchanging information among competitors relating to costs,

sales, profitability, prices, marketing, or distribution of any product, process, or service that is not reasonably required to conduct the research and development that is the purpose of such venture;

(2) Entering into any agreement or engaging in any other conduct restricting, requiring, or otherwise involving the production or marketing by any person who is a party to such joint venture of any product, process, or service, other than the production or marketing of proprietary information developed through such venture, such as patents and trade secrets; and

(3) Entering into any agreement or engaging in any other conduct:

(i) To restrict or require the sale, licensing, or sharing of inventions or developments not developed through such venture, or

(ii) To restrict or require participation by such party in other research and development activities, that is not reasonably required to prevent misappropriation of proprietary information contributed by any person who is a party to such venture or of the results of such venture.

(j) The term intellectual property means an invention patentable under title 35, US Code, or any patent on such an invention.

(k) The term large business for a particular ATP competition means any business, including any parent company plus related subsidiaries, having annual revenues in excess of the amount published by ATP in the relevant annual notice of availability of funds required by Sec. 295.7(a). In establishing this amount, ATP may consider the dollar value of the total revenues of the 500th company in Fortune Magazine's Fortune 500 listing.

(l) The term matching funds or cost sharing means that portion of project costs not borne by the Federal government. Sources of revenue to satisfy the required cost share include cash and in-kind contributions. Cash contributions can be from recipient, state, county, city, or other non-federal sources. In-kind contributions can be made by recipients or non-federal third parties (except subcontractors working on an ATP project) and include but are not limited to equipment, research tools, software, and supplies. Except as specified at Sec. 295.25, the value of in-kind contributions shall be determined in accordance with OMB Circular A-110, Subpart C, Section 23. The value of in-kind contributions will be prorated according to the share of total use dedicated to the ATP program. ATP restricts the total value of in-kind contributions that can be used to satisfy the cost share by requiring that such contributions not exceed 30 percent of the non-federal share of the total project costs. ATP shall determine the allowability of matching share costs in accordance with applicable federal cost principles.

[[Page 456]]

(m) The term person shall be deemed to include corporations and associations existing under or authorized by the laws of either the US, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

(n) The term Program means the Advanced Technology Program.

(o) The term Secretary means the Secretary of Commerce or the Secretary's designee.

(p) The term small business means a business that is independently owned and operated, is organized for profit, and is not dominant in the field of operation in which it is proposing, and meets the other requirements found in 13 CFR part 121.

    (q) The term US-owned company means a for-profit
organization, including sole proprietors, partnerships, or corporations,
that has a majority ownership or control by individuals who are citizens
of the US.

[55 FR 30145, July 24, 1990, as amended at 59 FR 666, 667, Jan. 6, 1994;
62 FR 64684, 64685, Dec. 9, 1997; 63 FR 64413, Nov. 20, 1998]

## 3.    Sec. 295.3  Eligibility of US- and foreign-owned businesses.

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.3]

[Page 456]

TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart A--General

Sec. 295.3  Eligibility of US- and foreign-owned businesses.

    (a) A company shall be eligible to receive an award from the Program
only if:
    (1) The Program finds that the company's participation in the
Program would be in the economic interest of the US, as
evidenced by investments in the US in research, development,
and manufacturing (including, for example, the manufacture of major
components or subassemblies in the US); significant
contributions to employment in the US; and agreement with
respect to any technology arising from assistance provided by the
Program to promote the manufacture within the US of products
resulting from that technology (taking into account the goals of
promoting the competitiveness of US industry), and to procure
parts and materials from competitive suppliers; and
    (2) Either the company is a US-owned company, or the
Program finds that the company is incorporated in the US and
has a parent company which is incorporated in a country which affords to
US-owned companies opportunities, comparable to those
afforded to any other company, to participate in any joint venture
similar to those authorized under the Program; affords the United
States-owned companies local investment opportunities comparable to

those afforded to any other company; and affords adequate and effective
protection for the intellectual property rights of US-owned
companies.
    (b) The Program may, within 30 days after notice to Congress,
suspend a company or joint venture from continued assistance under the
Program if the Program determines that the company, the country of
incorporation of the company or a parent company, or the joint venture
has failed to satisfy any of the criteria contained in paragraph (a) of
this section, and that it is in the national interest of the United
States to do so.
    (c) Companies owned by legal residents (green card holders) may
apply to the Program, but before an award can be given, the owner(s)
must either become a citizen or ownership must be transferred to a US
citizen(s).

