Development Ventures

Sec. 295.24  Registration.

    Joint ventures selected for funding under the Program must notify
the Department of Justice and the Federal Trade Commission under the
National Cooperative Research Act of 1984. No funds will be released
prior to receipt by the Program of copies of such notification.

[63 FR 64415, Nov. 20, 1998]

## 24.  Sec. 295.25  Special rule for the valuation of transfers between separately-owned joint venture members

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.25]

[Page 461]

            TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                          OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

   Subpart B--Assistance to US Industry-Led Joint Research and
                    Development Ventures

Sec. 295.25  Special rule for the valuation of transfers between separately-
owned joint venture members.

    (a) Applicability. This section applies to transfers of goods,
including computer software, and services provided by the transferor
related to the maintenance of those goods, when those goods or services
are transferred from one joint venture member to other separately-owned
joint venture members.
    (b) Rule. The greater amount of the actual cost of the transferred
goods and services as determined in accordance with applicable Federal
cost principles, or 75 percent of the best customer price of the
transferred goods and services, shall be deemed to be allowable costs;
provided, however, that in no event shall the aggregate of these
allowable costs exceed 30 percent of the non-Federal share of the total
cost of the joint research and development program.
    (c) Definition. The term ``best customer price'' shall mean the GSA
schedule price, or if such price is unavailable, the lowest price at
which a sale was made during the last twelve months prior to the
transfer of the particular good or service.

[62 FR 64687, Dec. 9, 1997]

# 30.  Sec. 295.30  Types of assistance available

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.30]

[Page 461]

TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

Subpart C--Assistance to Single-Proposer US Businesses

Sec. 295.30  Types of assistance available.


    This subpart describes the types of assistance that may be provided
under the authority of 15 USC. 278n(b)(2). Such assistance includes
but is not limited to entering into cooperative agreements with United
States businesses, especially small businesses.

[59 FR 670, Jan. 6, 1994]


# 31.  Sec. 295.31  Qualification of proposers

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.31]

[Page 461]

TITLE 15--COMMERCE AND FOREIGN TRADE

CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT

OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

      Subpart C--Assistance to Single-Proposer US Businesses

Sec. 295.31   Qualification of proposers.

    Awards under this subpart will be available to all businesses,
subject to the limitations set out in Secs. 295.3 and 295.32.

[62 FR 64687, Dec. 9, 1997]

# 32.  Sec. 295.32  Limitations on assistance

[Code of Federal Regulations]
[Title 15, Volume 1, Parts 0 to 299]
[Revised as of January 1, 2001]
From the US Government Printing Office via GPO Access
[CITE: 15CFR295.32]

[Page 461-462]

           TITLE 15--COMMERCE AND FOREIGN TRADE

  CHAPTER II--NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, DEPARTMENT
                    OF COMMERCE

PART 295--ADVANCED TECHNOLOGY PROGRAM--Table of Contents

      Subpart C--Assistance to Single-Proposer US Businesses

Sec. 295.32   Limitations on assistance.

    (a) The Program will not directly provide funding under this subpart
to any governmental entity, academic institution or independent research
organization.
    (b) For proposals submitted to ATP after December 31, 1997, awards
to large businesses made under this subpart shall not exceed 40 percent
of the total project costs of those awards in any year of the award.

[[Page 462]]

    (c) Awards under this subpart may not exceed $2,000,000, or be for
more than three years, unless the Secretary provides a written
explanation to the authorizing committees of both Houses of Congress and
then, only after thirty days during which both Houses of Congress are in
session. No funding for indirect costs, profits, or management fees
shall be available for awards made under this subpart.

(d) The total value of any in-kind contributions used to satisfy a cost sharing requirement may not exceed 30 percent of the non-federal share of the total project costs.

[62 FR 64687, Dec. 9, 1997]

## (5)   CIRCULAR A-110 REVISED 11/19/93 As Further Amended 9/30/99[227]

### APPENDIX A - CONTRACT PROVISIONS

**SUBPART A - General**

#### (1) 1. Purpose.

This Circular establishes uniform administrative requirements for Federal grants and agreements awarded to institutions of higher education, hospitals, and other non-profit organizations. Federal awarding agencies shall not impose additional or inconsistent requirements, except as provided in Sections ___.4, and ___.14 or unless specifically required by Federal statute or executive order. Non-profit organizations that implement Federal programs for the States are also subject to State requirements.

#### (1) __.2 Definitions.

 (a) **Accrued expenditures** means the charges incurred by the recipient during a given period requiring the provision of funds for: (1) goods and other tangible property received; (2) services performed by employees, contractors, subrecipients, and other payees; and, (3) other amounts becoming owed under programs for which no current services or performance is required.

 (b) **Accrued income** means the sum of: (1) earnings during a given period from (i) services performed by the recipient, and (ii) goods and other tangible property delivered to purchasers, and (2) amounts becoming owed to the recipient for which no current services or performance is required by the recipient.

 (c) **Acquisition cost of equipment** means the net invoice price of the equipment, including the cost of modifications, attachments, accessories, or auxiliary apparatus necessary to make the property usable for the purpose for which it was acquired. Other charges, such as the cost of installation, transportation, taxes, duty or protective in-transit insurance, shall be included or excluded from the unit acquisition cost in accordance with the recipient's regular accounting practices.

### 5) GENERAL PRINCIPLES

---

[227] http://www.whitehouse.gov/omb/circulars_a110

## 33.   A. Basic Considerations

1)  1. Composition of total costs.

The total cost of an award is the sum of the allowable direct and allocable indirect costs less any applicable credits.

2)  2. Factors affecting allowability of costs.

To be allowable under an award, costs must meet the following general criteria:

a.   Be reasonable for the performance of the award and be allocable thereto under these principles.

b.   Conform to any limitations or exclusions set forth in these principles or in the award as to types or amount of cost items.

c.   Be consistent with policies and procedures that apply uniformly to both federally financed and other activities of the organization.

d.   Be accorded consistent treatment.

e.   Be determined in accordance with generally accepted accounting principles (GAAP).

f.   Not be included as a cost or used to meet cost sharing or matching requirements of any other federally financed program in either the current or a prior period.

g.   Be adequately documented.

3)  3. Reasonable costs.