[59 FR 667, Jan. 6, 1994, as amended at 62 FR 64685, Dec. 9, 1997]


# 4.   Sec. 295.4  The selection process


[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.4]

[Page 456-457]

                    TITLE 15--COMMERCE AND FOREIGN TRADE

    CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                             OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                          Subpart A--General

Sec. 295.4  The selection process.

    (a) The selection process for awards is a multi-step process based
on the criteria listed in Sec. 295.6. Source evaluation boards (SEB) are
established to ensure that all proposals receive careful consideration.
In the first step, called ``preliminary screening,'' proposals may be
eliminated by the SEB that do not meet the requirements of this Part of
the annual Federal Register Program announcement. Typical but not
exclusive of the reasons for eliminating a proposal at this stage are
that the proposal: is deemed to have serious deficiencies in either the
technical or business plan; involves product development rather than
high-risk R&D; is not industry-led; is significantly overpriced or
underpriced given the scope of the work; does not meet the requirements
set out in the notice of availability of funds issued pursuant to

[[Page 457]]

Sec. 295.7; or does not meet the cost-sharing requirement. NIST will
also examine proposals that have been submitted to a previous
competition to determine whether substantive revisions have been made to
the earlier proposal, and, if not, may reject the proposal.
    (b) In the second step, referred to as the ``technical and business
review,'' proposals are evaluated under the criteria found in
Sec. 295.6. Proposals judged by the SEB after considering the technical
and business evaluations to have the highest merit based on the
selection criteria receive further consideration and are referred to as
``semifinalists.''
    (c) In the third step, referred to as ``selection of finalists,''
the SEB prepares a final ranking of semifinalist proposals by a majority
vote, based on the evaluation criteria in Sec. 295.6. During this step,
the semifinalist proposers will be invited to an oral review of their
proposals with NIST, and in some cases site visits may be required.
Subject to the provisions of Sec. 295.6, a list of ranked finalists is
submitted to the Selecting Official.
    (d) In the final step, referred to as ``selection of recipients,''
the Selecting Official selects funding recipients from among the
finalists, based upon: the SEB rank order of the proposals on the basis
of all selection criteria (Sec. 295.6); assuring an appropriate
distribution of funds among technologies and their applications; the
availability of funds; and adherence to the Program selection criteria.
The Program reserves the right to deny awards in any case where
information is uncovered which raises a reasonable doubt as to the
responsibility of the proposer. The decision of the Selecting Official
is final.
    (e) NIST reserves the right to negotiate the cost and scope of the
proposed work with the proposers that have been selected to receive
awards. For example, NIST may request that the proposer delete from the
scope of work a particular task that is deemed by NIST to be product
development or otherwise inappropriate for ATP support.

[63 FR 64413, Nov. 20, 1998]


## 5.    Sec. 295.5  Use of pre-proposals in the selection process


[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.5]

[Page 457]

TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart A--General

Sec. 295.5  Use of pre-proposals in the selection process.

    To reduce proposal preparation costs incurred by proposers and to
make the selection process more efficient, NIST may use mandatory or
optional preliminary qualification processes based on pre-proposals. In
such cases, announcements requesting pre-proposals will be published as
indicated in Sec. 295.7, and will seek abbreviated proposals (pre-
proposals) that address both of the selection criteria, but in
considerably less detail than full proposals. The Program will review
the pre-proposals in accordance with the selection criteria and provide
written feedback to the proposers to determine whether the proposed
projects appear sufficiently promising to warrant further development
into full proposals. Proposals are neither ``accepted'' or ``rejected''
at the pre-proposal stage. When the full proposals are received in
response to the notice of availability of funds described in Sec. 295.7,
the review and selection process will occur as described in Sec. 295.4.

[63 FR 64414, Nov. 20, 1998]


# 6.    Sec. 295.6  Criteria for selection


[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.6]

[Page 457-458]

TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart A--General

Sec. 295.6  Criteria for selection.