A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs. The question of the reasonableness of specific costs must be scrutinized with particular care in connection with organizations or separate divisions thereof which receive the preponderance of their support from awards made by Federal agencies. In determining the reasonableness of a given cost, consideration shall be given to:

a.   Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award.

b.   The restraints or requirements imposed by such factors as generally accepted sound business practices, arms length bargaining, Federal and State laws and regulations, and terms and conditions of the award.

c.   Whether the individuals concerned acted with prudence in the circumstances, considering their responsibilities to the organization, its members, employees, and clients, the public at large, and the Federal Government.

d.   Significant deviations from the established practices of the organization which may unjustifiably increase the award costs.

4)  4. Allocable costs.

A cost is allocable to a particular cost objective, such as a grant, contract, project, service, or other activity, in accordance with the relative benefits received. A cost is allocable to a Federal award if it is treated consistently with other costs incurred for the same purpose in like circumstances and if it:

(1) Is incurred specifically for the award.

(2) Benefits both the award and other work and can be distributed in reasonable proportion to the benefits received, or (3) Is necessary to the overall operation of the organization, although a direct relationship to any particular cost objective cannot be shown.

a.  Any cost allocable to a particular award or other cost objective under these principles may not be shifted to other Federal awards to overcome funding deficiencies, or to avoid restrictions imposed by law or by the terms of the award.

## 5)  5. Applicable credits.

a.  The term applicable credits refers to those receipts, or reduction of expenditures which operate to offset or reduce expense items that are allocable to awards as direct or indirect costs. Typical examples of such transactions are: purchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds, and adjustments of overpayments or erroneous charges. To the extent that such credits accruing or received by the organization relate to allowable cost, they shall be credited to the Federal Government either as a cost reduction or cash refund, as appropriate.

b.  In some instances, the amounts received from the Federal Government to finance organizational activities or service operations should be treated as applicable credits. Specifically, the concept of netting such credit items against related expenditures should be applied by the organization in determining the rates or amounts to be charged to Federal awards for services rendered whenever the facilities or other resources used in providing such services have been financed directly, in whole or in part, by Federal funds.

c.  For rules covering program income (i.e., gross income earned from federally supported activities) see Sec. ___.24 of Office of Management and Budget (OMB) Circular A-110, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations."

## 6)  6. **Advance understandings**.

Under any given award, the reasonableness and allocability of certain items of costs may be difficult to determine. This is particularly true in connection with organizations that receive a preponderance of their support from Federal agencies. In order to avoid subsequent disallowance or dispute based on unreasonableness or nonallocability, it is often desirable to seek a written agreement with the cognizant or awarding agency in advance of the incurrence of special or unusual costs. The absence of an advance agreement on any element of cost will not, in itself, affect the reasonableness or allocability of that element.

## 7)  7. Conditional exemptions.

a.  OMB authorizes conditional exemption from OMB administrative requirements and cost principles circulars for certain Federal programs with statutorily-authorized consolidated planning and consolidated administrative funding, that are identified by a Federal agency and approved by the head of the Executive department or establishment. A Federal agency shall consult with OMB during its consideration of whether to grant such an exemption.

b.  To promote efficiency in State and local program administration, when Federal non-entitlement programs with common purposes have specific statutorily-authorized consolidated planning and consolidated administrative funding and where most of the State agency's resources come from non-Federal sources, Federal agencies may exempt these covered State-administered, non-entitlement grant programs from certain OMB grants management requirements. The exemptions would be from all but the allocability of costs provisions of OMB Circulars A-87 (Attachment A, subsection C.3), "Cost Principles for State, Local, and Indian Tribal Governments," A-21 (Section C, subpart 4), "Cost Principles for Educational Institutions," and A-122 (Attachment A, subsection A.4), "Cost Principles for Non-Profit Organizations," and from all of the administrative requirements provisions of OMB Circular A-110, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations," and the agencies' grants management common rule.

c.  When a Federal agency provides this flexibility, as a prerequisite to a State's exercising this option, a State must adopt its own written fiscal and administrative requirements for expending and accounting for all funds, which are consistent with the provisions of OMB Circular A-87, and extend such policies to all subrecipients. These fiscal

and administrative requirements must be sufficiently specific to ensure that: funds are used in compliance with all applicable Federal statutory and regulatory provisions, costs are reasonable and necessary for operating these programs, and funds are not used for general expenses required to carry out other responsibilities of a State or its subrecipients.

# 34.   B. Direct Costs

1. Direct costs are those that can be identified specifically with a particular final cost objective, i.e., a particular award, project, service, or other direct activity of an organization. However, a cost may not be assigned to an award as a direct cost if any other cost incurred for the same purpose, in like circumstance, has been allocated to an award as an indirect cost. Costs identified specifically with awards are direct costs of the awards and are to be assigned directly thereto. Costs identified specifically with other final cost objectives of the organization are direct costs of those cost objectives and are not to be assigned to other awards directly or indirectly.

2. Any direct cost of a minor amount may be treated as an indirect cost for reasons of practicality where the accounting treatment for such cost is consistently applied to all final cost objectives.

3. The cost of certain activities are not allowable as charges to Federal awards (see, for example, fundraising costs in paragraph 17 of Attachment B). However, even though these costs are unallowable for purposes of computing charges to Federal awards, they nonetheless must be treated as direct costs for purposes of determining indirect cost rates and be allocated their share of the organization's indirect costs if they represent activities which (1) include the salaries of personnel, (2) occupy space, and (3) benefit from the organization's indirect costs.

4. The costs of activities performed primarily as a service to members, clients, or the general public when significant and necessary to the organization's mission must be treated as direct costs whether or not allowable and be allocated an equitable share of indirect costs. Some examples of these types of activities include:

a.   Maintenance of membership rolls, subscriptions, publications, and related functions.

b.   Providing services and information to members, legislative or administrative bodies, or the public.

c.   Promotion, lobbying, and other forms of public relations.

d.   Meetings and conferences except those held to conduct the general administration of the organization.

e.   Maintenance, protection, and investment of special funds not used in operation of the organization.

f.   Administration of group benefits on behalf of members or clients, including life and hospital insurance, annuity or retirement plans, financial aid, etc.

# 35.   C. Indirect Costs

1. Indirect costs are those that have been incurred for common or joint objectives and cannot be readily identified with a particular final cost objective. Direct cost of minor amounts may be treated as indirect costs under the conditions described in subparagraph B.2. After direct costs have been determined and assigned directly to awards or other work as appropriate, indirect costs are those remaining to be allocated to benefiting cost objectives. A cost may not be allocated to an award as an indirect cost if any other cost incurred for the same purpose, in like circumstances, has been assigned to an award as a direct cost.