    The evaluation criteria to be used in selecting any proposal for

funding under this program, and their respective weights, are listed in
this section. No proposal will be funded unless the Program determines
that it has scientific and technological merit and that the proposed
technology has strong potential for broad-based economic benefits to the
nation. Additionally, no proposal will be funded that does not require
Federal support, that is product development rather than high risk R&D,
that does not display an appropriate level of commitment from the
proposer, or does not have an adequate technical and commercialization
plan.

(a) Scientific and technological merit (50%). The proposed
technology must be highly innovative. The research must be challenging,
with high technical risk. It must be aimed at overcoming an important
problem(s) or exploiting a promising opportunity. The technical leverage
of the technology must be adequately explained. The research must have a
strong potential for

[[Page 458]]

advancing the state of the art and contributing significantly to the
US scientific and technical knowledge base. The technical plan must be
clear and concise, and must clearly identify the core innovation, the
technical approach, major technical hurdles, the attendant risks, and
clearly establish feasibility through adequately detailed plans linked
to major technical barriers. The plan must address the questions of
``what, how, where, when, why, and by whom'' in substantial detail. The
Program will assess the proposing team's relevant experience for
pursuing the technical plan. The team carrying out the work must
demonstrate a high level of scientific/technical expertise to conduct
the R&D and have access to the necessary research facilities.

(b) Potential for broad-based economic benefits (50%). The proposed
technology must have a strong potential to generate substantial benefits
to the nation that extend significantly beyond the direct returns to the
proposing organization(s). The proposal must explain why ATP support is
needed and what difference ATP funding is expected to make in terms of
what will be accomplished with the ATP funding versus without it. The
pathways to economic benefit must be described, including the proposer's
plan for getting the technology into commercial use, as well as
additional routes that might be taken to achieve broader diffusion of
the technology. The proposal should identify the expected returns that
the proposer expects to gain, as well as returns that are expected to
accrue to others, i.e., spillover effects. The Program will assess the
proposer's relevant experience and level of commitment to the project
and project's organizational structure and management plan, including
the extent to which participation by small businesses is encouraged and
is a key component in a joint venture proposal, and for large company
single proposers, the extent to which subcontractor/subrecipient teaming
arrangements are featured and are a key component of the proposal.

[63 FR 64414, Nov. 20, 1998]

# 7.    Sec. 295.7  Notice of availability of funds.

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.7]

[Page 458]

              TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                         OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                      Subpart A--General

Sec. 295.7  Notice of availability of funds.

    The Program shall publish at least annually a Federal Register
notice inviting interested parties to submit proposals, and may more
frequently publish invitations for proposals in the Commerce Business
Daily, based upon the annual notice. Proposals must be submitted in
accordance with the guidelines in the ATP Proposal Preparation Kit as
identified in the published notice. Proposals will only be considered
for funding when submitted in response to an invitation published in the
Federal Register, or a related announcement in the Commerce Business
Daily.

[63 FR 64414, Nov. 20, 1998]
```

# 8.    Sec. 295.8  Intellectual property rights; publication of research results

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.8]

[Page 458-459]

              TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                         OF COMMERCE
```

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart A--General

Sec. 295.8   Intellectual property rights; publication of research results.

   (a)(1) Patent rights. Title to inventions arising from assistance
provided by the Program must vest in a company or companies incorporated
in the US. Joint ventures shall provide to NIST a copy of
their written agreement which defines the disposition of ownership
rights among the members of the joint venture, and their contractors and
subcontractors as appropriate, that complies with the first sentence of
this paragraph. The US will reserve a nonexclusive,
nontransferable, irrevocable, paid-up license to practice or have
practiced for or on behalf of the US any such intellectual
property, but shall not, in the exercise of such license, publicly
disclose proprietary information related to the license. Title to any
such intellectual property shall not be transferred or passed, except to
a company incorporated in the US, until the expiration of the
first patent obtained in connection with such intellectual property.
Nothing in this paragraph shall be construed to prohibit the licensing
to any company of intellectual property rights arising from assistance
provided under this section.
   (2) Patent procedures. Each award by the Program shall include
provisions assuring the retention of a governmental use license in each
disclosed invention, and the government's retention of march-in rights.
In addition, each award by the Program will contain procedures regarding
reporting of subject inventions by the funding Recipient to the Program,
including the