2. Because of the diverse characteristics and accounting practices of non-profit organizations, it is not possible to specify the types of cost which may be classified as indirect cost in all situations. However, typical examples of indirect cost for many non-profit organizations may include depreciation or use allowances on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

3. Indirect costs shall be classified within two broad categories: "Facilities" and "Administration." "Facilities" is defined as depreciation and use allowances on buildings, equipment and capital improvement, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses. "Administration" is defined as general administration and general expenses such as the director's office, accounting, personnel, library expenses and all other types of expenditures not listed specifically under one of the subcategories of "Facilities" (including cross allocations from other pools, where applicable). See indirect cost rate reporting requirements in subparagraphs D.2.e and D.3.g.

# 36.   D. Allocation of Indirect Costs and Determination of Indirect Cost Rates

8) 1. General.

a.   Where a non-profit organization has only one major function, or where all its major functions benefit from its indirect costs to approximately the same degree, the allocation of indirect costs and the computation of an indirect cost rate may be accomplished through simplified allocation procedures, as described in subparagraph 2.

b.   Where an organization has several major functions which benefit from its indirect costs in varying degrees, allocation of indirect costs may require the accumulation of such costs into separate cost groupings which then are allocated individually to benefiting functions by means of a base which best measures the relative degree of benefit. The indirect costs allocated to each function are then distributed to individual awards and other activities included in that function by means of an indirect cost rate(s).

c.   The determination of what constitutes an organization's major functions will depend on its purpose in being; the types of services it renders to the public, its clients, and its members; and the amount of effort it devotes to such activities as fundraising, public information and membership activities.

d.   Specific methods for allocating indirect costs and computing indirect cost rates along with the conditions under which each method should be used are described in subparagraphs 2 through 5.

e.   The base period for the allocation of indirect costs is the period in which such costs are incurred and accumulated for allocation to work performed in that period. The base period normally should coincide with the organization's fiscal year but, in any event, shall be so selected as to avoid inequities in the allocation of the costs.

## (2)___.14 Special award conditions

If an applicant or recipient:

(a) has a history of poor performance,
(b) is not financially stable,
(c) has a management system that does not meet the standards prescribed in this Circular,
(d) has not conformed to the terms and conditions of a previous award, or
(e) is not otherwise responsible,

Federal awarding agencies may impose additional requirements as needed, provided that such applicant or recipient is notified in writing as to: the nature of the additional requirements, the reason why the additional requirements are being imposed, the nature of the corrective action needed, the time allowed for completing the corrective actions, and the method for requesting reconsideration of the additional requirements imposed. Any special conditions shall be promptly removed once the conditions that prompted them have been corrected.

## (3)___.23 Cost sharing or matching

(a) All contributions, including cash and third party in-kind, shall be accepted as part of the recipient's cost sharing or matching when such contributions meet all of the following criteria.

(1) Are verifiable from the recipient's records.
(2) Are not included as contributions for any other federally-assisted project or program.
(3) Are necessary and reasonable for proper and efficient accomplishment of project or program objectives.
(4) Are allowable under the applicable cost principles.
(5) Are not paid by the Federal Government under another award, except where authorized by Federal statute to be used for cost sharing or matching.
(6) Are provided for in the approved budget when required by the Federal awarding agency.
(7) Conform to other provisions of this Circular, as applicable.
(b) Unrecovered indirect costs may be included as part of cost sharing or matching only with the prior approval of the Federal awarding agency.
(c) Values for recipient contributions of services and property shall be established in accordance with the applicable cost principles. If a Federal awarding agency authorizes recipients to donate buildings or land for construction/facilities acquisition projects or long-term use, the value of the donated property for cost sharing or matching shall be the lesser of (1) or (2).

(1) The certified value of the remaining life of the property recorded in the recipient's accounting records at the time of donation.

(2) The current fair market value. However, when there is sufficient justification, the Federal awarding agency may approve the use of the current fair market value of the donated property, even if it exceeds the certified value at the time of donation to the project.
(d) Volunteer services furnished by professional and technical personnel, consultants, and other skilled and unskilled labor may be counted as cost sharing or matching if the service is an integral and necessary part of an approved project or program. Rates for volunteer services shall be consistent with those paid for similar work in the recipient's organization. In those instances in which the required skills are not found in the recipient organization, rates shall be consistent with those paid for similar work in the labor market in which the recipient competes for the kind of services involved. In either case, paid fringe benefits that are reasonable, allowable, and allocable may be included in the valuation.

(e) When an employer other than the recipient furnishes the services of an employee, these services shall be valued at the employee's regular rate of pay (plus an amount of fringe benefits that are reasonable, allowable, and allocable, but exclusive of overhead costs), provided these services are in the same skill for which the employee is normally paid.

(f) Donated supplies may include such items as expendable equipment, office supplies, laboratory supplies or workshop and classroom supplies. Value assessed to donated supplies included in the cost sharing or matching share shall be reasonable and shall not exceed the fair market value of the property at the time of the donation.

(g) The method used for determining cost sharing or matching for donated equipment, buildings and land for which title passes to the recipient may differ according to the purpose of the award, if (1) or (2) apply.

(1) If the purpose of the award is to assist the recipient in the acquisition of equipment, buildings or land, the total value of the donated property may be claimed as cost sharing or matching.

(2) If the purpose of the award is to support activities that require the use of equipment, buildings or land, normally only depreciation or use charges for equipment and buildings may be made. However, the full value of equipment or other capital assets and fair rental charges for land may be allowed, provided that the Federal awarding agency has approved the charges.
(h) The value of donated property shall be determined in accordance with the usual accounting policies of the recipient, with the following qualifications.

(1) The value of donated land and buildings shall not exceed its fair market value at the time of donation to the recipient as established by an independent appraiser (e.g., certified real property appraiser or General Services Administration representative) and certified by a responsible official of the recipient.

(2) The value of donated equipment shall not exceed the fair market value of equipment of the same age and condition at the time of donation.

(3) The value of donated space shall not exceed the fair rental value of comparable space as established by an independent appraisal of comparable space and facilities in a privately-owned building in the same locality.