[[Page 459]]

subject inventions of members of the joint venture (if applicable) in
which the funding Recipient is a participant, contractors and
subcontractors of the funding Recipient. The funding Recipient shall
disclose such subject inventions to the Program within two months after
the inventor discloses it in writing to the Recipient's designated
representative responsible for patent matters. The disclosure shall
consist of a detailed, written report which provides the Program with
the following: the title of the present invention; the names of all
inventors; the name and address of the assignee (if any); an
acknowledgment that the US has rights in the subject
invention; the filing date of the present invention, or, in the
alternative, a statement identifying that the Recipient determined that
filing was not feasible; an abstract of the disclosure; a description or
summary of the present invention; the background of the present
invention or the prior art; a description of the preferred embodiments;
and what matter is claimed. Upon issuance of the patent, the funding
Recipient or Recipients must notify the Program accordingly, providing
it with the Serial Number of the patent as issued, the date of issuance,
a copy of the disclosure as issued, and if appropriate, the name,
address, and telephone number(s) of an assignee.
   (b) Copyrights: Except as otherwise specifically provided for in an
Award, funding recipients under the Program may establish claim to
copyright subsisting in any data first produced in the performance of

the award. When claim is made to copyright, the funding recipient shall affix the applicable copyright notice of 17 USC. 401 or 402 and acknowledgment of Government sponsorship to the data when and if the data are delivered to the Government, are published, or are deposited for registration as a published work in the US Copyright Office. The funding recipient shall grant to the Government, and others acting on its behalf, a paid up, nonexclusive, irrevocable, worldwide license for all such data to reproduce, prepare derivative works, perform publicly and display publicly, and for data other than computer software to distribute to the public by or on behalf of the Government.

    (c) Publication of research results: The decision on whether or not to publish research results will be made by the funding recipient(s). Unpublished intellectual property owned and developed by any business or joint research and development venture receiving funding or by any member of such a joint venture may not be disclosed by any officer or employee of the Federal Government except in accordance with a written agreement between the owner or developer and the Program. The licenses granted to the Government under Sec. 295.8(b) shall not be considered a waiver of this requirement.

[55 FR 30145, July 24, 1990. Redesignated and amended at 59 FR 667, 669, Jan. 6, 1994; 63 FR 64414, Nov. 20, 1998]


# 9.  Sec. 295.9  Protection of confidential information


[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.9]

[Page 459]

                TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                          OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                      Subpart A--General

Sec. 295.9  Protection of confidential information.

    As required by section 278n(d)(5) of title 15 of the US
Code, the following information obtained by the Secretary on a

```
confidential basis in connection with the activities of any business or
joint research and development venture receiving funding under the
program shall be exempt from disclosure under the Freedom of Information
Act--
    (1) Information on the business operation of any member of the
business or joint venture;
    (2) Trade secrets possessed by any business or any member of the
joint venture.

[55 FR 30145, July 24, 1990. Redesignated at 59 FR 667, Jan. 6, 1994]
```

## 10.  Sec. 295.10  Special reporting and auditing requirements

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.10]

[Page 459-460]

                TITLE 15--COMMERCE AND FOREIGN TRADE

    CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                            OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                        Subpart A--General

Sec. 295.10  Special reporting and auditing requirements.

    Each award by the Program shall contain procedures regarding
technical, business, and financial reporting and auditing requirements
to ensure that awards are being used in accordance with the Program's
objectives and applicable Federal cost principles. The purpose of the
technical reporting is to monitor ``best effort'' progress toward
overall project goals. The purpose of the business reporting system is
to monitor project performance against the Program's mission as required
by

[[Page 460]]