(4) The value of loaned equipment shall not exceed its fair rental value.

(5) The following requirements pertain to the recipient's supporting records for in-kind contributions from third parties.

    (i) Volunteer services shall be documented and, to the extent feasible, supported by the same methods used by the recipient for its own employees.

    (ii) The basis for determining the valuation for personal service, material, equipment, buildings and land shall be documented.

## (25)    \_\_.25 Revision of budget and program plans.

(a) The budget plan is the financial expression of the project or program as approved during the award process. It may include either the Federal and non-Federal share, or only the Federal share, depending upon Federal awarding agency requirements. It shall be related to performance for program evaluation purposes whenever appropriate.

(b) Recipients are required to report deviations from budget and program plans, and request prior approvals for budget and program plan revisions, in accordance with this section.

(c) For nonconstruction awards, recipients shall request prior approvals from Federal awarding agencies for one or more of the following program or budget related reasons.

    (1) Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval).

    (2) Change in a key person specified in the application or award document.

    (3) The absence for more than three months, or a 25 percent reduction in time devoted to the project, by the approved project director or principal investigator.

    (4) The need for additional Federal funding.

    (5) The transfer of amounts budgeted for indirect costs to absorb increases in direct costs, or vice versa, if approval is required by the Federal awarding agency.

    (6) The inclusion, unless waived by the Federal awarding agency, of costs that require prior approval in accordance with OMB Circular A-21, "Cost Principles for Educational Institutions," OMB Circular A-122, "Cost Principles for Non-Profit Organizations," or 45 CFR part 74 Appendix E, "Principles for Determining Costs Applicable to Research and Development under Grants and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

    (7) The transfer of funds allotted for training allowances (direct payment to trainees) to other categories of expense.

    (8) Unless described in the application and funded in the approved awards, the subaward, transfer or contracting out of any work under an award. This provision does not apply to the purchase of supplies, material, equipment or general support services.

(d) No other prior approval requirements for specific items may be imposed unless a deviation has been approved by OMB.

(e) Except for requirements listed in paragraphs (c)(1) and (c)(4) of this section, Federal awarding agencies are authorized, at their option, to waive cost-related and administrative prior written approvals required by this Circular and OMB Circulars A-21 and A-122. Such waivers may include authorizing recipients to do any one or more of the following.

    (1) Incur pre-award costs 90 calendar days prior to award or more than 90 calendar days with the prior approval of the Federal awarding agency. All pre-award costs are incurred at the recipient's risk (i.e., the

Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive an award or if the award is less than anticipated and inadequate to cover such costs).

(2) Initiate a one-time extension of the expiration date of the award of up to 12 months unless one or more of the following conditions apply. For one-time extensions, the recipient must notify the Federal awarding agency in writing with the supporting reasons and revised expiration date at least 10 days before the expiration date specified in the award. This one-time extension may not be exercised merely for the purpose of using unobligated balances.

(i) The terms and conditions of award prohibit the extension.

(ii) The extension requires additional Federal funds.

(iii) The extension involves any change in the approved objectives or scope of the project.

(3) Carry forward unobligated balances to subsequent funding periods.

(4) For awards that support research, unless the Federal awarding agency provides otherwise in the award or in the agency's regulations, the prior approval requirements described in paragraph (e) are automatically waived (i.e., recipients need not obtain such prior approvals) unless one of the conditions included in paragraph (e)(2) applies.

(f) The Federal awarding agency may, at its option, restrict the transfer of funds among direct cost categories or programs, functions and activities for awards in which the Federal share of the project exceeds $100,000 and the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency. No Federal awarding agency shall permit a transfer that would cause any Federal appropriation or part thereof to be used for purposes other than those consistent with the original intent of the appropriation.

(g) All other changes to nonconstruction budgets, except for the changes described in paragraph (j), do not require prior approval.

(h) For construction awards, recipients shall request prior written approval promptly from Federal awarding agencies for budget revisions whenever (1), (2) or (3) apply.

(1) The revision results from changes in the scope or the objective of the project or program.

(2) The need arises for additional Federal funds to complete the project.

(3) A revision is desired which involves specific costs for which prior written approval requirements may be imposed consistent with applicable OMB cost principles listed in Section ___.27.

(i) No other prior approval requirements for specific items may be imposed unless a deviation has been approved by OMB.

(j) When a Federal awarding agency makes an award that provides support for both construction and nonconstruction work, the Federal awarding agency may require the recipient to request prior approval from the Federal awarding agency before making any fund or budget transfers between the two types of work supported.

(k) For both construction and nonconstruction awards, Federal awarding agencies shall require recipients to notify the Federal awarding agency in writing promptly whenever the amount of Federal authorized funds is expected to exceed the needs of the recipient for the project period by more than $5000 or five percent of the Federal award, whichever is greater. This notification shall not be required if an application for additional funding is submitted for a continuation award.

(l) When requesting approval for budget revisions, recipients shall use the budget forms that were used in the application unless the Federal awarding agency indicates a letter of request suffices.

(m) Within 30 calendar days from the date of receipt of the request for budget revisions, Federal awarding agencies shall review the request and notify the recipient whether the budget revisions have been approved. If the revision is still under consideration at the end of 30 calendar days, the Federal awarding agency shall inform the recipient in writing of the date when the recipient may expect the decision.

**(26)        Brady Cases and treatises**

**(1) Recent Brady Cases in Circuit Courts of Appeal**

For recent Brady cases (not an exhaustive list) in which the Circuit Courts of Appeal granted relief, or criticized prosecutors for nondisclosures, see

US v. Robinson, 583 F.3d 1265 (10th Cir. 2009)(nondisclosure of mental health records of confidential informant requires vacating conviction);

Simmons v. Beard, 581 F.3d 158 (3d Cir. 2009)(suppression of evidence discrediting key witness violates due process);

Montgomery v. Bagley, 581 F.3d 440 (6th Cir. 2009)(suppression of police report undermining credibility of key witness violates due process);

US v. Lee, 573 F.3d 155 (3d Cir. 2009)(nondisclosure of back of hotel registration card suggesting defendant had registered in hotel required vacating conviction);

US v. Burke, 571 F.3d 1048 (10th Cir. 2009)(court greatly concerned that prosecutor's belated disclosure "encourages gamesmanship" and "creates dangerous incentives [to misconduct]" but defendant did not show material prejudice);