the Government Performance and Results Act (GPRA) mandate for program
evaluation. The audit standards to be applied to ATP awards are the
``Government Auditing Standards'' (GAS) issued by the Comptroller
General of the US (also known as yellow book standards) and
the ATP program-specified audit guidelines. The ATP program-specific
audit guidelines include guidance on the number of audits required under
```

an award. In the interest of efficiency, the recipients are encouraged
to retain their own independent CPA firm to perform these audits. The
Department of Commerce's Office of Inspector General (OIG) reserves the
right to conduct audits as deemed necessary and appropriate.

[62 FR 64686, Dec. 9, 1997. Redesignated at 63 FR 64415, Nov. 20, 1998]

## 11.  Sec. 295.11  Technical and educational services for ATP recipients.

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.11]

[Page 460]

              TITLE 15--COMMERCE AND FOREIGN TRADE

   CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                          OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

                     Subpart A--General

Sec. 295.11  Technical and educational services for ATP recipients.

     (a) Under the Federal Technology Transfer Act of 1986, the National
Institute of Standards and Technology of the Technology Administration
has the authority to enter into cooperative research and development
agreements with non-Federal parties to provide personnel, services,
facilities, equipment, or other resources except funds toward the
conduct of specified research or development efforts which are
consistent with the missions of the laboratory. In turn, the National
Institute of Standards and Technology has the authority to accept funds,
personnel, services, facilities, equipment and other resources from the
non-Federal party or parties for the joint research effort. Cooperative
research and development agreements do not include procurement contracts
or cooperative agreements as those terms are used in sections 6303,
6304, and 6305 of title 31, US Code.
     (b) In no event will the National Institute of Standards and
Technology enter into a cooperative research and development agreement
with a recipient of awards under the Program which provides for the
payment of Program funds from the award recipient to the National

Institute of Standards and Technology.
     (c) From time to time, ATP may conduct public workshops and
undertake other educational activities to foster the collaboration of
funding Recipients with other funding resources for purposes of further
development and commercialization of ATP-related technologies. In no
event will ATP provide recommendations, endorsements, or approvals of
any ATP funding Recipients to any outside party.

[55 FR 30145, July 24, 1990. Redesignated at 59 FR 667, Jan. 6, 1994.
Redesignated and amended at 63 FR 64415, Nov. 20, 1998]

# 20.  Sec. 295.21  Qualifications of proposers

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.21]

[Page 460-461]

                    TITLE 15--COMMERCE AND FOREIGN TRADE

   CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                            OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

   Subpart B--Assistance to US Industry-Led Joint Research and
                      Development Ventures

Sec. 295.21  Qualifications of proposers.

     Subject to the limitations set out in Sec. 295.3, assistance under
this subpart is available only to industry-led joint research and
development ventures. These ventures may include universities,
independent research organizations, and governmental entities. Proposals
for funding under this Subpart may be submitted on behalf of a joint
venture by a for-profit company or an independent research organization
that is a member of the joint venture. Proposals should include letters
of commitment or excerpts of such letters from all proposed members of
the joint venture, verifying the availability of cost-sharing funds, and
authorizing the party submitting the proposal to act on behalf of the
venture with the Program on all matters pertaining to the proposal. No
costs shall be incurred under an ATP project by the joint venture
members until such time as a

[[Page 461]]

joint venture agreement has been executed by all of the joint venture
members and approved by NIST. NIST will withhold approval until it
determines that a sufficient number of members have signed the joint
venture agreement. Costs will only be allowed after the execution of the
joint venture agreement and approval by NIST.

[63 FR 64415, Nov. 20, 1998]

## 21.  Sec. 295.22  Limitations on assistance

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.22]

[Page 461]

                TITLE 15--COMMERCE AND FOREIGN TRADE

   CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                            OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

   Subpart B--Assistance to US Industry-Led Joint Research and
                        Development Ventures

Sec. 295.22  Limitations on assistance.

    (a) An award will be made under this subpart only if the award will
facilitate the formation of a joint venture or the initiation of a new
research and development project by an existing joint venture.
    (b) The total value of any in-kind contributions used to satisfy the
cost sharing requirement may not exceed 30 percent of the non-federal
share of the total project costs.

[62 FR 64687, Dec. 9, 1997]

## 22.  Sec. 295.23  Dissolution of joint research and development ventures

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.23]

[Page 461]

             TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                       OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart B--Assistance to US Industry-Led Joint Research and
                  Development Ventures

Sec. 295.23  Dissolution of joint research and development ventures.

    Upon dissolution of any joint research and development venture
receiving funds under these procedures or at a time otherwise agreed
upon, the Federal Government shall be entitled to a share of the
residual assets of the joint venture proportional to the Federal share
of the costs of the joint venture as determined by independent audit.
```

## 23.  Sec. 295.24  Registration

```
[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.24]

[Page 461]

             TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                       OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart B--Assistance to US Industry-Led Joint Research and
```