US v. Torres, 569 F.3d 1277 (10thCir. 2009)(nondisclosure that confidential informant had been retained by government on two previous occasions required vacating conviction);

US v. Price, 566 F.3d 900 (9th Cir. 2009)(nondisclosure of extensive criminal history of key government witness requires vacating conviction);

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009)(suppression of deal with key witness violates due process);

US v. Mauskar, 557 F.3d 219, 232 (5th Cir. 2009)(court "deeply concerned" at prosecutor's belated disclosure of key evidence and at prosecutor's justification which is

"beneath a member of the Bar representing the US before this Court" but defendant failed to prove prejudice); );

US v. Gibson, 328 Fed. Appx. 860 (4th Cir. 2009)(new trial ordered on some counts based on prosecutor's discovery violation);

Harris v. Lafler, 553 F.3d 1028 (6th Cir. 2009)(suppression of evidence that key witness promised substantial benefits for his testimony);

US v. Triumph Capital Group, Inc., 544 F.3d 149 (2d Cir. 2008)((new trial ordered based on prosecutor's "inexplicably withholding" material exculpatory and impeachment evidence);

US v. Aviles-Colon, 536 F.3d 1 (1st Cir. 2008)(nondisclosure of DEA reports materially prejudicial and new trial ordered);

Unite States v. Lopez, 534 F.3d 1027 (9th Cir. 2008)(prosecutor's Brady violation "troubling" but motion for new trial denied);

D'Ambrosio v. Bagley, 527 F.3d 489 (6th Cir. 2008)(suppression of several items of exculpatory evidence that substantially contradicts testimony of state's only eyewitness);

US v. Rittweger, 524 F.3d 171, 180 (2d Cir. 2008)(Sotomayor, J.)(court "troubled" and "disappointed" by prosecutor's belated disclosure of exculpatory evidence and prosecutor's argument that evidence not material disingenous but defendant failed to shop prejudice;

US v. Chapman, 524 F.3d 1073 (9th Cir. 2008)(prosecutor's "unconscionable," "willful," and "bad faith" violation of discovery obligations and "flagrant" misrepresentations to court justified mistrial

US v. Zomber, 299 Fed. Appx. 130 (3d Cir. 2008)(prosecutor's discovery violation requires reversal of conviction and new trial);

US v. Garcia, 271 Fed. Appx. 347 (4th Cir. 2008)(prosecutor's failure to disclose key impeachment evidence not

prejudicial because defendant's counsel uncovered information day before witness testified);

US v. Butler, 275 Fed. Appx. 816 (11th Cir. 2008)(suppression of impeachment evidence but no new trial);

US v. White, 492 F.3d 380 (6th Cir. 2007)(remanded for hearing on Brady violation but court observes that given conflicting statements, "US Attorney's word is worth considerably less");

Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008)(suppression of evidence of cooperation agreement with key witness);

US v. Jernigan, 492 F.3d 1050 (9th Cir. 2007)(en banc)(prosecutor suppresses evidence that other similar bank robberies were committed by someone after defendant's arrest who bore

striking resemblance to defendant);

US v. garner, 507 F.3d 399 (6th Cir. 2007)(belated disclosure of evidence used to impeach government's key witness violates due process);

US v. Velarde, 485 F.3d 553 (10th Cir. 2007)(suppression of evidence undermining credibility of key witness violates due process);

US v. Rodriguez, 496 F.3d 221 (2d Cir. 2007)(remanded for Brady hearing after prosecution witness admits lies in initial interviews and prosecutor seeks to avoid disclosure by not taking notes);

Trammel v. McKune, 485 F.3d 546 (10th Cir. 2007)(in theft prosecution, suppression of receipts  linking third party to theft violated due process);

US v. Chases, 230 Fed. Appx. 761 (9th Cir. 2007)(no reversal but court admonishes prosecution for "shocking sloppiness" in carrying out its disclosure duty);

Ferrara v. US, 456 F.3d 278 (1st Cir. 2006)(nondisclosure of recantation by key government witness was "blatant" and "so outrageous" as to undermine defendant's guilty plea);

US v. Risha, 445 F.3d 298 (3d Cir. 2006)(suppression of evidence discrediting testimony of key witness violates due process).

### (2) Brady Cases in District Court where relief was granted

For recent cases in the district courts (not an exhaustive list) where relief was granted based on Brady violations, see

US v. Shaygan, 2009 WL 989289 (S.D. Fla. 2009);

US v. Stevens, Cr. No., 08-231 (D.D.C. April 7, 2009)Docket No. 372);

US v. Jones, 620 F. Supp.2d 163 (D. Mass. 2009);

US v. Fitzgerald, 615 F. Supp.2d 1156 (S.D. Cal. 2009);

Cardoso v. US, 642 F. Supp.2d 251 (S.D.N.Y. 2009);

Hernandez v. City of El Paso, 2009 WL 2096272 (W.D. Tex.);

US v. Quinn, 537 F. Supp.2d 99 (D.D.C. 2008);

US  US v. Freeman, 2009 WL 2748483 (N.D.Ill.)(prosecutor's misconduct in allowing witness's false testimony to materially prejudice defendants requires new trial);

Sykes v. US, 897 A.2d 769 (D.C. App. 2006).

### (3) Professional and Popular Press reports on Brady Violations

Ken Armstrong & Maurice Possley,  The Verdict: Dishonor, CHICAGO TRIBUNE, Jan. 10, 1999,

Historic Case Sent Ripples Through Legal Community, CHICAGO TRIBUNE, June 6, 1999,

Win at All Costs, PITTSBURGH POST-GAZETTE, Nov. 24, 1998 (study of over 1,500 cases nationwide during past decade found hundreds of cases in which prosecutors intentionally concealed exculpatory evidence).

## (27)    GX 3 DoC FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS

October 1998 Edition

### (3).03 Federal and Non-Federal Sharing

a. Awards which include Federal and non-Federal sharing incorporate an estimated budget consisting of shared allowable costs. If actual allowable costs are less than the total approved estimated budget, the Federal and non-Federal cost share ratio shall be calculated as a percentage of Federal and non-Federal approved amounts. If actual allowable costs are greater than the total approved estimated budget, the Federal share shall not exceed the total Federal dollar amount as reflected in the Financial Assistance Award (CD-450) and Amendment to Financial Assistance Award (CD-451).

b. The non-Federal share, whether in cash or in in-kind, is expected to be paid out at the same general rate as the Federal share. Exceptions to this requirement may be granted by the Grants Officer based on sufficient documentation demonstrating previously determined plans for or later commitment of cash or in-kind contributions. However, the Recipient must meet its cost share commitment over the life of the award.

### (4).04 Budget Changes and Transfer of Funds Among Categories

a. Requests for budget changes to the approved estimated budget in accordance with the provision noted below must be submitted to the Federal Program Officer who shall review them and make a recommendation to the Grants Officer. The Grants Officer shall make the final determination on such requests and notify the Recipient in writing.

b. Unless the Recipient is subject to 15 CFR Part 24 and the Federal share of the budget is $100,000 or less, cumulative transfers of funds of an amount above 10 percent of the total award must be approved by the Grants Officer in writing. This allows the Recipient to transfer funds among approved direct cost categories when the cumulative amount of such transfers does not exceed 10 percent of the current (last approved) total budget. The same criteria applies to the cumulative amount of transfer of funds among projects, functions, joint ventures, consortia, activities, and annual costs when budgeted separately within an award, except  transfers will not be permitted if such transfers would cause any Federal appropriation, or part thereof, to be used for purposes other than those intended.
This transfer authority does not authorize the Recipient to create new budget categories within an approved budget unless the Grants Officer has provided prior approval.

c. The Recipient is not authorized at any time to transfer amounts budgeted for direct costs to the indirect costs line item or vice versa, without written prior approval of the Grants Officer.

**(5).07 Tax Refunds**

Refunds of FICA/FUTA taxes received by the Recipient during or after the award period must be refunded or credited to the DoC where the benefits were financed with Federal funds under the award. The Recipient agrees to contact the Grants Officer immediately upon receipt of these refunds. The Recipient further agrees to refund portions of FICA/FUTA taxes determined to belong to the Federal Government, including refunds received after the expiration of the award.
10

# 8   Signature Page

Signed on this day April 28, 2011

Long Beach, New York

_____
Daniel B. Karron
Petitioner *pro se*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,

- v. –

DANIEL B. KARRON,

Defendant.

08 Civ. 10223 (NRB) (DFE)

DECLARATION OF ERIC A. EISEN,
ESQ. IN RE OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

----------------------------------------------------------------

I, ERIC A. EISEN, ESQ, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury as follows:

1.    My name is Eric A. Eisen. I am a principal of the law firm of Eisen & Shapiro, which is located at 10028 Woodhill Road, Bethesda, Maryland 20817.

2.    I am admitted to practice law in the District of Columbia and Maryland. I am also admitted to practice in several United States District Courts, Courts of Appeal, and the United States Supreme Court.

3.    Dr. Daniel Karron is an acquaintance of a friend of mine from childhood. I first met him shortly before his criminal trial and was asked to provide him help.

4.    Dr. Karron had no funds to my knowledge and the last time I had been involved in any criminal matter was over thirty years ago. Based on this I was unable to provide him assistance.

5.    Recently Dr. Karron asked me to review for accuracy a transcript he had prepared from a video of what he told me was a presentation made by a government agency and to certify the accuracy of excerpts he had transcribed from that video.

6.    As a pro bono action and a service to the court and the administration of justice, I agreed to review the transcript, correct it, and certify the accuracy of the corrected transcript.

7,    I was presented with a video and transcript excerpts. For each excerpt, I located the corresponding time in the video, listened to the speakers, and corrected the transcript so that it was as accurate as possible. I did not select the excerpts to be transcribed and I did not listen to

what was said before and after the excerpts, focusing only on the accuracy of what was transcribed.

8.     Because I did not know the names of the speakers, I omitted names, which Dr. Karron had sometimes placed in his draft. Where more than one person on the podium responded to a question, I reflected the multiple responses by putting more than one answer to a question in the order in which the answers were given.

9.     The attached transcript is the result of that effort. It contains a total of 11 excerpts, each identified by the time reported on the video of when the excerpt begins. The identifiers, preceded by Dr. Karron's exhibit numbers, are:

| | |
|---|---|
| 115. | 1:54:00 |
| 116. | 2:02:45 |
| 117. | 2:37:33 |
| 118. | 2:42:26 |
| 119. | 2:45:35 |
| 120. | 21:51:30 |
| 121. | 2:58:30 |
| 122. | 2:59:30 |
| 123. | 3:03:15 |
| 124. | 2:28:27 |
| 125. | 2:31:14 |

I certify that the attached transcription is accurate and complete as to the material it contains, with no elisions (except immaterial stuttering and the like such as are typically removed from transcripts) in the text produced.

SO SWORN: _____     August 30, 2009

Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Rd.
Bethesda MD 20817
301-469-8590

Digitally signed by Eric A. Eisen
DN: cn=Eric A. Eisen, o=Eisen &
Shapiro, ou, email=eric@eisen-
shapiro.com, c=US
Date: 2010.08.30 22:35:02 -04'00'

**BEGINNING OF EXCERPTS**

**1:54:00**

A:    Well, now you're all experts in ATP, hopefully.

We are going to conclude with a few remarks. I'll ask my colleagues to approach the table for the Q and A section. Just to repeat a few comments the competition is currently open, we've announced on April 4, we are accepting proposals, again, in all technology areas, but we're also interested in receiving proposals in the 4 cross cutting areas of national interest, described earlier. Again, Let me repeat, that deadline at 3pm on May 21, is exact; no exceptions.

[…]

**2:02:45**

Q:      I have two quick questions.

First question is that if you're a single company, and I understand that the limit of the budget is 2 million dollars for three years, does that include the cost sharing that can be up to 30 percent. So...

A:      The Federal share is limited to 2 million dollars.

Q:      So that if you submit 2 million you can..., that doesn't count the cost sharing; you can add to that.  Right? So the total budget is more than 2 million.

A:      That's correct.

Q:      Thank you.

Second Question. Is that you didn't mention about the fringe benefit could be looked at as direct for those companies  in which that  is normally counted as direct and not included for those companies that doesn't included include that. Is that in the regulations in the kit?

A:      Well we stipulate in the budget that you can charge fringe benefits as a direct cost. However if your company normally charges them as an indirect,  you have to leave them as an indirect and if you're a single company you will have to absorb those costs.  And when your project is audited, the auditors will be looking to insure that you've charged the cost in the appropriate category.

Q:      I see because that's a huge difference in the application. But anyway... it's in the kit that's stated. Thank you.

[...]

-2-

2:28:27

Q:     My question has to do with how broad your definition is of 'technology'. Our company
       works in medical informatics developing classification schemes, thesauri, mapping
       strategies, and then we subcontract out a lot of the computer work.  Would our work
       qualify for an ATP proposal?

A:     It can.  We've actually funded a fair amount of in medical informatics.  If you go to our
       web site and look under the funded projects you might see some examples.  Basically you
       need to make it very clear to as to what..., where is the high technical risk and who is
       working on those high technical risk tasks so that it doesn't look like it is an entire pass
       through to the subcontractor for all the high technical risk issues.  But you need to make
       the business case and the technical case as to why this is the best way to put a project
       together.
       Ok so it is possible, but I think you have to make the case as to what is the technical risk .
       And what innovation approach do you have to overcoming those barriers.

Q:     And who is assuming the technical risk, primary application and not the subcontractor?

A:     Well, I think we like to see that it's not all in one place and not in the other. I think that
       we do get a little bit concerned if all the high-risk tasks are in the subcontractor and not in
       the primary awardee.  But to be honest, you have to explain why that may be the only way
       to do this project. You know it really depends on your rationale based on how companies
       are structured in your business sector and how they construct their businesses, that might
       be the only way anybody could do it. You need to explain that to us as to why this
       approach is the best technical way to address the risks and innovation.
       And I would encourage you to call one of our information technology folks; is there
       anyone in the room that could raise their hand that would love to chat with this guy later?
       Well, call Barbara Cuthill... and Ammet. Ammet is in the back there. So there will be

-3-

some folks who can talk to you about that.

**2:37:33**

Q:   I have a two part question.

Part 1. If a small company is subcontracting with a university does the company have to cost share other than indirect costs?

A:   The University or any subcontractors are allowed to charge indirect costs. It's the prime recipient that is submitting the proposal as a single company that is not allowed to charge indirect costs.

Q:   Does the small company have to do cost sharing other than the indirect costs?

A:   No. No they do not.

[…]

2:42:26

Q:    With a startup company, we are generally pretty lucky if we can accurately forecast what's
      going to happen in 96 hours in the future... if a...a  sort of a two part question..,
      How detailed does the planning have to be, if we reach a decision point,  and we go A-B,
      or is it A-B-C and then second point is, How flexible is the funding if we end up pursuing
      some route that we didn't even envision to begin with.

A:    OK, basically I would have to say on average, most decisions points in the technical
      plans, we rarely see people with more than two or three alternative directions. We are
      looking for where do you think are the highest priority things to go after that are also still
      consistent with our criteria of high risk and innovation
      OK, so. basically what you can't do, or hope to do is, is 'OK we'll get to this decision
      point, and  if it looks like we can't do A, which is the highest risk thing, we'll go right to
      B, which is product development,' because we'll say, 'Ah no you won't,' because we can't
      fund  product development.
      OK, so basically your alternatives that you might be considering in a decision point have
      to also be meritorious against the scientific and technological criteria.
      Sometimes, though, things happen along the way, in a high-risk research project where
      you say 'You know ...' or something may have happened out in the community, that a new
      discovery that makes you want to rethink a particular direction or part of your proposal.
      If you ever want to make a recommendation for a major technical scope change,
      depending on how major it is, sometimes companies have requested to suspend the
      project in order to stop the clock because we don't want your three years to run out while
      it gets evaluated and then they would send us in a 'This is how we would like to change
      the technical scope.  Depending on how big of a change it is -it could be something that
      the technical and business project managers can evaluate and decide 'yes' or 'no'- they may
      decide they want additional peer review from federal technical folks to see if it still makes
      sense. And in a few cases, though it has happened rarely in ATP's history, sometimes

we've had a oral review for that particular company on their major technical scope change to see if the SEB would have -if the Source Evaluation Board- would have selected it had it been submitted that way.

Because we want to see that whatever change that you propose is of equivalent or higher merit to the original proposal. So it depends on the scope change -how big it is, how much of a change- but we can accommodate those things, but sometimes it can take a suspension of the award in order to stop the time period and give us time to evaluate it. It's not a negative against you to suspend an award for that because it just stops the clock so you don't lose any of your time.

2:45:35

A:    [STANLEY] I would take one more crack at that.  One of the things I pride myself on in
      this program and with my colleagues is that:

      We try not to be too bureaucratic.

      We are very supportive of the companies that win awards from us, and you actually have
      a management team that we assign, as Linda Beth has described.

      So to the degree it maintains the true fidelity of the original proposal, in terms of the
      innovation and the risk, we recognize that, we're not going to give up on you if you can
      present appropriate evidence.  It may have to go through various quick reviews, to make
      sure that you're not creating a whole new opportunity that we didn't hear of, because that
      would be unfair for people who have already gone through the process.

      But it's not unusual for us to go through that process.  It's not unique, and to the extent
      possible we all are in agreement that this would add strength to it, it's in line with general
      fidelity with the original proposal we certainly will do all we can with you giving us
      appropriate information to continue that project along.  Because we have obviously
      determined that it has great value to our country.

      And as for your future look in terms of the business plans things of that sort, we also
      understand, we don't expect you to be a gipsy ball reader either.  So you have to indicate
      to us against the criteria, why and where, and what the commercial pathway is, but we
      have our own ways of reviewing that and we have ways of clarifying that with you before
      we make that award.  But, we understand some of the things, nobody knows yet.  But you
      should be able to nail some of those things because you know one of the real problems,
      and I've talked to a lot of VC is… well, is, inventors are wonderful people, particularly
      in the United States.  Entrepreneurs are just wonderful to talk to.  But there is a disconnect
      sometimes between clearly what the technology is going to be and how you are going to
      penetrate the market .  The nuance in this program is we don't support basic science.
      There's lots of federal programs that do that .  What we are interested in is capturing that
      innovation, defining the risk and the feasibility and the commercialization plan and

-8-

having it getting to the market here, before anyplace else in the world, so we maintain increased US competitiveness and jobs etc.  So, that's the gap we play in, and that's what you have to address in that proposal . You can ask very serious hundred thousand foot questions before you submit the proposal. If you don't completely understand what we have talked about today we welcome those opportunities to talk to you .  The difference here is we can't write the proposal for you.  But you can always ask for points of clarification.  And you'll find many people, including  the people I've got out in the employees lounge for those who are not staying here, that can highlight on some if the things we've talked about right now.

**2:51:33**

Q:     Yes please.  Our product consists of three components.
       One of them is the high risk - technically high risk- component, the other two are there is
       some risk, but not the same degree. So the first component is necessary [garbled] but not
       sufficient.  I was wondering if, as part of the project, obviously that would be part of the
       project, would the development of the other two components, and more importantly, the
       integration of the all three components be fair game for the tasks of the project?

A:     Absolutely.

Q:     On both questions?

A:     Yes.
       It's very common for us to see...,  that's one reason that a lot of companies do come to
       ATP, we are looking for the whole risk profile. But we're also looking for projects that
       where we define risk as not just the point risk but it's also if there's risk associated with
       that integration where it can fail,  that's an element of risk that, you know, for example,
       maybe your components aren't that compatible with each other right now.  Why is that?
       Why do you hope you can make them compatible  So I think that we look at risk as not
       just by-component; We are looking at the whole profile of risk , of the whole project.  So,
       there are often lower risk aspects of a project and higher risk aspects of a project.  We
       want you to identify for us in each task where you think all the risks are, y'know high,
       medium, and low, something to that regard, because then we can evaluate the profile of
       the whole project.

**2:58:30**

Q:   [Unidentified Questioner 3] Yes sir, this is a cost-share question

Would you clarify the use of fringe benefits being part of or not part of your overhead rate.

I don't have my DCAA disclosure in front of me, here but I know that we typically will refer to fringes as part of our overhead but I also know that they are broken out as a separate line item in our disclosure. So how does that work?

A:   It depends on how your..., you said you have a DCA ?

Q:   Yes.

A:   It depends on how they established it. If it is part of your indirect cost pool, you must charge it as an indirect cost and cannot charge it as a direct. We do allow it as a direct, because we do have a lot of small businesses, a lot of startups, who don't have big accounting systems and they are able to charge it as a direct expense.

Q:   Thank you.

A:   You're welcome. Strange new face.

**2:59:30**

Q:     I'll try to ask yet again another new question this time.

A:     Go ahead.

Q:     About past performance:  The kit does not specify past performance as part of the
       evaluation criteria, either past performance with the NIST ATP or with other similar
       externally funded programs . So I'm wondering, is there in some subtle way, past
       performance factored into evaluations?

A:     Well, in terms of evaluating your qualifications and experience I'd say in that context it
       does,  but to be honest, from a real negative point of view, only if you have been debarred
       is that going to be a really negative thing overall.  We are really just going to look at your
       experience based on how it relates to this award and do we think that you have the
       qualifications to perform the work that you're doing .  Past federal awards might not have
       been in this area, so it really wouldn't be an indicator of whether or not you can perform
       research in this particular area.  So we're looking for relevant experience and
       qualifications that relate to this proposal.

Q:     So just as a quick follow up if we do have prior NIST ATP experience but it isn't
       necessarily relevant to this proposal, there's no need to include that  in the write up. Is that
       what I'm hearing more or less?

A:     I would say it's only relevant in terms of you know how to manage projects, you're good
       at managing, talking to your collaborators, and from that perspective if it's not specifically
       relevant to the R and D area that you're working on on this particular proposal , but you
       know  we're looking at your business qualifications  as well as your technical, so I think it
       can relate but having had a past ATP award doesn't necessarily mean you're more

-12-

qualified for this award. OK? But you need to really make the case; what are the qualifications. 'cause sometimes we have had companies that have had more than one ATP award and for example a particular company would come to an oral review and they always would bring a particular scientist who is very eloquent in explaining the science and at one point we had to say 'OK, you've really explained it well but are you gonna really be the PI on this project, or as soon as it starts are you gonna be gone?' Alright? The old Bait and Switch on qualified personnel doesn't go over really well, so sometimes just putting a familiar face on a proposal if your intention is to not really have that person on it for the entire time won't go over very well.  So we are looking for how are..., what are the best resources that you're allocating qualifications to this project.

Q:     Let me do a favor here, in the effort to those who want to stay and talk to Dr. Utag or want to go on and talk to my business people and some who are just, hungry.  I'm going to say the remaining three are the remaining three. But all of us here, up on the table, there's a lot of program managers I see standing up at the back end of the auditorium, we're all going to be sticking around. But I think in order to make sure we cover all the parts we promised I'm going to limit these last three.

       [...]

**3:03:15**

Q:   This question [is] about the personnel that can be involved with the project.  Some
      startups spring out of university research.  [Garbled] To what extent can they wear their
      hats as company personnel and at the same time retain their university affiliation and not
      be frowned upon on by NIST?

A:   It depends on the rules of the university. If the university has no restrictions on employees
      having their own companies or doing work in other companies, and as long as they are
      employed by that company as well as the university, there is no problem.  But it does
      depend on the university restrictions.

Q:   Okay. So NIST doesn't have to specify how this going to be arranged?

A:   Correct.

A:   There can't be a conflict of interest between the two relationships so you have to really
      make sure there is no financial conflict of interest.

Q:   So if its ok with the university, its ok with you?

A:   It's actually addressed in the kit in more detail so we might want to find the page and it
      gives you the regulation to look at just to make sure there's no conflict of interest.  So, for
      example if you're the small company and you're the professor and you're gonna come out
      here and have a company and then you wanna be able to subcontract back to your group
      that might..., we might ask a few questions cause we want to make sure there's really no
      conflict of interest, and that might not work out.  Ok so it really depends on what your
      role is and do you want the university to be part of the project as well as your company .
      That's where it could get a little confusing and the kit actually does have some

                                          -14-

information on that to make sure that you avoid those conflicts of interest.  Ok?

A:    There are also codes of conduct standards in the federal regulations that I had up on the slides... 14 CFR..., 15 CFR Part 14; you may want to look at those.

**2:31:14**

Q:     I have two questions concerning budgets.

How much budget justification details are required?  Do we have to explain also where we gonna get the money for indirect for small business.

A:     You don't have to identify the source of your indirect costs unless you're getting  on... on the 1262 page 3, in the middle portion of the page 3, it identifies the cost-sharing, so most of the companies do have it within their own company. But if you're getting it from state funding then you would identify the state.

[...]

**END OF EXCERPTS**